**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NICHOLAS MARTIN on behalf of himself and others similarly situated,<br>    Plaintiff, | ) ) ) | 1:10-cv-3494 |
| | ) | |
| v. | ) ) | Judge Dow |
| | ) | |
| CCH, INCORPORATED,<br>    Defendant. | ) ) ) ) | Magistrate Judge Ashman<br><br>JURY DEMANDED |

**PLAINTIFF'S MOTION FOR
<u>RULE TO SHOW CAUSE AND FOR SANCTIONS</u>**

Between 2006 and 2010, defendant CCH, Incorporated ("CCH") was engaged in an aggressive advertising campaign directed at plaintiff and others (with whom it had no previous relationship) to sell its tax preparation software and other products. This lawsuit challenges an unsolicited autodialed and prerecorded telephone call to plaintiff's cellular telephone pursuant to the Telephone Consumer Protection Act, 47 U.S.C. §227(b).

CCH has had an ongoing duty to preserve and produce documents and data relating to its telemarketing pursuant to common law, regulatory requirements and a document preservation demand[1] and it has failed to do so. At the same time it has withheld or delayed production of documents that the discovery rules and prior court orders require it to produce.

Plaintiff has been prejudiced by these failures. For example, although CCH was compelled to produce all documents and data relating to its dialer, it has apparently not done so, having made a half-hearted search for documents in the first place, and having had no mechanism in place to preserve responsive materials. Further, CCH's potential customer database, which keeps track of marketing

---

[1] Plaintiff served a document preservation demand in the complaint, which was served upon CCH on June 16, 2010. [Docket item 8].

contacts and from which each of CCH's dialer campaigns was queried, was not preserved until March 2011, almost a year after the case was filed and four months after the Court ordered CCH to produce it. As indicated in defendant's discovery responses, the database is constantly changing. It was even altered as to plaintiff after this litigation began. Had the database been properly preserved and produced timely, recreating a list of persons CCH called using its dialer would be much easier.

Only a few weeks ago, nine months after it was compelled to produce all documents regarding its dialer, CCH produced 120 emails, 95% of which have the word "dialer" in their text. Although plaintiff asked for the names of all persons responsible for its dialers, until June 2010, CCH concealed the fact that it has an employee whose title is "Dialer Specialist" and whose entire job it is to administer the dialer.

Other examples abound. This gamesmanship is apparently specifically designed to prevent plaintiff from prevailing in the litigation. Plaintiff requests that the Court issue sanctions, and suggests that appropriate sanction for failure to produce documents would be to order that the hard drives of each person involved with marketing via automatic telephone dialing system be produced to Plaintiffs, along with the image of each server that holds any dialer-related information. Further, the appropriate sanction for failure to preserve its database would be to order CCH to recreate the database as it existed before the case, or to bar CCH from using any information contained in the current version of the database in connection with its defenses. Costs of this motion should also be awarded.

## I.    Background and Fed.R.Civ.P 37 Talks.

Plaintiff has more than satisfied his Fed.R.Civ.P. 37 and Local Rule 37.2 "meet and confer" duties. Plaintiff served a document preservation demand in the complaint, which was served upon CCH on June 16, 2010. [Docket item 8]. Plaintiff issued his first discovery requests discovery on July 26, 2010 and CCH responded on September 29, 2010. Defendant insisted upon a long extension for its

initial responses to these requests, and the parties had a conversation on the record regarding preservation of documents and data with Judge Dow on August 24, 2010.  Exhibit A.  CCH's original responses to plaintiff's first discovery requests are attached as Exhibit B.

After extensive discovery talks, on November 17, 2010, plaintiff filed a motion to compel, which was referred to Judge Ashman and heard, after briefing, on December 7, 2010.  [Docket Item 42].  The transcript of proceedings is attached as Exhibit C, and Judge Ashman's order is attached as Exhibit D.  The Court compelled Interrogatories 3, 5, 7 and 11; and document requests 1, 2, 3, 5, 12, 15, 19, 23, 24, 25, 26, 31, 35 and 37.  Pursuant to plaintiff's request, on April 20, 2011, Judge Ashman ordered that all pending written discovery was to be produced within 14 days.  [Docket Item 67].  As explained below, it has become apparent that this did not happen.  Responses to the compelled discovery requests began to dribble in after the December 7, 2010 hearing on the motion to compel as follows:

January 2011 Production:  *Recordings and Insurance*: Although it represented to the Court at oral argument that it had none of the recordings used with its dialer, Exhibit A at 8-9, on January 28, 2011, CCH produced eighty-three recordings that it used, along with the 2003 version of the manual for its Avaya-brand predictive dialer and CCH's insurance policies.

February 2011 Production:  *Phone Bills Part One*:  During oral argument, CCH represented that it had no records of phone calls:  "we have no records of phone calls made within this class period." Exhibit A at 15.  However, on or about February 15, 2011, CCH produced fifteen boxes of double-sided Verizon phone records, going back approximately two years.  CCH counsel told plaintiff's counsel at that time that this was all CCH had, and that all other records were lost.  Based upon conversations with Verizon pursuant to subpoena, plaintiff's counsel believed that these were the only records.

March 2011 Production:  *Database*.  On or about March 4, 2011, CCH produced a copy of its customer/potential customer database in Microsoft Access format, along with pdf versions of 488

3

"scripts" that had been run against the database during the class period. The database file, which is corrupt and crashes often, has more than 1.5 million entries, and appears to have been created on March 7, 2011.

The database is not only corrupt, the copy produced had been materially and substantially altered since the case was filed. For example, the database entry for plaintiff Nicholas Martin was altered because of this lawsuit to indicate a "do-not-call" request. According to CCH, this database changed every day.

*Supplemental Interrogatory Responses*. Pursuant to Judge Ashman's order on plaintiff's motion to compel, in March, 2011, CCH also produced supplemental responses to plaintiff's interrogatories 3, 5 and 11. Exhibit E.

May 2011 Production: *FOIA Lists*. On the last day for production of materials compelled pursuant to Judge Ashman's December order, and pursuant to Docket Item 67 setting May 4, 2011, CCH revealed for the first time that it had retained the data files containing identifying data for persons (including plaintiff) whose information it obtained through FOIA requests. Three lists were produced, which included several hundred thousand names, phone numbers, addresses and emails.

June 2011 Production. *More Phone Bills*. In early June 2011, CCH produced its Verizon phone bills for most months between April 2009 and June 2010, in native pdf format.

And despite that CCH had agreed to provide plaintiff with the name of its phone company nearly a year earlier when raised by plaintiff for fear of destruction of records, see Exhibit A 8/24/10 transcript at 6-8, and despite that it had been compelled to provide plaintiff with its phone bills by Judge Ashman, CCH told plaintiff **for the first time** that it used the phone company Bell South for the bulk of the class period, 2006 through April 2009.

June 2011 Deposition of Brian Holbrook. In response to plaintiff's interrogatory requesting that CCH identify all persons that had any duties relating to the dialer, CCH identified one person, Brian Holbrook. On June 17, 2011, plaintiff took the deposition of Mr. Holbrook in Atlanta, Georgia. Exhibit D. Mr. Holbrook revealed for the first time in the case that CCH employee Daniel Wilson is "the person most familiar with the dialer." Exhibit D at 9. Mr. Wilson's title at CCH is "dialer manager."

Despite that the Court ordered CCH to produce all documents concerning the dialer, and despite that Mr. Wilson's entire job is to administer the dialer, no documents other than those identified above were produced by CCH at this time.

August 2011 Production. *Script Files and Other Documents*. After several back-and-forth emails and discovery talks between counsel, CCH finally agreed to produce the native files of the dialer campaign scripts it ran during the class period. To plaintiff's surprise, CCH also produced pdf files of 43 more documents regarding its dialer, including more up-to-date dialer manuals, documents explaining how to back up the dialer data, live telemarketing talk-sheets and other dialer-related documents.

As with nearly all materials produced by CCH, these documents were produced in pdf format that had been manipulated so that plaintiff could not electronically search or reliably scan the documents.

September 2011 Production: *Emails*. In September 2011, CCH produced approximately 120 emails that were directly related to its dialer; most mentioned the word "dialer" specifically. This was more than nine months after the order compelling it to produce such materials, and after defense counsel indicated that these emails did not exist. See Transcript, Exhibit C at 11-12. Furthermore, 95 of these emails contain the word "dialer" in it. This suggests that (1) CCH has known (or should have known) about these emails for a long time, and (2) the search was likely not exhaustive.

The above history conclusively demonstrates that CCH (1) willfully not complied with the Court's order as to numerous discovery requests that were compelled, and (2) that CCH did not properly preserve its database. Further, the chronology strongly suggests that CCH still has not been forthcoming with information and data.

Plaintiff's counsel has exchanged countless emails and letters, and has had numerous telephone conversations about CCH's compliance with the Court's order compelling it to provide information. Plaintiff has requested several times to have a meet and confer with CCH's e-discovery liaison, pursuant to Seventh Circuit E-Discovery Principle 2.02. Each of these requests has been ignored. Plaintiff requests that the Court issue sanctions for CCH's willful noncompliance with its orders, as described below.

## II. Discovery Standard Generally

"Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). The Rules have broadened the scope of discovery to "any matter, not privileged, that is relevant to the claim or defense of any party.... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1).

"[T]he discovery-deposition provisions of the Federal Rules, were intended to insure 'proper litigation' by making the trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *Goldman v. Checker Taxi Co.*, 325 F.2d 853, 855 (7th Cir. 1963) (internal citations and quotations omitted). Furthermore, complete interrogatory responses may help the parties avoid unnecessary depositions and further cost to the parties. *In re Shopping Carts Antitrust Litigation*, 95 F.R.D. 299, 307-308 (S.D.N.Y. 1982).

### III. **CCH had No Document Retention Policy**

CCH has little to no document retention policy, and it is clear that all sorts of documents and data relating to this case were altered or deleted, both before the case was filed and during the pendency of this litigation.

The most telling evidence of this is that CCH stated in response to plaintiff's interrogatory 5 asking for all written and unwritten policies, practices and procedures, which was compelled by this Court, that "Defendant has no written or unwritten policies, practices or policies concerning the use of Predictive Dialers and Prerecorded Messages. Exhibit E, Supplemental Discovery Responses at Int. 5.[2]

This statement is consistent with Mr. Holbrook's testimony that CCH has virtually no email retention policy at all. While employees have "strict size limitations on what [employees] can have in [their] mailboxes," employees are free to archive email messages as the wish. There is no "directive" as to what should be preserved and what should not. "It is up to the individual employee."

Conflicting information from defendant suggests that there may have been a retention policy regarding dialer data, but that this policy was not followed. CCH's post-compel order interrogatory response indicates that "Defendant refreshed the dialer on a daily basis in order to capture any changes in the prospective customer database made in the past day." Exhibit E at Int 3. But documents from CCH indicate that CCH had a policy of backing up the dialer every day, that records were retained for at least three days, and suggesting that regular backups and reports of dialer campaigns were made. See Exhibit F at 9: "Back up is very important, if the Dialer should go down it is a matter of hours vs. days wither we are up and running again. DO NOT forget to backup daily," and 17-18 explaining how to generate backups and reports.

---

[2] As explained below, it turns out that this statement was false.

CCH's customer database, from which it queried dialing campaigns based upon database entry criteria, was apparently never backed up, and changes all the time. And although CCH has indicated that it has a "log" of all changes to the database, this log of data is so large that it will not fit on typical hard drive, and defense counsel has indicated that it would be impossible to recreate the database as it existed at the time this case was filed.

### IV. CCH Had a Duty to Preserve Materials Both Before and After this Case was Filed.

CCH had a duty to preserve materials that were relevant to this case on an ongoing basis from the beginning of the class period to the present. This duty arose because: (1) CCH is a sophisticated multinational corporation that specializes in managing and giving advice as to document retention and management, and failed to have any document preservation or retention policies, (2) the Internal Revenue Service requires companies like CCH and its wholly-owned subsidiary Universal Tax Systems, Inc. to keep detailed records of the precise direct marketing upon which this case is based, (3) plaintiff's process server served a document and data preservation demand upon CCH at the beginning of this case, (4) plaintiff issued discovery requests that triggered a duty to preserve, (5) defense counsel represented to Judge Dow at the first court appearance that records would be preserved in order to placate plaintiff's counsel, and (5) because this Court compelled production of documents and data.

"When a party first reasonably foresees that litigation is on the horizon, it is required to suspend its ordinary policies governing how information is retained or destroyed and put into place a litigation hold to preserve relevant documents." *Oleksy v. General Electric Co.*, 2011 WL 3471016 (N.D.Ill. Aug. 8, 2011) (Ashman, J.); *Bryant v. Gardner*, F.Supp.2d 951, 967-68 (N.D.Ill. 2008); Rambus, Inc. v. Infineon Tech, AG, 220 F.R.D. 264 (E.D.Va. 2004). The existence of a duty to preserve evidence

does not depend on a court order, but instead arises when a reasonable party would anticipate litigation. *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir.2008).

<u>CCH Should have Known that it Would be Sued for its Telemarketing Robocalls</u>. CCH should reasonably have anticipated litigation relating to its telemarketing calls. It is a sophisticated multinational company that not only sells tax related software, but also sells publications about how to comply with marketing and advertising laws, and sells a document management and preservation software package called *ProSystem fx Document*. <u>Exhibit G</u>. CCH knows the importance of document preservation; it quite literally, "wrote the book." Advertisements for *ProSystem fx* on CCH website "cchknowledgecenter.prosystemfx.com" boast that:

> The retention and destruction of information is critical to minimize the various risks associated with litigation and ensure compliance with regulatory requirements. Firms are able to maintain vastly more client information due to technology and a decreased reliance on paper-based information.

<u>Exhibit H</u>. An employee of CCH even has a blog called "Trade Regulation Talk" that has had no fewer than eight detailed entries all credited to CCH executives, discussing the intricacies of TCPA liability, including liability for "robocalls" such as that which is challenged in this case. CCH knew that these calls were impermissible, and recklessly failed to keep track of who it called. <u>Exhibit I</u>.

Thus, because CCH had the institutional knowledge that its telemarketing robocalls were illegal, it should reasonably have anticipated litigation like this, and should have taken steps to preserve its call records, database and other documents concerning its dialer.

<u>Regulatory Duty</u>  - CCH also had a Regulatory Reason to preserve information about who it called, when, and what prerecorded messages were used. CCH's answer to the amended complaint reveals that CCH's marketing efforts were performed by its subsidiary, "Universal Tax Services, Inc."

Answer, Docket Item 19, at ¶6. Universal Tax Services, Inc. is an "Authorized E-File provider" with the Internal Revenue Service. <u>Exhibit J</u>.

IRS Publication 3112 dealing with authorized E-File providers requires that E-File providers like defendant retain records of their direct marketing efforts (including to whom the marketing was directed and the content of the marketing) for at least one year so that, in case of an audit, this information may be shared with the IRS:

> If an Authorized IRS e-file Provider uses direct mail, e-mail, fax communications, or other distribution methods to advertise, the Provider must retain a copy, as well as a list or other description of the firms, organizations, or individuals to whom the communication was sent. The Provider must retain the records until the end of the calendar year following the date sent and provide the records to the IRS upon request.

<u>Exhibit K</u> at 29. CCH is bound by this requirement, but failed to keep the required records.

<u>Notice of Lawsuit and Document Preservation Demand</u>. Even if the Court finds that CCH, an expert in advertising law, did not reasonably anticipate litigation, and finds that CCH did not have a regulatory duty to maintain  call information, CCH came under an unquestionable duty to preserve documents and data when it was served with the complaint. Notice of imminent or actual litigation is one point where a party has an affirmative duty to preserve. *Jones v. Bremen High School District 228*, 08-cv-3548, 2010 WL 2106640 (N.D.Ill. May 25, 2010) (Cox, J.). And if being sued in a class action complaint was not enough to suggest to CCH that it should place a litigation hold, and preserve its customer database, the document preservation demand served along with the complaint should have done so. The demand states:

> **DOCUMENT PRESERVATION DEMAND**
>
> Plaintiff hereby demands that the defendant take affirmative steps to preserve all recordings, data, emails, documents and all other tangible things that relate to plaintiff or the putative class members, or the sending of emails or making of telephone calls, the events described herein, any third party associated with any telephone call, campaign,

account, sale or file associated with plaintiff or the putative class members, and any account or number or symbol relating to any of them.

These materials are very likely relevant to the litigation of this claim. If defendant is aware of any third party that has possession, custody or control of any such materials, plaintiff demands that defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the defendant.

[Docket Item 1 at 8-9; emphasis original, paragraph break supplied.]

CCH also should have performed a litigation hold when it received plaintiff's discovery requests. As explained below, there is no evidence that this was ever done.

<u>Order Compelling Information, Documents and Data</u>. It is clear that a party has a duty to preserve documents and data when it learns about imminent litigation. What is even clearer is that a party has a duty to preserve, and produce, materials that a federal judge has ordered it to produce. Once in court, once in writing, and a final time giving a final deadline of May 4, 2011 for all outstanding materials. As explained below, CCH waited three months after the initial order before it preserved its customer database, and none of CCH's files were reviewed by an attorney until after June 2011.

**IV.     CCH Breached Its Duty to Preserve Documents and Data.**

It is clear that CCH had a duty to preserve documents and data relating to this case, and the class. What is also clear is that CCH breached that duty as to (a) electronic documents generally, (b) dialer records and (c) its customer database.

**(a)  CCH Should have Preserved and Produced Documents Concerning its Dialer, But Did Not.**

Judge Ashman compelled CCH to produce documents, contracts, emails or agreements concerning the predictive dialer or prerecorded messages. See Transcript at 9-11; document requests 15 and 19. CCH did not produce all of these materials, and the evidence suggests that substantial documents were probably deleted. Up until September 2011, CCH had produced only a handful of

documents other than voluminous phone records, including three emails and a 2003 dialer manual.

Suspicious, plaintiff noticed the Fed.R.Civ.P. 30(b)(6) deposition of CCH on the following topic:

> What efforts CCH made to preserve information, documents and ESI that relate who it called, when, using its dialer, after this action was filed, including steps taken as a result of this action. (the chronological scope of this topic will begin on June 7, 2006, and go to the present day.

The deponent, Brian Holbrook. testified that there was a search performed for emails at the beginning

of the case where the sales manager and dialer manager (the people who ordered and initiated the

violations complained of herein) were requested to search their email themselves:

> We made a request of the sales management and Daniel to look at what was available within their Outlook and provide anything that was sent to Daniel or that Daniel received.

Exhibit L, Holbrook Depo at 83-84.  There apparently were no backups or archived email messages ever

searched.   Holbrook at 84.   Sales agents' files were not searched.   Id. at 84.   And there was no

indication that counsel or any ESI liaison ever performed an independent search for any materials.

According to Mr. Holbrook, the only data that was attempted to be preserved was the data

from the dialer itself.  *Id*. at 84.  And although CCH attempted to obtain data about the class period

from the dialer, it did not preserve the dialer itself; instead it reinitiated the dialer, which overwrote

whatever data remained, forever, so that plaintiff did not have a chance to inspect the dialer or

whatever data existed on it, at all.  CCH also represented under oath, after having been compelled to

provide all policies, practices and procedures relating to its dialer, that it had none.  Exhibit E at Int. 5.

After the Holbrook testimony, and after discovery was supposed to have closed (twice), in

September 2011, defendant produced 120 emails that specifically mention the dialer, and 43

documents detailing policies, practices and procedures relating to CCH's dialer.  These include more

up-to-date dialer manuals, contracts with a newly disclosed dialer administration company called

"Continuant," information concerning the dialer itself, for example the phone number for the dialer is

770-857-5692, procedures for loading prerecorded messages into the dialer, outbound dialer talking scripts not previously disclosed, and policies, practices and procedures for generating dialer reports and for doing backups of dialer data.

Furthermore, although plaintiff issued interrogatory 8 asking CCH to identify each person responsible for its dialer, CCH identified only Mr. Holbrook. This turned out to be false: CCH employs a person named Daniel Wilson whose job title is "Dialer Specialist" and whose sole responsibility is to administer the dialer. Holbrook Depo at 9.

The forgoing demonstrates that CCH has breached its duty to preserve and produce materials, and strongly suggests that CCH has intentionally misled plaintiff as to the nature of its dialer. Indeed, every document on Mr. Wilson's computer would likely be responsive to interrogatories 15 and 19.

There is also substantial evidence that CCH has not produced all of the data or documents concerning the plaintiff. Plaintiff sent CCH an email stating that he did not want to receive unsolicited marketing messages on or about January 7, 2010. CCH has repeatedly ignored plaintiff counsel's request for this email and any documents relating to it.

Plaintiff has been prejudiced by these breaches and obstructionist shenanigans. Part of what plaintiff has to prove in this case was that CCH's violations were "willful" or "knowing." Any materials that mention the dialer at all may bear on whether CCH knew its calls violated the TCPA. Further, it appears that CCH intends to attempt to prevail in this case by suggesting that plaintiff cannot put together a class list. While plaintiff is resourceful and has found ways to circumvent this roadblock, he should not have had to do so.

Plaintiff requests that, as a sanction for this misconduct, the Court order CCH to turn over images of the hard drives of all PCs and servers that may possibly have, or have had, information relating to its dialer.

### b. CCH Breached its Duty to Preserve and Produce its Customer Database.

CCH's customer database, which CCH contends is "constantly evolving" was not preserved until March 3, 2011.  This was nine months after it received actual notice of this lawsuit and of the preservation demand, and three months after it was ordered to produce the database to plaintiff.

The database is important because it is the source from which the dialer campaign "Scripts" were queried, in order to pick out the telephone numbers to be called.  Exhibit E at Int. 3.  The database changed over time as new perspective customers were added, and lost leads were deleted. For example, during Rule 37 talks, defense counsel told plaintiff's counsel that the entry in the database for plaintiff Nicholas Martin was altered on the version of the database CCH produced to as to be designated as a "do not call."

Also during Rule 37 talks, defense counsel stated that CCH did not preserve the database because it did not identify this customer database as a likely source of discoverable or relevant information for this case.  This contention is implausible.  The customer database was the source from which the marketing calls at issue here were queried.  Each of the illegal calls CCH made originated from this database.

Plaintiff has been prejudiced by the failure to preserve and produce this database.  Had CCH properly preserved the database the date it was served, June 16, 2010, the database would look more like it did two weeks earlier when it robodialed plaintiff, May  31, 2010.  Scripts could be run against the database as it existed, and the results would be closer to the list of persons who were called. Instead, because of the long delay the database appears to be severely compromised for litigation purposes, including straightforward and accurate identification of class members.[3]

---

[3] Plaintiffs are now, instead, incurring expert fees associated with identifying class members from telephone records. It also appears that CCH has not been completely forthcoming about

### c. CCH Breached its Duty to Preserve Call Records.

It is unclear what CCH's policy, practice or procedure regarding its dialer records was. While its interrogatory responses say that the dialer data was lost every single day, documents produced by CCH suggest that it did a "backup" every single day, and that "reports" from dialing campaigns were commonplace. See Exhibit F generally. This document even specifies a specific place on a particular server where dialer backups are stored.

It is also unclear whether CCH has any of the data or documents that the recently produced documents suggest. Plaintiff's counsel has inquired, and received no additional information.

What is clear is that CCH has not been forthcoming about discovery in this case. It should not be permitted to win the case by hiding the ball. Plaintiff respectfully suggests that a reasonably proportionate sanction would be again to order CCH to turn over images of every computer and server that could have had informatnoi relating to its dialer, so that plaintiff can ensure that an adequate search has been done.

### CONCLUSION

Plaintiff respectfully requests that the Court order CCH to show cause why it breached its duty to preserve and produce materials and information, and issue appropriate and proportional sanctions for these material failures. These sanctions should include:

---

what its phone records show. Although counsel represented to Judge Dow on August 24, 2010, that CCH had "a switch on site so that all the calls get routed through our switch so you wouldn't be able to tell from the phone company records whether it's a call made from the autodialer as opposed to a call from somebody's desk," and that he would "share that [information] with plaintiff's counsel," Exhibit A, defense counsel revealed for the first time on September 12, 2011 that dialer calls *are* ascertainable from many phone records. Exhibit M.

1.      production of accurate copies of hard drives of each person involved with marketing via automatic telephone dialing system, along with the image of each server that holds any dialer-related information;

2.       an  order requiring CCH to recreate the database as it existed before the case, or, in the alternative to  bar CCH from using any information contained in the current version of the database in connection with its defenses;

3.      an award of the costs of this motion; and

4.      any further relief the Court finds proper.


Respectfully submitted,

/s/ Alexander H. Burke


Alexander H. Burke
**BURKE LAW OFFICES, LLC**
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com


Gary Klein (*admitted pro hac vice*)
Shennan Kavanagh (*admitted pro hac vice*)
Roddy Klein & Ryan
 727 Atlantic Ave. 2d Floor
 Boston, MA 02111
(617) 357-5500
klein@roddykleinryan.com
kavanagh@roddykleinryan.com

# Exhibit A

```
1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3   NICHOLAS MARTIN, on behalf    )
    of himself and others         ) Docket No. 10 C 3494
4   similarly situated,           )
                                  ) Chicago, Illinois
5              Plaintiff,         ) August 24, 2010
                                  ) 9:00 a.m.
6          v                      )
                                  )
7   CCH INCORPORATED,             )
                                  )
8              Defendant          )

9

10             TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE ROBERT M. DOW, JR.

11

    PRESENT:
12

13  For the Plaintiff:      ALEXANDER H. BURKE
                            Burke Law Offices, LLC
13                          155 North Michigan Avenue
                            Suite 9020
14                          Chicago, Illinois 60601

15

16  For the Defendant:      DAVID L. HARTSELL
                            SUSAN E. GROH
17                          McGuireWoods LLP
                            77 West Wacker Drive
18                          Suite 4400
                            Chicago, Illinois 60601-7567
19

20

21

22

    Court Reporter:         Lois A. LaCorte
23                          219 South Dearborn  Room 1918
                            Chicago, Illinois 60604
24                          (312) 435-5558

25
```

1          THE CLERK:  10 C 3494, Martin v CCH, Inc.

2          THE COURT:   Good morning.

3          MR. BURKE:  Good morning, your Honor, Alexander Burke for

4     the plaintiff.

5          MS. GROH:  Good morning, Judge, Susan Groh on behalf of

6     defendant.

7          MR. HARTSELL:  Also David Hartsell on behalf of the

8     defendant.

9          THE COURT:  Good morning to everybody.  We have got a

10    bevy of things here.  So I got your status report and it looks

11    like you have proposed your initial disclosures for

12    September 7th, all discovery April 25th, dispositive motions

13    May 25th.  Those seem fine to me.  And then there is a class

14    cert motion that was filed a while back, there is a motion to

15    dismiss Count 1, which is the state law count, and as to

16    Count 2 there was an answer filed?

17         MS. GROH:   Right.

18         THE COURT:   Okay.  And then in terms of discovery there,

19    what the defendants are asking is 30 days to get you, Mr.

20    Burke, the discovery that goes to Count 2 and a stay of

21    discovery until the motion to dismiss as to Count 1 is

22    resolved, and they're saying that that would be expensive

23    discovery and they think they have a decent motion to dismiss.

24         And it was unclear where you came out on all that, so

25    I'll give you the floor, Mr. Burke.

1        MR. BURKE:  Sure. Of course, we oppose the motion to

2   dismiss.

3        THE COURT:   Right.

4        MR. BURKE:   We would like a briefing schedule for that

5   one.

6        THE COURT:   Absolutely.  What do you want, 28?

7        MR. BURKE:  Your Honor, I have already partially drafted

8   the response.

9        THE COURT:  Okay.

10       MR. BURKE:  And I looked at my calendar, I was thinking

11  maybe September 10th.

12       THE COURT:   Okay, that's fine.  And you guys want 14 for

13  reply?

14       MS. GROH:   Yes, please.

15       THE COURT:   Okay, that's the 24th.  So that takes care

16  of motion to dismiss Count 1.  Okay?

17       MR. BURKE:   I propose that we again enter and continue

18  the motion for class certification.

19       THE COURT:   Okay.  And I understand there is a request

20  for some information so that you can make a class demand as

21  well?

22       MR. BURKE:   That's right.

23       THE COURT:   Okay. And that information will be provided

24  so you guys can move that path?

25       MR. HARTSELL:  We are working on that to try to determine

1    whether in fact we can -- whether we have the class

2    information.  These calls were made from an autodialer, and

3    the dialer itself doesn't maintain the information beyond

4    30 days, it automatically overwrites, and what we are trying

5    to do now is see what kind of backup or re-creation we can do.

6              THE COURT:  Okay.

7              MR. HARTSELL:  My guess is that if we can't come to

8    ascertain what the class is and this is just an individual

9    case, it will settle in a minute because it's just $500 for

10   the -- 500 each for the two phone calls and $10 for the

11   e-mail, and I'm sure we would just settle it on an individual

12   basis.

13             So we're trying to pull that information together.  I

14   have met with the client, I have been down on site, and I will

15   provide that voluntarily to Mr. Burke once we get it so that

16   we can start having some discussions.

17             THE COURT:  Okay, and that's good.  Then in terms of the

18   rest of the discovery?

19             MR. BURKE:  That leads into the discovery motion, and I

20   understand counsel had to file the motion.  When I received

21   the motion, I was in the process of responding to the last

22   e-mail that had happened.

23             My primary concern is that we don't want data and

24   documents that are in the hands of third parties to be

25   destroyed in the regular course of business, particularly as

1    to the autodialer or the e-mail blasts.

2        Counsel has informed me this morning that the autodialer

3    was in house and that the e-mail blasting happened in-house as

4    well, which takes some of the pressure off.  Although --

5        THE COURT:   Presumably they have a litigation hold and

6    all that kind of stuff.

7        MR. BURKE:   Right, although I think -- I think probably

8    the phone company has phone records of the calls that were

9    made and that's a third-party that I would like to be able to

10   subpoena immediately in order to figure out, you know, to help

11   identify the class.

12       THE COURT:   Okay.  Any objection to letting him subpoena

13   the phone company?

14       MR. HARTSELL:   I don't, but I can tell the court and Mr.

15   Burke that my understanding is that we have a switch on site

16   so that all the calls get routed through our switch so you

17   wouldn't be able to tell from the phone company records

18   whether it's a call made from the autodialer as opposed to a

19   call made from somebody's desk.  I mean, I have already been

20   down this path.  This is part of what I'm trying to do.  That

21   was one of the first places I went was okay, would the phone

22   company have these records, but this is the kind of

23   information I'm in the process of trying to ascertain and

24   develop.  And again, I'm going to share that with plaintiff's

25   counsel, but I certainly don't have an objection if he wants

1   to subpoena the phone company, but maybe he can let me try to

2   get to the bottom of it first.  However he wants to proceed, I

3   don't have any objection to that.

4       THE COURT:   Okay, because I guess my take on it, I

5   suppose, is 30 more days to respond, that's your first

6   request, and you're going to respond on Count 2, that seems

7   fine.

8       MR. BURKE:   I would say, and we agreed this morning

9   based on, based on the assertions of counsel that the

10  autodialer and the e-mailing were in house.  Although I'm

11  still concerned about the phone company, different phone

12  companies have different policies about destruction of records

13  and such.

14      THE COURT:   That's okay, Mr. Burke, because I would say

15  talk to Mr. Hartsell and if you're not entirely satisfied that

16  he is sort of pursuing whatever angles you want with the phone

17  company, since they don't control the phone company, the phone

18  company maybe even doesn't have notice of this, I don't have

19  any problem with you going ahead with them.

20      It seems that as long as we're going to put together some

21  information that would help you formulate a class demand, that

22  we have got a motion to dismiss pending and we have got a

23  long enough discovery schedule, it seems to me there wouldn't

24  be any prejudice in staying Count 1 as to these guys because

25  it could be a lot of discovery and we have got a long schedule

1    that we can work that in.

2         So if I do that -- but if you come back and have another

3    third-party you have got to worry about, talk to these guys,

4    they seem very reasonable, and if it comes out that you need

5    me to give you leave to take some other third-party because

6    you got a legitimate concern that the stuff won't be around

7    when the motion to dismiss is decided, I'll be reasonable

8    about that too.

9         MR. BURKE:   We object to the stay, but I understand what

10   you're saying, Judge.  So for the record, we object to the

11   stay.

12        THE COURT:   And I understand, and I wasn't quite clear

13   and I didn't really mean to shut you off there, but I was just

14   trying to figure out what makes the most sense here, and

15   again, if it turns out that there is third parties that you

16   got some concerns about, you know, I think we'll all work that

17   out.

18        MR. BURKE:   I just ask -- and the phone company concerns

19   the TCPA claims, which are going forward with discovery.  I

20   would ask that maybe defense counsel disclose the phone

21   company within an earlier period than, you know, I don't know,

22   45 days from now the discovery would be due given the

23   extension.

24        THE COURT:   Just the name of the phone company?

25        MR. BURKE:  Yes.

1      THE COURT:  Do you have any problem telling him the name

2  of the phone company?

3      MR. HARTSELL:   I would tell him right now except I'm not

4  sure what it is.  It's in my notes someplace.   But I will

5  certainly provide the name of it.  I'll tell him who the

6  provider or providers are.

7      THE COURT:   Very good.  Well, I appreciate the way you

8  guys are working together on this.

9      So what we are going to do is we will enter the dates you

10  had in your status report for initial disclosures, all

11  discovery and dispositive motions.  The class certification

12  motion will be entered and continued.  If at some point that

13  turns up on my Biden list, we will do something about striking

14  it and reinstating it if it's not briefed by then.

15      MR. BURKE:   We filed that motion early just to stop the

16  case from being mooted.

17      THE COURT:  I understand that, and we will make sure that

18  you're not prejudiced and I'm not either, but we have our

19  ways.

20      MR. BURKE:   Understood.

21      THE COURT:   And it won't prejudice you in any way.

22      MR. BURKE:  Okay.

23      THE COURT:  And then in terms of the motion to dismiss

24  Count 1, we have got a briefing schedule on that, and then the

25  requests on the discovery will be granted essentially.  So you

1  got 30 days from today to give him the responses that you have

2  agreed to give him as they go to Count 2.  And then discovery

3  on Count 1 will be stayed pending the motion to dismiss with

4  the exception of the third-party discovery as to the phone

5  company that we have carved out today.  Okay?

6      Thank you all for your cooperation.  I appreciate it.

7      MR. HARTSELL:  Thank you, Judge.

8      THE COURT:  Anything else?

9      MS. GROH:  That's fine.

10      MR. BURKE:  Thank you.

11      THE COURT:   Thanks a lot.

12      *            *            *

13      I certify that the above is a true and correct

14      transcript of proceedings had in the above matter.

15      /s/ Lois A. LaCorte

16

17      _____   _____

18          Lois A. LaCorte            Date

19

20

21

22

23

24

25

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NICHOLAS MARTIN, on behalf of himself  )
and others similarly situated,          )
                                        )
      Plaintiff,                       )     1: 10-cv-3494
                                        )
          v.                          )     Judge Dow
                                        )
CCH, INCORPORATED,                      )
                                        )
      Defendant.                       )
                                        )

## DEFENDANT'S RESPONSE TO PLAINTIFF'S INTERROGATORIES

Defendant CCH, Incorporated responds to the following interrogatories submitted by Plaintiff Nicholas Martin:

1.    Identify the intended recipient, all communications to and from this person (attempted and completed), and from what sources you obtained the personal information (e.g. name, address, email, if any) for each of the following persons:

> All persons with Illinois addresses who were sent an unsolicited advertising email by or on behalf of defendant, where the email was sent at any time between and including June 8, 2007 and June 8, 2010, where the recipient and CCH did not have a prior or existing business or personal relationship at the time the email(s) were sent.

**ANSWER**: Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Interrogatory as it relates to Plaintiff's Illinois Electronic Mail Act Claim.

2.    If you contend that the sending of any unsolicited advertising email to any person responsive to the previous interrogatory was privileged or permissible (for example, you contend there was a prior or existing business or personal relationship or (ii) the email was sent at the request of or with the express consent of the recipient), please explain why, and identify all documents, facts and law that support or refute this contention for each person specifically.

Cite to bates numbers. If you are not in custody, possession or control of any responsive materials or information, identify all such materials and their believed location and custodian.

**ANSWER**: Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Interrogatory as it relates to Plaintiff's Illinois Electronic Mail Act Claim.

      3.    Identify the intended recipient, all communications (attempted and completed) to and from this person, and from what sources you obtained the personal information (including email and phone number) for the following persons:

      All persons with addresses in Illinois, Indiana or Wisconsin, who defendant or some person on its behalf called on their cell phone using an automatic telephone dialing system and/or prerecorded voice message, where the recipient had not provided CCH its prior express consent to receive such, where the call was made at any time between and including June 8, 2006 to June 8, 2010.

**ANSWER**: Defendant specifically objects that this Interrogatory is vague, unduly burdensome, and undefined. Defendant further objects that this Interrogatory is irrelevant and seeks information not reasonably calculated to lead to admissible evidence. Defendant further objects that this Interrogatory is premature in that no class has been certified.

      4.    If you contend that you had prior express consent to call any person responsive to the previous interrogatory using an automatic telephone dialing system or prerecorded or artificial voice message, explain why, and identify all documents, facts and law that support or refute this contention for each person specifically.

      Cite to bates numbers. If you are not in custody, possession or control of any responsive materials or information, identify all such materials and their believed location and custodian.

**ANSWER**: Defendant specifically objects that this Interrogatory is vague, unduly burdensome, and undefined. Defendant further objects that this Interrogatory is irrelevant and seeks information not reasonably calculated to lead to admissible evidence. Defendant further objects that this Interrogatory is premature in that no class has been certified.

      5.    Identify and explain all written and unwritten policies, practices and procedures concerning use of Predictive Dialers and Prerecorded Messages, going back to when you began considering the use of such, and ending on June 9, 2010.

**ANSWER**: Defendant specifically objects that this Interrogatory is vague, unduly burdensome, undefined, and immaterial. Defendant further objects that this Interrogatory is irrelevant and

seeks information not reasonably calculated to lead to admissible evidence. Defendant further objects that this Interrogatory is premature in that no class has been certified.

6. Identify and explain all written and unwritten policies, practices and procedures concerning use of email advertising, going back to when you began considering the use of such, and ending on June 9, 2010.

**ANSWER**: Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Interrogatory as it relates to Plaintiff's Illinois Electronic Mail Act Claim.

7. Identify and state the location and the person who has possession, custody or control of any document, data or information responsive to any discovery request in this case, that is not being produced because of any objection, privilege, or because you contend that such is not within your possession, custody or control.

**ANSWER**: Defendant states that, at this time, no documents are being withheld on the basis of any objection or privilege, and Defendant does not contend, at this time, that there are documents not within its possession, custody, or control.

8. State the name, employer, most current home address, title and job description of each person (including present or former third parties, companies, officers and/or employees) who is responsible for your Predictive Dialer(s), Prerecorded Messages, telephony systems and operations, and state specifically what that person's duties are.

**ANSWER**: Defendant identifies Brian Holbrook, Director of Operations.

9. State the name, employer, most current home address, title and job description of each person (including present or former third parties, companies, officers and/or employees) who is responsible for your email advertising, and state specifically what that person's duties are.

**ANSWER**: Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Interrogatory as it relates to Plaintiff's Illinois Electronic Mail Act Claim.

10. Identify and explain the basis for any claim that any violation alleged in the complaint was unintentional and/or resulted from an error notwithstanding the maintenance of procedures reasonably adapted to avoid such error. Identify what procedures exist, how they are maintained, how they are adapted to avoid the matters complained of and why the alleged

violations happened despite the procedures. Please answer this interrogatory specifically for each putative class member.

**ANSWER**: Defendant specifically objects that this Interrogatory is overly broad, unduly burdensome, and vague. Defendant further objects that this Interrogatory is irrelevant, immaterial, and seeks information not reasonably calculated to lead to admissible evidence. Defendant further objects that this Interrogatory is premature in that no class has been certified.

11. Identify all facts and law you contend support any defense or affirmative defense you have raised or will raise in this case, as to plaintiff and any putative class member. A complete answer will at least: explain the defense, cite the facts the support the defense (including citation to bates number, or descriptions of the location and custodian for documents that are not produced), and identify each person(s) with information regarding the defense and state what information each person has.

**ANSWER**: Defendant specifically objects that this Interrogatory is overly broad, unduly burdensome, compound, and vague. Defendant further objects that this Interrogatory seeks information protected by the attorney-client privilege and work product doctrine. Defendant further objects that this Interrogatory is premature in that no class has been certified. Investigation continues.

12. With respect to each expert, retained or nonretained, whom you will or may call upon to give evidence or testimony in connection with this case, please state: (a) his name, address, telephone number, occupation, and current employment; (b) the subject matter of his expertise; (c) his educational background, academic degrees, employment history, employment experience, and any other matters which you contend qualify him as an expert; (d) the substance of all facts and opinions to which he could testify if called as a witness; (e) a summary of the grounds for each such opinion.

**ANSWER**: Defendant will identify any experts consistent with the scheduling order in this case and the applicable Federal Rules of Civil Procedure.

Date: September 29, 2010

Respectfully submitted,

David L. Hartsell
Susan E. Groh
McGuireWoods LLP
77 W. Wacker Drive
Suite 4100
Chicago, Illinois 60601
T: (312) 849-8100
F: (312) 849-3690
dhartsell@mcguirewoods.com
sgroh@mcguirewoods.com

5

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, *Brian Holbrook*, declare under penalty of perjury that the foregoing Defendant's Responses to Plaintiff's Interrogatories are true and correct to the best of my knowledge.

Executed on September 29, 2010.



## CERTIFICATE OF SERVICE

I, Susan E. Groh, certify that on September 29, 2010, I served this document via email and US Mail delivery to:

> Alexander H. Burke
> BURKE LAW OFFICES, LLC
> 155 N. Michigan Ave., Suite 9020
> Chicago, IL 60601
> ABurke@BurkeLawLLC.com

Susan E. Groh

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NICHOLAS MARTIN, on behalf of himself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | 1: 10-cv-3494 |
| v. | ) ) | Judge Dow |
| CCH, INCORPORATED, | ) ) ) | |
| Defendant. | ) ) | |

## <u>DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUESTS TO PRODUCE</u>

Defendant CCH, Incorporated responds to the following requests to produce submitted by Plaintiff Nicholas Martin:

1.      All documents, records, data, recordings and other materials relating to plaintiff, or which are indexed, filed or retrievable under plaintiff's name or any number, symbol, designation or code (such as an account number or Social Security number) assigned to plaintiff, the phone number 630-████3271, or the email ████████████hotmail.com.

**RESPONSE:**  Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Request to the extent that it relates to Plaintiff's Illinois Electronic Mail Act Claim.  To the extent this Request relates to Plaintiff's TCPA claim, Defendant states that, upon entry of a protective order, it will produce responsive documents.

2.      All documents transmitted to any third party as to any account or other designation associated with plaintiff, the phone number 630-████3271, or the email address ████████hotmail.com. Please include the "form" for any letter, email or document which you sent but for which you do not have a precise copy.

**RESPONSE:**  Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Request to the extent that it relates to Plaintiff's Illinois Electronic Mail Act Claim.  To the extent this Request relates to Plaintiff's TCPA claim, Defendant states: none.

3.     A copy of the recording for any telephone call to 630-███3271, and any for the call to any person responsive to interrogatory 3.

**RESPONSE**: Defendant specifically objects to this Request as unduly vague, overly broad, burdensome, and undefined.  Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence.  Defendant further objects that this Request is premature in that no class has been certified.

4.     A copy of all unsolicited email advertisements you or someone on your behalf has sent to persons in Illinois between June 8, 2007 and June 8, 2010.

**RESPONSE**:  Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Request as it relates to Plaintiff's Illinois Electronic Mail Act Claim.

5.     All documents evincing, or relating to, any policies, practices or procedures concerning who you, or any person on your behalf, calls or called using a Predictive Dialer or Prerecorded Message.

**RESPONSE**:  Defendant specifically objects to this Request as unduly vague, overly broad, burdensome, and undefined.  Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence.  Defendant further objects that this Request is premature in that no class has been certified.

6.     All documents evincing, or relating to, any policies, practices or procedures concerning who you, or any person on your behalf, send or sent advertising emails.

**RESPONSE**:  Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Request as it relates to Plaintiff's Illinois Electronic Mail Act Claim.

7.     All documents concern any person whose cell phone you called using your Predictive Dialer and/or Prerecorded Message (including all documents that relate to, show or refute any claim of prior express consent) for persons with addresses in Illinois, Indiana or Wisconsin, who you or some person on your behalf called using an automatic telephone dialing system and/or prerecorded voice message, where the recipient had not provided you his prior

express consent to receive such, where the call was made at any time between and including June 8, 2006 to June 8, 2010.

**RESPONSE**: Defendant specifically objects to this Request as unduly vague, overly broad, burdensome, and undefined. Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence. Defendant further objects that this Request is premature in that no class has been certified.

8.    All documents that show your prior or existing business or personal relationship, or the absence of such, as to any person that falls within the following set:

All persons with Illinois addresses who were sent an advertising email by or on behalf of defendant, where the email was sent at any time between and including June 8, 2007 and June 8, 2010.

**RESPONSE**: Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Request as it relates to Plaintiff's Illinois Electronic Mail Act Claim.

9.    All documents that show that any email you sent to any person in the following set was sent at the request of, or with the express consent of, the recipient:

All persons with Illinois addresses who were sent an advertising email by or on behalf of defendant, where the email was sent at any time between and including June 8, 2007 and June 8, 2010.

**RESPONSE**: Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Request as it relates to Plaintiff's Illinois Electronic Mail Act Claim.

10.    For each person identified in response to interrogatories 1 and 3, please provide any and all documents, data or things that relate to the nature of your relationship with such person, including for example, the individual's consent to receive autodialed or prerecorded telephone calls on a cellular telephone, express consent to receive advertising emails, and that show a preexisting relationship between you and the called party.

**RESPONSE**: Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Request to the extent that it relates to Plaintiff's

Illinois Electronic Mail Act Claim. To the extent that this Request relates to Plaintiff's TCPA claim, Defendant specifically objects to this Request as it is unduly vague, overly broad, burdensome, and duplicative of other discovery responses. Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence. Defendant further objects that this Request is premature in that no class has been certified.

11.     For each putative class member as the classes are defined in the Complaint, produce all documents that demonstrate that defendant had prior express consent to call such person through use of an automatic telephone dialing system, and\or using an artificial or prerecorded voice, or send advertising emails to such person.

**RESPONSE**: Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Request to the extent that it relates to Plaintiff's Illinois Electronic Mail Act Claim. To the extent that this Request relates to Plaintiff's TCPA claim, Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined. Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence. Defendant further objects that this Request is premature in that no class has been certified.

12.     All records of outgoing calls made with either an automatic dialing system or prerecorded or artificial voice since April 28, 2005.

**RESPONSE**: Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined. Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence. Defendant further objects that this Request is premature in that no class has been certified.

13.     All contracts and communications with any third party concerning the making of autodialed calls or prerecorded messages, or the sending of advertising emails to Illinois residents.

**RESPONSE**: Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Request to the extent it relates to Plaintiff's Illinois Electronic Mail Act Claim. To the extent that this Request relates to Plaintiff's TCPA claim, Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined. Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence. Defendant further objects that this Request is premature in that no class has been certified.

14.     The complete personnel record for any employee or executive responsive to any interrogatory herein.

**RESPONSE**: Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, undefined, immaterial, and harassing. Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence.

15.     All documents, contracts, emails or agreements concerning use of your Predictive Dialer or Prerecorded Message.

**RESPONSE**: Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined. Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence.

16.     All documents, contracts, emails or agreements concerning use of your advertising emails.

**RESPONSE**: Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Request as it relates to Plaintiff's Illinois Electronic Mail Act Claim.

17.     Please do a manual and computer search (irrespective of date) for all documents (including but not limited to: emails memos, communications or things) relating to TCPA compliance without regard to timeframe.

**RESPONSE**:  Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined.  Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence.

18.    All manuals, communications and other documents relating to telephony hardware, software and other telephone equipment.

**RESPONSE**:  Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined.  Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence.

19.    All manuals, communications and other documents relating to telephony hardware, software and other telephone equipment.

**RESPONSE**:  Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined.  Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence.

20.    All studies, reports, statistics or other data compilations you have access to that concern the use of your Predictive Dialer or Prerecorded Messages.

**RESPONSE** Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined.  Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence.

21.    All studies, reports, statistics or other data compilations you have access to that concern advertising emails. A complete response would include but not be limited to aggregate or specific data concerning what emails were opened, from what IP address emails were opened and other such data.

**RESPONSE**:  Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Request as it relates to Plaintiff's Illinois Electronic Mail Act Claim.

22.    All invoices for telephony equipment or software, including but not limited to Predictive Dialers, Prerecorded Messages, automatic dialing systems and artificial or prerecorded voice messages.

**RESPONSE**: Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined. Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence.

23.     A copy of the complaint for any lawsuit against you for violation of the TCPA or any law that governs the sending of advertising emails.

**RESPONSE**: Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined. Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence.

24.     A copy of any written complaint and your response (formal or informal) you or your attorneys have ever received that complains about violations of the TCPA or laws that govern the sending of advertising emails, including but not limited to calls using your Predictive Dialer and Prerecorded Messages, without regard to date.

**RESPONSE**: Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Request to the extent it relates to Plaintiff's Illinois Electronic Mail Act Claim. To the extent this Request relates to Plaintiff's TCPA claim, Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined. Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence. Defendant further specifically objects to this Request on the bases that it seeks confidential information and seeks information potentially protected by the attorney-client privilege information and work-product doctrine.

25.     All documents from any source that concern the legality or propriety of making telephone calls to debtors using your Predictive Dialer, Prerecorded Message, an autodialer or a prerecorded or artificial voice.

**RESPONSE**: Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined. Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence. .

26.    All documents (irrespective of date) that discuss defendant's compliance or lack of compliance with the Telephone Consumer Protection Act.

**RESPONSE**: Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined. Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence.

27.    All organizational charts of defendant showing personnel.

**RESPONSE**: Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined. Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence.

28.    All organizational charts of defendant showing ownership and/or corporate structure, including all affiliates.

**RESPONSE**: Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined. Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence.

29.    All documents, contracts and communications concerning any third party involved with the sending of advertising emails, or collection of data regarding advertising emails.

**RESPONSE**: Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Request as it relates to Plaintiff's Illinois Electronic Mail Act Claim.

30.    All documents, contracts and communications concerning any third party involved with the making of telephone calls using Predictive Dialers and/or Prerecorded Messages.

**RESPONSE**: None.

31.    All documents concerning or relating to any effort, ever, by you to determine a process, policy or practice whereby you could use your Predictive Dialer or Prerecorded Message, and still comply with the TCPA.

**RESPONSE**:  Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined.  Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence.  Defendant further objects that this Request is premature in that no class has been certified.

32.    All documents concerning or relating to any effort, ever, by you to determine a process, policy or practice whereby you could send advertising emails and still comply with state of federal laws that govern such, including but not limited to the CAN SPAM ACT, and the IEMA.

**RESPONSE**:  Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Request as it relates to Plaintiff's Illinois Electronic Mail Act Claim.

33.    All insurance policies that could possibly afford any coverage with respect to the matters complained of in this case together with all correspondence accepting or declining coverage or reserving rights with respect thereto.

**RESPONSE**:  Upon the entry of a protective order, Defendant will produce the insurance policies identified in its Rule 26(a)(1) Disclosures.

34.    All statistics, studies and/or reports concerning the use of your Predictive Dialer or Prerecorded Message in the past four years.

**RESPONSE**:  Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined.  Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence.  Defendant further objects that this Request is premature in that no class has been certified.

35.    All documents relating to the creation or maintenance by defendant of policies, practices or procedures adapted to avoid using your Predictive Dialer or Prerecorded Messages in calling persons who did not consent, or revoked consent, to be called on their cellular telephones, without regard to date.

**RESPONSE**:  Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined.  Defendant further objects that this Request is irrelevant and seeks

information not reasonably calculated to lead to admissible evidence. Defendant further objects that this Request is premature in that no class has been certified.

36. All documents relating to the creation or maintenance by defendant of policies, practices or procedures adapted to avoid violating any laws that govern the sending of electronic mail advertisements, without regard to date.

**RESPONSE**: Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Request as it relates to Plaintiff's Illinois Electronic Mail Act Claim.

37. Your entire file, including any documents or data that show consent or lack thereof to receive calls made with your Predictive Dialer, Prerecorded Message, automatic telephone dialing system or using artificial or prerecorded voice calls on their cellular telephone, or advertising emails, for the following sets of persons:

A: All persons with Illinois addresses who were sent an unsolicited advertising email by or on behalf of defendant, where the email was sent at any time between and including June 8, 2007 and June 8, 2010, where the recipient and CCH did not have a prior or existing business or personal relationship at the time the email(s) were sent.

B: All persons with addresses in Illinois, Indiana or Wisconsin, who defendant or some person on its behalf called on their cell phone using an automatic telephone dialing system and/or prerecorded voice message, where the recipient had not provided CCH its prior express consent to receive such, where the call was made at any time between and including June 8, 2006 to June 8, 2010.

**RESPONSE**: Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Request to the extent it relates to Plaintiff's Illinois Electronic Mail Act Claim. To the extent this Request relates to Plaintiff's TCPA claim, Defendant specifically objects that this Request is unduly vague, overly broad, burdensome, and undefined. Defendant further objects that this Request is irrelevant and seeks information not reasonably calculated to lead to admissible evidence. Defendant further objects that this Request is premature in that no class has been certified.

38. All documents that support or refute any defense you have raised or intend to raise in this case.

**RESPONSE**: Defendant specifically objects to this Request on the bases that it is unduly vague, overbroad, and burdensome. Defendant further objects that this Request seeks confidential information and seeks information protected by the attorney-client privilege and work-product doctrine.

39.     A copy of all publications, white papers, seminars, updates you have published or issued since January 1, 1990 that concern compliance with marketing laws, the TCPA or email marketing laws. For example, the publication that is mentioned in the press release on CCH.com, "CCH Offers Comprehensive, New Privacy Law Resource: CCH Privacy Law in Marketing" would be responsive, as would the 2000 version of this, or related documents, and all updates thereto.

**RESPONSE**: Pursuant to the Court's August 24, 2010 Order granting Defendant's Motion to Stay Discovery, Defendant does not answer this Request to the extent it relates to Plaintiff's Illinois Electronic Mail Act Claim. To the extent this Request relates to Plaintiff's TCPA claim, Defendant specifically objects to this Request on the bases that it is unduly vague, overly broad, burdensome, irrelevant, immaterial, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence.

Date:  September 29, 2010                        Respectfully submitted,

David L. Hartsell
Susan E. Groh
McGuireWoods LLP
77 W. Wacker Drive
Suite 4100
Chicago, Illinois 60601
T: (312) 849-8100
F: (312) 849-3690
dhartsell@mcguirewoods.com
sgroh@mcguirewoods.com

## <u>CERTIFICATE OF SERVICE</u>

I, Susan E. Groh, certify that on September 29, 2010, I served this document via email and US Mail delivery to:

> Alexander H. Burke
> BURKE LAW OFFICES, LLC
> 155 N. Michigan Ave., Suite 9020
> Chicago, IL 60601
> ABurke@BurkeLawLLC.com

Susan E. Groh

# Exhibit C

1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3   NICHOLAS MARTIN, on behalf    )
    of himself and others         ) Docket No. 10 C 3494
4   similarly situated,           )
                                  ) Chicago, Illinois
5               Plaintiff,        ) December 7, 2010
                                  ) 9:30 a.m.
6          v                      )
                                  )
7   CCH, Incorporated,            )
                                  )
8               Defendant         )
                                  )
9

10             TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE MARTIN C. ASHMAN
11

12  PRESENT:

13  For the Plaintiff:      ALEXANDER H. BURKE
                            Burke Law Offices, LLC
14                          155 North Michigan Avenue
                            Suite 9020
15                          Chicago, Illinois  60601

16  For the Defendant:      SUSAN E. GROH
                            77 West Wacker Drive
17                          Suite 4100
                            Chicago, Illinois  60601
18

19
    (TRANSCRIBED FROM DIGITAL RECORDING.)
20

21
    Court Reporter:         Lois A. LaCorte
22                          219 South Dearborn  Room 1918
                            Chicago, Illinois 60604
23                          (312) 435-5558

24

25

1       THE CLERK:  10 C 3494, Martin v CCH.

2       MR. BURKE:  Good morning, Judge, Alexander Burke for the

3  plaintiff.

4       MS. GROH:   Good morning, your Honor, Susan Groh on

5  behalf of the defendant CCH.

6       THE COURT:   Good morning.  All right, we have

7  plaintiff's motion to compel.

8       MR. BURKE:   That's right, Judge.  We issued discovery

9  about a month ago and I have gotten almost nothing.  We tried

10  to work through this with counsel, several long telephone

11  conversations, long e-mails, still have nothing, so we moved

12  to compel.  There are five categories of requests that --

13      THE COURT:   Let's take them one by one.

14      MR. BURKE:   I would like to start with Section C, which

15  has to do with the dialer and the prerecorded messages and the

16  procedures that the defendant has to make the auto dialed and

17  prerecorded calls.

18      Probably the most fundamental request -- this is on page

19  10 of 15 of our motion -- probably the most fundamental

20  request is interrogatory 5, which asks the defendant to

21  explain their policies, practices, and procedures regarding

22  the use of predictive dialers and prerecorded messages going

23  back to when they began using such.  The defendant provided no

24  substantive response to this interrogatory.

25      MS. GROH:   Judge, if I may, plaintiff served extensive

1    discovery requests on the defendant before we even filed our

2    answer in this case.  As a result, plaintiff's discovery is

3    overbroad, unduly burdensome, and irrelevant.  To a large

4    extent --

5          THE COURT:   Would you speak a little louder.

6          MS. GROH:   Sure.

7          THE COURT:   And speak into the mike.

8          MS. GROH:   Sure.

9          THE COURT:   Thank you.

10         MS. GROH:   As I was saying, Judge, plaintiffs served

11   extensive discovery requests on defendant before we even had a

12   chance to answer the complaint.  As a result, most of this

13   discovery is extremely broad and irrelevant.

14         Plaintiff requested a Rule 37 conference, which we spent

15   several hours on the phone discussing various issues.  In

16   those conversations we provided plaintiff with detailed

17   information about how our calling campaigns work and took him

18   through the steps of that.  As a result of these

19   conversations, plaintiff has served us with a second set of

20   discovery which are much more narrowed and focused than his

21   first set of discovery.

22         THE COURT:   Is it on the same subject?

23         MS. GROH:   Largely, yes, your Honor.

24         MR. BURKE:   Some of it is on the same subject, but I

25   think it's two interrogatories and three document requests or

1    something.  I mean, I think --

2        THE COURT:   Do you have another discovery request that

3    is on this subject?

4        MS. GROH:   Yes, your Honor.

5        THE COURT:   I'm asking him.

6        MR. BURKE:   I think that it touches on some of the

7    subjects that are requested in interrogatory 5, but I don't

8    think that it nullifies interrogatory 5.  I mean, I think this

9    is --

10        THE COURT:   How many times do you want them to answer it

11   though?

12        MR. BURKE:   If I get a full response to 5, I'll withdraw

13   the second set of discovery.

14        THE COURT:   Well, but what she is saying is if you come

15   up with the second set, the answer to the second set will

16   suffice for this.

17        What does your second set of interrogatories, what does

18   it ask about this subject?

19        MR. BURKE:   I don't have it with me, Judge.

20        THE COURT:   Well, do you have it with you?

21        MS. GROH:   I do have it with me, your Honor.

22        THE COURT:   All right.  Let's hear what it says.

23        MS. GROH:   As an example, as plaintiff is indicating,

24   his request relating to the dialer, he asks for every single

25   document that relates in any way to our telephone equipment.

1  In our conversations --

2      THE COURT:   This one says for you to identify and

3  explain the written and unwritten policies, practices, et

4  cetera.

5      MS. GROH:   Sure, and in our conversations pursuant to

6  Rule 37 plaintiff clarified that he was looking for the dialer

7  manuals.  In his second set of requests he specifically

8  requests the dialer manuals, which we are happy to produce

9  when they are due on December 20th, which is two weeks from

10  today.

11      THE COURT:   Do you agree that that's what you wanted

12  here?

13      MR. BURKE:   I mean, Judge, I issued that second set of

14  discovery to appease the defendant.  I mean, we had a long

15  discussion about whether document request 19 that's on the

16  same page as interrogatory 5 sufficiently asks for telephone

17  manuals.  It asks for all manuals, communications and other

18  documents related to telephony, hardware, software and other

19  telephone equipment.  I mean, these requests are reasonable.

20  I'm asking him -- because these are the most basic requests.

21      THE COURT:   This is the point that's being made.  The

22  point that's being made is you have got a more restrictive

23  apparently interrogatory or document request on the same

24  subject and that, as a result of your conference, that was

25  something you agreed to that that's what you wanted.  So why

1   do you want this?

2       MR. BURKE:  No, Judge, I didn't agree that the second set

3   of discovery was going to supersede the first set of

4   discovery.  I mean, when I issued those requests I was still

5   seeking responses to these requests for which I have no

6   responses.

7       I'm willing at this point to withdraw the second set of

8   discovery and seek full responses to this discovery.

9       MS. GROH:   Judge, I would suggest that we wait two weeks

10  and let us respond to the second set of discovery and if

11  plaintiff still has some issue with our responses, then he can

12  renotice this motion, but at this time I believe it's

13  premature to address these issues when our discovery isn't due

14  for two weeks.

15      MR. BURKE:  This discovery has been due for three months.

16  And I have been working for three months --

17      THE COURT:   He has just withdrawn his second set, so

18  your argument with regard to the second -- the second set no

19  longer exists.  It is withdrawn as of record.

20      All right.  Now, why can't you answer Interrogatory

21  No. 5?

22      MS. GROH:   Interrogatory No. 5 is overly broad and

23  unduly burdensome, and that's the basis of our --

24      THE COURT:   Explain the written policies in document

25  request No. 5, come up with all the documents, why can't you

1  do that?

2     MS. GROH:   As we objected, your Honor, this request is

3  asking for every single document.  It's not tailored at all in

4  any way to the circumstances of this case.  As we have

5  identified to the plaintiff, we don't have any class

6  information so his claim is based on one phone call that was

7  made to the plaintiff.  Based on that, this is completely

8  overbroad.

9     THE COURT:   Well, this is a putative class action, isn't

10 it?  It's a class action or an attempt at a class action.  So

11 you're saying this is not relevant?  What is your answer?

12    MS. GROH:   Our answer is that it's overbroad.  He is

13 asking for every single policy --

14    THE COURT:   I don't think it's overbroad at all.  The

15 motion to compel interrogatory No. 5 and document request No.

16 5 is granted.  Okay, next.

17    MR. BURKE:   Let's see, document request 3, a copy of the

18 recordings that the defendant used with its dialer to make

19 these unsolicited telephone calls.

20    MS. GROH:   I'm sorry, what number was that?

21    MR. BURKE:   Document request 3.  Just by matter of

22 background, your Honor, the TCPA portion of this case has to

23 do with prerecorded telephone solicitations to purchase or to

24 sell tax software.

25    THE COURT:   Yes, I read the complaint.

1      MR. BURKE:  Okay.

2      MS. GROH:  Our response to document request No. 3 in our

3  Rule 37 conference with plaintiff is that we have no recording

4  of this phone call.

5      THE COURT:  Well, did you answer to that effect?

6      MS. GROH:  We indicated to plaintiff that we would

7  supplement our answer to that effect.

8      MR. BURKE:  Judge, I suspect that we have a little bit --

9  and maybe I'm wrong, but a little bit of sharpshooting going

10  on here.  What counsel just said is they have no recording of

11  the telephone call to plaintiff, but what we're asking for

12  here is a copy of the recordings that they used with their

13  dialer during the class period.

14      MS. GROH:  To the plaintiff's phone number.

15      MR. BURKE:  Or any other person in the class.

16      THE COURT:  It says and for the call to any person

17  responsive to interrogatory No. 3.

18      MR. BURKE:  Which is the class list for the

19  interrogatory.

20      THE COURT:  So that's a recording more than just to the

21  plaintiff's telephone number.

22      MS. GROH:  We indicated to plaintiff that we would agree

23  to supplement this.

24      THE COURT:  So you agree that you will provide this?

25      MS. GROH:  My understanding is that we have no data on

1     this, so we would supplement our response to state that.

2        THE COURT:   Then what do you mean you're going to

3     supplement?

4        MS. GROH:   We would supplement our response to the

5     interrogatory -- to the request to produce to state that there

6     is no copy of any recordings responsive to this request.

7        THE COURT:   Well, if there is no -- it's hard to believe

8     that there is no copy. So I think what you need to do is also

9     provide, have somebody from the company provide what search

10    they made, what happened to any recordings, when it happened.

11    You have got to get into the detail of the search and the

12    detail of whatever happened to these recordings or this

13    recording.

14       MR. BURKE:   I suspect that where they're coming from is

15    they're going to say "Well, we don't know which recording we

16    used with which class member." And I think that the document

17    request -- or maybe they just destroyed the recording, I'm not

18    sure.

19       THE COURT:   I don't know, and there is no point in your

20    speculating or the court speculating. I want a detailed

21    response as to what happened to any recordings, when it

22    happened, under whose authority it happened, what the search

23    consisted of, and any other detail with regard to why these

24    recordings -- why you don't have these recordings at this

25    time.

1    MS. GROH:   Sure, Judge.

2    THE COURT:   Next.

3    MR. BURKE:   Judge, skipping over 13 because I think that

4    it's included in document request 15.

5    THE COURT:   Okay.

6    MR. BURKE:   All documents, contracts, e-mails, or

7    agreements concerning use of your predictive dialer for

8    recorded messages.

9    THE COURT:   E-mails or agreements.  I don't even

10   understand what you mean there.  What agreements are you

11   referring to?

12   MR. BURKE:   Well --

13   THE COURT:   You buy an autodialer and it dials.

14   MR. BURKE:   Well, when we filed the case I wasn't sure if

15   they did the dialing in-house or out of house, so we have

16   learned at least through counsel's representation to Judge

17   Dow, not through these discovery responses, that the defendant

18   has an in-house dialer.  So you know, if there are

19   communications with -- pardon me, contracts, maybe there is a

20   contract for purchase of the dialer or maintenance of the

21   dialer.  Perhaps if there is a third-party that's --

22   THE COURT:   What's the relevance of that?

23   MR. BURKE:   Well, say, for example, they have a

24   third-party vendor maintain the dialer and that third-party

25   vendor has access to or has downloaded data regarding which

1    calls it made to whom at what time, the very data that the

2    defendant says does not exist, that would be -- the identity

3    of that third-party would be revealed in the response to

4    document request 15.

5         Similarly, I suspect, although counsel says it's not

6    true, that when sales associates wanted to do a dialer

7    campaign, they e-mailed somebody saying "Hey, I want to do

8    this dialer campaign, you know, please, have the dialer call

9    this set of people from the database," that information would

10   be probably in an e-mail or a memo.

11        Defendant tells me that the sales agents walked over to

12   this guy Brian Holbrook at the office in Atlanta and verbally

13   asked for a dialer campaign to be done and the dialer campaign

14   was done without any, any documentation at all.

15        MS. GROH:    To that, Judge, as we told plaintiff in our

16   Rule 37 conference, mostly what was done was, you know, in

17   sales everything has to be prompt and fast.  It was mostly

18   face-to-face contact.  There may have been some e-mails that

19   were sent.  However, the information that was contained in the

20   e-mails was contained in scripts that were run against the

21   database, which we have, we have copies of the script and

22   we're happy to provide that to plaintiff's counsel.  They're

23   more inclusive and more responsive than the e-mails

24   themselves, so we feel that those would be irrelevant.

25        THE COURT:    I think document request 15 is not too broad

1  and I think it ought to be answered.  It certainly is relevant

2  as to what was told to who with regard to doing these dialings

3  and, of course, what the script was.  So all documents -- I'm

4  not so sure that the purchase of a dialing system, I don't

5  think you need to provide any contract with regard to that,

6  but any other use of the dialing system, documents, contracts,

7  e-mails or agreements, that certainly is relevant and not very

8  broad at all.  So the motion to compel document request 15 is

9  granted.  What's next?

10      MR. BURKE:  Skipping down to 19, please.

11      THE COURT:  Okay.

12      MR. BURKE:  Manuals, communications, other documents

13  relating to the telephony hardware, software and other

14  telephone equipment.  What I understand --

15      THE COURT:  Is that a -- telephony, is that on purpose?

16      MR. BURKE:  Yes, I think that's a word.

17      THE COURT:  Is it really a word?

18      MR. BURKE:  Telephony.

19      THE COURT:  Telephony.

20      MR. BURKE:  Yes.

21      THE COURT:  I'll go look it up.

22      MR. BURKE:  What we are looking for here, Judge, is --

23  well, based on Rule 37 talks we understand that there is some

24  database from which the telephone numbers that the dialer

25  called is taken.  We understand that there is a dialer and

1    that there is some process by which the -- that the sales

2    agents asked Brian Holbrook to make these calls.  Of course,we

3    don't have the full responses to interrogatory 5 so I don't

4    have anything sworn that says that this is what happens, but

5    this is what has been explained to me.

6         In order to hire an expert, which I think I'm going to

7    have to do in this case to help me sort through this, through

8    this E discovery, I need to know what type of telephones they

9    have, what kind of dialer they have, what kind of database

10   this is that operates with the dialer to make these calls, and

11   how these things interact.  So that's the primary basis for

12   the document request.

13        MS. GROH:   If I may respond to that, your Honor, just,

14   as plaintiffs describe in detail, that's the type of discovery

15   request that we could respond to, but in this discovery

16   request where he is asking for all manuals, communications and

17   other documents related to all of our telephone software and

18   hardware, he is not limiting it to the dialer in issue.  It's

19   all --

20        THE COURT:   The motion to compel is granted with regard

21   to the automatic dialing system rather than all telephones.

22        MR. BURKE:  So the telephone --

23        THE COURT:   It excludes regular telephone calls.

24        MR. BURKE:  Okay, we will work with that.  I think that

25   there may be overlap, so there --

1      THE COURT:   Well, yes, certainly there may be overlap,

2   but you're not entitled to all of their information regarding

3   their regular telephone system.

4      MR. BURKE:  I don't care about that stuff.

5      THE COURT:   Just the auto dialling.  So the motion to

6   compel is granted to that limited extent only.  Next.

7      MR. BURKE:   Going back to section 8 please, page 6.

8      THE COURT:   Yes.

9      MR. BURKE:   These materials have to do with the class

10  list and documents and data concerning the class members.

11     THE COURT:   Are you talking about interrogatory 3 or

12  what?

13     MR. BURKE:   Interrogatory 3 -- beginning with

14  interrogatory 3, your Honor.

15     THE COURT:   All right.  I'll read it.

16     (Pause)

17     THE COURT:  Counsel, why don't you respond.

18     MS. GROH:   As we have indicated to plaintiff's

19  counsel --

20     THE COURT:   Pardon?

21     MS. GROH:   As we have indicated to plaintiff's counsel

22  in our Rule 37 conversations, we do not have any responsive

23  class data.

24     THE COURT:   You don't have the intended recipient, you

25  don't have communications attempted and completed, from the

1    recipients of these auto dialers?

2        MS. GROH:   No, your Honor, there is no business reason

3    for us to keep that data.  So they didn't keep it.  So we have

4    no records of phone calls made within this class period.

5        THE COURT:   How about the people who responded?  Didn't

6    somebody respond and buy your client's material?

7        MS. GROH:   I can't say.

8        THE COURT:   They were auto dialed and they responded.

9    You can't tell me you don't know them.

10       MS. GROH:   The records that we have don't, don't

11   indicate that one way or the other.  We don't have any records

12   to show the calls that were made.

13       MR. BURKE:   Furthermore, I suspect that they have a Do

14   Not Call list subject to the federal Do Not Call regulations.

15   Most states have similar Do Not Call regulations.

16       THE COURT:   But you're asking here for the intended

17   recipient and the communications to and from the person and

18   where they got the personal information, including the e-mail

19   and telephone number for these people.

20       MR. BURKE:   Yes.

21       THE COURT:   You don't have any documents with regard to

22   that?

23       MS. GROH:   I'm telling you that we can't, we can't

24   identify what phone calls were made from the dialer and we

25   have indicated this to plaintiff's counsel and we are willing

 1   to supplement --

 2       THE COURT:   So you could be dialing these people over

 3   and over and over again, right, since you don't know who you

 4   dialed in the first place or the second place.

 5       MS. GROH:   That very well could be because that's not

 6   information that we retain.

 7       THE COURT:   That's very difficult to believe.  I want a

 8   detailed exposition of how this works and why you do not have

 9   the intended recipient of auto dialing.  You didn't dial

10   everybody in these states, did you?  It was limited in some

11   fashion.  Where did you get that limitation from?  You didn't

12   dial everybody, did you?

13       MS. GROH:   No, we had a database that had prospective

14   customers, existing customers.

15       THE COURT:   So you do have a list of prospective

16   customers.  That's the source.

17       MS. GROH:   But we do not have information of who on that

18   list were called.

19       MR. BURKE:   But they do have these database queries.

20       MS. GROH:   Yes, we have the database queries and we have

21   a database but even if you cross reference them it won't

22   indicate whether a phone call was made to that person.

23       THE COURT:   So once again, I say so that means you could

24   dial the same person twice or three times or ten times.

25       MS. GROH:   That very well could be.

1      THE COURT:  All right.  I want the database and I want

2  you to, and to produce the database and a detailed exposition

3  of how this works.

4      MR. BURKE:  I suspect that there are backup tapes or

5  something about the database that might help us recreate what

6  it looked like when these calls were queried.

7      MS. GROH:  We have run this down from two different

8  angles, your Honor.  We have looked at what was preserved and

9  then we have looked at what can be recreated, and as I have

10  said before, what was preserved is nothing, there is no

11  business reason for them to keep this data.

12      THE COURT:  Well, you mean there was some of this

13  information and it wasn't preserved?

14      MS. GROH:  There were calls that were made to --

15      THE COURT:  There were calls that were made and the

16  second after the call was made you didn't know to whom it was

17  made?

18      MS. GROH:  The way the dialer worked is it was

19  refreshed.  If it was refreshed, then the numbers that were

20  loaded in the dialer were deleted, all the records were

21  deleted, or if it was not refreshed, after 30 days it just

22  overwrote over itself.

23      So there is -- there is no compelling business reason for

24  us to preserve any of the data from the dialer.  What we have

25  done is, you know, try to figure out what was preserved, what

1  could be on the tapes, which is nothing, and then we have

2  tried to recreate what numbers were called based on what we

3  have.  There are a number of deficiencies with that process,

4  though, and like I said before, you can run the scripts

5  against the current database that we have.  However, we don't

6  have a historic database to indicate what calls -- what was in

7  the database at the time that these calls were made within the

8  class period.

9       And although we have the scripts, if you cross reference

10  the scripts against our current database, that still doesn't

11  show whether or not a call was made, it just shows that a list

12  was made based on that information.

13       THE COURT:  Well, take us through the list, the list

14  from which everything was made and the entire process --

15       MS. GROH:  We would be happy to do that --

16       THE COURT:  -- because it's difficult to believe that a

17  company would not keep track of who they called.  It's very

18  difficult to believe.

19       MS. GROH:  I understand that, but as -- the way this

20  business worked is they kept track of their customers, their

21  existing customers was very important to them, but prospective

22  customers were not as significant for them to keep track of.

23  So that wasn't something --

24       THE COURT:  But you would think that a company would

25  then eliminate them so that they wouldn't bother -- they

1   wouldn't call them again, they wouldn't -- they wouldn't have

2   any expense with regard to promoting those prospects.

3       MS. GROH:   And that's something that did happen within

4   the database.  The database itself was constantly changing.

5   People were kicked out, people were added in, depending on --

6       THE COURT:   But the next day suppose you told the

7   database or you told the machine do 10,000 others.  Did the

8   machine know who it did the day before?

9       MS. GROH:   My understanding is no, your Honor, but if a

10  sales person had reached out to an individual who said "Please

11  don't call meany more," it would have kicked that person out

12  of the database.  So that individual might not be in the

13  database anymore is my understanding of how it worked.  We are

14  happy to detail this in our supplemental response to this

15  interrogatory.

16      THE COURT:   Well, all right.  Make a very detailed

17  response as to how it works and we will take it from there.

18  Next.

19      MR. BURKE:   I suspect that the discussion that we just

20  had would be the same as to document request 37 and document

21  request 12, both on Page 6.  Again, we are trying to figure

22  out who they called.

23      THE COURT:   Let me ask you, the automatic dialer, does

24  the telephone company provide these for nothing?  Do you get

25  billed by a telephone company?

1      MS. GROH:   It's a phone record, so we --

2      THE COURT:   So you get billed.  So the telephone company

3  has copies of who you called, do they not?

4      MS. GROH:   We have run down that angle as well, your

5  Honor.  The way it worked is we had an internal switch on our,

6  at our company so that outbound calls all came from the same

7  number, the same three numbers, and there is no way to tell if

8  the call was made from the dialer or if the call was made from

9  a salesperson's desk.

10      THE COURT:   Well, then let's include all the calls.

11  Let's include all the calls.

12      MS. GROH:   But the fact that --

13      THE COURT:   I would suspect that the regular telephone

14  calls made by people are way less than the automatic dialing,

15  right?  They would have to be.

16      MS. GROH:   I don't know if we can say that for certain,

17  Judge, but there is no way for us to tell which calls were

18  made from, you know, a salesperson to his wife or made from --

19      THE COURT:   Well, maybe there is no way to tell at the

20  beginning, but maybe some further investigation will be able

21  to figure that out.  All the telephone calls under these

22  circumstances, you provide this information on all the

23  telephone company -- all the telephone calls out of this

24  company.  And if that is too inclusive, then such is life.

25  But it would include everyone who was called.

1      MS. GROH:   In addition to --

2      THE COURT:   Well, that's what these interrogatories are

3   looking for is who was called, and who was called is in that

4   list.

5      MS. GROH:   Well, it should be narrowed to who was called

6   from the dialer.

7      THE COURT:   Well, that would be nice, but you're saying

8   you can't do that.  Then give us the entire list and let him

9   worry about who was called and who wasn't called.  So the

10  motion with regard to document request 12 is granted.

11      Okay, next.

12      MR. BURKE:  Page 7, Judge, affirmative defenses.  I would

13  like to skip to 11 because I think 4 is subsumed in 11, which

14  is an interrogatory that asks for the facts and law that

15  supports their affirmative defenses.

16      THE COURT:   Counsel.

17      MS. GROH:   In our Rule 37 conferences with the plaintiff

18  we told him that our main affirmative defense or defense at

19  this time is that we got these phone numbers, we got the

20  plaintiff's phone number from the IRS.

21      THE COURT:   How do you get the phone numbers from the

22  IRS?  I saw that in these papers.  I'm interested.  How do you

23  get telephone numbers from the IRS?

24      MS. GROH:   It was pursuant to a FOIA request.

25      THE COURT:   Pardon?

1        MS. GROH:    It was pursuant to a FOIA request to the IRS.

2        THE COURT:    You mean you can get telephone numbers from

3    the IRS, telephone numbers of taxpayers so you can call them

4    from the IRS?

5        MS. GROH:    Correct, your Honor.  Our business is selling

6    tax software to businesses.

7        THE COURT:    Yes.

8        MS. GROH:    We got a list of businesses that filed a

9    certain number of tax returns on behalf of individuals.  So

10   our marketing was towards businesses.

11       THE COURT:    And you get that from the IRS.  Does that

12   mean that these people consented?

13       MS. GROH:    Our argument is that these are businesses and

14   not individuals.

15       THE COURT:    And businesses have consented that their

16   income tax return information, some information from the

17   income tax return can be disseminated by the Internal Revenue

18   Service?

19       MS. GROH:    Our position is that businesses are not

20   covered by the TCPA or the Do Not Call list, that by holding

21   out a phone number as your business, you're consenting for the

22   world to call you in that capacity.

23       THE COURT:    Maybe they're not covered by the Do Not Call

24   list.  What I'm talking about is if you're running a law firm,

25   that's a business, okay?  You file an income tax return.  Are

1   you consenting that your telephone number can be provided to

2   John Fisher here by filing an income tax return?

3       MS. GROH:   I think the issue that we are arguing is a

4   little different than that, but that would be subject to the

5   FOIA document request, which is something that is exactly what

6   can be done.

7       THE COURT:   I'm trying to understand how this works so I

8   can rule fairly on these discovery requests and I still can't

9   understand, it's beyond me that the IRS would provide

10   telephone numbers of its taxpayers, whether they're corporate

11   or individual, to anybody.

12       MS. GROH:   That's exactly what happens and that's what

13   happened here.  But our defense is a little bit different.

14   It's that these are businesses that were holding themselves

15   out under these numbers and those are the numbers we called,

16   and as a result of that --

17       THE COURT:   And did they consent?

18       MS. GROH:   We believe they did consent by using these

19   numbers as their business numbers, which would not be

20   covered --

21       THE COURT:   They consented by filing the income tax

22   return which contained their telephone number?

23       MS. GROH:   Holding themselves out as a business.  We

24   believe that you can contact businesses in that capacity,

25   which would not be covered by the TCPA or the Do Not Call

1    list.

2         THE COURT:   Holding -- once again, your law firm is a

3    business.  You file an income tax return with the government.

4    Are you by so doing -- you hold yourself out as a business,

5    are you by so doing consenting that the IRS provide or

6    disclose your telephone number?

7         MS. GROH:   Well, the IRS is a separate entity.  We would

8    say --

9         THE COURT:   Yes, I know it's a separate entity.

10        MS. GROH:   -- you are consenting.

11        THE COURT:   I know it's a separate entity, but I'm

12   talking about the consent part of the taxpayer.  Have you by

13   so doing consented?

14        MS. GROH:   We would say yes, your Honor.

15        THE COURT:   All right.

16        MR. BURKE:   There are six affirmative defenses, Judge.

17   We are asking for them to explain them.

18        THE COURT:   All right.  Well, you talk about affirmative

19   defenses that haven't yet been made.  I don't think they need

20   to explain those.

21        MR. BURKE:   Well, not now.

22        THE COURT:   No.  So why can't you respond to that?

23        MS. GROH:   We indicated to plaintiff's counsel that we

24   would supplement our response to state that our defense is

25   that the plaintiff in this case --

1      THE COURT:   So you will respond to it?

2      MS. GROH:   Yes.

3      THE COURT:   So the motion to compel with regard to

4  Interrogatory No. 4 is granted in that any objections thereto

5  are being waived.  The next one.

6      MS. GROH:   If I could just clarify one point, your

7  Honor, we indicated that we would supplement to state the

8  defense I just explained, that the plaintiff consented by

9  holding out this number as its business number.  Beyond that,

10  our investigation continues and at this time we can't identify

11  every affirmative defense or every defense that we may have,

12  every argument --

13      THE COURT:   No, no, you don't have to explain any

14  affirmative defenses that you have not made.

15      MS. GROH:  Okay.  When you said, waiver, Judge, I just

16  wanted to clarify that we weren't waiving --

17      THE COURT:   Only affirmative defenses that are stated in

18  your answer, in your pleading.

19      Okay, next.  Anything else?

20      MR. BURKE:   Document request 7, documents that concern

21  any person whose cell phone was called using the dialer, could

22  be persons who were within the class as defined.

23      MS. GROH:   And again, your Honor, we don't have any

24  class information, and as far as the --

25      THE COURT:   Just a moment, just a moment.  Before you

1     respond, let me read it.

2         (Pause)

3         THE COURT:  Okay, your response is?

4         MS. GROH:   As we stated before, we have no information

5     about the class, what phone calls were made to these class

6     members.  As far as the prior express consent, it's the same

7     defense that we stated before.

8         THE COURT:   In other words, what you're saying is you

9     have no express consent from anybody, right?

10        MS. GROH:   We are saying that we don't know who was

11    called so there is no way for us to say --

12        THE COURT:   Go through your files of all your customers

13    and tell us who made an express consent, "express" meaning

14    they consented to you, they sent you a letter saying "It's

15    okay for you to call me."

16        MS. GROH:   And as I have explained before, we don't have

17    any class data.  We can't indicate what calls were made to

18    individuals and there is no way for us to track that down.

19        THE COURT:   You can indicate as to those people who you

20    had contact with who responded to the autodialer.

21        MS. GROH:  And we don't have a record of that

22    information.  But we do have the same --

23        THE COURT:   Now, wait a minute, wait.  You also don't

24    have a record -- the autodialer calls John Jones Company.

25    John Jones Company calls you and says "I'm interested in what

1    the autodialer said."  There is no follow-up, there is no

2    record?

3        MS. GROH:   There is no way for us to track that down.

4        THE COURT:   Why not?  Can't you look in a file?  A file

5    was created when somebody called and affirmatively responded

6    to the promotion.  You can't tell me you have no records of

7    that.  That's how you make your living.

8        MS. GROH:   If someone called us in response to a

9    promotion, then there was no auto dial call.  Maybe I'm not

10   following you, Judge.

11       THE COURT:   If somebody called you and said "I was

12   called by your company, I'm interested," you have a record of

13   that, don't you?

14       MS. GROH:   If that prospective customer became a

15   customer, then that entry would be in our --

16       THE COURT:   Either became a customer or had

17   conversations regarding getting to be a customer.

18       MS. GROH:   As far as tracking how that occurred --

19       THE COURT:   No, that isn't what this asks.  What this

20   asks is any documents with any of these people that showed

21   express consent to call them.  I think that's what it asks

22   for, right?

23       MR. BURKE:  Yes.

24       THE COURT:   What you're saying is you have no such

25   documents?

1       MS. GROH:    Correct.

2       THE COURT:    Okay.  Well, why don't you answer that way.

3   If that's the truth, then answer that way.

4       MS. GROH:    And we have indicated to plaintiff that we

5   would supplement these responses accordingly.

6       MR. BURKE:    No documents supporting the affirmative

7   defenses, fine with us.

8       THE COURT:    Okay, what else?

9       MR. BURKE:    Page 11, Judge, information concerning the

10  plaintiff.  The defendant has refused to provide us with

11  information that it has regarding the plaintiff.  We have

12  asked for that stuff.  They're saying we don't get it.

13      MS. GROH:    We identified one document that we have that

14  has the plaintiff's name, his address, his phone number, the

15  name of his business.  Before we produce this to the

16  plaintiff, we would like to have it covered by the protective

17  order.

18      THE COURT:    What protective order?

19      MS. GROH:    We have been working on getting a protective

20  order entered in this case.

21      THE COURT:    What do you need a protective order for

22  plaintiff's information?  Plaintiff waives that, doesn't

23  plaintiff?

24      MR. BURKE:    As long as they don't put it in the public

25  record for discovery purposes, absolutely.

1     MS. GROH:   Out of an excess of caution, the plaintiff is

2  suing --

3     THE COURT:   Out of an excess -- it's excessive caution,

4  not an excess of caution.  You have -- if I tell you "Look,

5  this is my telephone number, you can tell John Jones my phone

6  number and you can tell John Jones everything you know about

7  me," you need a protective order after that if the party says

8  do it?

9     MS. GROH:   In this case the plaintiff is suing us for

10  violation of his privacy.  Out of an excess of caution it

11  would be our preference to designate that document as

12  confidential.

13     THE COURT:   The motion to compel on that is granted.

14  You give them all information that you have.  You can work out

15  protective orders generally, but with regard to plaintiff's

16  information that plaintiff is requesting, that's a ridiculous

17  position.  It is ridiculous.  The plaintiff wants you to tell

18  the plaintiff what information you have on the plaintiff.

19     MS. GROH:   Okay.

20     THE COURT:   And you have an excess of caution --

21  baloney.  Next.

22     MR. BURKE:   Page 12, Judge, materials bearing on

23  willfulness.  Treble damages are available if we can prove

24  that the violation is willful.  These requests are designed to

25  show that the defendant knew about the TCPA and made these

1    calls anyway.

2        THE COURT:   Complaints, written complaints, lawsuits.

3        MS. GROH:   We object to this, your Honor.

4        THE COURT:   Pardon?

5        MS. GROH:   We object to this.  Any complaint that was

6    filed against defendant does not have any bearing on this

7    case, it would never be admissible in court.  And it's -- it's

8    just plainly irrelevant and overbroad.

9        THE COURT:   I disagree.  If the complaints are the same

10   or similar, that somebody was called without their permission,

11   that shows knowledge, that shows intent, that shows or may

12   show -- all of these things may tend to show willfulness.

13   Willfulness has something to do with punitive damages.

14       MS. GROH:   Your Honor, if I may, the, just the fact that

15   a plaintiff lodged an allegation against the defendant would

16   not bear on willfulness --

17       THE COURT:   Oh, no, it's not --

18       MS. GROH:   That case could be dismissed, that case could

19   have been subject to Rule 11 sanctions.

20       THE COURT:   That's very true, that's very true, but we

21   are not talking about admissibility into evidence right now,

22   we are talking about discovery.  How is he to know what may be

23   admissible and what may not be admissible unless he has the

24   information?

25       MS. GROH:   I would again say that this is overbroad and

1  perhaps a judgment that was entered against the defendant in a

2  circumstance similar to this could be relevant to willfulness,

3  but as far as every allegation --

4      THE COURT:   Suppose you settled 10,000 of these

5  complaints individually.  You mean to say -- so there is no

6  judgment.  Isn't that potentially relevant?

7      MS. GROH:   We would say no, your Honor.

8      THE COURT:   I disagree with you.  I think it's

9  potentially relevant, the multiplicity -- I don't know if it

10  is and I'm not ruling that it is, don't get me wrong.  I'm not

11  ruling that it's admissible.  What I am ruling is first you

12  have to get the facts.  Once you get the facts, you will know

13  whether something is admissible or not.  It may lead to

14  admissible evidence and that's the standard.  Therefore, the

15  motion to compel with regard to that is granted.

16      MR. BURKE:   So that would be, Judge, request 23, 24, 25

17  is similar, your Honor, it asks for documents from any source

18  concerning the legality or propriety of making dialer calls.

19      THE COURT:   I would say all documents from any source

20  other than the defendant's own lawyers.

21      MR. BURKE:   They have already told us that there are no

22  such documents.

23      THE COURT:   Pardon?

24      MR. BURKE:   They have told us that there are no such

25  documents, no documents subject to privilege.

1     THE COURT:   All right.  So -- no such documents subject

2  to privilege.

3     MR. BURKE:   That's right, they put that in their papers

4  that there are no privileged documents.

5     THE COURT:   Motion to compel request No. 5 is granted.

6     MR. BURKE:   25, your Honor?

7     THE COURT:   Yes.

8     MR. BURKE:   Okay.  Documents that discuss defendant's

9  compliance or lack of compliance with the TCPA.

10    MS. GROH:   Again, your Honor, we will argue that this

11  does not bear on willfulness.  Perhaps if this was an FDCPA

12  case and there was a bona fide error defense, it could be

13  relevant, but as far as this case goes, the compliance or lack

14  of compliance with the policies and procedures in this regard

15  are not relevant and this motion should be denied.

16    MR. BURKE:   It's the same thing as with the complaints.

17  I mean, if you have got a hundred e-mails that were sent a

18  month before the autodialer called the plaintiff, it shows

19  that the defendant knew that they were taking a chance.

20    THE COURT:   I agree.  Document request 26 is granted for

21  the same reason.  Next.

22    MR. BURKE:   31.

23    THE COURT:   That's the same thing.

24    MR. BURKE:   Same thing.  32 is similar as well.

25    THE COURT:   Granted, granted.  And No. 32 --

1    MS. GROH:   Your Honor, if I could clarify --

2    MR. BURKE:  32 we withdraw.  That has to do with the

3  e-mail claim and there is a stay of discovery having to do

4  with the e-mail claim.

5    THE COURT:   All right.

6    MR. BURKE:  35.  35 is a little bit different than 31 in

7  that it has to do with revocation of consent.  For example,

8  somebody has called in to defendant and said "Hey, don't call

9  me," I think that would probably be subsumed in 31 and 26, but

10  this one is a little bit more explicit.

11    THE COURT:   Well, you do, maintain a Do Not Call list,

12  right?

13    MS. GROH:   Currently we do, your Honor, and I don't know

14  the time frame on that, but again, within the class period we

15  don't have any data that would be responsive to this.

16    THE COURT:   Well, you have documents -- you have some

17  documents which list Do Not Call.  You must have some sort of

18  a procedure as to what happens when somebody says "Don't call

19  me," right?

20    MS. GROH:   I'm not sure if it's a written procedure or

21  if it's a --

22    THE COURT:   Well, you're not sure, answer it.  You don't

23  have to create any documents, all you have to do is answer it.

24  And come up with the documents that you have.  Request No. 35

25  is granted.

1      MR. BURKE:  39, your Honor, another arm of what CCH does

2  is they publish legal treatises for compliance with marketing

3  and advertising laws.

4      THE COURT:  I know about CCH.  I used to use them.  They

5  were pretty tough to use when I was in law school.  Maybe

6  they're a lot better now.

7      MR. BURKE:  They're organized by date rather than by

8  subject.  Your Honor, we are asking for anything -- and I

9  think this is included in 25, maybe some of the other

10  requests, but expressly we are asking for their legal

11  treatises and updates that have to do with TCPA compliance.

12      MS. GROH:  And, your Honor, I see no relevance in this

13  whatsoever.

14      THE COURT:  I don't think it's relevant either.  If you

15  want to, look them up.  They're published, aren't they?

16      MS. GROH:  Correct.

17      THE COURT:  These are treatises.  They're published, you

18  can look them up.

19      MR. BURKE:  I haven't been able to find one, your Honor.

20      THE COURT:  Well, so maybe --

21      MR. BURKE:  On eBay, not in the library, not anywhere

22  else.

23      THE COURT:  Well --

24      MR. BURKE:  And we are asking to show knowledge of

25  these -- of the TCPA.

1        THE COURT:   I don't think it's relevant however.

2        MR. BURKE:   Okay.

3        THE COURT:   Their exposition of the law, I don't think

4    that's relevant.

5        MR. BURKE:   Organizational charts of the defendant.

6        THE COURT:   What else -- where are you at?

7        MR. BURKE:   Sorry, Judge.  We are almost done.  Page 14.

8        THE COURT:   Organization charts.

9        MR. BURKE:   Both of personnel and the corporate structure

10   of the defendant.

11       THE COURT:   What's the relevance?

12       MR. BURKE:   Well, as to personnel I want to know where

13   Brian Holbrook, this autodialer guy, where he falls, who his

14   boss is, who works underneath him.

15       THE COURT:   Why don't you ask that specifically.  You

16   want an entire organizational chart for a company that's been

17   in existence a long time and is a large company.  You don't

18   need to know all that, do you?  If you want something specific

19   about specific people that are involved with the autodialer,

20   okay, but --

21       MR. BURKE:   I don't think -- I suspect they're not going

22   to have a chart that just deals with Brian Holbrook, but any

23   chart that includes Brian Holbrook I think would be

24   appropriate.

25       MS. GROH:   Judge, I would agree with you that this is

1   plainly irrelevant and overbroad, and as you stated, this is a

2   large company with a lot of players and personnel --

3        THE COURT:   If you want anything specific, you can ask

4   something specific, but I think this is overly broad and is

5   irrelevant and therefore, that motion is denied.

6        MR. BURKE:   Judge, we don't have an insurance policy from

7   the defendant.

8        MS. GROH:   On this point, your Honor, we were seeking to

9   enter a protective order before disclosing this proprietary

10  business contract with a third-party.

11       THE COURT:   Can I ask you what's proprietary about an

12  insurance policy?

13       MS. GROH:   It's a private contract that is commercial

14  information under Rule 26(c).

15       THE COURT:   It's a private contract.  You have already

16  disclosed what company.

17       MS. GROH:   Pursuant to our Rule 26 obligations, we

18  have --

19       THE COURT:   So --

20       MS. GROH:   -- identified the policy limits --

21       THE COURT:   If somebody wanted to call that company and

22  say "Look, I would like to have a liability policy that covers

23  the following," they would present that policy, wouldn't they?

24  They should be happy with that.  I don't understand what's so

25  proprietary.  Everything these days is proprietary and

1    confidential. How does it hurt you -- how does a competitor

2    gain an advantage over your liability insurance policy for

3    heaven's sake?

4        MS. GROH: It's our position, your Honor, that it's

5    commercial information that should be protected --

6        THE COURT: Why?

7        MS. GROH: -- from disclosure.

8        THE COURT: Why? What I'm trying to get at is why.

9    You're not the only one. The lawyers now, everything is

10   proprietary and everything is confidential. That isn't the

11   way it's supposed to work. It's supposed to be secrets that

12   are subject to protective orders, not any other old document

13   that doesn't hurt you competitively.

14       Anyway, you're going to work on a protective order. The

15   motion with regard to the insurance -- produce the insurance

16   policy. Also, work on your protective order.

17       MR. BURKE: Judge, two more issues remain. One is that

18   there is no privilege log, but in their papers they said that

19   they're not withholding anything based on privilege, so I

20   think that's a non-issue.

21       THE COURT: Well, so we don't have to visit it.

22       MR. BURKE: And the final issue is an interrogatory that

23   I issued asking for essentially a privilege log of documents

24   that the defendant knows are responsive to the discovery

25   requests but they don't have in their possession, custody, or

1   control.  And I have narrowed that interrogatory to dialer
2   documents.
3        THE COURT:  I don't understand that.  Documents that
4   they know exist, but they do not have any control --
5        MR. BURKE:  I'm asking where they are so I can go get
6   them.
7        THE COURT:  Well, it's not a privilege log.
8        MR. BURKE:  No, it's sort of a log of what they don't
9   have.
10       THE COURT:  It's a list.
11       MR. BURKE:  Yes, it's a list.
12       THE COURT:  A list of --
13       MS. GROH:  Interrogatory No. 7 requests defendant
14  identify all responsive documents that are being withheld on
15  the basis of privilege or an objection.  Defendant answered
16  that to say that there are none.  Somehow plaintiff is still
17  moving to compel on this request.
18       THE COURT:  There are none.
19       MR. BURKE:  Well, I mean, your Honor, for example, there
20  are manuals that were not being produced before today that the
21  defendant was withholding based upon objection of overly
22  burdensome.
23       THE COURT:  But they are going to produce them in
24  accordance with our rulings today.
25       MR. BURKE:  For sure.

1          THE COURT:   Okay.

2          MR. BURKE:   What I'm asking for here, what I wanted was

3     for them to tell me is "Oh, we have got these manuals, but

4     we're not giving them to you because we think it's unduly

5     burdensome."  If there is anything after today that they're

6     not giving me because of some objection, I would like to know

7     what it is.  And if there is something that they don't have

8     custody of --

9          THE COURT:   They have to give you everything they have.

10    If they know where something is and they do not have control

11    over it, ask them that specifically, but you didn't ask them

12    that in this interrogatory.

13         MR. BURKE:   Not specific enough.

14         THE COURT:   Therefore, the motion with regard to that

15    interrogatory is denied.

16         MR. BURKE:   Judge, as to the protective order, this is

17    our last issue.  There are two subjects that were, that the

18    parties are dealing with and I think that if we can resolve

19    them today, the defendant will probably be able to file a

20    motion for protective order.

21         One, I would like to have a sentence in Paragraph 1 that

22    says "Nothing herein shall expand or restrict the scope of

23    materials that may be designated as confidential pursuant to

24    Rule 26 and applicable case law."  The defendant finds that

25    objectionable.

1    MS. GROH:   We have three objections to that, your Honor.

2    Frankly, we wouldn't have a problem if we cut that sentence

3    off at "Nothing herein shall expand or restrict the scope of

4    materials that may be designated as confidential," period.

5    The remaining part of the sentence, however, restricts the

6    designation of confidential materials while the first part of

7    the sentence expands it.  We find that to be contradictory

8    and --

9    THE COURT:   But you still have a provision that says if

10   somebody challenges that, you can go to court and the court

11   can determine that.

12   MS. GROH:   Exactly, which is why we don't think that

13   this provision is necessary because there is a provision later

14   on on how to challenge the designation of a document.

15   Additionally, this "pursuant to Rule 26(c) and applicable case

16   law" is just a vague statement that we find to be unnecessary

17   and unclear.

18   MR. BURKE:   Earlier in the paragraph it says that the

19   defendant or any party -- first it said defendant only -- can

20   make any document that's not previously made available to the

21   public confidential in this case.

22   THE COURT:   All right.

23   MR. BURKE:   I think that's too broad.  I don't see --

24   THE COURT:   Well, then you can challenge -- there is a

25   challenge provision here, isn't there?

1      MR. BURKE:  There is.

2      THE COURT:   So challenge it when the time comes,

3  challenge it.

4      MR. BURKE:  As long as I don't get stuck with some

5  argument that says oh, the law of the case is that any

6  document that wasn't previously disclosed to the public, the

7  order already tells us that it's confidential.  That's what

8  I'm worried about.  And I think that any motion challenging

9  confidentiality, we are going to be arguing Rule 26(c) and

10 applicable case law.

11     THE COURT:   Have the words "subject to the challenge

12 provisions as shown in paragraphs" whatever they are, you can

13 add that, but make it subject to the challenge provisions.

14     MR. BURKE:  And the second issue is that I think that

15 it's appropriate, and I have had this in other protective

16 orders, to have a provision that third parties that seek to

17 use the protective order in subpoena responses subject

18 themselves to the jurisdiction of this court for any disputes

19 or anything else having to do with their subpoenaed responses.

20     THE COURT:   Well, they are anyhow.  They are anyhow.  If

21 you subpoena somebody and they don't want to come up with the

22 documents that you have subpoenaed, you come to court, you ask

23 that they be held in contempt of court.

24     MR. BURKE:  I don't want to have to --

25     THE COURT:   What do you need that for?

1   MR. BURKE: Well, say, for example, a subpoena issues out

2 of the District of Alaska.

3   THE COURT: Then you have got to go up to Alaska. We're

4 not going to circumvent that and say -- first of all, it

5 doesn't bind any of the third parties anyway. I can make all

6 kinds of orders with regard to that, they didn't agree, and

7 you're saying, well, if they look at it --

8   MR. BURKE: No, I'm saying if they use the protective

9 order, if they designate materials protected, confidential

10 under this protective order, they're submitting to the

11 jurisdiction of this court with regard to those documents.

12   MS. GROH: We don't think this language is necessary,

13 your Honor, and think it's overly burdensome to require a

14 third party to submit to the jurisdiction of this court.

15   THE COURT: I agree. It's an attempt to circumvent that

16 portion of the Rules that say, that have to do with where

17 disputes as to third-party subpoenas are resolved and I don't

18 think you can do that, and I don't think it's binding upon

19 them at all even if they use it. Therefore, the order is

20 don't put it in.

21   MR. BURKE: Very good.

22   THE COURT: Okay. You're going to submit a draft order

23 on this.

24   MR. BURKE: Okay.

25   THE COURT: All right. We will circulate it and --

1    submit a draft order.

2        MR. BURKE:  I'm going to also order the transcript.

3        THE COURT:   I think you're going to need to.

4        MR. BURKE:  Okay.

5        THE COURT:   All right.

6            *                    *                    *

7            I certify that the above was transcribed

8            from digital recording to the best of my ability.

9

10                    /s/ Lois A. LaCorte

11        _____        _____

12        Lois A. LaCorte                    Date

13        Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **NICHOLAS MARTIN**, on behalf of himself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 10 C 3494 |
| v. | ) ) | Judge Robert M. Dow |
| **CCH, Incorporated**, | ) ) | Magistrate Judge |
| Defendant. | ) ) | Martin C. Ashman |

## <u>ORDER</u>

Before the Court is Plaintiff Nicholas Martin's ("Martin") Motion to Compel Defendant CCH, Incorporated ("CCH") to respond to interrogatories and requests for production. The Court rules on this motion under District Judge Robert Dow's referral for a decision pursuant to N.D. Ill. Rule 72.1. Based on the parties' briefs and a hearing on the motion, the Court finds that Martin's motion is granted in part and denied in part, as follows:

1.    The motion to compel a response to Interrogatory No. 3 is granted. For the reasons stated in open court, CCH shall also provide a detailed explanation of how its automatic dialer operated during the class period, the reasons why any information requested by Martin is missing, and a statement explaining what happened to the missing information. CCH is also ordered to produce its phone records for all calls placed by the automatic dialer and the database CCH referred to during the hearing that tells the automatic dialer which person to call.

2.    The motion to compel a response to Interrogatories Nos. 5 and 11 is granted.

3.    The motion to compel a response to Interrogatory No. 7 is denied.

4.     The motion to compel documents responsive to Requests for Production Nos. 1 and 2 is granted.

5.     The motion to compel documents responsive to Request for Production No. 3 is granted.  CCH shall provide a detailed response about what search was made for the recordings sought in Request No. 3, what happened to any recordings that are not available, when such recordings became unavailable, and by whose authority they were made unavailable.

6.     The motion to compel documents responsive to Requests for Production Nos. 5 and 7 is granted.

7.     The motion to compel documents responsive to Request for Production No. 12 is granted.  In responding to this request, CCH shall also provide the additional information outlined above in relation to Interrogatory No. 3.

8.     The motion to compel documents responsive to Request for Production No. 15 is granted.  For the reasons stated in Court, however, CCH's response need not include the contract for the purchase of the automatic dialing system.

9.     The motion to compel documents responsive to Request for Production No. 19 is granted as to the automatic dialing system.  CCH need not produce records related to calls made from its non-automatic dialing systems.

10.     The motion to compel documents responsive to Requests for Production Nos. 23, 24, 26, 31, and 35 is granted.

11.     The motion to compel all non-privileged documents responsive to Request for production No. 25 is granted.

12.     The motion to compel documents responsive to Requests for Production Nos. 27 and 28 is denied.

13.     The motion to compel documents responsive to Request for Production No. 37 is granted.  CCH's responsive, however, is subject to the same requirements as stated above in relation to Interrogatory No. 3.

14.     The motion to compel documents responsive to Request for Production No. 39 is denied.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
Dated:  January 24, 2011.                    United States Magistrate Judge

- 3 -

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NICHOLAS MARTIN, on behalf of himself )
and others similarly situated, )
                                  )
      Plaintiff,             )     1: 10-cv-3494
                                    )
          v.                )     Judge Dow
                                    )
CCH, INCORPORATED,       )
                                    )
      Defendant.          )
                                    )

## DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORIES

Defendant CCH, Incorporated submits this supplemental response to the following interrogatories submitted by Plaintiff Nicholas Martin:

     3.    Identify the intended recipient, all communications (attempted and completed) to and from this person, and from what sources you obtained the personal information (including email and phone number) for the following persons:

> All persons with addresses in Illinois, Indiana or Wisconsin, who defendant or some person on its behalf called on their cell phone using an automatic telephone dialing system and/or prerecorded voice message, where the recipient had not provided CCH its prior express consent to receive such, where the call was made at any time between and including June 8, 2006 to June 8, 2010.

**ANSWER**:    Defendant is unable to identify what communications, if any whatsoever, were made to and from those persons defined in Plaintiff's Interrogatory No. 3. Defendant states that the reason it is unable to identify such communications is because the Verizon phone records in defendant's possession do not distinguish between phone calls made to cell phones and to land lines. Accordingly, Defendant cannot determine whether the phone numbers called were cell phone numbers. Furthermore, there was no justified business reason to retain data reflecting calls made by the automatic dialer.

Further answering in compliance with the Court's order of January 24, 2011, Defendant states that during the class period, the automatic dialer operated as follows:

For each automatic dialer advertising campaign, Defendant would create a "script," or search query, based on the criteria for the campaign. Defendant would run this script against its prospective customer database in order to obtain a list of phone numbers for the automatic dialer to call. Defendant did not retain a copy of such lists of phone numbers because there was no justified business reason to do so. Defendant did retain copies of the scripts, which have been produced. Defendant cannot recreate these lists of phone numbers because the prospective customer database is constantly evolving. Prospective customers are continuously added to the prospective customer database, and contact information is frequently updated. Defendant did not retain a copy of the prospective customer database as it existed at the time of each automatic dialer advertising campaign because there was no justified business reason for doing so. If Defendant were to run a script from a past automatic dialer advertising campaign against the current prospective customer database, it would give a much different list than the list of phone numbers actually called during the campaign.

During the course of an automatic dialer advertising campaign, the dialer records certain call data, such as the name of the call recipient, the time and date of the call, the phone number dialed, and the location of the person called. The automatic dialer has the capability of retaining this data for thirty days or until the dialer is "refreshed," *i.e.*, until the script for the advertising campaign is re-run against the prospective customer database. Defendant refreshed the dialer on a daily basis in order to capture any changes in the prospective customer database made in the past day. There was no business justification for Defendant to retain a daily list of calls made by the dialer. There is no way for Defendant to recreate this data.

2

5. Identify and explain all written and unwritten policies, practices and procedures concerning use of Predictive Dialers and Prerecorded Messages, going back to when you began considering the use of such, and ending on June 9, 2010.

**ANSWER**: Defendant has no written or unwritten policies, practices or procedures concerning the use of Predictive Dialers and Prerecorded Messages. See Defendant's response to Interrogatory No. 3 for an explanation of how the automatic dialer operated during the class period.

11. Identify all facts and law you contend support any defense or affirmative defense you have raised or will raise in this case, as to plaintiff and any putative class member. A complete answer will at least: explain the defense, cite the facts the support the defense (including citation to bates number, or descriptions of the location and custodian for documents that are not produced), and identify each person(s) with information regarding the defense and state what information each person has.

**ANSWER**:

(1) Failure to state a claim upon which relief can be granted.

Upon information and belief, plaintiff is using his cell phone number as a business phone number for 21st Century Tax Services, Inc. Upon information and belief, Plaintiff voluntarily held that phone number out to the public at large as a business phone number. Plaintiff has information regarding this defense. Investigation continues. Defendant will supplement its response to this interrogatory as it discovers additional information.

(2) Damage to Plaintiff was caused by third parties.

See response to (1), above.

(3) Plaintiff consented.

See response to (1), above.

(4) Defendant did not willfully violate the TCPA.

Defendant had no knowledge that Plaintiff's phone number was a cell phone number.

3

(5) Laches, waiver, and/or estoppel.

     See response to (1), above.

(6) Failure to mitigate damages.

     See response to (1), above.

Date: March  11, 2011

Respectfully submitted,

CCH, INCORPORATED

*Sarah Zielinski*

David L. Hartsell
Susan E. Groh
Sarah A. Zielinski
MCGUIREWOODS LLP
77 W. Wacker Drive
Suite 4100
Chicago, Illinois 60601
T: (312) 849-8100
F: (312) 849-3690
dhartsell@mcguirewoods.com
sgroh@mcguirewoods.com

4

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, _Brian Holbrook_ , declare under penalty of perjury that the foregoing Supplemental Responses to Plaintiff's Interrogatories are true and correct to the best of my knowledge.

Executed on March _11_, 2011.

## CERTIFICATE OF SERVICE

I, Sarah A. Zielinski, certify that on March 11, 2011, I served this document via email and U.S. Mail delivery to:

> Alexander H. Burke
> BURKE LAW OFFICES, LLC
> 155 N. Michigan Ave., Suite 9020
> Chicago, IL 60601
> ABurke@BurkeLawLLC.com

Sarah A. Zielinski

Exhibit F

# Exhibit G



CCH
a Wolters Kluwer business

ACCOUNTING & AUDIT    TAX    WORKFLOW    CORPORATE

# ProSystem *fx*® Document

Minimize the costs associated with managing paper documents.

ProSystem *fx*® Document manages the full range of documents found in an accounting practice — from tax returns to client correspondence, employee records and email — reducing the costs associated with creating and storing paper documents. By having all your documents in one central, searchable repository, you'll be ready to deliver better client service by minimizing time spent searching for binders or pieces of paper.

## Document Storage and Retention

In addition to increased efficiency and cost savings, ProSystem *fx* Document also provides the risk mitigation you need for document storage and retention. Comply with regulations and standards, all in the background of your day-to-day work, and provide your firm with:

- Automated document retention capability that lets you implement a consistent firm-wide retention policy.

- Streamlined workflows, resulting in improved productivity.

- Secure, remote, 24/7 access to your client files.

- Freedom from dependence on physical pieces of paper. Storing your documents in digital format provides the ability to back up all your client files. When properly stored, this backup will keep your firm's content safe in the event of a disaster.

## Redefining Document Management

Finding files with ProSystem *fx* Document is fast and easy. Client, document and word searches are combined on one screen, letting you search using any combination of parameters.

Improve your efficiency by evolving the way you manage files, including application data files. With Document's Extended Storage Area, you can manage the application files created by ProSystem *fx*® Fixed Assets and QuickBooks® — a unique feature of ProSystem *fx* Document.

The Extended Storage Area also allows you to track application file history, apply retention periods, and include them in your search results. Just set your preferences in ProSystem *fx* Document to store selected application files in Extended Storage — no additional management is necessary.

## Award-Winning Email Management

In addition to storing your workpapers, data files, and back-office documentation, ProSystem *fx* Document also helps you better manage your email by allowing you to:

- Drag and drop emails and attachments directly to ProSystem *fx* Document from within Microsoft® Outlook®.

- Enhance collaboration within the firm by saving pertinent client emails to ProSystem *fx* Document, making them accessible to everyone.

- Use ProSystem *fx* Document to ensure compliance with regulations related to email retention and destruction.

- Manage the size of exchange servers by archiving emails in a secure, searchable location.

- Eliminate risks related to local hard drive crashes or laptop thefts by storing emails outside of archived email storage.

> "ProSystem *fx* Document is a home run… Over the past five years [of] using Document, we have successfully consolidated staff, we have no off-site storage, our last paper files are ready for destruction and most importantly, it's almost impossible to lose a file."
>
> — Richard W. Jackson
> *Jackson Coles, PLLC*

## Maximize Productivity with Integration

CCH® integration allows your staff to spend less time looking for the information they need and more time focusing on getting the job done.

For example, you can:

- Scan, organize and bookmark client source documents using ProSystem *fx*® Scan, then automatically import them to ProSystem *fx* Document in one step. Your client source documents are then searchable and accessible to everyone at your firm.

- Easily move or copy files to or from ProSystem *fx*® Engagement, allowing your firm instant access to client deliverables and providing improved management of permanent files.

- Print returns directly from ProSystem *fx*® Tax to the correct client in ProSystem *fx* Document.

The integration between the ProSystem *fx* Suite and Microsoft® Office allows you to maintain completely paperless processes. This unmatched integration offers support for all firm workflows including tax returns, A&A engagements, special projects and back-office processes such as Human Resources.

## Streamline Your Workflow

Customize your ProSystem *fx* Document homepage to support the way you work every day.

Start by effortlessly configuring a display of 1-6 panels. Select how you want the panels organized, and even choose to make the search screen your homepage. All panels are displayed in the left navigation bar — readily available for full-screen viewing.

The most widely-used functions — such as locking, check-out, check-in, versioning, direct editing, discussions and over-due notifications — are readily accessible, improving your efficiency by helping you easily manage your documents.

## Enhance Communication — Internally and with Clients

ProSystem *fx* Document will enhance communication both within your firm and with your clients. For example, convenient Client and Document Discussion features allow the entire firm to communicate about specific documents or clients.

Add ProSystem *fx*® Portal to the mix, and you have a reliable, secure method of exchanging information and collaborating with your clients. Simply upload documents to folders that have customizable names. Files are readily available upon Portal login, and can be designated as Read Only or Read/Write for greater control and security.

## CCH Works with You to Achieve a Digital Workflow

CCH offers a full range of services to make your transition to a paperless environment as smooth and productive as possible. We'll guide you through installation and provide firm-wide best practices through training and consulting. In fact, our consultants will even conduct a personalized survey to determine if any special preparation is needed for your firm to implement ProSystem *fx* Document.

It's time to reduce the costs associated with creating, storing and managing paper documents, while achieving dramatic improvements in workflow and client service. Take the first step with ProSystem *fx* Document, and gain a competitive edge today!



From acquiring new clients to gathering source documents and generating the tax return, the ProSystem *fx* Suite offers a multitude of solutions that keep your firm running smoothly.

*The most up-to-date product information, including detailed system requirements, enhancements, and new features, is available at CCHGroup.com/ProSystemDocument. If you plan to use multiple ProSystem fx Suite products within the same system, call 800-PFX-9998 (800-739-9998) and ask to speak to your sales representative about whether or not your system availability is adequate.*

*All trademarks and copyrights are property of their respective owners.*

For more information on ProSystem *fx*® Document call **800-PFX-9998** (800-739-9998) or visit **CCHGroup.com/ProSystemDocument**

Join us on  at CCHGroup.com/Social

ACS 90092669  4/11

2011-0052-20


. CCH
a Wolters Kluwer business

800-PFX-9998 (800-739-9998)
CCHGroup.com

©2011 CCH. All Rights Reserved.

# Exhibit H



Questions?
Call 800-739-9998, option 2, option 4 or option 10.

| | New Attendees | Returning Attendees | |
|---|---|---|---|
| Keynote Speakers | Register | Deactivate | Register | Login |

The impressive lineup of expert keynote speakers at CCH Connections: User Conference 2011 will cover topics that are important to every tax and accounting professional, including leadership, innovation and technology.

### Keynote Speakers    Featured External Speakers

- Paul DePodesta
- Tim Sanders
- Kevin Robert
- Mike Sabbatis

- Jim Boomer
- Bill Carlino
- Kathryn A. Bryne
- Bryan Clark
- T. Martin Guenthal
- David P. Bennedy
- Steven L. Ellis

- Michael Giarvis
- Natalie B. Brantis
- Glenn Goldman
- Samuel G. Jordan
- John B. Jenkins
- Claudia Hill
- Joni Holst

- Christine Jones
- Mike Johnson
- Randolph P. Johnston
- Edward Jacoby
- Roman L. Kepczyk
- April Little
- Becky MacEachern

- John McGowanH
- Cecil E. Blackman
- Edi Rosenne
- Fallie Prince
- Gail Perry
- Jim Pully
- Randy Beaupre

- W. Darrin Barts
- Shanna G. Siegel
- Brian E. Tankersley
- Sandra Wiley
- Arthur W. Winstead, Jr.

### Featured Internal Speakers

- Deborah Stackwell
- Jimmy Brown
- Donata Squire-Solomon
- Jim Ferrell

- Bill Lee
- Charles Flowers
- Amanda Felley
- Ed Jennison

- Rick Mongello
- Adam Moye
- Joan Skudlas
- Patti Tobian

- Jim Keaton
- Karen Senson
- Sheila Yuskis
- Dina Tatus

- Wendy Worley



**Paul DePodesta**
*New York Mets VP of Player Development and Scouting*
Paul DePodesta has made a career of evaluating, measuring and assigning value to talent. He is currently Vice President of Player Development and Scouting for the New York Mets. Formerly the Executive Vice President of the San Diego Padres, and General Manager of the Los Angeles Dodgers during the 2004-05 seasons, DePodesta will discuss the innovative strategies he used to create a winning team, and how to apply those same strategies in the corporate world.



**Tim Sanders**
*New York Times' Bestselling Author Former Chief Solutions Officer at Yahoo!*
Tim Sanders is a three-time bestselling business author, former Chief Solutions Officer at Yahoo!, and owner of Deeper Media, a company that conducts research on business trends, new media and human behavior. In his presentations and his books, "Love is the Killer App", "The Likeability Factor", and "Saving the World at Work", Sanders explores a variety of topics including people skills and how to build strong relationships that will help grow business.



**Kevin Robert**
*CEO, Wolters Kluwer Tax and Accounting*
Kevin Robert is CEO of Wolters Kluwer Tax and Accounting, the global leader in providing tax, accounting and audit professionals with information, software and services. Leading operations in the U.S., Europe, Asia/Pacific and Canada, Robert has significantly expanded CCH's global footprint in serving professionals with premier workflow solutions worldwide.



**Mike Sabbatis**
*President and CEO, CCH Tax and Accounting North America*
One of Accounting Today's Top 100 Most Influential People, Mike Sabbatis has more than 29 years of experience in the software, technology and information industries, successfully leading activities in strategic planning, business development, marketing, consulting and sales. He is president and CEO of the CCH Tax and Accounting North American business, serving as a strategic partner in delivering innovative, customer-focused workflow solutions for professionals.

Featured External Speakers

### Accounting & Audit Track

**Kathryn A. Bryne, CPA**
*Partner, WeiserMazars*
Kathryn A. Bryne has more than 20 years of experience in providing accounting, auditing, tax and consulting services to domestic and foreign corporations in various industries. Her expertise includes specializing in the audit of public companies, operational reviews of company processes, inventory management, and forecasting and strategic planning. She has extensive industry-specific experience providing accounting services to companies in the software/technology, distribution, manufacturing, telecommunication, import/export, automotive, paper, and cosmetic industries, as well as service companies.

Bryne was also a former member of Quality Peer Review Subcommittee of the IFAC Forum of Firms, discussion leader for in-house professional education programs and a frequent speaker on International Financial Reporting Standards.

**Cecil K. Nazareth, CPA, M.B.A., Chartered Accountant**
*Managing Partner, IFRS Partners, Inc.*
Cecil Nazareth is a partner with IFRS Partners in New York City, which specializes in IFRS education, training, consulting and conversion. Clients include CPA firms and small to medium-size businesses, including subsidiaries of foreign parents. He is currently training and advising the largest Japanese CPA firm in the US on conversion to IFRS. In 2011, IFRS partners launched a 20 part IFRS interactive Web series (a deep-dive into IFRS technical learning). www.myifrspartners.com. Nazareth is recognized as a thought leader in the IFRS space and has conducted several sessions all over the world. Previously he was the Director of AICPA's Internal Audit and Strategy. In that key role he worked on the AICPA overall strategic goals and organizational development. Nazareth worked closely with the CEO and developed and implemented an Executive Performance Measurement System and Balanced Score Card. Additionally, he also reported to the Audit Committee and Board of Directors and interacted with the external auditors. Nazareth pioneered the ISO 9001:2000 Quality program at the AICPA and led it to becoming the first professional organization certified in the United States.

Cecil has an M.B.A. in Finance from Fordham University, and an M.B.A. in Information Technology from Columbia University in New York City.

**Nicolas D. Glorieux**
*Partner, ParenteBeard, LLC*
Nicolas Glorieux is based in ParenteBeard's Pittsburgh office where he is responsible for the day-to-day execution of audit engagements. He is the firm's first Commercial Audit Partner in the Pittsburgh Region.

During his more than 12 years of public accounting experience, Glorieux has served a variety of multi-national public and large private clients in a diverse range of industries, including manufacturing, retail, distribution, construction, professional services and non-profit. Additionally, in his previous role with a national accounting firm, Glorieux led the Pittsburgh region's employee benefit plan audit practice. He has also assisted companies and their audit committees in researching technical accounting issues and implementation of new accounting standards, including IFRS.

Glorieux also possesses an in-depth knowledge of corporate income tax planning and compliance and has participated in several recent implementations of the Sarbanes-Oxley Act for his public client portfolio. His participation in internal quality review processes has led to implementation of audit process improvements.

top of page

**Ahava Goldman, CPA**
*Senior Technical Manager, AICPA*
Ahava Goldman, CPA is a senior technical manager with the American Institute of CPA's (AICPA) Audit and Attest Standards team. She is the staff liaison for the Auditing Standards Board and supports their standard-setting activities. Goldman staffs the Clarity Task Force which supports the ASB with its Clarity Project to revise its standards to make them easier to read, understand and apply. As senior technical manager, she also helps develop non-authoritative professional guidance. Before joining the Audit and Attest Standards team, Goldman was a senior manager on the AICPA's Examinations Team where she was responsible for the content and development of all sections of the Uniform CPA Examination and provided staff support to senior-level committees and task forces focusing on examination policies, content and computerization. Before joining the AICPA, she was a supervisor at DDK & Company, manager at Ernst & Young LLP, and senior accountant at Kipnis & Karchmer. She graduated magna cum laude from Stern College of Yeshiva University with a Bachelor of Science in Accounting.

**Kathy Parker**
*Partner, Radman & Rodman PC*
Kathy Parker came to Rodman & Rodman in 1999. She graduated from the University of Texas at Austin with a degree in accounting. Parker is also a Certified Advanced ProAdvisor for QuickBooks. She is thoroughly involved with the clientele of Rodman & Rodman. She works closely with their clients -- assisting them with their tax and financial needs. Many of them find her commitment to giving them competent and practical advice a comfort. Parker specifically enjoys fostering a relationship of trust, and the resulting enjoyment of watching her clients grow and prosper. A second, increasingly important part of her responsibilities are those associated with her deep involvement in Rodman & Rodman's Software Coordinator Team. She is a QuickBooks Pro Advisor and is highly qualified to assist clients on Peachtree along with other small business accounting software. In that regard, she assists her clients with software selection, implementation and support.

**Arthur M. Winstead, Jr., CPA**
*Partner, DMJ Greensboro Office*
Art Winstead joined DMJ in 1978 and became a partner in 1984. He is a general services partner in the Greensboro office and is the firm-wide accounting and auditing partner. He serves as team captain and team member for on-site peer reviews throughout the country and state of North Carolina, as well as conducts off-site peer reviews within North Carolina. Winstead is the National Accounting and Audit Consultant for CPAmerica International and has also served as Chairman of the CPAmerica Accounting and Auditing Executive Committees.

His memberships include the American Institute of Certified Public Accountants and the North Carolina Association of Certified Public Accountants. He recently served a three-year term on the AICPA Auditing Standards Board. He also served six years on the North Carolina Board of CPA Examiners where he served as President and Vice President and Chairman of the Professional Standards, Audit and Personnel Committees. He is also a member of the North Carolina Association of CPA's Peer Review Executive Committee.

Winstead is originally from Greensboro, NC. He earned his Bachelor of Science Degree in Business with a concentration in Accounting from the University of North Carolina at Greensboro.

### General Track

**Mike Johnson, CPA,CITP**
*Partner, O'Sullivan Creel, LLP*
Mike Johnson has been a partner in the regional accounting firm of O'Sullivan Creel, LLP, located in the Florida panhandle. Johnson serves as the partner-in-charge of the Pensacola office as well as the partner responsible for directinginformation Technology and Consulting practices for O'Sullivan Creel, LLP. Additionally, he is responsible for the technology strategies and its implementations for not only the firm but for clients as well. Johnson also serves as the relationship manager on a variety of audit and tax engagements. He joined the firm in 1987 after having worked with the international accounting firm Price Waterhouse.

Johnson earned his Bachelor of Arts degree in Accounting from the University of West Florida in 1977 and was licensed as a Certified Public Accountant in the state of Florida in 1987. In 2001, he earned the Certified Information Technology Professional (CITP) designation from the AICPA. In addition, he has received numerous certifications in an expansive range of software products and the processes surrounding their implementation.

**Barry MacQuarrie**
*IT Director, KAF Financial Gro*
Barry MacQuarrie is the Director of Technology at KAF Financial Group. He combines his experience as a CPA and his knowledge of technology to provide consulting services to CPA firms. His areas of expertise include social networking, workflow, process improvement, disaster recovery planning and paperless office technologies. MacQuarrie is a member of the AICPA and has served on the AICPA's Information Technology Executive Committee and the Top Technology Initiatives Task Force. He is a member of the Massachusetts Society of CPAs and JHI International. MacQuarrie is a monthly contributor to AICPA's Corporate Finance Insider and author of the SocialCPAs.com blog. He serves on the CCH User Conference Customer Advisory Committee, the Boomer Technology Circles Advisory Board and the Babson Alumni Technology Council's Executive Committee.


◆〉 Management Track

**Bill Carlino**
*Editor-in-Chief, Accounting Today*
Bill Carlino is a veteran journalist and editor-in-chief of Accounting Today, as well as editorial director for all accounting-related content at parent company SourceMedia, such as the Top 100 Firms and Most Influential People rankings, the *Accounting Today Daily Edition* and *Tax Practice* newsletters, the Special Reports series and the group's online portal, AccountingToday.com. He has been a frequent speaker and panel moderator at industryrelated meetings and events as well as a featured commentator on such cable business channels as CNBC, Reuters, MSNBC, Bloomberg, CNN and National Public Radio. Prior to assuming the editor's post at *Accounting Today* in 2000, Bill spent 12 years covering the restaurant industry as managing editor at Nation's Restaurant News and two years with Gannett newspapers in New York as a news and sports correspondent. A graduate of the University of Denver, he is a member of the New York Financial Writers' Association and the American Business Press Editors.

top of page

**David P. Donnelly , CPA**
*Partner, Gainer, Donnelly & Desroches, LLP*
David Donnelly, CPA is a partner with Houston's oldest and largest local public accounting firm, Gainer, Donnelly & Desroches, LLP. Prior to joining the firm in 1983, Donnelly served as a controller in the communications industry for six years after receiving a BBA, with Honors, from the University of Texas at Austin. With over 25 years in public accounting, Donnelly's expertise includes management, tax planning and consulting for both domestic and international clients. Leading the real estate practice at GD&D, his primary clients are in real estate development, brokerage and operations with a client base extending to the industries of oil and gas trading, advertising, engineering and the arts.

Donnelly currently serves on the State Tax Committee for the Texas Society of Certified Public Accountants and is also a board member for DiverseWorks, Inc., a Houston nonprofit arts organization.

**Michael Gaines, CPA**
*Human Resources & Administrative Partner, Friedman LLP*
Michael Gaines, the human resources and administrative partner at Friedman LLP, has extensive experience in the management functions of CPA firms and is in charge of the firm's human resources, office management, and overall firm administration. Gaines was previously co-managing partner and director of operations of a local New York City public accounting firm. He has also had experience as the director of program development at the Foundation for Accounting Education of the New York State Society of CPAs, where he directed the development of over 150 seminars, conferences and technical sessions. Gaines has taught courses in accounting, auditing, practice development, and in managerial and supervisory skills. He received a B.A. degree from Queens College. He was licensed as a Certified Public Accountant in New York State in 1985.

**Tom Hood, CPA, CITP**
*CEO, Maryland Association of CPAs and Business Learning Institute*
Tom Hood, CPA, CITP is CEO of both the Maryland Association of CPAs and the Business Learning Institute, a center for the development of leadership, strategic thinking and competencies necessary to thrive in the new participatory economy. He has worked with many of the top 100 CPA firms and teaches at the AICPA Leadership Academy. Most recently he ran the future forums for the AICPA Horizons 2025 Project.

**Christian James**
*Xcentric, Co-founder*
Christian James is the co-founder of Xcentric, which specializes in Cloud Computing and IT consulting for CPA firms. James is a seasoned veteran, having worked in the CPA technology industry for over a decade. After selling his first business Covenant Systems, James became the lead technology engineer at CPA Systems prior to starting Xcentric.

At Xcentric, he became the primary architect behind the development of Xcentric's Cloud hosting service. James has a business degree from Texas Wesleyan University and is the former Director of Technology for the Boys & Girls Clubs of Greater Fort Worth.

**Roman H. Kepczyk, CPA,CITP**
*President, InfoTech Partners North America, Inc.*
*(Roman is also a speaker for a session in the Technology Track)*

Roman H. Kepczyk, CPA,CITP is regarded as one of the most entertaining, knowledgeable, and most importantly - understandable technology speakers throughout the industry. He brings with him 25 years of CPA firm experience where he thrives as a technology consultant and where he was an administrative partner in one of the largest firms in Arizona.

Kepczyk is President of InfoTech Partners North America, Inc. and the Lead Technology Management Strategist for the firm. His primary focus is helping firms throughout North America effectively use information technology by implementing digital best practices and directing them towards today's "less paper" or Digital CPA firm. He is a past member of the AICPA PCPS Executive Committee and past Chairman of the AICPA's Information Technology Executive Committee. He has served as a member of other AICPA initiatives including the Special Committee on Enhanced Business Reporting, eBusiness Task Force, IT Best Practices, IT Research, IT Practices Committees, and Group of 100 projects. In addition he is past Chairman of the AICPA Top Technologies Task Force.

Roman was named by INSIDE Public Accounting as one of the profession's Most Recommended Consultants from 2004 through 2010, and Accounting Today's Most Influential People from 2000 through 2005.

He also authored *Quantum of Paperless: Partners Guide to CPA Firm Optimization*, which outlines 32 key best practices (available on Amazon.com).

top of page

**Edi Osborne**
*CEO, Mentor Plus*
The CEO of Mentor Plus, Edi Osborne is a recognized leader in the area of Business Performance Measurement and Management and holds a Trimetrix certification in behavioral assessments. Since 1990, her efforts have been focused primarily on helping the accounting profession develop and deliver performance-focused advisory services. Osborne is a sought-after speaker known for her information-packed, entertaining style. She has presented her message to many institutes, international accounting and leadership groups, state societies, accounting associations, CCH, Microsoft®, ACCPAC (now part of Sage), and many other professional organizations. You will find her credits in the *Journal of Accountancy*, *Accounting Today*, *INSIDE Public Accounting*, *Accounting Web*, *State Society* and many other professional publications. Osborne is co-author of the book, *Strategic Benchmarking for Value*. Recently named as one of the TOP 25 Thought Leaders in Public Accounting. Osborne is dedicated to helping firms make the transition from a "service centric" traditional accounting focus to a "client centric" advisory services culture. For more info go to: http://www.mentorplus.com.

**Gail Perry**
*Editor-in-Chief, AccountingWeb*
Gail Perry is Editor-in-Chief at Sift-Media US, Inc., and oversees the content on all of the Sift sites: AccountingWEB, Going Concern, and USBusinessForums. She also speaks at many accounting events, trade shows, and webinars. Perry is the author of 30 books (the latest is *Mint.com For Dummies*, published in November, 2010), teaches an online personal finance course, and maintains a small tax practice. She is a graduate of Indiana University where she received a bachelors degree in

journalism. She returned to school to study accounting at Illinois State University, received her CPA, and worked for Deloitte in the Chicago tax department. She also taught a college-level introductory accounting class and was on staff at the Indiana CPA Society as a computer applications instructor. Perry was a contributing editor for *Accounting Today* magazine for five years before taking over the helm at AccountingWEB.

**M. Darren Root**
*CEO, RootWorks LLC and Executive Editor, CPA Practice Advisor*
M. Darren Root is CEO of RootWorks LLC, a national consulting firm helping small CPA firms. In addition, he is the Executive Editor of *CPA Practice Advisor*, print and online publication serving the accounting and tax profession. With more than two decades working in the tax and accounting profession, Root's vision for the structure and functionality of the modern accounting firm and his pragmatic, engaging style have made him one of the most-sought presenters in the tax and accounting profession. Viewed as a technology and workflow expert, he is a regular speaker at industry-related events and a frequent guest lecturer at Indiana University's Kelley School of Business. Root holds CPA and Certified Information Technology Professional certificates. He is an AICPA CITP Credential Committee Board Member and has served on the Board of Directors for the Indiana CPA Society. Root is also a recipient of the Top 25 Most Influential Thought Leaders award in Accounting Technology, and a co-Author of The E-Myth Accountant: Why Most Accounting Practices Don't Work and What to Do About It.

**Sandra Wiley**
*Shareholder & COO, Boomer Consulting, Inc.*
Sandra Wiley is a Partner and the Chief Operating Officer of Boomer Consulting, Inc. She has been named by *Accounting Today* as one of the 100 most influential people in accounting. In her 14 years with Boomer, she has worked with clients to strengthen their firm's human capital using Strategic Planning and Team Building Tools. Wiley is the co-developer of The Performance3™ Management Program where she facilitates the knowledge development of mid-level managers from professional services firms. She is also a certified Kolbe™ Master Consultant and assists clients with building teams, managing employee conflict and hiring within their management and technology staff. Wiley helps facilitate The Boomer Technology Circles™, The Annual Human Capital Symposium™ and the Annual Training Symposium™.

top of page

**◆》 Tax Track**

**Bryan Clark**
*Partner, BC Consulting, LLP*
Bryan Clark, a partner at BC Consulting, LLP, has more than two decades of experience providing tax compliance services to a wide variety of clients. His clients have ranged from newlyweds just beginning to build their wealth to Fortune 500 companies, from owner operated entities to high-wealth individuals and their family offices. Clark formed BC Consulting in 2002 after working more than 11 years for a then Big 5 accounting firm. In his former job, he was the Tax Process Improvement Leader for the Gulf Coast region and was responsible for developing firm-wide methodologies and work programs for preparing various types of tax returns. He was also a member of the team responsible for transitioning that firm from its own internally developed tax software to CCH's ProSystem *fx*® Tax.

In his current role at a much smaller firm and with many more clients than he previously served, Clark quickly realized the importance of process efficiency and standardization. He has devoted a significant amount of time to implementing new technologies in his firm's tax compliance process, while maintaining a focus on accuracy and staff development. He is a member of the AICPA and the Texas Society of Certified Public Accountants.

**E. Martin Davidoff**
*CPA, Esq., Founder, E. Martin Davidoff & Associates*
E. Martin Davidoff established a sole proprietorship CPA office in 1981 with a vision of providing the highest level of tax expertise in a warm, friendly environment. Today, the firm is a dual CPA-attorney practice specializing in taxation and tax controversy work.

Davidoff is a Past President (2008-09) of the American Association of Attorney-Certified Public Accountants. Using his extensive knowledge base as the impetus, he founded and chairs the group's IRS Tax Liaison Committee which enables him to work side-by-side with high level officials at the IRS and other tax agencies, as well as state and federal lawmakers. In addition, Davidoff authors a regular column in CPA Magazine on IRS representation, and he has been distinguished as one of the nation's "Top 100 Most Influential People in Accounting" by Accounting Today in each of the past seven years. CPA Magazine also named him one of the "Top 50 IRS Representation Practitioners" in 2008, and one of the "Top 40 Tax Advisors to Know During a Recession" in 2009.

Davidoff is a staunch advocate for small businesses. He represented their best interests at two White House Conferences on Small Business, authored New Jersey's S Corporation legislation and frequently testifies on small business issues. The U.S. Small Business Administration named him the regional Accountant Advocate of the Year in 1997. As a nationally recognized tax expert, he speaks at seminars across the country, educating other tax professionals about IRS procedures and policies, tax law changes, and various tax planning strategies. He earned his undergraduate degree from Massachusetts Institute of Technology, an MBA from Boston University Graduate School of Management, and his JD from Washington University School of Law.

**Steven J. Eller**
*Tax Partner, Rosen Seymour Shapss Martin & Co. LLP*
Steven J. Eller, CPA, JD, is a Tax Partner and chairs the firm's State and Local Taxation Service Group. Eller has 25 years of professional experience assisting individuals, businesses, as well as estates and trusts plan for and comply with federal, state and local regulations. He advises clients with respect to sales and use taxes, payroll taxes, residency and nexus issues, with a focus on strategy planning and compliance. His industry expertise includes real estate, manufacturing and closely held and family businesses. Eller has also been influential in having both New York State and New York City change various provisions of their tax laws and regulations in favor of individuals and businesses.

Eller received his J.D. from Widener University School of Law (formerly Delaware Law School of Widener University), and his B.S. in Accounting from the University of Delaware. He is a CPA in New York and New Jersey, and a member of the American Institute of Certified Public Accountants, the New York State Society of Certified Public Accountants ("NYSSCPA"), and the New Jersey Society of Certified Public Accountants. Eller is a licensed attorney in New Jersey and admitted to practice before the United States Tax Court. He is the former chairman of the NYSSCPA's New York, Multistate and Local Tax Committee, the current co-chair of its legislative subcommittee and a member of the New York State Taxpayer Advisory Council. For the past eight years, he has chaired and lectured at the Foundation for Accounting Education's highly acclaimed New York State Taxation Conference.

**Michael G. Goller**
*Chair, Federal Tax Controversies, Reinhart Boerner Van Deuren*
Michael Goller is a shareholder with the law firm, Reinhart Boerner Van Deuren s.c. in Milwaukee, Wisconsin. He focuses on tax controversy and tax litigation, as well as tax planning for clients ranging from large public corporations to mid-sized, privately-held businesses and their owners. Goller works on behalf of his clients in disputes with the IRS, Department of Justice and various other taxing authorities. An experienced tax attorney and tax litigator, he helps his clients navigate the challenges of complex federal and state tax audits, disputes, administrative appeals, trials, and subsequent appeals. He has an impressive track record of both trying cases and negotiating favorable settlements for his clients before trial. Goller regularly shares and deepens his expertise as a tax litigator through professional speaking and writing. He frequently speaks to professional and business audiences and organizations on issues of tax controversy, tax litigation and tax planning. Goller is a faculty member at the University of Wisconsin Milwaukee's School of Business where he teaches Tax Practice and Procedure in the Graduate Tax Program, and he has authored a number of significant articles and publications. Michael received his undergraduate degree in accounting and his law degree, *cum laude*, from Marquette University.

**Claudia Hill**
*Tax Mam, Inc.*
Claudia Hill, EA, MBA is a nationally recognized tax professional and frequent lecturer on taxation of individuals and representation before IRS. She is Editor in Chief of the *CCH Journal of Tax Practice & Procedure* and blogger for Forbes IRS Watch. She is a frequent presenter for CCH Online Seminars.

Hill has testified before both the Senate Finance Committee and House Ways & Means Committee. In March 2005, she testified about the individual AMT before the President's Tax Reform Panel. She is often called upon by the media for comment about tax issues. She served on the 1987 Commissioner's Advisory Group to the National Office of the Internal Revenue Service.

top of page

**Philip M. Juravel, CPA.CITP**
*Owner, Juravel & Company, LLC*

Phil Juravel is the owner of Juravel & Company, LLC, a small full service CPA firm in Alpharetta, Georgia in operation since 1987. Juravel is presently the Treasurer of the Georgia Ensemble Theatre Company in Roswell, Georgia and the treasurer of the Atlanta Music Project. The Atlanta Music Project is a newly organized 501(c)3 charity which is bringing music to Atlanta Inner City Schools using the El Sistema program which originated in Venezuela.

Previously, Juravel was a member of the CPA Advisory Board for Paychex, a national payroll company. He is also a member of the AICPA Privacy Task Force responsible for the development and implementation of privacy standard for all CPA's in the US and Chartered Accountants in Canada. He was one of the members of the taskforce that authored *Building a Privacy Practice in Small and Medium-Sized CPA Firms* that was published by the AICPA and CICA in 2006. As a member of the taskforce, he also wrote an article for the *Practicing CPA* that was published in the September/October issue.

Phil holds a BS degree in Forestry from the College of Environmental Science and Forestry, Syracuse, NY as well as an Accounting Certificate from Siena College in Loudonville, NY and attended the festival at Woodstock in the summer of 1969.

### April Little (co-presenting with Randy Robason)
*Director, Tax Accounting & Risk Advisory Services, Grant Thornton*
April Little is the Director of the Grant Thornton Tax Accounting and Risk Advisory Services group ("TARAS") located in the Houston office. Little specializes in accounting for income taxes under US GAAP, International Financial Reporting Standards and other foreign reporting standards. She is responsible for providing thought leadership, technical expertise and training programs for income tax accounting firm-wide.

Little has over eleven years of experience serving clients across industries. Prior to joining Grant Thornton, she spent six years with a large accounting firm, serving both public and private clients. She has experience in Sarbanes Oxley 404 consulting for the income tax process and accounting for the income tax impacts of equity compensation, business combinations, derivatives, and other areas.

Little is also a member of the American Institute of Certified Public Accountants and the Texas Society of Certified Public Accountants. She currently chairs a committee for the Houston Society of CPAs Scholarship Extravaganza.

### Randy Robason (co-presenting with April Little)
*Partner in Charge, Tax Accounting & Risk Advisory Services, Grant Thornton*
Randy Robason serves as the Grant Thornton National Partner in Charge of the firm's Tax Accounting and Risk Advisory Services Practice. He is also a member of the firm's Partnership Board. Robason has served as Carolinas Tax Practice Leader, Southeast Region Tax Practice Leader and Dallas Office Managing Partner since joining the firm in August 2004. With more than 33 years of diverse business, financial and tax consulting experience, including 23 years in key leadership roles, he has served in key client service leadership roles for companies from the Fortune 100 to the Carolina Panthers. Prior to joining Grant Thornton, Robason served as Global Managing Director of Private Client Services where he built and ran a $300 million net revenue, 1,200-person, multinational group offering family wealth planning services, investment advisory services and tax and financial services both domestically and internationally. Robason was also co-founder and Chief Operating Officer of a 350-person, national New York-based wealth and tax advisory consulting service company prior to joining Grant Thornton LLP. He received his MBA and Juris Doctorate from Texas Tech University.

top of page

### Steven G. Siegel
*President, The Siegel Group*
Steven G. Siegel is president of The Siegel Group, a national consulting firm specializing in tax consulting, estate planning and advising family business owners and entrepreneurs. Siegel holds a BS from Georgetown University, a JD from Harvard Law School and an LLM in Taxation from New York University. He is the author of several books. Siegel has lectured extensively throughout the United States on tax, business and estate planning topics on behalf of numerous organizations, including National Law Foundation, AICPA, CCH, National Tax Institute, PESI, National Society of Accountants, state CPA societies, and many others. He has also served as an adjunct professor of law at Seton Hall and Rutgers University law schools.

## Technology Track

### Jim Boomer
*CIO, Boomer Consulting, Inc.*
Jim Boomer, CIO, is the director of the Boomer Technology Circles™ and an expert on managing technology within an accounting firm. He also serves as a strategic planning and technology consultant and firm adviser in the areas of performance and risk management.

### John H. Higgins, CPA, CITP
*Strategic Advisor, CPA Crossings, LLC*
John H. Higgins serves as a strategic technology advisor to CPAs in the planning and deployment of effective technology solutions. As a principal at CPA Crossings, Higgins specializes in facilitating the development of strategic technology plans, paperless workflows, client portal solutions and a comprehensive digital practice model. His primary qualification is his passion for helping CPAs achieve success by leveraging technology. He has extensive knowledge and experience working with CPAs throughout the country. Higgins has been actively involved in working with local, regional and national CPA firms over the past 25 years. He has facilitated hundreds of planning sessions and retreats to develop strategic plans, technology plans, workflow design, innovative client services and more. He is a nationally recognized speaker and author on technology issues affecting the CPA profession, with an emphasis on transforming to a digital practice model. He has also been awarded for being one of the Top 25 Thought Leaders in the accounting profession by *The CPA Technology Advisor*. Higgins is a member of the AICPA Business & Industry Hall of Fame and the AICPA Council and CPE Advisory Committee.

### Randolph P. Johnston
*Executive Vice President and Shareholder, K2 Enterprises*
Randolph P. Johnston is a nationally recognized educator, consultant and writer with over 30 years of experience in Strategic Technology Planning, Systems and Network Integration, Accounting Software and Paperless Selection, Business Development and Management, Disaster Recovery and Contingency Planning, and Process Engineering. He is currently an Executive Vice President and Shareholder of K2 Enterprises where he presents technology seminars on 30+ technology topics.

Johnston was listed in Accounting Today as one of the "Top 100 Most Influential People" for the past six years and in Accounting Technology as one of the "Top 10 Technology Professionals" in the industry. His NMGI company specializes in CPA firm technology assessments and implementations. Johnston is also a contributor to the CPA Practice Advisor, Journal of Accountancy, PCWeek, InfoWorld and several other publications.

### John McGowan
*Global Tax Chief Information Officer*
John McGowan is the Chief Information Officer for the global practice at KPMG and has extensive experience in systems integration, service oriented architecture and agile development. He manages a group of 300+ tax and technology professionals developing applications for KPMG's professionals and clients.

Prior to becoming CIO, McGowen served as KPMG's Tax Chief Technology Officer. During his tenure at KPMG he has led several major tax engagements in both the financial services and expatriate tax services area and was also selected to join KPMG's Washington National Tax practice to provide complex tax consultative services to Fortune 500 clients.

McGowen holds a BA and a Masters of Tax degree from the University of North Carolina, Chapel Hill.

### Jim Piller
*Principal, Margolin, Winer & Evens, LLP*
Jim Piller heads the firm's System Consulting and Training Practice Group of Margolin, Winer & Evens, LLP, which maintains a specialty in enterprise project management and infrastructure deployments. As a consultant to a number of Fortune 500 companies, Piller specializes in working with organizations that understand the strategic nature of enterprise technology projects and how they relate to their competitiveness and success. He assists clients with the full project life cycle, from concept to delivery, giving them a competitive edge in meeting their goals. Piller is an active member of various systems groups, as well as a frequent lecturer/panelist on Information Systems topics and a computer education trainer. His professional credentials include Microsoft® Certified Professional and Microsoft® Certified Partner.

### Brian F. Tankersley
*CPA.CITP, Associate, K2 Enterprises*

Brian Tankersley is a consultant based in Farragut, TN. Tankersley is a frequent speaker at national continuing education courses on auditing and technology for K2 Enterprises, and publishes a nationally recognized blog on accounting and technology (www.cpatechblog.com). He also writes a column and serves as the Technical Editor for The CPA Practice Advisor.

Tankersley was recognized as one of the Top 25 People in Public Accounting Technology in 2011 by Cygnus Business Media. He received the 2009 Outstanding Discussion Leader Award from the Tennessee Society of CPAs, and is a Senior Faculty Member with Becker CPA Review. In 2007 and 2008, Brian was selected by The CPA Technology Advisor as a "40 Under 40" honoree.

Tankersley's areas of practice include accounting systems, IT consulting, and general business consulting. His public accounting experience includes accounting system implementations, tax returns, financial analysis, and audits of public and private companies. His information technology experience includes technology strategy, technology management, software design review, systems implementation, technical training and documentation.

## Featured Internal Speakers

**Deborah Blackwell**
*Senior Research Consultant*
Deborah Blackwell is a Senior Research Consultant for CCH, a Wolters Kluwer business in Michigan, Ohio, and Pennsylvania.

Deborah joined CCH in 1989 and has been involved with the development of customer training programs for ProSystem fx tax software and CCH IntelliConnect.

As a member of the Training & Consulting department, Deborah brings her knowledge and experience to her responsibilities that include customer training & consulting in person and via the web, and the development of customer training guides.

Prior to joining CCH, Deborah worked at IFS Inc. for 15 years, in customer service and training customers on tax software. She has an Associate's Degree from Henry Ford Community College.

**Jeremy Brown**
*Software Consultant*
Jeremy Brown is a Software Consultant with Training and Consulting for CCH Tax and Accounting, a Wolters Kluwer business. He joined CCH in 2005 as part of the ProSystem fx Document team. He is currently responsible for IT consulting and technical pre-sales support for the ProSystem fx Suite, as well as assisting with the development of new products and training.

Prior to joining CCH, he was the Systems Administrator for the Document Imaging and Document Management solution at a large global shipping company. In addition to his background in Document Management Systems implementation and support, he is also holds various certifications including CDIA+ (Certified Document Imaging Architect).

**Devona Squire-Coleman, CPA**
*Senior Software Engagement Consultant*
Devona Squire-Coleman, CPA is a Senior Software Engagement Consultant for CCH Tax and Accounting, a Wolters Kluwer business. She received her Bachelor of Arts from the University of Virginia and her Master of Accountancy from Old Dominion University, in Norfolk, Virginia, where she currently resides with her husband and two sons.

Devona has been employed with CCH since 2005. She conducts training and consulting for both ProSystem fx Engagement and ProSystem fx ActiveData. Prior to joining the Tax and Accounting team, Devona spent three years in public accounting as an auditor, tax specialist, and internal Engagement and Visual Practice Management trainer.

As a member of the Customer Training Department, Devona provides customers with both onsite and web based training and consulting. Devona is also certified as a Microsoft Office Specialist (MOS) and Microsoft Certified Application Specialist (MCAS). She has added value to the organization by incorporating her prior accounting experience and knowledge.

**Kim Forsyth**
*Software Consultant*
Kim Forsyth is a Software Consultant within the Training & Consulting department. Her primary role is with conducting training and consulting services for customers of ProSystem fx Practice Advantage, Practice Management and ProSystem fx Practice the Next Generation to the list of training and consulting. She is also involved with product testing, providing enhancement requests and developing training content and materials.

Kim started with a company in Vancouver, British Columbia, that sold Time and Billing software. She moved to the United States in 1989 when they opened an office in Atlanta, GA. That company and the product, which became ProSystem fx Practice Advantage, was acquired by CCH in 1999.

Kim has over 20 years of experience with practice management software doing technical support and training. She received a service excellence award in 2001 and was selected to attend CCH's achievement club in 2008.

top of page

**Dipti Gor**
*Software Consultant*
Dipti Gor is a software consultant for Training and Consulting with CCH, a Wolters Kluwer business. She graduated from Roosevelt University in Chicago with a Bachelors in Accounting degree. Dipti joined CCH in 2009 and her focus is on training with Prosystem fx Document, Portal and Practice Management.

Prior to joining CCH, Dipti worked in tax for two of the Big 4 accounting firms. The majority of her time was spent in individual taxation. She is based out of Washington DC, and is currently in the process of obtaining her CPA certification.

**Charles Gunnels**
*Software Consultant*
Charles Gunnels is a Software Consultant with CCH. He received his Bachelor of Business Administration in the field of Information Systems from Georgia Southern University in Statesboro, Georgia. He is based in Savannah, GA.

As a member of the Training & Consulting department, Charles brings his knowledge and experience to responsibilities that include CCH software deployment and IT focused customer training, training and converting clients to the ProSystem Suite(SaaS), developing and updating customer training guides, and working on various projects within CCH.

Prior to joining CCH, Charles worked for a tech startup focusing on medical practices and was an IT administrator at Georgia Southern University. In 2003, Charles joined Hancock Askew & Co., LLP in Savannah, Georgia where he spent multiple years deploying and supporting CCH products to a multi office environment. He served on numerous tech committees and was on the deployment teams for all CCH products. He also performed IT audits in relation to the firms' 404 Sarbanes Oxley work. Charles holds his MCP, CISA and CDIA+ credentials. Charles is a member of ITPA, Infraguard of the Coastal Empire and ISACA.

**Amanda Kelley**
*Lead Software Consultant*
Amanda Kelley joined CCH in 2008. She is the Lead Software Consultant on the Practice Consulting Team. In addition to leading the consulting team, Amanda provides training and consulting services for customers of ProSystem fx Practice Management, Practice (SaaS) and Workstream.

Amanda received her Bachelor's degree from Florida State University in Sociology with an emphasis in Public Administration. Prior to joining CCH, Amanda worked for CPASoftware as a member of the technical support team supporting Visual Practice Management (currently ProSystem fx Practice Management), and she worked in the Accounting department with the Escambia Sheriff's Office in Pensacola, Florida.

**Ben Koker**
*Senior Software Consultant*

Ben Koker is a Senior Software Consultant for CCH Training and Consulting. Ben holds a Master's Degree in Library and Information Management and is a Microsoft Certified Server Administrator. Ben originally joined CCH as a Support and Release Representative with ProSystem fx Scan in 2007.

In his current role within Training and Consulting, Ben provides pre-sales technical support, project management, and IT consulting for the ProSystem fx Suite. Ben is based out of Portland, Oregon.

top of page

**Nick Mangano**
*Lead Software Consultant*
Nick Mangano is a Lead Software Consultant for CCH, a Wolters Kluwer business. He has been employed with CCH since 2003 conducting consulting and training on ProSystem fx Engagement, Knowledge Coach and ActiveData among others. Nick resides in Orange, California.

Nick is a CPA and worked in public accounting for over three years. He also has been an Implementation Consultant for an employee services company consulting and training on payroll and HR software applications. Nick has worked in private industry accounting as an assistant controller for an energy trading company as well.

Nick received his Bachelor's degree in accounting from Northern Illinois University in DeKalb, Illinois. He also is a Microsoft Certified Application Specialist.

**Jackie Meyer, CPA, MSA**
*Software Consultant*
Jackie Meyer is a Software Consultant for Training & Consulting at CCH. Her primary focus is ProSystem fx Scan with AutoFlow technology. Jackie has also been involved in creating and facilitating training and consulting programs such as the School of Tax.

Prior to joining CCH, Jackie was in private practice specializing in taxation of high net wealth clientele, private companies, and Oil & Gas Accounting. She started her career at Deloitte Tax, LLP, and then transitioned as a senior tax consultant to a mid-sized CPA Firm in the Dallas area.

Jackie is a CPA with a Master's degree in Accounting from Southern Methodist University, and a B.B.A in Finance from the University of Texas at Arlington.

**Julie Nicolai, CPA**
*Software Consultant*
Julie Nicolai is a Software Consultant within the Training & Consulting department. Her primary focus is conducting training and consulting services for customers of ProSystem fx Practice Management, ProSystem fx Workstream and ProSystem fx Practice (SaaS). She received her degree in economics from the University of California, Davis and later earned a Master of Science in Accounting from California State University Fullerton.

Julie has been employed with CCH since 2006 and has also consulted on the Tax and Engagement products. Prior to joining CCH, Julie worked for such firms as Arthur Andersen, Deloitte & Touche LLP and McGladrey & Pullen. She also spent a semester teaching Introduction to Managerial Accounting at her alma mater, Cal State Fullerton. Julie is a practicing CPA .

**Ruth O'Toole**
*Senior Research Consultant, Training & Consulting*
Ruth O'Toole is a Senior Research Consultant for CCH, a Wolters Kluwer business in the Southeast. She received her Bachelor's degree from Carson-Newman College in English with a minor in Corporate Communications.

Ruth initially joined CCH in 1992, where she worked for several years helping customers make the transition from print research to electronic platforms. During this time she pilot tested Customer Training programs that were then implemented by CCH around the country.

As a member of the Training & Consulting Team, Ruth brings a passion for helping researchers learn methods to access their answers quickly and efficiently.

top of page

**Ann Ramos**
*Lead Research Consultant*
Ann Ramos is a Lead Research Consultant with Training & Consulting for CCH, a Wolters Kluwer business in the metropolitan Chicago area.

Ann joined CCH in 1995 and brings 15 years of experience to the Tax & Accounting industry in the areas of training and consultation and technical writing. Ann conducts consulting engagements on integration and implementation of CCH IntelliConnect, Accounting Research Manager and ClientRelate.

Ann has a Bachelor of Science in Business/Information Systems and a Masters degree in Business/Information Systems in Management.

**Aaron Seeman MCITP**
*Lead Software Consultant*
Aaron Seeman is a Lead Software Consultant at CCH. Aaron joined CCH in 2000 and worked with the Practice Management support team before moving to the Training and Consulting department in 2008.

As a Lead Software Consultant Aaron is responsible for the supervision of the IT consulting team as well as performing IT consulting for the ProSystem fx Suite of products. Aaron also works on a planning committee that defines the best practices for clients whom are migrating to the ProSystem fx SaaS Suite.

He received his B.S in Business Administration with emphasis in Accounting from the University of West Florida in Pensacola FL. Aaron is also a Microsoft Certified IT Professional.

**Diana Walgis**
*Software Consultant*
Diana Walgis serves as a Software Consultant in the Training & Consulting department with a primary focus on ProSystem fx Practice Management, along with ProSystem fx Practice (SaaS) and ProSystem fx Workstream.

Prior to joining CCH, Diana attended both Pensacola State College and the University of West Florida in Pensacola, FL and spent 7 years in accounting with Exxon Headquarters Marketing in Houston, TX, before joining Digital Systems in Pensacola, FL in 1978 as software instructor and support for the accounting market. Digital Systems evolved through a number of acquisitions, became CPASoftware in 1990, which was later purchased by Sage Software and finally was acquired by CCH January of 2006.

top of page

**Dana Yates**
*Software Consultant*
Dana Yates is a Consultant for CCH Tax and Accounting, a Wolters Kluwer business. Dana has been conducting consulting and training on ProSystem fx Engagement since joining CCH in July 2008. Dana also consults/trains on other audit products including ProSystem fx Knowledge Coach and ProSystem fx Active Data.

Dana worked four years in public accounting prior to joining CCH. Her industry experience includes non-profit, credit unions, employee benefit plans, and small business. Dana is a graduate of High Point University in High Point, NC. She received a bachelor's degree in Accounting with minors in mathematics and English. She is also certified as a Microsoft Certified Application Specialist. Dana currently resides in Winston-Salem, NC.

**Wendy Whitney**
*Senior IT Consultant*
Wendy Whitney is a Senior IT Consultant for CCH Tax & Accounting, a Wolters Kluwer Company. Wendy's primary duties include IT Consulting on the ProSystem fx Office Suite, including Engagement, Document, Scan, Practice Management, Tax and the Next Gen platform.

Wendy began her career with CCH in 1998. Wendy joined the Training and Consulting group in 2002. Prior to becoming part of the Customer Training Department, she worked with the Technical Support Team providing support for ProSystem fx Tax, ProSystem fx Practice and ProSystem fx Engagement.

Case: 1:10-cv-03494 Document #: 80 Filed: 10/13/11 Page 114 of 215 PageID #:948 Page 8 of 8

top of page

∴ 2011 CCH All Rights Reserved.

Customer Advisory Committee | Privacy Policy

# Exhibit I

| Share | Report Abuse | Next Blog» | | Create Blog | Sign In |

# Trade Regulation Talk

A blog on antitrust, consumer protection, franchising, advertising, privacy, and civil RICO law.

> Showing newest posts for query **tcpa**.   Show older posts

**MONDAY, JULY 11, 2011**



## Supreme Court Strikes Down Vermont Prescriber Data Privacy Law . . .

*This posting was written by Thomas A. Long, Editor of CCH Privacy Law in Marketing.*

A Vermont statute regulating the collection and use of data identifying health care providers' prescribing patterns impermissibly restricted data mining companies' free speech rights in violation of the First Amendment, the U.S. Supreme Court has determined.

The challenged statute banned the sale, transmission, or use of prescriber-identifiable data ("PI data") for marketing or promoting a prescription drug unless the prescriber gave consent.

### Freedom of Speech

The statute imposed content- and speaker-based burdens on protected expression, so it was subject to heightened judicial scrutiny, the Court said. The creation and dissemination of information were speech for First Amendment purposes.

The law forbade the sale of PI data subject to exceptions based in large part on the content of a purchaser's speech. It then barred pharmacies from disclosing the information when recipient speakers would use that information for marketing. Finally, it prohibited pharmaceutical manufacturers from using the information for marketing.

The statute disfavored marketing—speech with a particular content. It also disfavored speech by particular speakers, according to the Court.

Specifically, it restricted the practice of "detailing" by data mining companies, which prepared reports helping pharmaceutical

### About Me

John W. Arden

John W. Arden, JD, LLM, is the Executive Editorial Director for the CCH Trade Regulation group of Wolters Kluwer Law & Business, a leading provider of research information and workflow solutions in antitrust and trade regulation, as well as other key specialty areas. He has written and edited legal publications for more than 25 years, focusing on the areas of antitrust, advertising, franchising and distribution law, and intellectual property. Prior to joining CCH in 1981, he was a practicing attorney, newspaper reporter, and free lance writer. He holds a B.A. from St. John's University (Minnesota), a J.D. from DePaul University College of Law, and a Master of Law in Intellectual Property from the John Marshall Law School.

View my complete profile

### Related Site

Antitrust Connect

### Blog Archive

▼ 2011 (184)
  ► October (5)
  ► September (21)
  ► August (22)
  ▼ July (18)

manufacturers to refine their marketing tactics. The law allowed PI data to be purchased, acquired, and used for other types of speech and by other speakers. Therefore, the statute went beyond mere content discrimination, to actual viewpoint discrimination.

Whether a special commercial speech inquiry or a stricter form of judicial scrutiny were applied, the statute did not advance a substantial government interest and was not narrowly tailored to serve that interest, in the Court's view.

Vermont contended that the statute was intended to:

(1) Protect medical privacy, including physician confidentiality, avoidance of harassment, and the integrity of the doctor-patient relationship, and

(2) Achieve the policy objectives of improving public health and reducing healthcare costs.

Assuming that physicians had an interest in keeping their prescription decisions confidential, the statute was not drawn to serve that interest, the Court said. Pharmacies were permitted to share prescriber-identifying information with anyone for any reason except for marketing. Vermont might have addressed physician confidentiality through "a more coherent policy," but it did not.

Vermont's goals of lowering the costs of medical services and promoting public health may have been proper, but the statute did not advance them in a permissible way, the Court stated. Vermont sought to achieve those objectives through the indirect means of restraining certain speech by certain speakers. Vermont did not contend that the statute would prevent false or misleading speech. The fear that people would make bad decisions if given truthful information cannot justify content-based burdens on speech, the Court concluded.

The opinion was delivered by Justice Kennedy and was joined by Chief Justice Roberts and Justices Scalia, Thomas, Alito, and Sotomayor.

The Court affirmed a decision of the U.S. Court of Appeals in New York City (CCH Privacy Law in Marketing ¶60,646). The U.S. Court of Appeals in Boston had upheld the validity of similar laws in Maine (*IMS Health Inc. v. Mills*, CCH Privacy Law in Marketing ¶60,527) and New Hampshire (*IMS Health Inc. v. Ayotte*, CCH Privacy Law in Marketing ¶60,270), rejecting constitutional challenges in both cases.

Dissenting Opinion

In a dissenting opinion joined by Justices Ginsburg and Kagan, Justice Breyer argued that the statute's effect on expression was inextricably related to a lawful governmental effort to regulate a commercial enterprise. In Breyer's view, heightened First Amendment scrutiny of

Antitrust Claims Against Google Properly Dismi…

Labeling, Advertising Food as "Healthy" Could …

Justice Department, FTC Enter into Cooperation…

No Exception to PSLRA Bar for Aiding and Abett…

Franchisor Not Required to Consider "Eleventh …

Startup Cost Projection in UFOC Might Constitu…

iPad Data Plan Fraud Claims Proceed Against Ap…

Ohlhausen to Be Nominated as FTC Commissioner …

Grocers' Agreement to Share Profits During Lab…

FTC Proceeding Stayed in Georgia Hospital Acqu…

International Franchise Association Comments o…

FTC Releases Ten-Year Regulatory Review Schedu…

Changes to Premerger Notification Rules, Form …

Supreme Court Strikes Down Vermont Prescriber…

Confidence in Internet Depends on Privacy Prot…

Antitrust Chief to Leave Justice Department fo…

Carpet Dealer's Renewed Refusal to Deal Claims…

NASAA Requests Public Comment on Model Exempti…

► June (22)

► May (18)

► April (18)

► March (22)

► February (18)

► January (20)

► 2010 (249)

► 2009 (265)

such an effort was not required. In any event, Breyer said, the statute met the First Amendment standard previously applied by the Court when the government sought to regulate commercial speech.

The decision is *Sorrell v. IMS Health Inc,* CCH Privacy Law in Marketing ¶60,646.

### . . . Agrees to Review Telephone Consumer Protection Act Jurisdictional Question

The U.S. Supreme Court has granted an individual's petition for certiorari requesting review of whether Congress divested the federal district courts of their federal-question jurisdiction under 28 U.S.C. Sec. 1331 over private actions brought under the Telephone Consumer Protection Act.

At issue is a decision of the U.S. Court of Appeals in Atlanta (CCH Privacy Law in Marketing ¶60,637) holding that the individual's TCPA claims against a debt collection agency could be pursued only in state court.

Six U.S. Courts of Appeals (the Second, Third, Fourth, Fifth, Ninth, and Eleventh Circuits) have held that federal courts lack federal-question jurisdiction over private TCPA actions. The Sixth and Seventh Circuits have taken the contrary position, with the Seventh Circuit reasoning in *Brill v. Countrywide Home Loans, Inc.,* 427 F.3d 446 (2005) that federal courts retained jurisdiction because the TCPA's provision authorizing private actions in state court did not declare state jurisdiction to be exclusive.

The petition for review is *Mims v. Arrow Financial Services, LLC,* Dkt. 10-1195, filed March 30, 2011, granted June 27, 2011.

Further information regarding **CCH Privacy Law in Marketing** appears here.

Posted by John W. Arden at 9:53 PM    0 comments

Labels: constitutionality, First Amendment, Mims v. Arrow Financial Services LLC, Sorrell v. IMS Health Inc., Telephone Consumer Protection Act, U.S. Supreme Court, Vermont prescriber privacy law

**FRIDAY, JUNE 10, 2011**



### Political Robocalls Held Subject to Identification Requirements of Federal Law

---

▶ 2008 (227)

©   ▶ 2007 (222)

▶ 2006 (32)

## Links

CCH

Aspen Publishers

Wolters Kluwer

Jim Hamilton's World of Securities Regulation

Federal Trade Commission

DOJ Antitrust Division

Nat'l Assn of Attorneys General

## Blog Details

About the Blog

About John Arden

Terms and Conditions

Privacy Policy

Disclaimer

### Subscribe to Trade Regulation Talk by E-Mail

Enter your Email

Subscribe me!

Preview | Powered by FeedBlitz

 Subscribe in a reader

Stat Counter

2006-2011 CCH Incorporated or its affiliates.

*This posting was written by Thomas A. Long, Editor of CCH Privacy
Law in Marketing.*

The State of Maryland could proceed with a Telephone Consumer
Protection Act (TCPA) suit against a corporation that provided various
services to candidates for political office, for broadcasting
prerecorded voice messages to more than 112,000 telephone numbers
belonging to Maryland residents, the federal district court in Baltimore
has determined.

The messages allegedly did not identify the caller or disclose on whose
behalf the call was being made, as required by the TCPA.

The corporation had been hired to serve as a political consultant by a
candidate in the 2010 Maryland gubernatorial election. The message—
which was broadcast via an automated dialing system on election day,
primarily to registered Democrats residing in Baltimore City and Prince
George's County—stated that the incumbent governor had been
"successful" in the election and did not need the recipients' votes.
The message did not indicate that the calls were made on behalf of
the opposing candidate.

Political robocalls are not exempt from the TCPA's identification and
disclosure requirements, the court said. Those requirements were not
limited to calls made for a commercial purpose: they apply to any
calls made with an autodialer.

Liability of Corporation, Owner, Employee

Even though the calls were placed by a third-party telemarketing
company, the corporation could be liable under the TCPA as an entity
responsible for initiating the calls.

The corporation allegedly went to the telemarketer's website,
uploaded a prerecorded message and a list of phone numbers, and
directed the telemarketer to broadcast the message to those numbers.
The corporation was in a position to ensure that the content of the
message complied with the TCPA, according to the court.

The corporation's owner and its employee could be individually liable
under the TCPA. The statute authorized state attorneys general to
bring actions against "any person" who violated the disclosure
requirements, the court said. The State contended that the owner and
employee personally participated in the violations.

First Amendment

The TCPA did not violate the First Amendment, in the court's view.
The TCPA section at issue imposed technical requirements that
applied to all prerecorded phone messages. The requirements were
content-neutral and subject to intermediate scrutiny.

The government had a substantial interest in protecting residential privacy. The disclosure requirements allowed call recipients to terminate the call and to contact the caller to prevent future unwanted calls.

The TCPA was narrowly tailored; the statute allowed the continued use of autodialers while protecting the right of the recipient to choose whether or not to receive a message. The corporation had ample alternative channels for communication. The TCPA also promoted the government's interest in preventing citizens from being misled as to the originators of recorded phone messages, the court said.

The May 25 decision is *State of Maryland v. Universal Elections, Inc.,* CCH Privacy Law in Marketing ¶60,634.

Posted by John W. Arden at 3:23 PM     0 comments

Labels: First Amendment, identification and disclosure requirements, political robocalls, State of Maryland v. Universal Elections Inc., Telephone Consumer Protection Act

**FRIDAY, SEPTEMBER 10, 2010**



## Class Action for Junk Faxes Prohibited by New York Law

*This posting was written by Thomas A. Long, Editor of CCH Privacy Law in Marketing.*

The federal district court in Brooklyn lacked jurisdiction over an individual's purported class action under the Telephone Consumer Protection Act (TCPA) against a sender of unsolicited fax advertisements, the U.S. Court of Appeals in New York City has held.

Federal courts lack federal question jurisdiction under the TCPA, and the federal Class Action Fairness Act could not be used to establish federal diversity jurisdiction because New York law prohibited class actions for statutory damages under the TCPA.

The case was before the court on remand from the U.S. Supreme Court (Privacy Law in Marketing ¶60,474), which had vacated a prior decision by the appellate court and remanded the case for further consideration in light of the Supreme Court's decision in Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co., 130 S.Ct. 1431 (2010).

New York Civil Practice Law

In the prior decision, the appellate court had affirmed a decision of

the federal district court in Brooklyn (Privacy Law in Marketing ¶60,473) that class actions could not be brought in New York under the TCPA because New York Civil Practice Law Sec. 901(b) provided that class actions could not be brought under statutes that imposed a penalty or a "minimum measure of recovery" unless that statute specifically authorized class actions.

### Preemption

In Shady Grove, the Supreme Court held that Sec. 901(b) did not apply to state-law claims in federal court, regardless of whether Sec. 901(b) was "substantive" or "procedural" in nature, because Sec. 901(b) was preempted by Federal Rule of Civil Procedure 23, which authorized class-action suits in federal courts when various criteria were met.

The appellate court distinguished Shady Grove from the present case, however, reasoning that the TCPA provided its own basis for determining that jurisdiction was lacking.

### Claims Not Permitted by State Law

Even if Sec. 901(b) was preempted by Rule 23, the appellate court said, the TCPA unambiguously precluded claims from being brought under its provisions if the claims were not permitted by state law. Federal courts were constrained to respect that limitation on the TCPA.

Because the TCPA used state law to define the federal cause of action, and the state refused to recognize that cause of action, there remained nothing to which any grant of federal jurisdiction could attach, the court concluded.

The decision is _Holster v. Gatco, Inc_., CCH Privacy Law in Marketing ¶60,523.

Further information regarding **CCH Privacy Law in Marketing** appears here on the CCH Online Store.

---

Posted by John W. Arden at 3:42 PM          0 comments   

Labels: class actions, Holster v. Gatco Inc., junk faxes, Telephone Consumer Protection Act

---

**FRIDAY, AUGUST 20, 2010**



## Attorney Is Liable for Unsolicited Fax Ads; Amount of Damages to Be Determined

*This posting was written by William Zale, Editor of CCH Advertising Law Guide.*

An estate planning attorney is liable in a class action under the federal Telephone Consumer Protection Act (TCPA) for sending "Daily Plan-It" documents to a list of accountants who did not request the documents, the federal district court in Chicago has ruled.

The attorney is liable for $500 in statutory damages for each fax received, the court held. The recipients seek an award of over $4.2 million for 8,430 successfully transmitted faxes, although further proceedings are needed to resolve a dispute over proof of receipt.

Nonadvertising Content

The crucial question in determining liability, according to the court, was whether the editorial, nonadvertising content of each fax made the advertising content "incidental" to the rest of the document. The attorney argued that under the regulations of the Federal Communication Commission, the Daily Plan-It is not an "advertisement" within the meaning of the TCPA, which prohibits the sending of unsolicited fax advertisements.

Two factors weighed in favor of the attorney's position: (1) the Daily Plan-Its were sent on a regular, twice monthly schedule; and (2) the editorial content changed from issue-to-issue.

The remaining factors weighed in favor of the recipients. First, the recipients were neither paid subscribers nor had they initiated membership with the attorney to receive the faxes. Second, the attorney's identifying information, presented with prominent font size and graphics, comprised slight more than 25 of the page of each of 41 different Daily Plan-It document.

Finally, the faxes, although appearing to be sent by the attorney on his own behalf, were created and sent by a marketing firm as part of a paid campaign. The faxes were advertisements, the court determined.

Opt-Out Notice

The attorney argued that there was a question of fact regarding whether some of the faxes were "unsolicited" under the TCPA because many of the potential recipients were his current and former business associates and students.

However, none of the 41 Daily Plan-Its included a clear and conspicuous opt-out notice stating that a recipient could request that the sender not transmit any future unsolicited fax advertisements. So the attorney was liable for every fax received regardless of whether he had an established business relationship with any of the recipients, the court concluded.

The August 3 opinion in *Holtzman v. Turza* will be reported in **CCH Advertising Law Guide** and **CCH Privacy Law in Marketing**, publications of **Wolters Kluwer Law & Business**.

Posted by John W. Arden at 11:34 AM      0 comments

Labels: attorney advertising, Holtzman v. Turza, nonadvertising content, opt-out notice, TCPA, Telephone Consumer Protection Act, unsolicited fax ads

**MONDAY, JULY 06, 2009**



## Telephone Consumer Protection Act Covers Text Messages Sent to Cell Phones

*This posting was written by Jody Coultas, Editor of CCH Telemarketing Law Guide.*

The Ninth Circuit Court of Appeals, in finding that the Telephone Consumer Protection Act (TCPA) applied to text messages, reinstated a class action against Simon & Schuster filed by a cell phone user who received an unsolicited text message from the company.

The cell phone user filed a TCPA class action after receiving a text message from Simon & Schuster, advertising its publication of a new novel. Simon & Schuster did not actually send the text message, but outsourced the promotional campaign to another company, which obtained a list of individual cell phone numbers from an agent of Nextones. The agent was authorized by Nextones to license the numbers of its subscribers.

The cell phone user had filled out a form stating that Nextones affiliates and brands could send promotional information. The list, in the form of a computer file, was sent to a service company that actually sent out the text messages to the wireless carriers for ultimate delivery to subscribers.

### Automatic Telephone Dialing System

The district court granted Simon & Schuster summary judgment on the TCPA claim, finding that Simon & Schuster had not used an automatic telephone dialing system (ATDS) in violation of the TCPA and the cell phone user consented to receiving the message. The TCPA prohibits making calls to cellular telephones using an ATDS unless the call is for emergency purposes or it is made with the prior express consent of the telephone owner.

A genuine issue of material fact existed as to whether the system

Simon & Schuster used was an ATDS, according to the appellate court.
In order to determine whether a device is an ATDS, the court must
determine whether the equipment had the capacity to store or
produce telephone numbers to be called, using a random or sequential
number generator.

The focus is on whether the system had the capacity to store,
produce, or call randomly or sequentially generated numbers, not
whether it actually did so. Because there was a question as to whether
the system in this case had the requisite capacity, the appellate court
remanded the case for further proceedings.

Text Message as "Call"

Based on a review of the language and history of the TCPA and Federal
Communication Commission (FCC) rules, the Ninth Circuit found that a
text message is a call within the meaning of the TCPA.

Because the TCPA was silent on the issue at hand, the court looked to
the FCC because it was the agency with the authority to make rules
and regulations to implement the TCPA. The FCC had previously
determined that a text message falls within the meaning of "call" in
the statute. Therefore, the court found that the text message in this
case could be considered a call under the TCPA.

Consent to Call

Finally, the district court erred in finding that the cell phone user
expressly consented to receiving the text message. Express consent is
consent that is clearly and unmistakably stated. In this case, the cell
phone user's consent to receive promotional materials from one
company could not be construed as consent to receive promotional
materials from Simon & Schuster, the appeals court held.

The June 19 decision is Satterfield v. Simon & Schuster, CCH
Telemarketing Law Guide ¶31,142. It will also appear in CCH Privacy
Law in Marketing and CCH Advertising Law Guide.

Posted by John W. Arden at 8:23 AM                  0 comments   
        Labels: cell phones, Satterfield v. Simon and Schuster, Telephone
                Consumer Protection Act, unsolicited text messages

**WEDNESDAY, FEBRUARY 25, 2009**



## Responses to Marketing List Compilers Not Consent to Receiving Fax Ads

*This posting was written by William Zale, Editor of CCH Advertising Law Guide.*

A facsimile advertiser did not have consent under the Telephone Consumer Protection Act to send ads to companies that had provided information to marketing list compilers from whom the advertiser purchased lead lists, the federal district court in Chicago has ruled. Over $3.8 million in class action damages were awarded based on the faxing of 7,725 unsolicited advertisements.

Companies providing information to list compilers could not be assumed to have consented to receive faxes from any entity, the court found. The most striking aspect of the communications described by representatives of the list compilers was their careful avoidance of any language that would clearly convey to companies that the fax numbers they provided would in turn be provided to third parties who sought to broadcast advertisements by fax.

The Federal Communication Commission had concluded that express permission to receive a faxed ad requires that a person providing a fax number understand that he or she is agreeing to receive faxed advertisements. No reasonable trier of fact could find, consistent with the law, that the plaintiffs consented to receive the fax ads, the court determined.

Damages Award

There was evidence that more than 20,000 fax transmissions were sent in five "blasts." The court declined to award damages for the first three blasts because recipients did not produce a copy of each of the three faxes sent. While the recipients provided some evidence that those faxes constituted advertisements, their evidence was insufficient to prove their claims under the TCPA.

Damages were awarded for the last two blasts because copies of the fax ads were available and plainly constituted advertisements of the commercial availability of services, the court concluded.

The January 27, 2009 opinion in *Hinman v. M and M Rental Center* will be reported at **CCH Advertising Law Guide** ¶63,282.

Posted by John W. Arden at 11:30 AM        0 comments   

**TUESDAY, OCTOBER 14, 2008**



## No Private Action under Telephone Consumer Protection Act for Prerecorded Political Calls

*This posting was written by Thomas A. Long, Editor of CCH Privacy Law in Marketing.*

An individual could not pursue claims under the Telephone Consumer Protection Act (TCPA) against candidates and promoters of candidates for public office for making, or causing to be made, prerecorded political campaign calls soliciting votes that failed to contain the telephone number of the business or entity responsible for making the calls, a Maryland state appellate court has determined.

Because the calls were political in nature, they were not prohibited by Sec. 227(b) of the TCPA, which provided a private right of action to recipients of unsolicited, prerecorded commercial telephone calls., according to the court.

Technical and Procedural Standards

Section 227(d) of the TCPA prohibited phone calls that did not comply with certain technical and procedural standards for automatic telephone dialing systems. Those standards were detailed in underlying regulations that required all prerecorded telephone message to clearly state the identity of the entity responsible for initiating the call, as well as the entity's telephone number. There was no private right of action under Sec. 227(d), the court said.

Preemption

The individual's Maryland Telephone Consumer Protection Act claims were preempted by the TCPA, the court held. Section 227(e) of the TCPA provided that states may create their own more-restrictive standards than the federal statute, except with regard to the technical and procedural standards set by Sec. 227(d).

The September 15 decision, *Worsham v. Ehrlich*, appears at CCH **Privacy Law in Marketing** ¶60,250.

---

Posted by John W. Arden at <u>11:17 PM</u>          <u>0 comments</u>    

---

**MONDAY, AUGUST 06, 2007**



## Wireless Text Message Promotion Did Not Violate Federal Telephone Law

*This posting was written by William Zale, editor of CCH Privacy Law in Marketing.*

Publisher Simon & Schuster and mobile marketing firm ipsh!net (defendants) did not violate the Telephone Consumer Protection Act by sending a promotional message for the "Stephen King VIP Mobile Club" to the seven-year-old son of a cellular telephone customer, the federal district court in Oakland has ruled.

The customer had expressly consented to receive branded promotions of a ringtone provider (Nextones), and the message contained the phrase "PwdbyNexton," the court noted. In addition, the promotional text messages to a targeted list of cellular telephone numbers were not subject to the Act's prohibitions against the use of an "automatic telephone dialing system," the court held.

The message, received by the customer's son at half past midnight, read as follows:

> "The next call you take may be your last... Join the Stephen King VIP Mobile Club at www.cellthebook.com. RplySTOP2OptOut. PwdByNexton."

### Consent to Branded Promotion

The customer had agreed to receive promotions from "Nextones affiliates and brands" when she obtained a ringtone from the Nextones website.

According to its privacy policy, Nextones maintained a strict "no-spam" policy and, absent prior consent, did not share personal profile information, including mobile phone numbers, with any "third party."

The defendants conceded that Nextones' website did not define "brands" and that it suggested that "affiliates" were those interested in selling mobile ringtones and graphics. The defendants pointed to no case law defining affiliates or brands as those terms related to the Telephone Consumer Protection Act (TCPA). They claimed that the customer's causes of action under the TCPA failed as a matter of law because the text message at issue was identified as carrying the Nextones brand and because defendant ipsh!net was a Nextones affiliate.

The customer disagreed and argued that, although she consented to receive promotional messages from Nextones affiliates and brands, she did not consent to receive the text message at issue. She contended that the defendants were "third parties" under Nextones' privacy policy. She further argued that phrase "PwdbyNexton" did not identify the Stephen King text message as a Nextones "brand."

That argument, however, was contradicted by the facts, according to the court. "PwdbyNexton" branded the text message as coming from Nextones. Thus, while there might be a dispute of fact concerning

whether the defendants were Nextones affiliates, there was no dispute of fact that the promotional text message at issue was identified with a Nextones brand. The customer had expressly consented to receive promotions of Nextones brands, in the court's view.

**Automatic Telephone Dialing System**

The text message was not subject to the TCPA's prohibitions against the use of an "automatic telephone dialing system" because the equipment used did not store, produce, or call randomly or sequentially generated telephone numbers, the court determined.

The TCPA defined an automatic telephone dialing system as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."

The court rejected the customer's contention that the equipment used to send the promotional message to the targeted list was an automatic telephone dialing system because it had the capacity to store numbers to be called and to dial numbers without human intervention, automatically making calls to thousands of numbers in a short period of time.

The decision, Satterfield v. Simon & Schuster, ND Cal., No. C 06-2893 CW, June 26, 2007, is reported at **CCH Privacy Law in Marketing** ¶60,091.

**Marketing to Wireless Devices**

Further information regarding marketing to wireless devices—including an explanation by D. Reed Freeman—can be found in the recently-launched **CCH Privacy Law in Marketing**, a monthly-updated reporter that combines treatise-style explanations with the full text of federal privacy laws and regulations, state privacy laws, and privacy laws and regulations from 35 foreign jurisdictions (provided in English translation).

To obtain further information about CCH Privacy Law in Marketing, call the CCH customer service department (1-800-248-3248) or visit the CCH Online Store (http://onlinestore.cch.com) and search the keyword "privacy."

---

Posted by John W. Arden at 5:37 PM        0 comments 

---

Newer Posts        Home        Older Posts

Subscribe to: Posts (Atom)

# Exhibit J



IRS.gov Home

**Authorized IRS e-file Providers**

| | |
|---|---|
| **Name of Business:** | ALS tax and accounting services |
| **Address:** | 1110 SILVERGATE LN |
| **City/State/ZIP:** | MABLETON, GA 30126 |
| **Point of Contact:** | Aida L Liciaga |
| **Telephone:** | 678/398-6962 |
| **Type of Service:** | Software Developer |

| | |
|---|---|
| **Name of Business:** | AVERAGE1040.COM C |
| **Address:** | 4804 WILLOWWOOD DR |
| **City/State/ZIP:** | KENNESAW, GA 30144 |
| **Point of Contact:** | RUSSELL W WAGNER |
| **Telephone:** | 770/592-8954 |
| **Type of Service:** | Software Developer |

| | |
|---|---|
| **Name of Business:** | AVERAGE1040.COM D |
| **Address:** | 4804 WILLOWWOOD DR |
| **City/State/ZIP:** | KENNESAW, GA 30144 |
| **Point of Contact:** | RUSSELL W WAGNER |
| **Telephone:** | 770/592-8954 |
| **Type of Service:** | Software Developer |

| | |
|---|---|
| **Name of Business:** | AVERAGE1040.COM E |
| **Address:** | 4804 WILLOWWOOD DR |
| **City/State/ZIP:** | KENNESAW, GA 30144 |
| **Point of Contact:** | RUSSELL W WAGNER |
| **Telephone:** | 770/592-8954 |
| **Type of Service:** | Software Developer |

| | |
|---|---|
| **Name of Business:** | AVERAGE1040.COM F |
| **Address:** | 4804 WILLOWWOOD DR |
| **City/State/ZIP:** | KENNESAW, GA 30144 |
| **Point of Contact:** | RUSSELL W WAGNER |
| **Telephone:** | 770/592-8954 |
| **Type of Service:** | Software Developer |

| | |
|---|---|
| **Name of Business:** | AVERAGE1040.COM G |
| **Address:** | 4804 WILLOWWOOD DR |
| **City/State/ZIP:** | KENNESAW, GA 30144 |
| **Point of Contact:** | RUSSELL W WAGNER |
| **Telephone:** | 770/592-8954 |
| **Type of Service:** | Software Developer |

| | |
|---|---|
| **Name of Business:** | UNIVERSAL TAX SYSTEMS INC |
| **Address:** | 225 CHASTAIN MEADOWS COURT NW SUITE 200 |
| **City/State/ZIP:** | KENNESAW, GA 30144 |
| **Point of Contact:** | Christopher L Manuel |
| **Telephone:** | 770/857-5045 |
| **Type of Service:** | Software Developer |

Start Over

# Exhibit K



# IRS *e-file*
## Application *and*
## Participation

w w w . I R S . g o v / e f i l e



## Why a New Publication 3112?

This edition of Publication 3112, *IRS e-file Application and Participation*, replaces the previous edition revised November 2004.

## Table of Contents

### IRS *e-file* Application

Why Participate in IRS *e-file*? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

What is an Authorized IRS *e-file* Provider? . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

IRS Supports Authorized IRS *e-file* Providers . . . . . . . . . . . . . . . . . . . . . . . . . **3**

Getting Started . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

Become an Authorized IRS *e-file* Provider in 3 Steps . . . . . . . . . . . . . . . . . . . **7**

Other Individuals on IRS *e-file* Applications . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

Denial to Participate in IRS *e-file* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

Acceptance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

EFINs, ETINs, and Password . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

Checking Other Authorized IRS *e-file* Providers . . . . . . . . . . . . . . . . . . . . . . . **16**

Using Third Parties for IRS *e-file* Related Activities . . . . . . . . . . . . . . . . . . . . **16**

When to Submit a New Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

Changes to Your IRS *e-file* Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

### Participation in IRS *e-file*

Safeguarding IRS *e-file* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

Provider Roles and Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

Not for Profit Providers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

Testing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

Advertising Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

Monitoring of Authorized IRS *e-file* Providers . . . . . . . . . . . . . . . . . . . . . . . . **29**

Revocation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

Sanctioning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

Administrative Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

Helpful Hints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **34**

### APPENDIX

**Revenue Procedure 2007-40**, *Requirements of Participants in the IRS e-file Program* . . . . . . . . . **35**



# What's new?



Highlights of changes included in this publication are listed below.
**Click on the topic to go directly to the page in this pdf.**

The IRS communicated many of these changes on its Web site at *IRS.gov* in the four years since the last revision of this publication.

## IRS *e-file* Application

### Support for Authorized IRS *e-file* Providers

e-Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
National Marketing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Marketing Tool Kit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
QuickAlerts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
e-News for Tax Professionals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

### Getting Started

Apply to Participate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Fed/State e-file for Business Publications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

### Become an Authorized IRS *e-file* Provider

STEP 1: CHOOSE PROVIDER OPTIONS

Reporting Agent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Note on Large Taxpayer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

STEP 2: COMPLETE AND SUBMIT THE IRS *e-file* APPLICATION

Principals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Other Individuals on IRS *e-file* Applications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Contacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Delegated Users . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
**Denial to Participate in IRS *e-file*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
**Checking Other Authorized IRS *e-file* Providers**. . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## IRS *e-file* Participation

**Safeguarding IRS *e-file***. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Safeguarding Taxpayer Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Registration of Web Sites with the IRS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
**Revocation**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
**Administrative Review**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## New Appendix

**Revenue Procedure 2007-40**
Requirements of Participants in the IRS *e-file* Program. . . . . . . . . . . . . . . . . . . . . . . 35

# Application

# IRS *e-file* Application

## Why Participate in IRS *e-file*?

IRS *e-file* builds strong client relationships and improves business. Authorized IRS *e-file* Providers meet the expectations of their clients. They electronically file their clients' returns including business, individual and information returns. The returns are processed faster and with fewer errors. This means quicker refunds and less contact with the IRS. IRS *e-file* provides proof of receipt within 48 hours of sending returns to the IRS. Individual and business clients can e-file balance due returns and schedule an electronic funds transfer (EFT) from their account for any date. Taxpayers can delay out of pocket expenses by paying their individual income tax with a credit card. IRS *e-file* provides good return on your investment by saving money on costs of printing, mailing, and document storage. It also helps to keep client information more organized, centralized, and readily available when needed.

## What is an Authorized IRS *e-file* Provider?

An Authorized IRS *e-file* Provider (Provider) is a business or organization authorized by the IRS to participate in IRS *e-file*. It may be a sole proprietorship, partnership, corporation, or other entity. The firm submits an e-file application, meets the eligibility criteria, and must pass a suitability check before the IRS assigns an Electronic Filing Identification Number (EFIN). Applicants accepted for participation in IRS *e-file* are Authorized IRS *e-file* Providers.

An Authorized IRS *e-file* Provider may be an Electronic Return Originator (ERO), Intermediate Service Provider, Transmitter, Software Developer, or Reporting Agent. These roles are not mutually exclusive. For example, an Authorized IRS *e-file* Provider that is an ERO may also be a Transmitter. Authorized IRS *e-file* Providers may also be tax return preparers, but the activities and responsibilities for IRS *e-file* and return preparation are each distinct and different from the other.



**N E W**

# IRS Supports Authorized
# IRS *e-file* Providers

**E-SERVICES –** Electronic products for Preparer Tax Identification Number (PTIN) Application and IRS *e-file* Application are available to all tax professionals, and TIN Matching is currently available for Payers Only. Electronic Return Originators that e-filed 5 or more accepted returns in either the prior or the current year, as well as Reporting Agents and Circular 230 tax practitioners have access to e-Services incentive products that include Disclosure Authorization, Transcript Delivery System and Electronic Account Resolution.

**IRS WEB SITE –** The IRS Web site supports IRS *e-file* in many ways. The IRS regularly posts important information, including updates and Frequently Asked Questions (FAQs). Taxpayers can use the IRS Web site to locate the nearest Electronic Return Originators to assist them with e-filing returns.

**NATIONAL MARKETING –** Nationally televised English and Spanish satellite media tours air on cable and prime networks, radio ads, printed articles and online media campaigns to create full multi-media exposure for IRS *e-file* prior to and during the filing season.

**MARKETING TOOL KIT –** The tool kit (Publication 3005) contains professionally developed material to help Authorized IRS *e-file* Providers advertise e-file and promote their participation in IRS *e-file* The IRS updates the tool kit each year. It includes a window decal for on-premise advertising, a desk placard, e-file posters, stickers and current informational publications. You can view and download portions of the Marketing Tool Kit at *IRS.gov* by searching keywords, "marketing" or "tool kit." However, the IRS recommends you order the entire tool kit by calling (800) 829-3676 and requesting Publication 3005.

**QUICKALERTS –** QuickAlerts provide up to the minute e-file information. It is the IRS' technology messaging system for Providers. Users receive messages by e-mail. The messages advise of problems that may interrupt processing or acknowledgment of electronically filed returns, publication changes for IRS *e-file* and other information of interest to Authorized IRS *e-file* Providers.

For more information on any of these products, check the IRS Web site at *IRS.gov*.



**E-NEWS FOR TAX PROFESSIONALS –** The IRS *e-News for Tax Professionals* provides the latest national news for the tax professional community, as well as links to resources on *IRS.gov* and local news and events by state. For more information on the electronic subscription services, visit "Tax Professionals" at *IRS.gov*, click on "Subscription Services" under "Tax Professional Topics."



## Getting Started

NEW

Apply to participate in IRS *e-file* using the IRS *e-file* Application (after registering for e-Services) at the IRS Web site, *IRS.gov*. Applying is an easy three-step process (explained on page 7). This applies to all applicants who want to develop software or e-file Forms 56, 720, 940, 941, 944, 990 series, 1040 series, 1041, 1065, 1120 series, 2290, 8849, 9465, certain state income tax returns, and extensions of time to file individual, business and exempt organization returns.

Filing state individual income tax returns electronically is an additional business decision. Federal/State e-file is cooperative tax filing between the IRS and most of the states that have income taxes. It allows both federal and state individual income tax returns to be filed electronically at one time. Each participating state has its own requirements, but all of the states require that applicants be accepted to participate in IRS *e-file* before they accept the applicant to participate in their state electronic filing programs.

NEW

There is also a Federal/State e-file option for business programs including Forms 1041 (New York only), 1065 and 1120. Refer to the respective publications listed below for more information regarding these Fed/State programs.

It is important that applicants become familiar with the rules and requirements for participation in IRS *e-file* by reading the applicable IRS *e-file* documents. The revenue procedure, publications and other information about IRS *e-file* and related topics, including state filing information, are available on the IRS Web site. Applicants with questions, or who do not know where to begin may call IRS e-Help, toll-free at (866) 255-0654 for assistance.

NEW

**REVENUE PROCEDURE 2007-40,** *Requirements of Participants in the IRS e-file Program*, specifies the requirements for participating as Authorized IRS *e-file* Providers, and is the official set of rules that govern participation in IRS *e-file*. The IRS revises the revenue procedure as needed. The IRS may post additional e-file rules to the IRS Web site and include the rules in IRS *e-file* publications.

**IRS *e-file* PUBLICATIONS** The IRS issues various publications that contain the requirements for participating in IRS *e-file.* You should read the applicable publications for your business needs. The publications are intended to supplement the revenue procedure but do not supersede it. However, the publications and *IRS.gov* have the same legal force and effect as the revenue procedure. Violating a provision of the publications may subject the Provider to sanctions (see Sanctioning later in this publication).

**PUBLICATION 3112,** *IRS e-file Application and Participation*, which you are reading, provides important information regarding the IRS *e-file* Application process. It also contains the rules for participation in IRS *e-file* that are applicable to all Authorized IRS *e-file* Providers. (Available only online at *IRS.gov*)

**PUBLICATION 1345,** *Handbook for Authorized IRS e-file Providers of Individual Income Tax Returns*, contains requirements and important information for participating in IRS *e-file* of Individual Income Tax Returns. (Available only online at *IRS.gov*)

**PUBLICATION 1346,** *Electronic Return File Specifications and Record Layouts for Individual Income Tax Returns*, includes information of particular interest to Providers that transmit or develop software for transmission to the IRS of Individual Income Tax Returns.

**PUBLICATION 1436,** *Test Package for Electronic Filers of Individual Income Tax Returns*, contains scenarios and instructions for preparing test material for Electronic Filing of Individual Income Tax Returns.

**PUBLICATION 1437,** *Procedures for the 1041 e-file Program U.S. Income Tax Return for Estates and Trusts*, provides the general requirements and procedures for electronically filing Form 1041 and accompanying forms and schedules.

**PUBLICATION 1438,** *File Specifications, Validation Criteria and Record Layouts for The Electronic Filing Program for Form 1041 U.S. Income Tax Return for Estates and Trusts*, provides file specifications, validation criteria, record layout, communication procedures and transmission format, as well as annual updates for Form 1041 and the accompanying forms and schedules that can be electronically filed with Form 1041.

**PUBLICATION 1438-A,** *(Supplement) 1041 e-file Program, U.S. Income Tax Return for Estates and Trusts* provides graphic exhibits of Form 1041 and its |accompanying forms and schedules showing the field numbers for each line of the tax forms and schedules.

NEW

Become an Authorized IRS *e-file* Provider to enhance your business and your clients' return filing experience.



**PUBLICATION 1474,** *Technical Specifications Guide For Reporting Agent Authorization For Magnetic Tape/Electronic Filers and Federal Tax Depositors*, contains technical file specifications for Reporting Agents.

**PUBLICATION 3823,** *Employment Tax e-file System User Guide*, contains the procedural guidelines and validation criteria for the Employment Tax e-file System.

**PUBLICATION 4162,** *Modernized e-file Test Package for Form 1120/1120S/1120-F/7004*, contains the test scenarios for Corporate Assurance Testing by Software Developers of 1120/1120S/1120-F/7004 software.

**PUBLICATION 4163,** *Modernized e-file (MeF) Information for Authorized IRS e-file Providers and Large Taxpayers (Corporations, Partnerships and Tax Exempt Organizations)*, contains rules and other specific information for e-file of Forms 1120/1120S.

**PUBLICATION 4164,** *Modernized e-file (MeF) Guide for Software Developers and Transmitters*, outlines the communication procedures, transmission formats, business rules and validation procedures for returns e-filed through the Modernized e-file (MeF) system.

**PUBLICATION 4205,** *Modernized e-file Test Package for Exempt Organization Filings*, contains the instructions and test case scenarios for software developers and transmitters to use for Assurance Testing System (ATS) of Forms 990, 990-EZ, 990-N, 990-PF, 1120-POL, and 8868.

**PUBLICATION 4505,** *Modernized e-file Test Package for Forms 1065/1065-B*, contains the instructions and test case scenarios for software developers and transmitters to use for Assurance Testing System (ATS) of Forms 1065/1065-B.

**PUBLICATION 4594,** *Modernized e-file Test Package for Excise Tax e-file*, contains the instructions and test case scenarios for software developers and transmitters to use for Assurance Testing System (ATS) of Forms 720, 2249, and 8849.

**REMOVED PUBLICATIONS:** 1345A, 1524, 1524, 1855, 3416, 3715, and 4206.

**IMPLEMENTING DOCUMENTS** The IRS may conduct pilot programs looking for ways to improve and simplify IRS *e-file*. The IRS may conduct Pilot Programs within a limited geographic area or with a limited taxpayer or practitioner community. The rules for pilot programs are contained in implementing documents referred to as "Memoranda of Understanding" (MOU) or "Memoranda of Agreement" (MOA). The implementing document has the same force as the revenue procedure.

6

It is important to submit your completed application no later than 45 days prior to the date you intend to begin filing returns electronically.

**1** CHOOSE the Authorized IRS *e-file* Provider options that are best for you.

**2** COMPLETE and submit the IRS *e-file* Application. The electronic IRS *e-file* Application ensures your application is complete. You can complete the electronic IRS *e-file* Application online after registering for e-services on the IRS Web site at *IRS.gov*.

**3** PASS a Suitability Check.

# Become an Authorized IRS *e-file* Provider in 3 Steps

## Step 1 – Choose Provider Options

Applicants choose Provider Options, which include Electronic Return Originator, Intermediate Service Provider, Online Provider, Transmitter, Software Developer, and Reporting Agent. Be sure to include all choices on the application. Applicants may choose more than one Provider Option, for example; ERO and Transmitter on one application.

Brief descriptions for each Provider type are below (See IRS *e-file* Participation, Provider Roles and Responsibilities for additional information):

**ELECTRONIC RETURN ORIGINATOR (ERO) –** originates the electronic submission of tax returns to the IRS.

**INTERMEDIATE SERVICE PROVIDER –** assists with processing return information between ERO (or the taxpayer in the case of Online Filing) and a Transmitter.

**REPORTING AGENT –** originates the electronic submission of certain returns for its clients, and/or transmits the returns to the IRS. A Reporting Agent must be an accounting service, franchiser, bank, or other entity that complies with Rev. Proc. 2007-38, 2007-25 I.R.B. 1442, and is authorized to perform one or more of the acts listed in Rev. Proc. 2007-38 on behalf of a taxpayer. Reporting Agents must submit Form 8655, *Reporting Agent Authorization*, to the IRS prior to or at the same time they submit an IRS *e-file* Application.

**SOFTWARE DEVELOPER –** writes either origination or transmission software according to the IRS *e-file* specifications.

**TRANSMITTER –** sends the electronic return data directly to the IRS. EROs and Reporting Agents may apply to be transmitters and transmit return data themselves, or they may contract with an accepted third-party transmitter that can transmit the data for them. A Transmitter must have software and computers that allow it to interface with the IRS.

**ONLINE PROVIDER –** An Online Provider allows taxpayers to self-prepare returns by entering return data directly on commercially available software, software downloaded from an Internet site and prepared off-line, or through an on-line internet site. An Online Provider also chooses another Provider Option, either

Software Developer, Transmitter, or Intermediate Service Provider as Online Provider is a secondary activity. Although an ERO may also use an internet Web site to obtain information from taxpayers to subsequently originate the electronic submission of returns, the ERO is not an Online Provider.

**NEW**

**NOTE:** A Large Taxpayer is a Provider Option on the IRS *e-file* Application but it is not an Authorized IRS *e-file* Provider. A Large Taxpayer is a business or other entity with assets of $10 million or more, or a partnership with more than 100 partners, that originates the electronic submission of its own return(s). To submit an IRS *e-file* Application, Large Taxpayers should follow instructions in Part V of Publication 4163, *Modernized e-file (MeF) Information for Authorized IRS Providers and Large Taxpayers (Corporations, Partnerships and Tax Exempt Organizations).*

## STEP 2 – Complete and Submit the IRS *e-file* Application

The IRS *e-file* Application is easy to use. The IRS *e-file* Application is available at the IRS Web site *IRS.gov* via e-services. Each individual who is a Principal or Responsible Official must register for e-services on the IRS Web site, if not already registered, prior to submitting the IRS *e-file* Application to the IRS.

Help is available when completing the application by clicking designated words and symbols. Contact e-Help toll-free at (866) 255-0654, for assistance with the IRS *e-file* Application or if unable to register for e-Services.

When completing the IRS *e-file* Application the applicant provides basic information about the business and its Principals and at least one Responsible Official. The roles of Principal and Responsible Official are not mutually exclusive; a Principal may also serve as the Responsible Official.

### Principals

Generally, the Principal for a business or organization includes the following:

- **SOLE PROPRIETORSHIP:** The sole proprietor is the Principal for a sole proprietorship.

- **PARTNERSHIP:** Each partner who has a 5 percent or more interest in the partnership is a Principal. If no partner has at least a 5 percent or more interest in the

Applicants with questions, or who do not know where to begin may call IRS e-Help, toll-free at (866) 255-0654 for assistance.

partnership, the Principal is an individual authorized to act for the partnership in legal and/or tax matters. At least one such individual must be on the application. See Note below.

■ **CORPORATION:** The President, Vice-President, Secretary, and Treasurer are each a Principal of the corporation. See Note below.

■ **OTHER:** The Principal for an entity that is not a sole proprietorship, partnership, or corporation is an individual authorized to act for the entity in legal and/or tax matters. At least one such individual must be on the application.

**NEW**

**NOTE:** A large firm with multilayered management, that is not a sole proprietor-ship, includes only Principals and "Key Persons" who "participate substantially" with control over the firm's electronic filing operations as Principals on the firm's IRS *e-file* Application. A large firm usually has subsidiaries or multiple operating divisions/branches. "Key Persons" are individuals other than Principals (as defined above) who participate substantially with control over the large firm's electronic filing operation. "Participate substantially" means participation that is extensive and substantive, and not peripheral, clerical or ministerial.



The IRS cannot process applications until it receives all required information and documents.

## Responsible Officials

A Responsible Official is an individual with authority over the Provider's IRS *e-file* operation at a location, is the first point of contact with the IRS, and has authority to sign revised IRS *e-file* applications. A Responsible Official ensures the Provider ad-heres to the provisions of the revenue procedure as well as all publications and no-tices governing IRS *e-file*. The Responsible Official may oversee IRS *e-file* operations at one or more offices, but must be able to fulfill identified responsibilities for each of the offices. If one individual cannot fulfill these responsibilities, add Responsible Officials to the *e-file* application. To add or change Responsible Officials, a Provider must revise its IRS *e-file* Application.

## Each individual who is a Principal or Responsible Official must:

■ Be a United States citizen or an alien lawfully admitted for permanent residence as described in 8 U.S.C. §1101(a)(20) (1994);

■ Be 21 years of age as of the date of application; and

■ Meet applicable state and local licensing and/or bonding requirements for the preparation and collection of tax returns.

9



Each Principal and Responsible Official must answer several personal questions, and sign the Terms of Agreement (TOA) using a PIN, selected during initial registration for e-services. The IRS *e-file* Application prompts for missing information to ensure that applicants submit only complete applications to the IRS.

Principals and Responsible Officials submit additional information, such as fingerprint cards or evidence of professional status, as described later. The electronic IRS *e-file* Application prompts with a message regarding additional documentation to mail to the IRS. Submit all supporting documentation with the tracking number provided in the e-Services e-file application when submitting the application.

**The IRS cannot process applications until it receives all required information and documents. Mail all required documentation to the Internal Revenue Service, Andover Campus, ATTN. EFU Acceptance, Testing Stop 983, at P. O. Box 4099, Woburn, MA 01888-40999, or if by overnight mail to 310 Lowell Street, Andover, MA 05501-0001.**

Principals and Responsible Officials must submit either fingerprint cards or evidence of professional status, unless the individuals meet one of the exceptions shown below. Only one set of fingerprint cards is required for each Principal and Responsible Official.

The unique fingerprint cards for IRS *e-file* are available only from the IRS by calling e-Help, toll-free at (866) 255-0654. A trained specialist must fingerprint the individuals. Most local law enforcement offices and fingerprinting service companies fingerprint individuals for a fee.

In lieu of fingerprints, Principals and Responsible Officials may choose to submit evidence that they are one of the following:

**ATTORNEY –** Provide proof of good standing of the bar of the highest court in any state, commonwealth, possession, territory, or the District of Columbia, such as a State Bar Card. An attorney should not be under suspension or disbarment from practice before the IRS or from the bar of any state, commonwealth, possession, territory, or the District of Columbia

**CERTIFIED PUBLIC ACCOUNTANT –** Provide proof of license to practice as Certified Public Accountant in any state, commonwealth, possession, territory, or the District of Columbia. A CPA should not be under suspension or disbarment from practice before the IRS or from practice by a state, commonwealth, possession,



territory, or the District of Columbia. Provide a copy of current active CPA license or wallet card. Licensed Public Accountants (LPAs) must provide fingerprints

**ENROLLED AGENT (pursuant to part 10 of 31 C.F.R. Subtitle A) –** Provide Enrolled Agent Number or copy of current Enrolled Agent card

**OFFICER OF A PUBLICLY HELD CORPORATION –** Provide on corporate letterhead which carries the name of the officer, the exchange where listed, and the name under which the stock is traded

**BANKING OFFICIAL, BONDED AND FINGERPRINTED WITHIN THE LAST TWO YEARS –** Provide a copy of the bonding certificate and proof of fingerprinting within the last two years

Evidence of professional status must show the name, the state of issuance, and that the license is active with an un-expired expiration date. Attorneys and CPAs may obtain proof by accessing their state licensing board Web site.

## STEP 3 – Pass a Suitability Check

The IRS conducts a suitability check on the applicant, and on all Principals and Responsible Officials listed on e-file applications to determine the applicant's suitability to be an Authorized IRS *e-file* Provider. IRS does not complete suitability checks on applicants applying only as a Software Developer.

**Suitability checks may include the following:**

- A criminal background check
- A credit history check
- A tax compliance check to ensure that all required returns are filed and paid, and to identify assessed penalties; and
- A check for prior non-compliance with IRS *e-file* requirements

## Other Individuals on IRS *e-file* Applications

Other individuals may also be included on IRS *e-file* Applications. The IRS does not usually conduct suitability checks on individuals other than Principals and Responsible Officials. Contacts and Delegated Users are not subject to suitability checks. Circular 230 Practitioners, including attorneys, certified public accountants and

The electronic IRS *e-file* Application prompts with a message regarding additional documentation to mail to the IRS.



enrolled agents eligible to practice before the IRS, who submit an IRS *e-file* Application to get access to the e-services incentive products are subject to suitability checks.

## Contacts

Contact persons should be available on a daily basis for the IRS to contact them for general questions during testing and the processing year. Contacts may be a Principal or Responsible Official. They may also be persons distinct from the Principals and Responsible Officials but if they are, they do not have access to private information that is only available to Principals and Responsible Officials.

A **Primary Contact** is required for each application. An **Alternate Contact** is not required, but Providers can specify one or more Alternate Contacts. It is important for a Principal or Responsible Official to change or delete Contacts when the Contacts are no longer with the firm or their position within the firm no longer warrants being a Contact.

## Delegated Users

Delegated Users are individuals authorized by the Provider to use one or more of the e-services products even though they are not a Principal or Responsible Official. A Principal or Responsible Official appoints an individual as a Delegated User on the IRS *e-file* Application available on the IRS Web site. A Delegated User should be an employee, partner, or other member of the Firm/Organization or have a business relationship with the Firm/Organization. Principals and Responsible Officials are responsible for the actions of all Delegated Users on the firm's application.

Each Delegated User needs to be on only one IRS *e-file* Application. It is not necessary for a Delegated User to be on more than one IRS *e-file* Application to access e-Services incentive products. Each Delegated User affiliated with different firms (identified by different TINs) and authorized to view and make changes to an e-file application, must be on the specific IRS *e-file* Application to be able to review and make changes to the application. Large firms with multiple Delegated Users on a single IRS *e-file* Application should limit the number of Delegated Users to 100.

A Principal or Responsible Official may authorize a Delegated User with any or all the following authorities:

■ Viewing, updating, signing, and submitting IRS *e-file* Applications

- Accessing e-services incentive products (Disclosure Authorization, Electronic Account Resolution and Transcript Delivery System)
- Transmitting Forms 990, 1120, and 1120-POL through the Internet (Internet Transmitter)
- Requesting a new password (Security Manager)
- Viewing Software Developer information

**NEW** Principals and Responsible Officials with authority to Add, Delete, and Change Principal can assign Principal Consent authority to a Delegated User. A Delegated User with Principal Consent authority has the same e-file application authorities as a Principal.

It is important for a Principal or Responsible Official to change or delete Delegated Users and authorities on the IRS *e-file* Application when the authorities of the Delegated Users change or the Delegated Users are no longer with the firm or their position within the firm no longer warrants the authorities.

*The IRS reviews each firm or organization, Principal, and Responsible Official listed on the IRS e-file Application.*

## Denial to Participate in IRS *e-file*

If the firm, a Principal, or a Responsible Official fails the suitability check, the IRS notifies the applicant of denial to participate in IRS *e-file* and of the date that the applicant may re-apply. In most circumstances, the denied applicant may appeal the decision through an Administrative Review as described later.

**NEW** An applicant denied because a Federal or State court enjoined it from filing returns or a Federal or State legal action prohibits it from participating in IRS *e-file* may not appeal its denial. If the injunction or other legal action expires or is reversed, the denied applicant may reapply to participate in IRS *e-file*.

The IRS reviews each firm or organization, Principal, and Responsible Official listed on the IRS *e-file* Application. An applicant may be denied participation in IRS *e-file* for a variety of reasons that include but are not limited to:

**NEW** 1. An indictment or conviction of any criminal offense under the laws of the United States or of a state or other political subdivision, or an active IRS criminal investigation;

2. Failure to file timely and accurate Federal, state, or local tax returns;

3. Failure to timely pay any Federal, state, or local tax liability;

4. Assessment of penalties;

5. Suspension/disbarment from practice before the IRS or before a state or local tax agency;

6. Disreputable conduct or other facts that may adversely impact IRS *e-file*;

7. Misrepresentation on an IRS *e-file* Application;

8. Unethical practices in return preparation;

9. Assessment against the applicant of a penalty under §6695(g) of the Internal Revenue Code;

10. Stockpiling returns prior to official acceptance to participate in IRS *e-file*;

11. Knowingly and directly or indirectly employing or accepting assistance from any firm, organization, or individual denied participation in IRS *e-file*, or suspended or expelled from participating in IRS *e-file*. This includes any individual whose actions resulted in the denial, suspension, or expulsion of a firm from IRS *e-file*;

After an applicant passes the suitability check and the IRS completes processing the application, the IRS notifies the applicant of acceptance to participate in IRS *e-file*.

12. Knowingly and directly or indirectly accepting employment as an associate, correspondent, or as a subagent from, or sharing fees with, any firm, organization, or individual denied participation in IRS *e-file*, or suspended or expelled from participating in IRS *e-file*. This includes any individual whose actions resulted in denial, suspension, or expulsion of a firm from IRS *e-file*.

NEW

13. Enjoined from filing returns by a Federal or State court injunction or prohibited from filing returns by any Federal or State legal action that prohibits them from participation. A type of such legal action is a Federal Executive Order such as Executive Order 13224 (September 23, 2001), which involves prohibitions directed at terrorist individuals and organizations.

## Acceptance

After an applicant passes the suitability check and the IRS completes processing the application, the IRS notifies the applicant of acceptance to participate in IRS *e-file*. Transmitters and Software Developers must complete testing before acceptance. The IRS assigns Electronic Identification Filing Numbers (EFINs) to all Providers and



assigns Electronic Identification Transmission Numbers (ETINs) to Transmitters, Software Providers, and Online Providers. The IRS assigns EFINs with prefix codes 10, 21, 32, 44, and 53 to Online Providers.

Authorized IRS *e-file* Providers do not have to reapply each year as long as they continue to e-file returns. However, if a Provider does not e-file returns for two consecutive years, the IRS will notify the Provider of removal from the IRS active Provider list. The IRS may reactivate a Provider if the Provider replies within sixty days and requests reactivation. Otherwise, the Provider will have to complete and submit a new application.

If the IRS suspends a Provider from participation in IRS *e-file*, the Provider may re-apply to participate in IRS e-file only after the suspension period is completed. Providers expelled or revoked from participation in IRS *e-file* usually may not reapply.

Providers do not need to submit a new IRS *e-file* Application each year to participate in IRS *e-file*. Providers are required to have the appropriate identification numbers and should review their IRS *e-file* Application at *IRS.gov* to check their status. Providers may contact e-Help, toll-free at (866) 255-0654 with questions regarding their e-file application status.

**Providers must update their application information within thirty days of the date of any changes to the information on their current application. They can make all changes using the IRS *e-file* Application at the *IRS.gov* Web site. See Changes to Your IRS *e-file* Application below.**

## EFINs, ETINs, and Password

Providers must protect their EFINs, ETINs, and passwords from unauthorized use. Providers must never share the numbers and passwords with others, including not transferring EFINs or ETINs to another entity when transferring the business by sale, gift, or other disposition. If the IRS learns that a Provider's EFIN or ETIN is compromised, the IRS changes the number and notifies the Provider by mailing a new acceptance letter to the Provider.

The IRS mails a security letter to new Transmitters, Software Developers, and Online Providers containing their EMS password and login ID. The last two digits of the corresponding Electronic Transmitter Identification Number (ETIN) are in the letterhead.

All Providers must include their identification numbers with the electronic return data of all returns it transmits to the IRS. If more than one Authorized IRS *e-file* Provider is involved in the origination and transmission of the return data, applicable electronic filing identification numbers (EFIN and ETIN) for each Provider must be included in the electronic return record. Online Providers must include an EFIN with a Prefix Code of 10, 21, 32, 44, or 53 with each Online Return for the filing of Individual Income Tax Returns.

## Checking Other Authorized IRS *e-file* Providers

Authorized IRS *e-file*
Providers may use only
other Authorized IRS *e-file*
Providers to perform IRS
*e-file* activities.

Authorized IRS *e-file* Providers may use only other Authorized IRS *e-file* Providers to perform IRS *e-file* activities, including but not limited to origination and transmission of electronic submission. For example, Transmitters must ensure they are transmitting only for Authorized IRS *e-file* Providers. Providers should request other Providers provide information to ascertain that they are Authorized IRS *e-file* Providers. Care is necessary to safeguard IRS *e-file*.

A Provider can print a summary of its e-file application via e-Services at *IRS.gov* and provide it to other Providers as needed. Providers can also confirm EROs using the ERO Locator Service on *IRS.gov*. If an ERO is not on the ERO Locator Service, the ERO may still be an Authorized IRS *e-file* Provider as EROs may elect to be excluded from the ERO Locator Service.

If you need additional assistance confirming a firm is an Authorized IRS *e-file* Provider contact the IRS by calling e-Help, toll-free at (866) 255-0654. The IRS can advise if the firm is an Authorized IRS *e-file* Provider or not.

## Using Third Parties for IRS *e-file* Related Activities

Authorized IRS *e-file* Providers may associate with third parties that are not Authorized IRS *e-file* Providers for related activities, such as advertising, collection of taxpayer data and Web services, which are not e-file activities only if the third party agrees to adhere to all applicable requirements for participation in IRS *e-file*. The IRS may require the Provider to discontinue their association with third parties that are not adhering to IRS *e-file* requirements. The IRS may also sanction a Provider that knowingly and either directly or indirectly associates with a third party that is not adhering to applicable IRS *e-file* requirements.

# When to Submit a New Application

Applicants and Authorized IRS *e-file* Providers must submit a new application with fingerprint cards or other documentation for the appropriate individuals for any of the following:

- They never participated in IRS *e-file*
- They were previously denied participation in IRS *e-file*
- They were previously suspended from IRS *e-file*
- They have not submitted any e-file returns for more than two years
- They want to originate the electronic submission of returns from an additional location (see Adding New Business Locations)
- The structure of the business has changed, requiring use of a new or different Taxpayer Identification Number (TIN)

## Adding New Business Locations

Providers may need to submit new IRS *e-file* Applications when expanding their e-file businesses to new business locations. EROs must submit new applications for additional fixed locations from which the origination of the electronic submission of returns will occur. A fixed location is an office owned or leased by the Provider.

EROs may originate the electronic submission from other than fixed locations without submitting an application for each such location. The ERO uses the EFIN assigned to a fixed location for electronic submission of returns originated from other than fixed locations.

An application is not required for a location if tax returns are only prepared or collected at the location and forwarded to another location for origination of the electronic submission of returns.

## Acquiring an IRS *e-file* Business by Purchase, Transfer or Gift

Providers that acquire an existing IRS *e-file* business by purchase, transfer, or gift must submit a new IRS *e-file* Application and receive new Electronic Filing Identification Numbers (EFINs), and passwords when applicable. The Provider must submit an e-file application and proof of sale, transfer, or gift during the period beginning forty-five days before and ending thirty days after the acquisition date.

Providers may need to submit new IRS *e-file* Applications when expanding their e-file businesses to new business locations.



 Providers that acquire an existing IRS *e-file* business by purchase, transfer or gift may not use the EFIN, other identification numbers or passwords of the previous Authorized IRS *e-file* Provider. Providers may not acquire the EFIN, other identification numbers, or passwords of another Authorized IRS *e-file* Provider by sale, merger, loan, gift, or otherwise.

When transfers occur during filing season Providers should contact the IRS prior to the acquisition for assistance in making a smooth transition. Providers interested in acquiring firms suspended, expelled, or revoked from participation in IRS *e-file* or denied acceptance to participate in IRS *e-file* should also contact the IRS. Contact IRS e-Help at (866) 255-0654 to discuss transition issues.

## Changes to Your IRS *e-file* Application

Providers should ensure that the IRS has current information by reviewing and either updating or revising their IRS *e-file* Applications. Providers may review and update or revise, as necessary, their IRS *e-file* Application information electronically on the IRS Web site via e-services. A Principal, Responsible Official, or a Delegated User authorized to revise an IRS *e-file* Application may submit all updates and revisions electronically using the firm's IRS *e-file* Application.

Providers must revise their IRS *e-file* Application within thirty days of a change of any information on the current application. It is important to update the IRS *e-file* Application with new information including but not limited to, changes to business structure, Principals, Responsible Officials, addresses, and telephone numbers. When the IRS does not have current information, it is not able to contact Providers to obtain and provide important information.

**If a Principal or Responsible Official loses their professional status, the firm must update its e-file application and provide the required fingerprints of the individual.**

The IRS removes Providers from participation in IRS *e-file* when it receives undeliverable mail back or the IRS is unable to contact the Providers. Until a Provider updates the information, the IRS rejects all returns submitted by the Provider.

**NOTE:** Changes submitted on an IRS *e-file* Application do not change the address of record for a business' tax records; just as a change to tax records do not automatically update information on a Provider's IRS *e-file* Application.

18

## Notifying the IRS of Changes to IRS *e-file* Application

If a Provider is unable to update its IRS *e-file* Application electronically it may notify the IRS of changes to the below information by letter, using the firm's official letterhead:

- All addresses
- All telephone and fax numbers
- e-mail addresses
- Contact persons
- Form types to be e-filed
- Transmission protocols
- Adding Federal/State e-file
- Changes to Foreign Filer information

Unless the firm is solely a Software Developer, you may also add additional Provider Options—ERO, Transmitter, Intermediate Service Provider, or Software Developer— by letter, using the firm's letterhead.

**EXCEPTIONS –** Changes that require a firm to acquire a new Employer Identification Number (EIN) require a Provider submit a new IRS *e-file* Application. Firms that change their form of organization, such as from a sole proprietorship to a corporation, generally require the firm to acquire a new EIN.

The letters must include sufficient information for the IRS to identify the application the Provider is revising. Be sure to include the appropriate EFIN and/or ETIN that applies, as well as a firm name, firm EIN or Social Security Number (SSN), and doing business as name. If the firm is controlled or owned by another Authorized IRS *e-file* Provider, the name, business address, and EFIN and ETIN (if applicable) of the controlling Authorized IRS *e-file* Provider must be included. A Principal or the Responsible Official of the firm must sign the letter. Providers can make most of the same changes by telephone. A Principal or the Responsible Official of the firm must sign the letter or call the IRS. The caller will have to provide identifying information.

Providers that sell, transfer, or otherwise discontinue an IRS *e-file* business must notify the IRS within thirty days. The easiest way to notify the IRS is to use the "Close Office" feature on IRS *e-file* Application on the IRS Web site. If notifying by letter, be

> Changes that require a firm to acquire a new Employer Identification Number (EIN) require a Provider submit a new IRS *e-file* Application.

sure to include enough information to identify the correct business location. Providers may not sell or transfer EFINs, other identification numbers, or passwords when selling, transferring or otherwise discontinuing an IRS *e-file* business.

## Required Revision of the IRS *e-file* Application

The following situations are changes that require revision of the IRS *e-file* Application:

- The Authorized IRS *e-file* Provider is functioning solely as a Software Developer or Reporting Agent and intends to do business as an ERO, Intermediate Service Provider, or Transmitter
- An additional Principal or Responsible Official is being added
- A Principal or Responsible Official is changed
- A Principal or Responsible Official must be deleted

These revised applications (except when Principal or Responsible Official must be deleted) must be submitted with fingerprint cards or evidence of professional status for new Principals and Responsible Officials of the firm unless the individual is listed as a Principal or Responsible Official on the application of a Provider currently participating in IRS *e-file*.



# Participation in IRS *e-file*

Authorized IRS *e-file* Providers (Providers) must adhere to applicable IRS *e-file* rules and requirements to continue participation in IRS *e-file*. The IRS *e-file* rules and requirements are included in Revenue Procedure 2007-40, throughout this publication, and in other IRS *e-file* publications and notices on the IRS Web site. Providers must adhere to all applicable IRS *e-file* rules and requirements regardless of where published.

Providers should familiarize themselves with the revenue procedure, the e-file publications, and e-file information on the IRS Web site *IRS.gov* to ensure compliance with requirements for participation in IRS *e-file*.

Some rules and requirements are specific to the e-file activity performed by the Provider. Additional rules and requirements specific to the Provider's e-file activity are included under each Provider Option. The list below, while not all-inclusive, applies to all Authorized IRS *e-file* Providers:

- Adhere to the advertising standards described in this publication

**NEW** ■ Clearly display the Provider's "doing business as" name at all locations and sites including Web sites at which the Provider or a third party obtains information from taxpayers for electronic filing of returns by the Provider

- Cooperate with the IRS' efforts to monitor Authorized IRS *e-file* Providers and investigate electronic filing fraud and abuse

**NEW** ■ Comply with provisions for all e-file programs, including free file and pilot programs in which the Provider participates

- Ensure against the unauthorized use of its EFIN and/or ETIN, including not transferring its EFIN or ETIN to another entity when transferring the business by sale, gift, or other disposition

- Ensure the security of taxpayer information

- Make changes to the IRS *e-file* Application as described in this publication in a timely manner

## Safeguarding IRS *e-file*

**NEW**

Safeguarding of IRS *e-file* from fraud and abuse is the shared responsibility of the IRS and Authorized IRS *e-file* Providers. Providers must be diligent in recognizing fraud and abuse, reporting it to the IRS, and preventing it when possible. Providers must also cooperate with the IRS' investigations by making available to the IRS upon request, information and documents related to returns with potential fraud or abuse. Additional information regarding Reporting Fraud and Abuse in IRS *e-file* is available at *IRS.gov*.

Indicators of abusive or fraudulent returns may be unsatisfactory responses to filing status questions, multiple returns with the same address, and missing or incomplete schedules for income and expense documentation. A "fraudulent return" is a return in which the individual is attempting to file using someone else's name or SSN on the return or where the taxpayer is presenting documents or information that have no basis in fact. A "potentially abusive return" is a return the taxpayer is required to file but may contain inaccurate information and may lead to an understatement of a liability or an overstatement of a credit resulting in production of a refund to which the taxpayer may not be entitled.

Safeguarding of IRS *e-file* from fraud and abuse is the shared responsibility of the IRS and Authorized IRS *e-file* Providers.

## Safeguarding Taxpayer Information

Safeguarding taxpayer information is a top priority for the Internal Revenue Service. It is the responsibility of governments, businesses, organizations, and individuals that receive, maintain, share, transmit, or store taxpayers' personal information. Taxpayer information is information furnished in any form or manner by or on behalf of taxpayers for preparation or filing of their returns. Authorized IRS *e-file* Providers must safeguard taxpayer information from unauthorized disclosure, use, and destruction.

Authorized IRS *e-file* Providers must have security systems in place to prevent unauthorized access by third parties to taxpayer accounts and personal information. The Gramm-Leach-Bliley Act, codified at 15 U.S.C. §§ 6801-6827, and the implementing rules and regulations promulgated by the Federal Trade Commission include rules that are designed to ensure the security and privacy of taxpayer information and are applicable to Providers. Providers should become familiar with the Privacy and Security Rules and other important information regarding safeguarding personal information available at the FTC Web site *www.ftc.gov*.



NEW

Providers must implement security and privacy practices that are appropriate for the size, complexity, nature, and scope of their business activities. The IRS Publication 4600, *Safeguarding Taxpayer Information Quick Reference Guide for Business*, and Publication 4557, *Safeguarding Taxpayer Data A Guide for Your Business*, contain information to help non-governmental businesses, organizations, and individuals to understand and meet their responsibility to safeguard taxpayer information.

The IRS may set forth additional safeguarding requirements for Providers as it determines appropriate. The requirements will be included in revisions of appropriate e-file publications or published on the IRS Web site at *IRS.gov*.

## Registration of Web Sites with the IRS

To safeguard taxpayer information by more quickly identifying fraud schemes including phishing, the IRS requires Providers to register with the IRS all internet Web sites from which information is collected from taxpayers, either directly or through third parties, and used by the Provider for federal returns that are filed electronically.

Providers must submit the below information to the IRS prior to the Web site being accessible on the Internet, and submit any changes to previously provided information to the IRS within three (3) business days.

1. An EFIN for the Provider;

2. The name of a Principal or Responsible Official shown on the e-file application for the EFIN; and

3. The Uniform Resource Locators (URLs) of all Web sites from which the Provider collects information from taxpayers, either directly or through third parties, for electronic filing of federal returns.

Until the IRS updates the e-file application to allow applicants and Providers to include the URLs on their e-file Applications, they must submit the requested information to the IRS in an encrypted or password protected Excel spreadsheet. The Principal or Responsible Official must submit the excel spreadsheet and the password via separate e-mail messages to *efileurlreg@IRS.gov*.

# Provider Roles and Responsibilities

The roles and responsibilities of Providers relate to the e-file activity the firm is conducting. The firm identified its e-file activity by selecting the appropriate Provider Option in the IRS *e-file* Application. Each Provider Option is a different

role and may have different responsibilities that relate specifically to the e-file activity of the firm. Some Providers may have more than one e-file business activity. For example, an ERO may also be a Transmitter. Providers must adhere to all IRS *e-file* rules and requirements applicable to their multiple e-file roles.

**AN ELECTRONIC RETURN ORIGINATOR (ERO)** is the Authorized IRS *e-file* Provider that originates the electronic submission of a return to the IRS. The ERO is usually the first point of contact for most taxpayers filing a return using IRS *e-file*.

## The Origination of an Electronic Return

Although an ERO may also engage in return preparation, that activity is separate and different from the origination of the electronic submission of the return to the IRS. An ERO originates the electronic submission of a return after the taxpayer authorizes the filing of the return via IRS *e-file*. An ERO must originate the electronic submission of only returns that the ERO either prepared or collected from a taxpayer. An ERO originates the electronic submission by any one of the following:

- Electronically sending the return to a Transmitter that will transmit the return to the IRS

- Directly transmitting the return to the IRS

- Providing a return to an Intermediate Service Provider for processing prior to transmission to the IRS

In originating the electronic submission of a return, the ERO has a variety of responsibilities, including, but not limited to:

- Timely originating the electronic submission of returns

- Submitting any required supporting paper documents to the IRS

- Providing copies to taxpayers

- Retaining records and making records available to the IRS

- Accepting returns only from taxpayers and Authorized IRS *e-file* Providers

- Having only one EFIN for the same firm for use at one location, unless the IRS issued more than one EFIN to the firm for the same location. For this purpose, the business entity is generally the entity that reports on its return the income derived from electronic filing. The IRS may issue more than one EFIN to accommodate a high volume of returns, or as it determines appropriate.

> Providers must implement security and privacy practices that are appropriate for the size, complexity, nature, and scope of their business activities.

**An ERO must clearly display the firm's "doing business as" name at all locations and sites including Web sites at which the ERO or a third party obtains information from taxpayers for electronic origination of returns by the ERO.**

**AN INTERMEDIATE SERVICE PROVIDER** receives tax information from an ERO (or from a taxpayer who files electronically using a personal computer, modem, and commercial tax preparation software), processes the tax return information, and either forwards the information to a Transmitter or sends the information back to the ERO (or taxpayer for Online Filing).

The Intermediate Service Provider has a variety of responsibilities that include, but are not limited to:

- Including its Electronic Filing Identification Number (EFIN) and the ERO's EFIN with all return information it forwards to a Transmitter

- Serving as a contact point between its client EROs and the IRS, if requested

- Providing the IRS with a list of each client ERO, if requested

- Adhering to all applicable rules that apply to Transmitters

**An Intermediate Service Provider must clearly display the firm's "doing business as" name at all locations and sites including Web sites at which the ERO or a third party obtains information from taxpayers for electronic origination of returns by the ERO.**

**A SOFTWARE DEVELOPER** develops software for the purposes of formatting electronic return information according to IRS *e-file* specifications and/or transmitting electronic return information directly to the IRS. IRS *e-file* specifications are in some of the e-file publications mentioned earlier.

Software Developers must pass what is referred to as either acceptance or assurance testing. If an Authorized IRS *e-file* Provider is a Software Developer that performs no other role in IRS *e-file* but that of software development, its Principals and Responsible Officials do not have to pass a suitability check during the application process.

A Software Developer has a variety of responsibilities that include, but are not limited to:

- Promptly correcting any software error causing returns to reject and distributing the correction

- Ensuring its software creates accurate returns

- Adhering to specifications provided by the IRS in publications

> Each Provider Option is a different role and may have different responsibilities that relate specifically to the e-file activity of the firm.

**A TRANSMITTER** transmits electronic tax return information directly to the IRS. A bump-up service provider that increases the transmission rate or line speed of formatted or reformatted information sent to the IRS via a public switched telephone network is also a Transmitter. The IRS accepts transmissions using a variety of telecommunication protocols.

In order to transmit electronic return data directly to the IRS, Transmitters must be equipped with both computer hardware and software that make it possible. Prior to transmitting return data to the IRS, an application requesting the "Transmitter" Provider Option must be submitted, and an EFIN, an ETIN and a password received for testing. Testing that ensures the compatibility of your transmission systems with the IRS systems must be completed to enable transmission of the electronic return data to the IRS.

A Transmitter has a variety of responsibilities that include, but are not limited to:

■ Ensuring EFINs of Authorized IRS *e-file* Providers are included as required by IRS *e-file* specifications in the electronic return record of returns it transmits

■ Timely transmitting returns to the IRS, retrieving acknowledgment files, and sending the acknowledgment file information to the ERO, Intermediate Service Provider or taxpayer (for Online Filing)

■ Promptly correcting any transmission error that causes an electronic transmission to be rejected

**A Transmitter participating as an Online Provider must clearly display the firm's "doing business as" name at all locations and sites including Web sites at which the Transmitter or a third party obtains information from taxpayers for electronic origination of returns by the ERO.**

## Not for Profit Providers

All requirements of an Authorized IRS *e-file* Provider apply to Not for Profit Providers, unless otherwise noted. See Publication 1345 for additional information.

### IRS Sponsored Programs

IRS sponsored programs, including Volunteer Income Tax Assistance (VITA), Tax Counseling for the Elderly (TCE), Outreach, Self-Help and Taxpayer Assistance Centers in IRS offices, may electronically file returns. In order to be accepted to

participate in IRS *e-file*, a VITA or TCE sponsor must obtain the permission of the IRS (and, in the case of a TCE sponsor, the permission of the IRS office that is funding the TCE program) to participate in IRS *e-file*.

## Employers Offering IRS *e-file* as an Employee Benefit

An employer may offer electronic filing as an employee benefit whether the employer chooses to transmit returns or contracts with a third party to transmit the tax returns.

## Testing

The purpose of testing is to ensure, prior to live processing, that Providers transmit in the correct format and meet the IRS electronic filing specifications; that returns have few validation or math errors; and that Providers understand the mechanics of IRS *e-file*.

All Software Developers must complete Acceptance or Assurance Testing in accordance with the applicable publication for each type of return. Communication testing is a requirement for Reporting Agents and Transmitters planning to transmit electronic returns to IRS. Most software packages (IRS accepted e-file software) have communications tests built in so that completing this requirement is relatively easy. Follow the directions in the software or documentation package. If you have problems, you should first contact either the vendor that sold you the software or the technical support operation for the software package.

A Provider can view the test status of each form it transmitted to the IRS by accessing the firm's IRS *e-file* application and clicking on the "FORMS" link. The form/format previously selected for Transmitter provider option is displayed in a table along with the status. The status is updated from "test" to "production" when required communication testing is completed. The status is set back to "test" around the end of October for Forms 1040, ETD (electronically transmitted documents), 1041. These are the only forms requiring renewed communications testing prior to each filing season. Software Developers can view the information they provided to the IRS about each of their software packages, the IRS assigned Software ID number, and the test status of a particular package.



A Provider can view the test status of each form it transmitted to the IRS by accessing the firm's IRS *e-file* application and clicking on the "FORMS" link.

If the software appears to be working correctly but you cannot complete the tests, you do not receive acknowledgment files, or experience other problems, contact e-Help at (866) 255-0654 (toll free).

## Advertising Standards

"IRS *e-file*" is a brand name. Firms accepted for participation in IRS *e-file* as EROs, Transmitters, Intermediate Service Providers, Reporting Agents and Software Developers are "Authorized IRS *e-file* Providers". Acceptance to participate in IRS *e-file* does not imply endorsement of the software or quality of services provided by the IRS, Financial Management Service (FMS), or Treasury. All Providers must abide by the following advertising standards.

An Authorized IRS *e-file* Provider must comply with the advertising and solicitation provisions of 31 C.F.R. Part 10 (Treasury Department Circular No. 230). This circular prohibits the use or participation in the use of any form of public communication containing a false, fraudulent, misleading, deceptive, unduly influencing, coercive, or unfair statement of claim. A Provider must adhere to all relevant Federal, state, and local consumer protection laws that relate to advertising and soliciting.

> The advertisement on a Refund Anticipation Loan (RAL) or other financial product must be easy to identify, and in easily readable print.

The Provider must not use improper or misleading advertising in relation to IRS *e-file*. For example, any claim concerning a faster refund by virtue of electronic filing must be consistent with the language in official IRS publications. The Provider must clearly describe that a financial institution is advancing funds as a loan or will provide the funds for other financial products. The advertisement on a Refund Anticipation Loan (RAL) or other financial product must be easy to identify, and in easily readable print. It must be clear in the advertising that the taxpayer is borrowing against the anticipated refund or obtaining funds from a financial institution, and not obtaining the refund itself from the financial institution.

A Provider must not use the IRS' name, "Internal Revenue Service," or "IRS" within a firm's name. However, once accepted to participate in IRS *e-file*, a firm may represent itself as an "Authorized IRS *e-file* Provider". If promotional materials or logos provided by the IRS are used, the Provider must comply with all IRS instructions pertaining to their use. Advertising materials must not carry the FMS, IRS, or other Treasury Seals. Advertising for a cooperative electronic filing project (public or private sector), must clearly state the names of all cooperating parties.

The IRS goes not have a copyright for the IRS *e-file* logo. Use the logo only to indicate that a Provider offers this service to taxpayers or has performed it on behalf of a



taxpayer. Providers must not use the logo to portray any other relationship between the IRS and any Provider. In using the IRS *e-file* logo, the Provider must use the following guidelines:

- Do not combine the logo with the IRS eagle symbol, the word "Federal", or with other words or symbols that suggest a special relationship between the IRS and the logo user

- Do not place text closer than ¼ inch from the logo

- Do not overprint other words or symbols on the logo

- Do not change the letter spacing or type style

In one-color products, the logo should be printed solid, preferably PMS 285 blue. In multi-color products, the logo should be printed in solid PMS 285 blue with the lightning bolt in solid PMS 109 yellow. When using color systems other than Pantone (PMS), the colors should be as close as possible to the PMS shades.

If an Authorized IRS *e-file* Provider uses radio, television, Internet, signage, or other methods of communication to advertise IRS *e-file*, the Provider must keep a copy and provide it to the IRS upon request, the text or, if prerecorded, the recorded advertisement. Provider must retain copies until the end of the calendar year following the last transmission or use.

If an Authorized IRS *e-file* Provider uses direct mail, e-mail, fax communications, or other distribution methods to advertise, the Provider must retain a copy, as well as a list or other description of the firms, organizations, or individuals to whom the communication was sent. The Provider must retain the records until the end of the calendar year following the date sent and provide the records to the IRS upon request.

## Monitoring of Authorized IRS *e-file* Providers

The IRS monitors Authorized IRS *e-file* Providers for compliance with the revenue procedure and IRS *e-file* rules and requirements.

### Suitability

All Authorized IRS *e-file* Providers, except those that function solely as Software Developers, must pass a suitability check on the firm as well as on all Principals and Responsible Officials of the firm prior to acceptance to participate in IRS *e-file*. To safeguard IRS *e-file*, the IRS completes suitability checks regularly on Authorized

IRS *e-file* Providers, Principals and Responsible Officials. If the results of a suitability check indicate that a firm or individual does not meet and adhere to IRS *e-file* requirements the Authorized IRS *e-file* Provider may be revoked from participating in IRS *e-file* or sanctioned as explained below.

## IRS *e-file* Monitoring

IRS personnel monitor Authorized IRS *e-file* Providers through review of IRS records and during visits to Providers' offices and other locations where Providers perform IRS *e-file* activities. During monitoring visits, the IRS may investigate complaints and ensure compliance with IRS *e-file* rules. Monitoring may include, but is not limited to the following:

- Reviewing the quality of IRS *e-file* submissions for rejects and other defects
- Checking adherence to signature requirements on returns
- Scrutinizing advertising material
- Examining records
- Observing office procedures

In addition, the IRS may monitor Authorized IRS *e-file* Providers for compliance with the tax return preparer regulations, including provisions of IRC section 6695(g), which relates to the due diligence requirements for Earned Income Tax Credit claims on individual income tax returns.

## Revocation

NEW

The IRS may revoke an Authorized IRS *e-file* Provider's participation in IRS *e-file* if the firm, a Principal, or a Responsible Official is either enjoined from filing returns by a Federal Court order or is prohibited from filing returns by any Federal or State legal action that prohibits participation in e-file. A type of such legal action is a Federal Executive Order, including Executive Order 13224 (September 23, 2001), which involves prohibitions directed at terrorist individuals and organizations.

An Authorized IRS *e-file* Provider is not entitled to an administrative review process for revocation of participation in IRS *e-file* if the firm, a Principal, or a Responsible Official is revoked or denied because of a Federal Court Order enjoining filing of returns or a Federal or State legal action that prohibits participation in filing of returns. If the injunction or other legal action expires or is reversed, the revoked Provider may reapply to participate in IRS *e-file* after the injunction or other legal action expires or is reversed.



# Sanctioning

Violations of IRS *e-file* requirements may result in warning or sanctioning an Authorized IRS *e-file* Provider. The IRS may sanction any Provider that fails to comply with any requirement or any provision of this publication, as well as other publications and notices that govern IRS *e-file*. The IRS may also sanction a Provider for the same reasons that it denies an application to participate in IRS *e-file*. See Denial to Participate in IRS *e-file*. Before sanctioning, the IRS may issue a warning letter that describes specific corrective action the Provider must take. The IRS may also sanction a Provider without issuance of a warning letter.

Sanctioning may be a written reprimand, suspension or expulsion from participation from IRS *e-file*, or other sanctions, depending on the seriousness of the infraction. The IRS categorizes the seriousness of infractions as Level One, Level Two, and Level Three. Providers may appeal sanctions through the Administrative Review Process. Un-reversed suspensions make Authorized IRS *e-file* Providers ineligible to participate in IRS *e-file* for a period of either one or two years from the effective date of the sanction.

In most circumstances, a sanction is effective thirty days after the date of the letter informing the Provider of the sanction, or the date the reviewing offices or the Office of Appeals affirms the sanction, whichever is later. In certain circumstances, the IRS can immediately suspend or expel an Authorized IRS *e-file* Provider without prior warning or notice. If a Principal or Responsible Official is suspended or expelled from participation in IRS *e-file*, every entity that listed the suspended or expelled Principal or Responsible Official on its IRS *e-file* Application may also be suspended or expelled.

The IRS may list in the *Internal Revenue Bulletin*, newsletters, or other media the name and owner of any entity suspended, expelled, or revoked from participation in IRS *e-file* and the effective date of the IRS action.

## Levels of Infraction

**LEVEL ONE INFRACTIONS —** Level One Infractions are violations of IRS *e-file* rules and requirements that, in the opinion of the IRS, have little or no adverse impact on the quality of electronically filed returns or on IRS *e-file*.

The IRS may issue a written reprimand for a Level One Infraction.

**LEVEL TWO INFRACTIONS —** Level Two Infractions are violations of IRS *e-file* rules and requirements that, in the opinion of the IRS, have an adverse impact upon the quality of electronically filed returns or on IRS *e-file*. Level Two Infractions include

continued Level One Infractions after the IRS has brought the Level One Infraction to the attention of the Authorized IRS *e-file* Provider.

Depending on the infractions, the IRS may either restrict participation in IRS *e-file* or suspend the Authorized IRS *e-file* Provider from participation in IRS *e-file* for a period of one year beginning with the effective date of suspension.

**LEVEL THREE INFRACTIONS —** Level Three Infractions are violations of IRS *e-file* rules and requirements that, in the opinion of the IRS, have a significant adverse impact on the quality of electronically filed returns or on IRS *e-file*. Level Three Infractions include continued Level Two Infractions after the IRS has brought the Level Two Infraction to the attention of the Authorized IRS *e-file* Provider.

A Level Three Infraction may result in suspension from participation in IRS *e-file* for two years beginning with the effective date of the suspension year, or depending on the severity of the infraction, such as fraud or criminal conduct, it may result in expulsion without the opportunity for future participation. The IRS reserves the right to suspend or expel an Authorized IRS *e-file* Provider prior to administrative review for Level Three Infractions.

## Administrative Review

Most denied applicants and sanctioned Providers are entitled to an administrative review. The administrative review process is usually a two-step process. The denied applicant or sanctioned Provider request administrative review by the office that denied or sanctioned it. If the reviewing office affirms the denial of the sanction, the applicant or Provider may request an appeal to the IRS Appeals Office, unless the sanction was a written reprimand. Failure to respond within thirty calendar days of the date of any denial letter or sanction letter irrevocably terminates an applicant's or Provider's right to an administrative review or appeal.

> Failure to respond within thirty calendar days of the date of any denial letter or sanction letter irrevocably terminates an applicant's or Provider's right to an administrative review or appeal.

### Administrative Review Process
### for Denial of Participation in IRS *e-file*

An applicant denied participation in IRS *e-file* usually has the right to an administrative review. An applicant may mail a written response to the address shown in the denial letter, within thirty calendar days of the date of the denial letter. The applicant's response must address the IRS' reason(s) for denial and have supporting documentation attached. During this administrative review process, the denial of participation remains in effect.



Upon receipt of an applicant's written response, the IRS reconsiders its denial of the applicant's participation in IRS *e-file*. Either the denial may be withdrawn and the applicant accepted for participation in IRS *e-file* or the affirming office will issue a second denial letter.

An applicant that receives a second denial letter is entitled to an appeal. The denied applicant must submit its appeal in writing to the attention of the Office of Appeals, by mailing the appeal to the address shown in the second denial letter within thirty calendar days of the date of the denial letter. An applicant's written appeal must contain a detailed explanation, along with documentation supporting why the IRS should reverse the denial.

## The Administrative Review Process for Sanctioning

An Authorized IRS *e-file* Provider has the right to an administrative review if the IRS advises of either a proposed sanction or an immediate sanction. The Provider may mail a detailed written explanation with supporting documentation, as to why the IRS should withdrawn the sanction within thirty calendar days of the date of the letter to the office that issued the letter. During this administrative review process, an immediate sanction remains in effect.

Upon receipt of the Provider's written response, the IRS reconsiders and may either withdraw or affirm the sanction in writing to the Provider. If a Provider receives a letter affirming a suspension or an expulsion, the Provider may appeal to the Office of Appeals. The appeal must be in writing and mailed to the IRS office that issued the recommended sanctioning letter within thirty calendar days of the date of the letter recommending the sanction. The Provider's written appeal must contain detailed reasons, with supporting documentation, to show why the IRS should not impose the recommended suspension or expulsion.

# Helpful Hints



**The below information may help to ensure continued participation in IRS *e-file*.**

## Tips For Passing IRS Suitability Check

- Anticipate suitability issues and avoid them or if necessary, correct them before they become problems
- Update all addresses and phone numbers on your IRS *e-file* Application as changes occur
- Respond timely and in writing with complete explanations and documentation to any letters you receive regarding suitability

## Tips For IRS *e-file* Monitoring Visits

- Adhere to IRS *e-file* rules and requirements
- Adhere to applicable statutory and regulatory requirements
- Cooperate by meeting with the IRS investigator and providing requested information and documents
- Respond timely and in writing with complete explanations and documentation to any letters you receive because of a monitoring visit

34



Rev. Proc. 2007-40, Requirements of Participants in the IRS *e-file* Program as included in Internal Revenue Bulletin (IRB) 2007- 26, published June 25, 2007.

## Table of Contents

**SECTION 1.** PURPOSE

**SECTION 2.** BACKGROUND AND CHANGES

**SECTION 3.** DEFINITIONS

**SECTION 4.** ACCEPTANCE TO PARTICIPATE IN THE IRS *e-file* PROGRAM

**SECTION 5.** RESPONSIBILITIES OF AN AUTHORIZED IRS *e-file* PROVIDER

**SECTION 6.** PENALTIES

**SECTION 7.** MONITORING AND SANCTIONING AN AUTHORIZED IRS *e-file* PROVIDER

**SECTION 8.** ADMINISTRATIVE REVIEW PROCESS

**SECTION 9.** DENIAL OF APPLICATION OR REVOCATION OF AN AUTHORIZED IRS *e-file* PROVIDER'S PARTICIPATION IN IRS *e-file* DUE TO COURT INJUNCTION OR OTHER LEGAL ACTION

**SECTION 10.** PILOT PROGRAMS

**SECTION 11.** EFFECT ON OTHER DOCUMENTS

**SECTION 12.** EFFECTIVE DATE

**SECTION 13.** INTERNAL REVENUE SERVICE OFFICE CONTACT

**SECTION 14.** DRAFTING INFORMATION

## SECTION 1. PURPOSE

This revenue procedure informs Authorized IRS *e-file* Providers of their obligations to the Internal Revenue Service (the Service), taxpayers, and other participants in the IRS *e-file* Program, and combines the rules governing IRS *e-file*.

## SECTION 2. BACKGROUND AND CHANGES

**.01** Section 1.6011-1(a) of the Income Tax Regulations provides that every person subject to income tax must make a return or statement as required by the regulations. The return or statement must include the information required by the applicable regulations or forms.

**.02** Section 301.6061-1(b) of the Regulations on Procedure and Administration authorizes the Secretary to prescribe in forms, instructions, or other appropriate guidance the method of signing any return, statement, or other document required to be made under any provision of the internal revenue laws or regulations.

**.03** Section 1.6012-5 of the Income Tax Regulations provide that the Commissioner may authorize the use, at the option of a person required to make a return, of a composite return in lieu of any form specified in 26 CFR Part 1 (Income Tax), subject to such conditions, limitations, and special rules governing the preparation, execution, filing, and correction thereof as the Commissioner may deem appropriate.

**.04** Section 6011(e)(1) of the Internal Revenue Code (the Code) gives specific authority for the Service and the Treasury Department to "prescribe regulations providing standards for determining which returns must be filed on magnetic media or in other machine-readable form." On January 12, 2005, the Service and the Treasury Department published in the Federal Register (T.D. 9175, 2005-1 C.B. 665 [70 FR 2012-01]) temporary regulations mandating the electronic filing of certain Forms 1120, 1120S, 990 and 990-PF under sections 301.6011-5T, 301.6037-2T, and 301.6033-4T. On November 12, 1999, the Service and the Treasury Department also published in the Federal Register (T.D. 8843, 1999-2 C.B. 590 [64 FR 61502]) final regulations mandating the electronic filing of certain Forms 1065 under section 301.6011-3.

**.05** This revenue procedure combines the rules governing IRS *e-file* including the rules governing electronic filing of:

(1) Form 56, *Notice Concerning Fiduciary Relationship*;

(2) Form 720, *Quarterly Federal Excise Tax Return*;

(3) Form 940, *Employer's Annual Federal Unemployment (FUTA) Tax Return*;

(4) Form 941, *Employer's QUARTERLY Federal Tax Return*;

(5) Form 944, *Employer's ANNUAL Federal Tax Return*;

(6) Form 990, *Return of Organization Exempt From Income Tax*;

(7) Form 990-EZ, *Short Form Return of Organization Exempt From Income Tax*;

(8) Form 990-PF, *Return of Private Foundation or Section 4947(a)(1) Nonexempt Charitable Trust Treated as a Private Foundation*;

(9) Form 1040 and 1040A, *U.S. Individual Income Tax Return,* and *Form 1040EZ, Income Tax Return for Single and Joint Filers With No Dependents*;

(10) Form 1041, *U.S. Income Tax Return for Estates and Trusts*;

(11) Form 1065, *U.S. Return of Partnership Income*;

(12) Form 1120, *U.S. Corporation Income Tax Return*;

(13) Form 1120-POL, *U.S. Income Tax Return for Certain Political Organizations*;

(14) Form 1120S, *U.S. Income Tax Return for an S Corporation*;

(15) Form 2290, *Heavy Highway Vehicle Use Tax Return*;

(16) Form 2350, *Application for Extension of Time To File U.S. Income Tax Return*;

(17) Form 2688, *Application for Additional Extension of Time To File U.S. Individual Income Tax Return*;

(18) Form 4868, *Application for Automatic Extension of Time To File U.S. Individual Income Tax Return*;

(19) Form 7004, *Application for Automatic 6-Month Extension of Time To File Certain Business Income Tax, Information, and Other Returns*;

(20) Form 8849, *Claim for Refund of Excise Taxes*;

(21) Form 8868, *Application for Extension of Time To File an Exempt Organization Return*;

(22) Form 9465, *Installment Agreement Request*; and

(23) Any successor forms to the forms listed above, and any future forms or returns that may be filed by Authorized IRS *e-file* Providers.

**.06** This revenue procedure does not cover procedures governing electronic filing of Form 1040NR, U.S. Nonresident Alien Income Tax Return. For procedures governing the electronic filing of Form 1040NR, see Rev. Proc. 2000-24, 2000-1 C.B. 1133.

**.07** This revenue procedure also does not cover providers of information returns that are filed under the FIRE (Filing Information Returns Electronically) Program. See Publication 1220, *Specifications for Filing Forms 1098, 1099, 5498 and W2-G Electronically or Magnetically*. The information returns not covered by this revenue procedure include:

(1) Form 1042-S, *Foreign Person's U.S. Source Income Subject to Withholding*;

(2) Form 1098 series;

(3) Form 1099 series;

(4) Form 5498, *IRA Contribution Information*;

(5) Form 8027, *Employer's Annual Information Return of Tip Income and Allocated Tips*; and

(6) Form W-2G, *Certain Gambling Winnings*.

**.08** Many of the rules governing participation in IRS *e-file* are now set forth in IRS Publications. See section 5.01 of this revenue procedure.

**.09** Rev. Proc. 2005-60, 2005-2 C.B. 449, is revised by adding a new section 9 that provides that the IRS may deny an application to participate in IRS *e-file* or revoke an Authorized IRS *e-file* Provider's participation in IRS *e-file* if the firm, a Principal, or Responsible Official has been enjoined from filing returns because of a Federal or State court order or injunction or other legal action that would prevent participation in the program. In such cases the denied applicant or e-file provider will not be entitled to seek administrative review of the denial under the procedures set out in this revenue procedure.

## SECTION 3. DEFINITIONS

**.01** Authorized IRS *e-file* Provider. A participant in IRS *e-file* is referred to as an "Authorized IRS *e-file* Provider." The five categories of Authorized IRS *e-file* Providers are:

(1) Electronic Return Originator. An Electronic Return Originator (ERO) originates the electronic submission of returns.

(2) Intermediate Service Provider. An Intermediate Service Provider receives tax return information from an ERO (or from a taxpayer or tax-exempt organization that files electronically using a personal computer, modem or the Internet, and commercial tax preparation software), processes the return information, and either forwards the information to a Transmitter, or sends the information back to the ERO (or taxpayer or tax-exempt organization).

(3) Software Developer. A Software Developer develops software for the purposes of (a) formatting electronic return information according to publications issued by the Service that set forth electronic return file specifications and record layouts for tax returns; and/or (b) transmitting electronic tax return information directly to the Service.

(4) Transmitter. A Transmitter transmits electronic return information directly to the Service.

(5) Reporting Agent. A Reporting Agent is an accounting service, franchiser, bank, service bureau, or other entity that complies with Rev. Proc. 2007-38, 2007-25 I.R.B. 1442, and is authorized to perform one or more of the acts listed in Rev. Proc. 2007-38 on behalf of a taxpayer.

The five categories of Authorized IRS *e-file* Providers are not mutually exclusive. For example, an ERO can, at the same time, be a Transmitter, Software Developer, or Intermediate Service Provider depending on the function(s) performed.

**.02** Responsible Official. A Responsible Official is an individual with authority over the IRS *e-file* operation of the office(s) of the Authorized IRS *e-file* Provider, is the first point of contact with the Service, and has authority to sign revised IRS *e-file* applications. A Responsible Official is responsible for ensuring that the Authorized IRS *e-file* Provider adheres to the provisions of this revenue procedure and the publications and notices governing the IRS *e-file* Program.

**.03** Principal. The Principal for a business or organization includes the following:

(1) Sole Proprietorship. The sole proprietor is the Principal for a sole proprietorship.

(2) Partnership. Each partner who has a 5 percent or more interest in a partnership is a Principal. If no partner has at least a 5 percent or more interest in the partnership, the Principal is an individual authorized to act for the partnership in legal and/or tax matters.

(3) Corporation. The President, Vice-President, Secretary, and Treasurer are each a Principal of the corporation.

(4) Other. The Principal for an entity that is not a sole proprietorship, partnership, or corporation is an individual authorized to act for the entity in legal and/or tax matters.

## SECTION 4. ACCEPTANCE TO PARTICIPATE IN THE IRS *e-file* PROGRAM

**.01** Sole proprietors, businesses, and organizations that wish to become an Authorized IRS *e-file* Provider must apply for participation and must be accepted by the Service.

**.02** The procedures governing application to the IRS *e-file* Program are included in Publication 3112, IRS *e-file* Application and Participation.

**.03** The circumstances under which the Service may deny participation in the IRS *e-file* Program are also included in Publication 3112. An applicant who is denied participation may seek administrative review of the denial except as provided for in section 8 of this revenue procedure.

**.04** To continue participation in the IRS *e-file* Program, an Authorized IRS *e-file* Provider must adhere to all requirements of this revenue procedure and the publications and notices governing IRS *e-file*.

## SECTION 5. RESPONSIBILITIES OF AN AUTHORIZED IRS *e-file* PROVIDER

**.01** To ensure that returns are accurately and efficiently filed, an Authorized IRS *e-file* Provider must comply with the provisions of this revenue procedure and all publications and notices governing IRS *e-file*. The Service will from time to time update such publications and notices to reflect changes to the program. It is the responsibility of the Authorized IRS *e-file* Provider to ensure that it complies with the latest version of all publications and notices. The publications and notices governing the IRS *e-file* Program include:

(1) Publication 1345, Handbook for Authorized IRS *e-file* Providers of Individual Income Tax Returns;

(2) Publication 1345A, *Filing Season Supplement for Authorized IRS e-file Providers of Individual Income Tax Returns*;

(3) Publication 1346, *Electronic Return File Specifications and Record Layouts for Individual Income Tax Returns*;

(4) Publication 1436, *Test Package for Electronic Filers of Individual Income Tax Returns*;

(5) Publication 1437, *Procedures for the 1041 e-file Program, U.S. Income Tax Return for Estates and Trusts*;

(6) Publication 1438, *File Specifications, Validation Criteria and Record Layouts for the Electronic Filing Program for Form 1041 U.S. Income Tax Return for Estates and Trusts*;

(7) Publication 1438-A, *(Supplement) for the 1041 e-file Program, U.S. Income Tax Return for Estates and Trusts*;

(8) Publication 1474, *Technical Specifications Guide For Reporting Agent Authorization and Federal Tax Depositors*;

(9) Publication 1855, *Technical Specifications Guide for the Electronic Filing of Form 941, Employer's Quarterly Federal Tax Return*;

(10) Publication 3112, *IRS e-file Application and Participation*;

(11) Publication 3715, *Technical Specifications Guide for the Electronic Filing of Form 940, Employer's Federal Unemployment (FUTA) Tax Return*;

(12) Publication 3823, *Employment Tax e-file System Implementation and User Guide*;

(13) Publication 4162, *Modernized e-file Test Package for Forms 1120/1120S/1120F/7004*;

(14) Publication 4163, *Modernized e-file (MeF) Information for Authorized IRS e-file Providers and Large Taxpayers (Corporations, Partnerships and Tax Exempt Organizations) for TY 2007*;

(15) Publication 4164, *Modernized e-file (MeF) Guide for Software Developers and Transmitters*;

(16) Publication 4205, *Modernized e-file Test Package for Exempt Organization Filings*;

(17) Publication 4505, *Modernized e-file Test Package for Forms 1065/1065-B*;

(18) Publication 4594, *Modernized e-file Test Package for Excise Tax e-file*;

Postings to the IRS Web site at: *http://IRS.gov* on the Internet, and published and future guidance in the Internal Revenue Bulletin and the Federal Register.

**.02** The publications and notices listed in section 5.01 supplement this revenue procedure. A violation of any provision of these publications and notices is considered a violation of this revenue procedure and may subject an Authorized IRS *e-file* Provider to the sanctions provided in section 7 of this revenue procedure.

**.03** The security of taxpayer accounts and personal information is a top priority for the Service. It is the responsibility of each Authorized IRS *e-file* Provider to have security systems in place to prevent unauthorized access to taxpayer accounts and personal information by third parties. The Gramm-Leach-Bliley Act, codified at 15

U.S.C. §§ 6801-6827, includes rules applicable to Authorized IRS *e-file* Providers that are designed to ensure the security and privacy of taxpayer information. Violation of the provisions of the Gramm-Leach-Bliley Act and the implementing rules and regulations promulgated by the Federal Trade Commission, or violations of the non-disclosure rules contained in sections 6713 or 7216 or the regulations promulgated there under, are considered violations of this revenue procedure and may subject an Authorized IRS *e-file* Provider to penalties as set forth in section 6 of this revenue procedure or sanctions provided in section 7 of this revenue procedure.

**.04** In addition to the responsibilities defined in 5.01, 5.02, and 5.03 above, additional Authorized IRS *e-file* Providers responsibilities may be defined in statutes and regulations, revenue procedures, publications, postings to the IRS Web site at: *http://IRS.gov* on the Internet, and published and future guidance in the Internal Revenue Bulletin and the Federal Register.

## SECTION 6. PENALTIES

**.01** Penalties for Disclosure or Use of Information.

(1) An Authorized IRS *e-file* Provider is a tax return preparer under the definition of section 7216(a) of the Code. Tax return preparers are subject to criminal penalties for unauthorized disclosure or use of tax return information. See section 7216 (a). In addition, section 6713 establishes civil penalties for unauthorized disclosure or use of income tax return information by tax return preparers.

(2) In certain situations, under section 7216(b)(2), disclosure of tax return information among Authorized IRS *e-file* Providers for the purpose of electronically filing a return is permissible. For example, an ERO may pass on tax return information to an Intermediate Service Provider and/or a Transmitter for the purpose of having an electronic return formatted and transmitted to the Service.

**.02** Other Preparer Penalties.

(1) Preparer penalties may be imposed against an individual or firm meeting the definition of a tax return preparer under section 7701(a)(36) and section 301.7701-15. Preparer penalties that may be imposed under appropriate circumstances include, but are not limited to, those set forth in sections 6694, 6695, and 6713. Caution: The regulations cited in this section 6.02 do not reflect amendments to the definition of tax return preparer made by the Small Business and Work Opportunity Act of 2007.

(2) Under section 301.7701-15(d)(1), Authorized IRS *e-file* Providers are not tax return preparers for the purpose of assessing most preparer penalties as long as their services are limited to "typing, reproduction, or other mechanical assistance in the preparation of a return or claim for refund."

(3) If an ERO, Intermediate Service Provider, Transmitter, or the product of a Software Developer alters the tax return information in a non-substantive way, this alteration will be considered to come under the "mechanical assistance" exception described in section 301.7701-15(d)(1), and will not cause an Authorized IRS *e-file* Provider to become a tax return preparer. A non-substantive change is a correction or change limited to a transposition error, misplaced entry, spelling error, or arithmetic correction.

(4) If an ERO, Intermediate Service Provider, Transmitter, or the product of a Software Developer alters tax return information in a way that does not come under the "mechanical assistance" exception, such Authorized IRS *e-file* Provider may be held liable for tax return preparer penalties.

**.03** Other Penalties. In addition to the above specified provisions, the Service may impose all appropriate preparer, non-preparer, and disclosure penalties against an Authorized IRS *e-file* Provider as warranted under the circumstances.

## SECTION 7. MONITORING AND SANCTIONING AN AUTHORIZED IRS *e-file* PROVIDER

**.01** The Service will monitor Authorized IRS *e-file* Providers for compliance with the rules governing IRS *e-file*. The Service may sanction an Authorized IRS *e-file* Provider for violating any provision of this revenue procedure or the publications and notices governing IRS *e-file*.

**.02** Sanctions that the Service may impose upon an Authorized IRS *e-file* Provider for violations described in section 7.01 of this revenue procedure include a written reprimand, suspension or expulsion from the program, and other sanctions, depending on the severity of the infraction. Publication 3112 describes the infraction categories and the rules governing the imposition of sanctions.

## SECTION 8. ADMINISTRATIVE REVIEW PROCESS

**.01** An applicant that has been denied participation in IRS *e-file* (see section 4.03 of this revenue procedure) has the right to an administrative review (except as provided in Section 9, below). During the administrative review process, the denial of participation remains in effect.

**.02** An Authorized IRS *e-file* Provider may seek administrative review for any sanction the Service may impose under section 7 of this revenue procedure.

**.03** Publication 3112 describes the procedures regarding administrative review of a denial of participation in IRS *e-file* and any sanction imposed by the Service.

## SECTION 9. DENIAL OF APPLICATION OR REVOCATION OF AN AUTHORIZED IRS *e-file* PROVIDER'S PARTICIPATION IN IRS *e-file* DUE TO COURT INJUNCTION OR OTHER LEGAL ACTION

**.01** The Service may deny an Application to participate in IRS *e-file* or revoke an Authorized IRS *e-file* Provider's participation in IRS *e-file* if the Provider, a Principal, or Responsible Official is enjoined from filing returns because of a Federal or State court injunction.

**.02** The Service may deny an application or revoke an Authorized IRS *e-file* Provider's participation in IRS *e-file* if the Provider, Principal, or Responsible Official is prohibited from filing returns by any Federal or State legal action that would prohibit them from participation. A type of such legal action would be a Federal Executive Order such as Executive Order 13224 (September 23, 2001), which involves prohibitions directed at terrorist individuals or organizations. An organization described in this Executive Order would not be given IRS *e-file* privileges.

**.03** If an Authorized IRS *e-file* Provider's participation in IRS *e-file* is revoked under this section, the Authorized IRS *e-file* Provider is not entitled to the Administrative Review Process set forth in Section 8 and cannot administratively appeal a revocation of its participation in IRS *e-file*. Nor can an applicant appeal its denial to participate in the program. If, however, the injunction or other legal action expires or a reviewing court reverses it, the enjoined Authorized IRS *e-file* Provider or denied applicant may reapply to participate in IRS *e-file* after the injunction or other legal action expires or the appellate decision reversing the injunction becomes final.

## SECTION 10. PILOT PROGRAMS

**.01** The Service regularly conducts pilot programs to introduce new technology into the IRS e-file Program. These pilot programs are usually conducted within a limited geographic area or within a limited taxpayer or practitioner community. The Service establishes rules for participating in these pilot programs and embodies these rules

in an implementing document typically referred to as a "Memorandum of Under-
standing" or "Memorandum of Agreement." Pilot participants must agree to the pro-
visions of the implementing document in order to participate in the pilot program.

**.02** An implementing document supplements this revenue procedure, but does not
supersede it.

**.03** A violation of a provision of an implementing document is considered a violation
of this revenue procedure and may subject the participant to sanctions (see section
7 of this revenue procedure).

## SECTION 11. EFFECT ON OTHER DOCUMENTS

Rev. Proc. 2005-60, 2005-2 C.B. 449, is superseded.

## SECTION 12. EFFECTIVE DATE

This revenue procedure is effective June 25, 2007.

## SECTION 13. INTERNAL REVENUE SERVICE OFFICE CONTACT

All questions regarding this revenue procedure should be directed to the Service.
The telephone number for this purpose is (202) 283-0261 (not a toll-free number).

## SECTION 14. DRAFTING INFORMATION

The principal author of this revenue procedure is Michael E. Hara of the Office
of Associate Chief Counsel (Procedure & Administration). For further information
regarding this revenue procedure, contact Michael E. Hara at (202) 622-4910 (not
a toll-free call).



Department of the Treasury
**Internal Revenue Service**

w w w . i r s . g o v

Publication 3112 (Rev. 03-09)
Catalog Number 25992L

# Exhibit L

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3       _____

 4    NICHOLAS MARTIN, on behalf   |
      of himself and others        |
      similarly situated,          |
 5                                  |
                     Plaintiff,    |  CASE NO.
 6                                  |
               vs.                 |  1:10-CV-3494
 7                                  |
      CCH, INCORPORATED,           |
 8                                  |
                     Defendant.    |
 9       _____

10

11          30(b)(6)DEPOSITION OF CCH, INCORPORATED
12             BY AND THROUGH BRIAN HOLBROOK
13
             Friday, June 17, 2011
14
                  9:15 a.m.
15
              Suite 2100
16         1230 Peachtree Street, N.E.
              Atlanta, Georgia
17
18
19
20       Lisa A. Hunsicker, RMR, CRR, CCR-A-421
21
22
23
24
```

Page 2

```
 1              APPEARANCES OF COUNSEL

 2
 3    On behalf of the Plaintiff:
 4        ALEXANDER H. BURKE, Esq.
          Burke Law Offices, LLC
 5        Suite 9020
          155 North Michigan Avenue
 6        Chicago, Illinois 60601
          312-729-5288
 7
          SHENNAN KAVANAGH, Esq.
 8        Roddy, Klein & Ryan
          Second Floor
 9        727 Atlantic Avenue
          Boston, Massachusetts 02111
10        617-357-5500
11
      On behalf of the Defendant:
12
          DAVID L. HARTSELL, Esq.
13        McGuireWoods
          Suite 4100
14        77 West Wacker Drive
          Chicago, Illinois 60601
15        312-849-8100
16        SARAH A. ZIELINSKI, Esq.
          (By Telephone)
17        McGuireWoods
          Suite 4100
18        77 West Wacker Drive
          Chicago, Illinois 60601
19        312-849-8100
20
21                    - - -
22
23
24
```

Page 3

```
 1              TABLE OF CONTENTS

 2
 3    Plaintiff's
      Exhibit          Description              Page
 4
 5       1      Fourth Revised Notice of         43
                Deposition
 6
 7       2      Collection of SQL statements     44

 8
 9
10
11
12
13
14       (Original Exhibits 1 and 2 have been attached to
      the original transcript.)
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1          (Reporter disclosure made pursuant to
 2       Article 10.B of the Rules and Regulations of the
 3       Board of Court Reporting of the Judicial Council
 4       of Georgia.)
 5                  BRIAN HOLBROOK,
 6    having been first duly sworn, was examined and
      testified as follows:
 7
 8                  CROSS-EXAMINATION
 9    BY MR. BURKE:
10       Q.   Would you state your name for the record,
11    please.
12       A.   Brian Holbrook.
13       Q.   Brian, where are you employed?
14       A.   I'm employed at CCH Small Firm Services.
15       Q.   Have you ever given a deposition before?
16       A.   No.
17       Q.   The court reporter will take down your
18    answers to my questions so you have to make sure that
19    your answers are audible.
20       A.   Okay.
21       Q.   That was a good one.  Uh-huhs don't work.
22    If you ever need a break just let me know and we'll
23    take a break.  If you don't understand a question or
24    you need clarification let me know and I'll clarify
```

Page 5

1   it.  Okay?
2       A.    Okay.
3       Q.    And if you give an answer I'm going to
4   understand that you understood my question and that
5   you answered it completely and accurately.  Okay?
6       A.    Okay.
7       Q.    What is CCH Small Firm Services?
8       A.    We are a developer of tax and accounting
9   software for professionals.
10      Q.    What is CCH Small Firm Services'
11  relationship to CCH, Inc.?
12      A.    CCH, Inc., acquired TaxWise and ATX
13  approximately four years ago and merged together into
14  CCH Small Firm Services.
15            MR. HARTSELL:  Alex, I forgot that I was
16       supposed to call Sarah and conference her in.  Do
17       you care if I do that if she's just on the
18       telephone?
19            MR. BURKE:  No, that's fine.
20            (Off the record.)
21      Q.    (By Mr. Burke)  I think you said just now
22  that CCH, Inc., acquired ATX and TaxWise; is that
23  right?
24      A.    Correct.

Page 6

1       Q.    And where does CCH Small Firm Services fit
2   in?
3       A.    CCH Small Firm Services is the business
4   unit name for the two product lines that were
5   acquired.
6       Q.    Do you know what Wolters Kluwer is?
7       A.    Wolters Kluwer is the parent company that
8   owns CCH.  I don't know any of the details of the
9   corporate relationship or how that plays out.
10      Q.    Who writes your paycheck?
11      A.    My paycheck is electronically deposited by
12  CCH Small Firm Services.
13      Q.    What is your job title at CCH?
14      A.    My current job title is director of
15  business operations.
16      Q.    And what are your duties as director of
17  business operations?
18      A.    Numerous and varied.  I have three
19  departments reporting to me which include our MIS
20  team, our web development team and our revenue
21  operations and analysis team.
22      Q.    What does MIS mean?
23      A.    Management information systems.
24      Q.    And how many people are under you in the

Page 7

1   MIS department?
2       A.    Six individuals.
3       Q.    And what do those individuals do?
4       A.    They're responsible for the development
5   and ongoing support and maintenance of our internal
6   back-office systems.
7       Q.    So PCs and servers and such?
8       A.    No.
9       Q.    What does that mean, then?
10      A.    They deal with software at an enterprise
11  level across the back-office, our CRM system.  We have
12  an information technology group that does desktop
13  support and such.
14      Q.    So would it be accurate to say CCH has
15  some sort of proprietary software management that
16  these six people deal with?
17      A.    I don't know what you mean by proprietary.
18      Q.    What is the software these six people deal
19  with?
20      A.    Primarily our CRM system and our
21  accounting system.
22      Q.    What does CRM mean?
23      A.    Our customer relationship management
24  system.

Page 8

1       Q.    How many people are in the web development
2   department under you?
3       A.    Four individuals.
4       Q.    And what do those people do?
5       A.    They develop and maintain our customer
6   support sites and online training tools as well as the
7   back-end front marketing sites.
8       Q.    For sure if I ever interrupt you just keep
9   going.  Okay?  I don't mean to interrupt you.
10            Then I think you said the third thing was
11  revenue analysis?
12      A.    Revenue operations and analysis, yes.
13      Q.    What does that mean?
14      A.    These are the individuals that are
15  responsible for supporting the sales department in
16  terms of reporting, dialer operation and ongoing daily
17  tasks such as lead assignment, voice mail
18  distribution.
19      Q.    Did you say dialer operation?
20      A.    Correct.
21      Q.    What do you mean by dialer operation?
22      A.    The individual, the dialer specialist, the
23  individual that's most familiar with the dialer and
24  the one that deals with the operation of the dialers

Page 9

1    is the one that resides in that department.
2        Q.    Who is that person who is most familiar
3    with the dialer?
4        A.    Daniel Wilson.
5        Q.    What is Daniel Wilson's title?
6        A.    I believe it's dialer specialist.
7        Q.    And is there a dialer team?
8        A.    No.
9        Q.    Is Daniel Wilson the only person who deals
10   directly with the dialer or are there others?
11       A.    He is the primary individual.  The other
12   individuals on the team do have access in case he's on
13   vacation or something happens.
14       Q.    So he's the main guy and then there are
15   others who sort of know the deal but --
16       A.    They know bits and pieces.  He is the main
17   resource responsible.
18       Q.    Is he here in the Atlanta area?
19       A.    He lives in Rome.
20       Q.    Georgia?
21       A.    Correct.
22       Q.    What is your educational background?
23       A.    I have a -- I attended Berry College.
24       Q.    Where is that?

Page 10

1        A.    Rome, Georgia.
2        Q.    And did you get a degree?
3        A.    Yes.
4        Q.    What year?
5        A.    I graduated in 1999.
6        Q.    And what is the degree?
7        A.    Bachelor of Science in psychology.
8        Q.    After college what did you do?  Did you
9    become employed?
10       A.    I went to work for TaxWise.
11       Q.    What did you do when you began at TaxWise
12   in 1999?
13       A.    I was the sales administrative assistant.
14       Q.    It sounds like you were an administrative
15   person rather than like a salesperson.  Is that right?
16       A.    Correct.
17       Q.    At some time you were promoted?
18       A.    Correct.
19       Q.    What was your next position?
20       A.    Sales analyst.
21       Q.    That sounds like a big jump.
22       A.    Not really.
23       Q.    No?  Okay.  What were your duties as sales
24   analyst?

Page 11

1        A.    Basically to provide reporting to the
2    sales management and executive group as required.
3        Q.    Reporting as to how sales were going?
4        A.    Correct.
5        Q.    What was your job after sales analyst?
6        A.    Business analyst.
7        Q.    What were your duties as business analyst?
8        A.    I worked directly for the CEO at the time
9    mainly reporting and whatever else he asked me to do.
10       Q.    And after business analyst?
11       A.    I was revenue operations and analysis
12   manager.
13       Q.    You have been at this company for a long
14   time.
15       A.    Yes.
16       Q.    After revenue operations and analysis
17   manager what was your title?
18       A.    MIS manager, the management information
19   systems group.
20       Q.    And after MIS manager?
21       A.    Business analyst once again.
22       Q.    Then?
23       A.    Director of business operations.
24       Q.    How long have you been director of

Page 12

1    business operations?
2        A.    Since last March.
3        Q.    And does Daniel Wilson report directly to
4    you?
5        A.    Correct.
6        Q.    And who do you report to?
7        A.    John Hutchinson, our CFO.
8        Q.    What is your interaction with other
9    departments in CCH?
10       A.    Constant.
11       Q.    Constant?  Okay.  Can you tell me what
12   other departments -- other than the three beneath you
13   what other departments do you deal with?
14       A.    Essentially everyone.  Because we deal
15   with the back-office systems our customers for most of
16   our departments are, in fact, our internal workers, so
17   we deal with everyone from sales, accounting, customer
18   service, development, fulfillment, executive group;
19   literally everyone in the building.
20       Q.    How does CCH market its products?
21       A.    We market our products to tax and
22   accounting businesses.  There are numerous ways we do
23   this.  We do trade shows which are very prevalent.  I
24   think we've averaged probably 20 trade shows that we

## Page 13

1  attend each trade show season over the last four or
2  five years.
3            We advertise in market publications that,
4  you know, cater to tax and accounting professionals.
5  I believe we've had an average of 30 advertisements
6  each year in marketing publications.
7            We also engage in direct mail.  I'm not
8  entirely certain, but I believe we've had an average
9  of around 10 direct mail pieces a year with that
10  number diminishing.  The trend is kind of going by the
11  wayside, the direct mail.
12            Then with increasing frequency over the
13  last several years we utilize the web for -- you know,
14  try to optimize searches that drive traffic to our
15  site and we have some interactive demos through a
16  company called Runaware which also drives traffic to
17  our site where these individuals in these businesses
18  can go out and interact with our product and if they
19  wish to, you know, buy our product they'll submit
20  information to us via our website.
21      Q.    When you say "our product" what do you
22  mean?
23      A.    We have multiple products which are
24  designed for tax and accounting professionals to use

## Page 14

1  in their business.  That includes tax preparation
2  software, it includes various accounting software and
3  includes professional research products that
4  businesses will use.  If they have, you know, any
5  questions about whatever accounting or tax issues
6  they're dealing with they have access to online
7  research.
8      Q.    Legal research?
9      A.    We do not deal with any legal research.
10  It's mostly tax research in terms of tax code.
11      Q.    Does CCH also use dialers to advertise?
12      A.    CCH U.S. or CCH Small Firm Services?
13      Q.    CCH Small Firm Services.
14      A.    Define advertise.
15      Q.    Well, you testified earlier that there's a
16  dialer, right?
17      A.    Correct.
18      Q.    Is there just one dialer or is there more
19  than one?
20      A.    There's one physical dialer.
21      Q.    How does CCH use the dialer?
22      A.    The dialer is used in a variety of
23  capacities by both our renewal and new sales
24  departments.

## Page 15

1      Q.    How does the renewal use it?
2      A.    Our products are on an annual renewal
3  cycle as opposed to your standard licensed maintenance
4  model and so our renewal group uses the dialer to
5  contact existing customers to try to solicit their
6  renewal of a tax product or accounting product for a
7  given year.
8      Q.    How does the sales department use the
9  dialer?
10      A.    They use it in a similar manner except
11  they're contacting prospective businesses.
12      Q.    What kind of dialer is it that is used?
13      A.    It's called Avaya PDS which stands for
14  predictive dialing system or predictive dialer system.
15  I'm not certain which of those two.
16      Q.    So how does a dialer work?  From a human
17  perspective how does a dialer work?  What do human
18  beings have to do in order to make a dialer campaign
19  happen?
20      A.    We have multiple points of involvement
21  both from our sales management staff, our dialer
22  specialist and our reps in order for any dialer
23  campaign to occur.
24      Q.    Well, let's start from the beginning.  For

## Page 16

1  a sales dialer campaign, who typically comes up with
2  the idea that a sales dialer campaign should happen?
3      A.    Typically it's a member of our sales
4  management.  Sometimes they work with product
5  management to identify opportunities in the
6  marketplace.
7      Q.    Is there a sales management team?
8      A.    Yes.
9      Q.    How many people are in that team?
10      A.    There's one director and three managers in
11  the inside sales group.  We also have a field sales
12  group, but they do not utilize a dialer.
13            Inside meaning they're all on site rather
14  than traveling around the country; is that right?
15      A.    Correct.
16      Q.    What are those people's names?  Who is the
17  one director?
18      A.    The director of new sales is Sam Burton.
19      Q.    Is Mr. Burton in the Atlanta area?
20      A.    Correct.
21      Q.    And then who are the three managers?
22      A.    The current managers are Molly Lewis,
23  Kawana Etterly, don't ask me to spell it, and Urie
24  Michaud.  Again, don't ask me to spell it.

Page 17

```
 1      Q.     Are Ms. Lewis, Ms. Etterly and
 2 Mr. Michaud, are they all in the Georgia area as well?
 3      A.     Yes, correct.  They're all Ms., but yes.
 4 Molly, Kawana and Urie, yes.
 5      Q.     So would it be accurate to say that
 6 typically a sales dialer campaign originates with one
 7 of these four people?
 8      A.     Correct.
 9      Q.     So when one of these salespeople decides
10 to do a campaign what do they do?
11      A.     They'll typically go over to our dialer
12 specialist and tell him here's the campaign we want to
13 run.
14      Q.     Are their offices close to each other or
15 are there cubes?
16      A.     They all sit right there together.
17      Q.     Do you know what I mean when I say dialer
18 campaign?
19      A.     I believe so, but if you would like to
20 expound upon it to make sure I'm on the same page.
21      Q.     Sure.  By campaign I mean when a group of
22 numbers is loaded into the dialer as part of a
23 particular sales initiative.  Okay?
24      A.     Okay.
```

Page 18

```
 1      Q.     Is there some word or term other than
 2 campaign that is used?
 3      A.     Typically campaign or job would be the
 4 common nomenclature.
 5      Q.     Would it be accurate to say that the four
 6 salespeople are each responsible for some different
 7 segment of sales?
 8      A.     No.  It's just a management structure so
 9 that they have a certain number of individuals they
10 try to manage effectively.
11      Q.     And do they sit in cubes or do they have
12 offices along a wall or how does that work?
13      A.     Directors have offices, managers have
14 cubes.
15      Q.     I'm just trying to get a picture in my
16 head.  Are they all on the same floor?
17      A.     Yes.
18      Q.     All in the same general area?
19      A.     Yes.
20      Q.     Can you describe the area where they are?
21      A.     It's basically a section of the third
22 floor in our building with, you know, just rows of
23 cubes more or less.
24      Q.     And Mr. Wilson, Ms. Lewis, Ms. Etterly and
```

Page 19

```
 1 Ms. Michaud, their cubes are all really close to each
 2 other, correct?
 3      A.     Correct.
 4      Q.     And then Mr. Burton's office is also right
 5 there?
 6      A.     There's a short physical separation, yes,
 7 but they're all in the same area.
 8      Q.     So I think you told me that the
 9 salespeople walk over to Mr. Wilson's desk and ask for
10 a campaign, right?
11      A.     Correct.
12      Q.     When Mr. Wilson has a salesperson talking
13 about a campaign, do you know what he does to
14 implement the campaign?
15      A.     It depends on the nature of the request.
16      Q.     Okay.  Say there's a sales and marketing
17 campaign that one of these salespeople wants to do and
18 they walk over to Mr. Wilson's desk and ask for a
19 campaign.
20             Do you know how he implements that
21 campaign or what he does when he receives a request
22 like that?
23      A.     Typically he'll ask for, you know,
24 refinement of the request; that they have to provide
```

Page 20

```
 1 parameters to him regarding what campaign they want to
 2 run.
 3      Q.     And what sort of parameters are we talking
 4 about?
 5      A.     Campaigns are -- it varies by new sale or
 6 renewal.  A new sale is typically influenced by market
 7 conditions or, you know, some type of product
 8 management initiative wherein we think we have a
 9 competitive advantage versus one of our competitors,
10 or it could be driven by legislation in a state
11 mandating e-filing and that provides us an
12 opportunity.
13             Renewals is slightly different because
14 we're contacting current customers.  We have
15 additional attributes of those customers and known
16 behaviors that we use to produce certain jobs at
17 certain times of the year.
18      Q.     Where do the telephone numbers that are
19 used in a campaign, where do those telephone numbers
20 come from; do you know?
21      A.     Are you referring to the initial source or
22 from the system which is utilized internally?
23      Q.     Let's start with the initial source.  What
24 is the initial source for telephone numbers that are
```

Page 21

1    used in a sales campaign, initial sales campaign?
2         A.    For the new sales campaign?
3         Q.    Yes, new sales.
4         A.    The source of the numbers is from
5    OnContact which is our prospect database and those
6    sources come from the aforementioned trade shows,
7    direct mail, the trade publications.
8         Q.    When you say they come from trade
9    publications do you mean -- what do you mean?
10        A.    Responses to advertising in trade
11   publications.  Typically it's some call to action
12   driving the individual reading the magazine to call
13   our support site or to call the number directly if
14   they wish to utilize our products in their business.
15        Q.    Are telephone numbers sometimes obtained
16   through Freedom of Information Act requests?
17        A.    Yes.
18        Q.    Can you tell me about those FOIA requests?
19        A.    Starting approximately four years ago we
20   made a request under the Freedom of Information Act to
21   the IRS for the information of businesses that filed
22   paid returns with the IRS in the prior tax season.
23        Q.    Was it a written request for this
24   information?

Page 22

1         A.    I believe so, yes.
2         Q.    And was that in 2006, then?
3         A.    I'm not certain of the initial date.
4         Q.    Roughly 2006?
5         A.    Most likely.
6         Q.    And how many times have FOIA requests been
7    made to the IRS; do you know?
8         A.    I'm not certain how many times we've
9    actually made the request.  I do believe we have had
10   four different lists delivered from the IRS.  I wasn't
11   involved with the actual process of making the request
12   so I don't know what was required to receive those.
13        Q.    Do you know who was involved in requesting
14   the lists?
15        A.    I believe it was primarily Lenny Holt who
16   was one of our VPs at the time.
17        Q.    VP of?
18        A.    At one point he was VP of customer care
19   and then he transitioned to VP of business
20   development, I believe.
21        Q.    I think I've seen those FOIA lists.
22   They're pretty big, aren't they?
23        A.    Yes, very large.
24        Q.    Couple a hundred-thousand names,

Page 23

1    addresses, phone numbers?
2         A.    I'm not certain of the exact size, but,
3    yes, they're very large files.
4         Q.    Text files?
5         A.    Yes, they're delivered in text files.
6         Q.    Comma delimited?
7         A.    I don't recall the specifics of the text
8    file.
9         Q.    So it can go straight into a database,
10   right?
11        A.    Yes, it can be loaded into a database.
12        Q.    So the salespeople walk over to
13   Mr. Wilson's desk and talk to Mr. Wilson about
14   parameters for a campaign, right?
15        A.    Correct.
16        Q.    And they probably discuss -- well, they
17   discuss who they want the campaign to go to, right?
18        MR. HARTSELL:  Object to the form of the
19        question.  Your question was they probably
20        discuss.  I mean, why don't you just ask him what
21        they discuss.
22        Q.    (By Mr. Burke)  What do they discuss?
23        A.    I don't know the specifics.  I'm not
24   involved in the process.  They make a request of what

Page 24

1    they want in the campaign and Daniel carries it out.
2         Q.    You said that the prospect database is
3    OnContact software; is that right?
4         A.    Correct.
5         Q.    Do the salespeople have OnContact on their
6    desktops?
7         A.    Yes.  The user interface is on the
8    salespeople's desktops.
9         Q.    Can the salespeople manipulate OnContact
10   at their workstation before they walk over to
11   Mr. Wilson's desk to decide who they want to include
12   in their query?
13        A.    I'm not sure I understand the question.
14        Q.    Can the salespeople play with the
15   OnContact system to try to formulate their campaign so
16   they have a good idea of what they want to talk to
17   Mr. Wilson about?
18        A.    First of all, it's the sales managers that
19   speak to Mr. Wilson but there's limited utility there.
20   It's designed around the tracking of incidents for an
21   individual salesperson, not any type of manipulation
22   by sales management.
23        Q.    You said incidents by any sales manager?
24        A.    When I say incidents I mean any

1  interaction by a prospective customer with the
2  salesperson.
3      Q.    So if somebody who's in the database calls
4  in that would probably be noted through the OnContact
5  software; is that right?
6      A.    The interaction should be logged, yes.
7      Q.    Are outgoing interactions logged through
8  OnContact, for example, dialer calls?
9      A.    The salespeople should be logging any
10 interactions they have with prospects.
11     Q.    What about dialer calls?
12     A.    It's no different than any other
13 interaction.  When they interact with a prospect part
14 of their business process is to record that
15 interaction in their notes or incidents.  We refer to
16 notes and incidents as the same thing.  It's basically
17 an indicator of interaction between a salesperson and
18 a prospective business.
19     Q.    Do you have OnContact on your desktop?
20     A.    No.
21     Q.    Do other salespeople other than the sales
22 director and managers have OnContact on their
23 desktops?
24     A.    Yes.  The user interface is on all the

1  salespeople -- new sales individuals' desktops.
2      Q.    How many new sales individuals are there?
3      A.    I don't know the exact number.  I believe
4  approximately 25 to 30 sales reps.
5      Q.    And so the hierarchy is there's one
6  director, there's three managers and then what's the
7  next level down?
8      A.    Sales rep.
9      Q.    Is there anything below that?
10     A.    No.
11     Q.    Are you familiar with the OnContact
12 interface generally?
13     A.    Vaguely.
14     A.    Vaguely.
15     A.    It's fairly simple.
16     Q.    So if John Doe were to call in and talk to
17 a sales rep probably that sales rep would pull up --
18 if he's in the database the sales rep would pull up a
19 record having to do with John Doe on the OnContact
20 software, right?
21     A.    Yes.  Any in-call the sales rep should
22 utilize OnContact to search for that individual to see
23 if they're an existing prospect or if they're assigned
24 to another rep.

1      Q.    What information would be available to the
2  sales rep when they pull up a prospective customer on
3  OnContact?
4      A.    The standard name, address, phone number,
5  any prior interactions sales reps have had with that
6  individual.  If the customer -- if that prospect has
7  purchased from us in the past or has some other
8  product of ours already a sold indicator would be in
9  there.  Then typically what they're most interested in
10 is the competitor tax package this individual was
11 utilizing and any type of transactional volume data
12 that may be available for that customer.  When I say
13 that I mean the number of returns that business has
14 filed in the past.
15     Q.    What other information about interactions
16 between CCH and that prospective customer would be
17 available?  For example, dialer calls?
18     A.    The dialer call -- any connect via the
19 dialer would be logged in as any other incident within
20 OnContact.  It would just be another note in there
21 with, you know, comments.
22     Q.    So once Mr. Wilson and the sales manager
23 or director figures out what the parameters for the
24 particular campaign will be then what happens?

1      A.    He'll take those parameters and modify
2  essentially a template script.  It's a SQL script.
3  That's structured query language.  He'll put that
4  script in what's called a SQL editor.  It's a tool we
5  use for interacting directly with tables in a database
6  and he will then execute that query against the
7  database.
8      Q.    And does he do that through OnContact or
9  through some other software?
10     A.    No.  PL/SQL Developer is the tool he's
11 utilizing.
12     Q.    PL --
13     A.    It's PL/SQL Developer.  It stands for
14 procedural language/structured query language
15 developer.
16     Q.    That sounds like it's a programming
17 development software tool.
18     A.    It's a tool intended for utilization for
19 either running queries or designing code for Oracle
20 databases.  In the instance of the dialer specialist
21 it is used strictly for executing queries.
22     Q.    So does OnContact run on Oracle, then?
23     A.    Correct.  I should say the database
24 resides on Oracle.  The OnContact application itself

Page 29

1   is a PowerBuilder application that resides on the
2   desktop in terms of the UI.
3       Q.    What does PowerBuilder mean?
4       A.    It's a programming language.
5       Q.    So would it be accurate to say that the
6   desktops that the sales managers and directors have
7   are not just simple Windows machines?
8       A.    No, they're standard Windows machines.
9       Q.    Windows machines that's running this
10  PowerBuilder --
11      A.    PowerBuilder is just the language in which
12  the application is built.  It's no different than any
13  other application.  You know, several different common
14  applications are built in PowerBuilder.  Our
15  accounting system UI is built in PowerBuilder.  It's
16  no different than C# .NET.  It's just a type of
17  language you use to code a program.
18      Q.    Do you know if Mr. Wilson's machine is a
19  Windows machine?
20      A.    I believe so.
21      Q.    Do you know if it's like Windows 98, XP,
22  7, Windows Me?
23      A.    I don't know what version Windows he has
24  on his machine.

Page 30

1       Q.    What version do you have?
2       A.    That's a very good question.  I believe I
3   still have XP Business on mine.
4       Q.    I think a lot of businesses have XP
5   Business.
6       A.    It's much more solid than 7.
7       Q.    I made a mistake when I converted to 7;
8   got totally screwed on a lot of stuff.
9             So the OnContact software is located on
10  the desktops of the salespeople.  Where is the
11  database itself located?  Is it on a server?
12      A.    Yes.
13      Q.    It's an Oracle server?
14      A.    Yes.
15      Q.    Where physically is that Oracle server?
16      A.    It is in our Kennesaw data room at our
17  Kennesaw office, our server room.
18      Q.    Is it just on one server?
19      A.    I believe so.
20      Q.    Of course, Mr. Wilson must also be
21  connected to that server.
22      A.    I don't know that -- again, we have to
23  define connect to the server.  He can access the
24  database utilizing the OracleClient, but in terms of

Page 31

1   actually accessing the server itself, no.  That's
2   logged down to just our IT individuals, the ones that
3   are responsible for the server and network
4   maintenance.
5       Q.    So after Mr. Wilson runs the query then
6   what happens?
7       A.    The results are returned within the SQL
8   editor.  He will then export the results as a text
9   file.
10      Q.    So a text file is created somewhere?
11      A.    Correct.
12      Q.    On his PC?
13      A.    I don't know the specific location where
14  he does the initial creation.
15      Q.    And then what does he do with the text
16  file?
17      A.    He then FTP's the text file somewhere on
18  the dialer server to make it available for load into
19  the dialer.
20      Q.    FTP is like a download type thing?
21      A.    File transfer protocol.
22      Q.    So without getting hypertechnical it means
23  that he uploads the data directly to the dialer
24  somehow?

Page 32

1       A.    I'm not sure -- if we want to get very
2   technical, directly to the dialer, no.  There are
3   multiple steps involved.  There's the export to
4   wherever, I don't know if he's using his hard drive,
5   and then that file is transferred via FTP to the
6   staging site where it is then pulled from that site
7   into the dialer.  Then there are different naming
8   conventions that have to be utilized and then
9   technical details that I'm not familiar with.
10      Q.    So at some point that text file gets
11  loaded into the dialer, right?
12      A.    Yes.  Once it's made available on the FTP
13  site Daniel can then use the dialer administration
14  module to take those records and load them up into one
15  of the -- the different job templates within the
16  dialer.
17      Q.    Is there like a workstation that's
18  dedicated to the dialer?
19      A.    It's on the dialer specialist's machine.
20      Q.    So the dialer has a screen on it or is it
21  just like a box?  What does it look like?
22      A.    It looks like any other server.  It's a
23  box in our server room.  The administration module is
24  installed on our data specialist's PC.

Page 33

1    Q.    So Mr. Wilson's PC can control the dialer;
2  is that right?
3    A.    He can administer it to the extent that he
4  is allowed to as a user, yes.
5    Q.    So once the numbers are loaded into the
6  dialer does somebody press a button to make the calls
7  or how does that happen?
8    A.    The calls are usually coordinated and it
9  depends on the type of calling campaign as far as how
10  it's going to be initiated.  There are three different
11  types of campaigns and there's differences to the
12  three different types of campaigns.
13    Q.    What are the three types of campaigns?
14    A.    Managed, predictive and virtual.
15    Q.    Are all three used by CCH?
16    A.    Yes.
17    Q.    What is a managed campaign?
18    A.    A managed campaign starts the same way as
19  every campaign, with a request for information, the
20  process of loading into the dialer, and then a managed
21  campaign essentially -- what happens in a managed
22  campaign, a rep logs into a managed campaign.  The rep
23  is presented with a preview of the next call to be
24  made.  The rep then has the ability to either click a

Page 34

1  button to execute that call immediately, click a
2  button to abort the call or wait for the call to be
3  placed.  So a managed campaign, it's essentially up to
4  the rep to initiate the call.
5    Q.    When you say rep you mean the salesperson,
6  right?
7    A.    The salesperson, the sales rep, yes.
8    Q.    So basically the dialer is standing by?
9    A.    Correct.
10    Q.    I think you testified that either the rep
11  can press a button or the rep can just let the dialer
12  make the call, right?
13    A.    Correct.  There are three options.
14  Essentially a managed call preview is shown to the rep
15  and, as I'm told by our data specialist, they can
16  either click a button to execute the call immediately,
17  they can click a button to abort the call for whatever
18  reason or if they do neither of those the call will be
19  placed in a certain time period.
20    Q.    Do you know what sort of campaigns are
21  best to use a managed campaign with?
22    A.    I can't speak to what they prefer with
23  respect to managed campaigns.
24    Q.    Certainly you have to have reps at work,

Page 35

1  right --
2    A.    Correct.
3    Q.    -- and are available?
4    A.    Correct.
5    Q.    There's a little bit of human involvement
6  there?
7    A.    It's entirely dependent upon the rep's
8  involvement.  No calls are made in the absence of a
9  rep being logged in to a managed campaign.  You can
10  set up a campaign and it can be sitting there, you
11  know, on the dialer ready to go, if you will, but
12  nothing is going to occur until a rep logs in, makes
13  himself active and says, okay, I'm ready to place a
14  call.
15    Q.    How about a predictive campaign?
16    A.    A predictive campaign is fundamentally
17  different in that the dialer uses the software and
18  then algorithms to place outbound calls and then upon
19  connect it will route that outbound call to a waiting
20  representative.
21    Q.    So predictive is closer to like autopilot?
22    MR. HARTSELL:  Object to the form.
23    Q.    (By Mr. Burke)  Would you agree?
24    A.    I don't know what you mean by autopilot.

Page 36

1    Q.    So there are operators waiting and as
2  people answer calls that are made by the dialer calls
3  are routed to sales agents, right?
4    A.    Correct.
5    Q.    Does it ever happen that there's no agent
6  available to talk to somebody who has answered one of
7  these predictive calls?
8    A.    It is a possibility.  However, there's
9  heavy involvement on the part of the sales management
10  and the dialer specialist.  We don't want to leave a
11  bad taste in any business mouth that might shoot
12  ourselves in the foot for future interactions in
13  trying to get that business to use our product, so our
14  sales management is responsible for ensuring that reps
15  are available and on the phone.
16    There are administrative tools through
17  that admin module that our specialist has that anytime
18  a predictive call is running he is actually the one
19  that's started it, you know, it's not automatic, it's
20  him actually starting the job, and then he also
21  monitors the job.  He has tools available to see if
22  there is anybody where a connect is made and a sales
23  rep isn't available and if that does become the case
24  he can either slow down or stop the job.

Page 37

1    Q.    The third kind of job is a virtual job.
2    Can you tell me about a virtual job, please?
3    A.    A virtual job is a job created with the
4    express intent of communication via a message.  We
5    utilize it not that frequently relative to the other
6    jobs.  One of the most frequent utilizations of that
7    is when we have important industry news or IRS
8    regulation or timing announcements that we need to
9    make to our customer base.
10   Q.    And when you say a message do you mean
11   like a message that was prerecorded?
12   A.    Correct.
13   Q.    Somebody sometime must have recorded each
14   of those messages, right?
15   A.    Correct.
16   Q.    Is there a certain person at CCH who has a
17   great voice that usually records those or is there a
18   third party that's hired to do so?
19   A.    Actually, we do have a person with a voice
20   that we use to record those.
21        MS. KAVANAGH:  It's his voice.  You have a
22   good voice.
23        THE WITNESS:  Thank you.  I've never heard
24   that one.  I very much dislike my voice when I

Page 38

1    hear it on phone recordings.
2        We have a multimedia studio that we use
3    for the creation of our online demos and we have
4    a streaming video to our customers that we
5    utilize.  The individual in that studio, Ben
6    Cleary, our manager of that facility, is the one
7    who typically does that recording.
8    Q.    (By Mr. Burke)  Ben Cleary?
9    A.    Ben Cleary.
10   Q.    How do you spell that last name?
11   A.    C-l-e-a-r-y, I believe.
12        (Off the record.)
13   Q.    (By Mr. Burke)  Are you familiar at all
14   with a dialer job on May 31st, 2010?
15   A.    I understand based on the admissions that
16   there was a job.  I'm not familiar with -- I guess I
17   need more information.  Through the research I have
18   some information regarding the job.
19   Q.    I can tell you May 31st, 2010, was
20   Memorial Day last year.  Okay?
21   A.    Okay.
22   Q.    It looks like there were roughly 3,000
23   phone calls made at least based on my review of phone
24   records.

Page 39

1        Does that sound about right based on your
2    knowledge of the situation?
3    A.    I can't speak to the approximate volume, I
4    have no knowledge of the volume, but I believe that
5    phone calls were made, yes.
6    Q.    Based on the circumstances of the job and
7    the fact that the 31st was a holiday, would it be fair
8    to understand that that job was a virtual job?
9    A.    I believe so, yes.
10   Q.    With respect to the FOIA response
11   information, what did CCH do with that information
12   when it received it?  Was it loaded into the database
13   or was it kept separate?  How did that work?
14   A.    It was loaded into a database.
15   Q.    A different database than the --
16   A.    OnContact.
17   Q.    -- OnContact?
18   A.    Correct.
19   Q.    What database was the FOIA information
20   loaded into?
21   A.    The database name is PROD.
22   Q.    Can you spell that?
23   A.    P-R-O-D.
24   Q.    What is the PROD database?

Page 40

1    A.    It's an Oracle database that houses our
2    production systems.
3    Q.    How does the PROD database interact with
4    the OnContact database?
5    A.    It doesn't.
6    Q.    Were all four of the FOIA responses loaded
7    into the PROD database?
8    A.    Yes.
9    Q.    When they were loaded in, did one
10   overwrite the previous one or are they presumably all
11   still there on the PROD database?
12   A.    I don't believe they're all still there.
13   We have storage constraints and so older data would
14   most likely be purged.
15   Q.    If Mr. Wilson wanted to do a dialer
16   campaign including some of the FOIA data, do you know
17   how that would work?
18        MR. HARTSELL:  Object to the form.  Go
19   ahead.
20        THE WITNESS:  Daniel has no direct access
21   to the FOIA data.  He only has access to the end
22   result as it resides in the OnContact database.
23   Q.    (By Mr. Burke)  So was the FOIA
24   information merged with the OnContact database?

Page 41

1    A.    Merged probably has a very different
2  meaning in Oracle terms so can you phrase the question
3  differently?
4    Q.    Were the names, addresses and phone
5  numbers that were included in the FOIA response
6  included in the OnContact database?
7    A.    Yes, a portion of the FOIA data was
8  imported into the OnContact database.
9    Q.    You said a portion.  What do you mean?
10    A.    When I say a portion was imported I mean
11  those records which did not already exist as a
12  customer or business prospect.
13    Q.    It strikes me as a difficult task to
14  figure out which of a couple hundred-thousand contacts
15  already exist in the database and I've done mergers
16  like that before by hand.  How did CCH do it?
17    A.    Ran matches, you know, basically
18  programming against the data, PL/SQL blocks that would
19  take the FOIA data and compare it to the existing data
20  on whatever date it existed, phone number, address,
21  company name, contact name.
22    Q.    And did OnContact do that or is there some
23  other software that was able to perform that task?
24    A.    This was direct programming on the Oracle

Page 42

1  database.
2    Q.    I know there are third parties that will
3  do that stuff for you, too, and they probably charge a
4  lot.
5    A.    I wouldn't know.
6    Q.    You guys did it in-house?
7    A.    Correct.
8    Q.    Do you know if for contacts in the FOIA
9  data that already had information in the OnContact
10  database, was there a notation made in the OnContact
11  database that says, oh, yes, this is also on the FOIA
12  list?
13    A.    Yes, a notation was made.
14    Q.    So in the OnContact database is there a
15  special field for inclusion in the FOIA list?
16    A.    What would have happened, a source would
17  have been logged.  There's a source table which
18  contains theoretically the source of it, the
19  interaction with a prospect.  So in this case if data
20  -- if that other prospect was found to match the FOIA
21  list and if any of the FOIA list data were appended to
22  that prospect, updated transactional volume of that
23  business, what-have-you for the most recent tax year,
24  then all the records that matched and were updated

Page 43

1  would have been flagged with a source of -- I don't
2  know what the source is but some indicator that it was
3  matched to the FOIA list.
4    Q.    So if a sales agent wanted to do a
5  campaign or a job for all the people who were in the
6  2008 or 2009 FOIA response would that be possible?
7    A.    Not for a sales agent.  A sales manager
8  could can make such a request.
9    Q.    Do you know if that has ever happened?
10    A.    I don't know that it's happened, that
11  there's been a request to do all the records.  The
12  record size is very large and it is unlikely based on
13  the way we run our campaigns that a request would have
14  been made for the entire list.  Typically they would
15  try to constrain it to only businesses that fell in
16  certain parameters, be that tax packages or filing
17  volumes.
18        (Plaintiff's Exhibit 1 was marked for
19        identification.)
20    Q.    (By Mr. Burke)  I'm handing you what's
21  been marked as Exhibit 1.  Have you ever seen this
22  document before?
23    A.    Yes.
24    Q.    Do you know what it is?

Page 44

1    A.    From a legal perspective, no.
2    Q.    It's a deposition notice, the notice that
3  I sent to CCH's lawyer in order to take this
4  deposition today.  Okay?
5    A.    Okay.
6    Q.    Would you please have a look at it and let
7  me know if you are not competent to testify as to any
8  of those topics on behalf of CCH.
9    A.    I believe I'm competent to testify.
10    Q.    Okay.  Are you the person most
11  knowledgeable as to each of those subjects?
12    A.    Yes.
13        (Plaintiff's Exhibit 2 was marked for
14        identification.)
15    Q.    (By Mr. Burke)  I've handed you what's
16  been marked as Exhibit 2.  It's a group exhibit.  It's
17  sort of hard to tell but I'll tell you that these
18  are -- it's a group of documents that were produced to
19  me by Mr. Hartsell.  Each separate document has been
20  marked with a number in my handwriting on the bottom
21  right-hand side.  Do you see that?
22    A.    Uh-huh.
23    Q.    Yes?
24    A.    Correct, yes.

Page 45

1    Q.    So it's six documents of varying length.
2          Starting on Page 1148, the first page --
3          MR. HARTSELL:  I just want to point out
4    for the record that this is -- this document,
5    this exhibit carries Bates numbers at the bottom
6    which the way you've put this document together
7    don't necessarily appear to be sequential, so it
8    seems to me that what you've done here is
9    compiled these.
10         MR. BURKE:  Right.  I just explained that.
11   This is a group exhibit --
12         MR. HARTSELL:  No, you really didn't.  You
13   said it was a group exhibit.  What I'm saying is
14   there are Bates numbers here that range from 1148
15   to 1150 and then it goes to 1280 to 1283 and then
16   it skips to 1285 and 1286 to 1287 and then it
17   skips to 1639 and then there's another one that's
18   1662.  I just want it to be clear what we're
19   looking at here.
20         MR. BURKE:  Right.  Each of the separate
21   documents have a different handwritten number on
22   the bottom.
23         MR. HARTSELL:  I understand that you've
24   put a handwritten number on the bottom, but I do

Page 46

1    not necessarily know or agree that they are
2    "separate" documents.  You have put them in this
3    particular order and designated it as a document,
4    but I don't know that that is how they would
5    necessarily be --
6          MR. BURKE:  Produced?
7          MR. HARTSELL:  Excuse me?  -- necessarily
8    appear or be considered individual or separate
9    documents within the documents as they're
10   maintained by the company.  I just don't know,
11   Alex.  You can put them together any way you
12   want.  I'm not necessarily agreeing that what
13   you've got marked with your handwriting as 1
14   which consists of three pages is a "document."
15         MR. BURKE:  Okay.
16         MR. HARTSELL:  I just don't know if it is
17   or isn't.
18         MR. BURKE:  I understand.
19   Q.    (By Mr. Burke)  Mr. Holbrook, have you
20   ever seen documents like these before?
21   A.    Yes.
22   Q.    Directing your attention to the first
23   three pages, 1148, 1149 and 1150, I'll represent to
24   you that this is one document, one PDF file that was

Page 47

1    produced by your counsel to me in this litigation.
2    These three pages, do you know what this is?
3    A.    It's a SQL statement.
4    Q.    A script?
5    A.    Or potentially a single SQL statement,
6    also referred to as a script, yes.
7    Q.    SQL, you mean S-Q-L?
8    A.    Yes.
9    Q.    And starting at the top of 1148, do you
10   know what this stuff means?
11   A.    Yes.
12   Q.    Great.  So that first line, can you
13   explain to me what that means?
14   A.    It's the beginning of a select statement.
15   Q.    What is a select statement?
16   A.    It's a statement designed to return data
17   from the database, a query.
18   Q.    Can you tell by looking at these three
19   first pages, 1148, 1149 and 1150, what kind of dialer
20   campaign this might have been for?
21   A.    The only thing I can determine is that
22   this is a prospecting campaign because the source
23   tables are in the prospect database.  As to the nature
24   of the campaign utilized I couldn't guess.  It's

Page 48

1    completely separate from the statement.
2    Q.    Can you tell me where you see the source
3    tables?
4    A.    If you look down to the tenth line where
5    it says "from," the "from" portion of the select
6    statement designates which tables the data is being
7    pulled from.
8    Q.    And do you know what the "gminfo g" table
9    is?
10   A.    ONC is the schema name, GM is the table
11   name.  G is a representation of that table or it's a
12   shorthand representation used for coding, a list used
13   for future reference within the code.
14   Q.    What is the GM table?
15   A.    The main information table in OnContact.
16   Q.    And then there's a g after gminfo.  Do you
17   see that?
18   A.    Uh-huh.
19   Q.    Yes?
20   A.    Yes.
21   Q.    What does the G mean?
22   A.    As I said, the G is an alias.  In Oracle
23   you can -- when doing joins and constraints within the
24   syntax you can either spell out the entire schema and

Page 49

1  table name or you can utilize an alias and then that
2  alias is then -- it's essentially a shorthand that
3  allows you to more quickly reference the source table.
4  It's much more efficient.
5       Q.    So the next table referenced looks like
6  it's -- well, it looks like it's the general table
7  again and then company; is that right?
8       A.    Correct.  It's the table that has the
9  company names.
10      Q.    And then the third one -- the C is another
11 shorthand designation; is that right?
12      A.    Correct.
13      Q.    And then "gmin_address," it looks like, is
14 that the general table having to do with the company
15 addresses?
16      A.    Correct.
17      Q.    And then the final one, it looks like a
18 query for phone numbers; is that right?
19      A.    Correct, or it's the table containing
20 phone numbers would be the most accurate statement,
21 yes.
22      Q.    And then going down, can you tell what
23 other parameters were used for this particular
24 campaign?

Page 50

1       A.    The next several lines are joins that
2  basically tell -- it joins the two -- I'm not sure how
3  familiar you are with relational databases, but you
4  have separate tables and you have to have a means of
5  joining the data in the two tables.  Essentially the
6  next several lines are telling you how to join the
7  tables and which row in the address and telephone
8  number to pull which would be the main number.
9       Then the first real parameter, if you
10 will, in terms of a condition of what's being pulled
11 is the exclusion of it looks like Texas there, the
12 line on -- I don't know what it is, probably 16, 17,
13 "a.state!=Texas."
14      Q.    So exclamation equals is a do not include?
15      A.    It's a not-equal-to in coding language in
16 SQL.
17      Q.    And then there's a "g.recordid not in" and
18 there's a series of six-digit numbers.  Do you see
19 that?
20      A.    Yes.
21      Q.    What does that stuff mean?
22      A.    "Recordid" is the primary identifier of a
23 given record within the system.  So basically it is
24 saying that these record IDs should be excluded from

Page 51

1  the result list.
2       Q.    I'm sure it's just the language, but why
3  isn't the not-equal-to sign not used here and "not in"
4  is used on that line?
5       A.    Not-equal-to refers to one specific
6  condition, not in refers to a group.
7       Q.    I have a little computer science; one
8  class.
9       So all these six-digit numbers refer to
10 particular companies that would otherwise probably be
11 included in the not Texas query result; is that right?
12      A.    There's not enough data available about
13 those to make that determination.
14      Q.    In any event, they're not going to be part
15 of the result?
16      A.    Correct.
17      Q.    Flipping to 1150 which is the third page
18 of the first of the group exhibits, the digits end on
19 the fourth line of this page.  Do you see that?
20      A.    Yes.
21      Q.    What's going on with this code here
22 beginning with the fourth line?
23      A.    The next line, "a.numb is not null," is
24 basically a constraint to ensure that an address

Page 52

1  exists for that individual.
2       Q.    What's the next line?
3       A.    "G.sold not equal to Y," basically it's
4  excluding individuals that are marked as sold at that
5  point in time.
6       Q.    So non-customers?
7       A.    Yes.  It excludes any businesses that have
8  that sold flag or a record that is marked as sold at
9  that point in time.
10      Q.    What about the next line?
11      A.    The "g.recordid in" is functioning just
12 like the previous one on the first page, the "not in,"
13 except it's looking where the record exists in a
14 subset and the following lines are sub-queries.
15      Q.    Let's skip down to where it says "and
16 s.source equals IMPORT-FOIA."  Do you see that?
17      A.    Yes.
18      Q.    Do you know what that means?
19      A.    That should indicate records that were
20 imported as a result of the FOIA list acquisition at
21 that time.
22      Q.    And I'm guessing that the FOIA list that
23 was queried for this one or the one that -- I'll start
24 over.

Page 53

```
 1          It looks like this is including people who
 2   were part of the 2006 FOIA response.  Would that be
 3   accurate?
 4     A.      It would have included any record with
 5   that source that was not excluded based on these other
 6   parameters.
 7     Q.      Is there any way to tell what date this
 8   script was run?
 9     A.      No.
10     Q.      If you went back to work and found the
11   file -- because this is a text file, right, or some
12   sort of computer file?
13     A.      I believe so, yes.
14     Q.      If you went back to work and found the
15   file itself, the file has some either creation date or
16   modified date on the file I would guess?
17     A.      If it's stored in TextPad or one of the
18   other common notepads it will have a date created in
19   there, yes.
20     Q.      Is there any way to tell on what date this
21   script was first run?
22     A.      No.
23     Q.      But if you went through OnContact and you
24   found some prospective customer who wound up part of
```

Page 54

```
 1   this campaign you would be able to tell if a call had
 2   been made, right?
 3     A.      Not necessarily, no.  I don't know that I
 4   really understand the nature of the question.  Perhaps
 5   you can rephrase it.
 6     Q.      Sure.  Let's go back to John Doe.  Say
 7   John Doe wound up part of this campaign.  Okay?
 8     A.      Okay.
 9     Q.      Two weeks after the campaign John Doe
10   calls in to CCH and a sales agent opens up John Doe's
11   information on OnContact.
12          Would the agent have access to information
13   about whether this person had received a marketing
14   call?
15     A.      Nothing is logged in OnContact for an
16   attempted call.  The only thing that I would be able
17   to see is if there was any actual interaction with
18   another rep logged in the OnContact database.
19     Q.      Is there anyplace besides OnContact that
20   dialer calls are logged?
21     A.      Yes.
22     Q.      Okay.  Where?
23          MR. HARTSELL:  Wait a minute.  We need to
24     get some clarification on this because I think,
```

Page 55

```
 1   Alex, what you're thinking is that all of the
 2     dialer calls are logged into OnContact and that's
 3     not correct.
 4          MR. BURKE:  Are you testifying?
 5          MR. HARTSELL:  No, I'm trying -- well,
 6     we'll take a break.  Okay?  Let's take a break.
 7          MR. BURKE:  I'm in the middle of a bunch
 8     of questions here, Dave.
 9          MR. HARTSELL:  We're going to take a break
10     because it's becoming misleading and I don't want
11     it to be misleading.  We're going to take a break
12     and I'll confer with my client and we'll come
13     back and clarify.
14          MR. BURKE:  I object to taking a break
15     right now.
16          MR. HARTSELL:  You object to taking a
17     break.  Noted.
18          (Recess from 10:23 a.m. to 10:31 a.m.)
19          MR. HARTSELL:  Mr. Holbrook wants to
20     clarify something about the OnContact database.
21          THE WITNESS:  I think there are certain
22     points that I need to maybe paint the picture of
23     our systems in the back office so we can be on
24     the same page in terms of what's occurring here.
```

Page 56

```
 1   The systems you're actually asking about here are
 2     the dialer and the OnContact.
 3     Q.      (By Mr. Burke)  Correct.
 4     A.      So for new sales the information that is
 5   the basis of the dialer campaign does come from
 6   OnContact and previously I described the process of
 7   SQL query, export, wrote into dialer and then Daniel
 8   does the administration and then the reps handle the
 9   calls.
10          Beyond that, however, there is almost no
11   integration between the dialer system and OnContact.
12   The only integration that exists is on the predictive
13   calls.  When a call is being passed to a rep a screen
14   pop occurs that says, okay, here's the record.  It's a
15   simple, you know, feed in the record and it displays
16   that record.
17          So there's no automated logging of
18   attempted or -- the dialer call is only going to be
19   actually be represented in OnContact in any way if
20   that rep logs it based off an interaction.  So any
21   calls of a campaign that aren't dialed, if the
22   campaign doesn't come to completion, anything that
23   gets a busy signal or a missed number or, you know,
24   voice mail or whatnot, none of that will be logged.
```

Page 57

1    Ideally, every interaction where there's
2  actually a connect between the rep and the individual
3  from the dialer, they should log that interaction in
4  OnContact. That's part of the business rules
5  surrounding their job.
6    However, that being said, the interaction
7  on OnContact, I believe you guys have the -- I think
8  we produced the notes as one of the requests -- you
9  know, it will basically look like any other note for
10 interaction; you know, talked to Bob, you know. So
11 there's no system integration there between the two
12 systems or very limited, I should say, and that is
13 limited just simply to a screen pop of a record.
14    Q.    So I think you're saying like for a
15 virtual job where there's just a prerecorded message
16 used, that job will not be logged in OnContact because
17 there will never be --
18    A.    Correct.
19    Q.    -- a sales agent that's attached to one of
20 those calls?
21    A.    Correct.
22    Q.    But for a managed or predictive job the
23 policy is that if a rep -- if a sales rep or sales
24 agent is connected with a prospective customer that

Page 58

1  sales rep is supposed to log the contact and write
2  down information about the contact; is that right?
3    A.    Yes, correct. They're supposed to log any
4  interaction with any business they contact.
5    MR. HARTSELL: Maybe you understood that
6     before, but it just wasn't clear to me and that's
7     why I wanted him to elaborate on that. I just
8     didn't want there to be any confusion on it.
9    Q.    (By Mr. Burke) You mentioned something
10 about notes just a minute ago. What do you mean
11 notes?
12    A.    Just that. There's a freeform text field
13 in the database where the representative can -- the
14 sales representative can make their notes of whatever
15 they happen to talk about in the interaction.
16    Q.    What do the notes look like?
17    A.    It varies. It's a freeform text field.
18 The representative can put anything in there I believe
19 up to 2,000 characters. It's a variable character
20 field in the database.
21    Q.    So for a campaign, say, of 10,000 calls,
22 are you aware of any success rate as to -- this is a
23 managed or predictive call campaign. Are you aware of
24 like a success rate as to how many prospective

Page 59

1  customers are connected with a sales agent?
2    A.    No. We typically don't do that type of
3  reporting.
4    Q.    Is it possible to do a query on OnContact
5  to figure that out or get some rough idea?
6    A.    I don't think the data is available to
7  make the comparison because to do so you would have to
8  have the actual number of dialer calls produced at
9  that time which we don't have. You could take the
10 number of notes or incidents logged in OnContact in a
11 time period, but those would also include any in-calls
12 from other sources, any follow-up calls, anything
13 driven from a web source where there's prior
14 information and we're calling back.
15    Q.    When the screen pops up, though, does the
16 screen for the sales agent indicate that it's a dialer
17 call that's coming in?
18    A.    The agent is -- when they're on predictive
19 dialer calls that's their dedicated focus. They have
20 to be there and available. Once they've logged in and
21 say I'm active and available for this campaign, yeah,
22 they know they're getting a handoff for a call at the
23 same time they're getting a screen pop.
24    Q.    Is there some way that the sales director

Page 60

1  or managers ensure that they're not calling the same
2  phone number seven days a week?
3    A.    The dialer has certain inherent settings
4  where on a given campaign it won't make -- it won't
5  call the same call twice -- the same number twice. I
6  believe it's configurable. So if you get a non-answer
7  I think you configure it to make multiple attempts.
8  However -- I lost my train of thought.
9    Q.    You were saying that within a particular
10 campaign I think you were saying the dialer knows not
11 to call the same number twice; is that right?
12    A.    Correct.
13    Q.    What about between campaigns?
14    MR. HARTSELL: I don't think that is what
15    he said. I think he said that you could
16    configure it to make multiple attempts.
17    THE WITNESS: If there's been a successful
18    attempt, if the dialer said, okay, we've had a
19    connect, it will not try to call again.
20    Q.    (By Mr. Burke) But if it gets a busy
21 signal maybe it will try again the same day; is that
22 right?
23    A.    It depends on the configuration for the
24 particular job.

Page 61

1    Q.    But what about day-to-day in certain
2    campaigns.  Is there some way that the sales directors
3    and managers ensure that one phone number isn't
4    included in seven consecutive separate campaigns?
5    A.    Typically the campaigns are mutually
6    exclusive in their requested content.  As I've
7    previously stated, that typically revolves around what
8    tax package a company is currently utilizing and in
9    the database a company can only have one tax package
10   listed.
11   Q.    So who makes sure that current UltraTax
12   customers aren't called seven days in a row?  Would it
13   be the director and managers?
14   A.    Yeah.  It's basically up to the director
15   and managers in the requests they're making to ensure
16   that they're not producing duplicate requests and part
17   of the role of Daniel like if he sees, you know,
18   multiple requests coming in that would potentially
19   have overlap to raise the red flag because that's just
20   going to upset our prospective businesses and we don't
21   want to do that.
22   Q.    I notice at the top of some of these
23   scripts there's mention of some of CCH's competitors
24   and I think that that ties in with some of your

Page 62

1    testimony a moment ago.
2    Would it be accurate to say that sometimes
3    CCH targets customers of other businesses with its
4    dialer campaigns?
5    A.    Correct.
6    Q.    How does CCH know what tax software
7    potential customers currently use?
8    A.    A variety of sources.  We have places on
9    the responses for our direct mail and at trade shows
10   we'll record the information.  We also ask for that
11   information on our website and then the
12   representatives -- if someone is to call in from a
13   source our sales rep, that's going to be one of the
14   first questions that they ask because that's the
15   entire basis of your sales pitch and how you're going
16   to approach that customer basically.
17   Q.    Has CCH ever scrubbed phone numbers to
18   determine whether they're cell phones?
19   A.    After this litigation -- notice of this
20   litigation, yes.
21   Q.    Before the litigation did CCH scrub for
22   cell phones?
23   A.    No.
24   Q.    Does the OnContact database include any

Page 63

1    notation at all for cell phones?
2    A.    It does now since the notice of
3    litigation.
4    Q.    Before the litigation was there any
5    notation for cell phones?
6    A.    Not to my knowledge.
7    Q.    For example, a field for home phone, work
8    phone, cell phone, anything like that?
9    A.    The storage allows for multiple phone
10   numbers to be stored and there is a place for the
11   sales rep to place a notation about that phone number,
12   but nothing systematic or consistent.
13   Q.    Have the sales director and sales managers
14   participated in discovery in this case?
15   A.    I believe so, yes.
16   Q.    In what way?
17   A.    Providing information regarding the
18   genesis of campaigns and the role that they play.
19   Q.    What information or documents did those
20   sales director and managers provide?
21   A.    They verbally conveyed the typical process
22   of, you know, asking Daniel what he or telling Daniel
23   here's the campaigns we want and how that process
24   flows and I believe at one point we were asked to

Page 64

1    produce any e-mail evidence of requests via e-mail.  I
2    believe we found a small number of requests via e-mail
3    and produced those that were relevant.
4    Q.    Does CCH do backups of its servers?
5    A.    Some servers, yes.  It varies depending on
6    tier and class.
7    Q.    Tier and class of the employee?
8    A.    No, tier and class of the server and its
9    criticality to the business.
10   Q.    What about as to the sales manager and
11   directors or director and managers, are their servers
12   backed up?
13   A.    They don't have any dedicated servers.
14   Q.    What about the database server?
15   A.    Which database?
16   Q.    Is the OnContact database server backed
17   up?
18   A.    Nightly a snap mirror is taken and the
19   backup is stored at our Bremen facility until the next
20   backup is taken and it stores the most recent backup.
21   Q.    So does that mean that there's a history
22   of database backups or is there just --
23   A.    No, there's only one copy.
24   Q.    -- one day?

Page 65

1     A.    The most recent copy is what's kept.

2     Q.    Are you familiar with caller ID?

3     A.    In what capacity?

4     Q.    At all.

5     A.    In a personal capacity, I have it on my

6 cell phone.

7     Q.    So sometimes when people call you can see

8 who's calling because the phone number or if it's

9 someone in your contacts the phone number and a name

10 pops up on your phone, right?

11    A.    Correct, yes.

12    Q.    Are you familiar with the occurrence that

13 sometimes no caller ID shows up on your phone even

14 though you're getting a call?

15    A.    Personally, yes.

16    Q.    Do you know whether CCH provides a caller

17 ID number when its dialer makes phone calls?

18    A.    I believe our system is currently

19 configured to provide the 800 number and an

20 identifier. I don't know what the identifier

21 specifically is, if it's currently TaxWise, ATX or

22 Small Firm Services because we have different brands,

23 but, yes, I'm sure we have that configured outbound.

24    Q.    What about a year ago, do you know whether

Page 66

1 the caller ID was configured in the same manner that

2 it is now?

3     A.    I cannot say for certainty that it was

4 configured in the exact same manner.

5     Q.    The phone call that my client received had

6 no caller ID in it.

7     MR. HARTSELL:  Object to the form.  Just

8     to be clear, that was his testimony.

9     Q.    (By Mr. Burke)  My client testified that

10 he didn't have any caller ID in his phone. Do you

11 have any idea why that would have happened with a call

12 from CCH on May 31st, 2010?

13     MR. HARTSELL:  Object to the form; assumes

14     that it could have happened.  Go ahead.

15     THE WITNESS:  My understanding is that we

16     configured on the outbound phone calls.  What

17     happens between the initiation of the call and

18     the receipt, there are multiple -- I'm not a

19     telephone expert but I do understand there are

20     multiple handoffs between different companies and

21     providers, you know, so any occurrence between

22     what we have configured outbound and what is

23     ultimately seen based on the configuration of

24     their network, their cell phone I have no

Page 67

1     visibility and can't speculate on what may occur

2     there.

3     Q.    (By Mr. Burke)  So far as you know was CCH

4 intending to provide caller ID information in May

5 of 2010?

6     A.    The intent would be there, yes.

7     Q.    Back to Exhibit 2, the scripts, do you

8 know who through discovery in this case searched for

9 these scripts?

10    A.    Daniel Wilson.

11    Q.    Do you know where he found them?

12    A.    I believe he has them stored either on his

13 local machine or a network drive.

14    Q.    Looking back at the FOIA notation on

15 Page 1150, it occurs to me that the six numbers after

16 FOIA could possibly be 2006 or they could be 2008 or

17 something else. Do you have any idea what those --

18    A.    It should be 2006.

19    Q.    And I think the testimony earlier was that

20 where the FOIA list -- I'll start over.

21     Would it be possible to create a list of

22 people whose numbers were obtained through FOIA

23 requests and who were called using the dialer?

24    A.    No.

Page 68

1     Q.    Why not?

2     A.    There's no systematic log indicating the

3 call was made from the dialer.

4     Q.    What if you ran the FOIA scripts over

5 again --

6     MR. HARTSELL:  The FOIA scripts?

7     Q.    (By Mr. Burke)  -- the scripts that

8 include queries to FOIA phone numbers, would it give

9 you a pretty good idea of who had been called

10 historically?

11     MR. HARTSELL:  Object to the form.  Go

12     ahead.

13     THE WITNESS:  I think there's some

14     fundamental misstatements in there when you say

15     FOIA phone numbers.  What we know is we have a

16     record with this listed as a source and if we

17     were to run this same script at this point in

18     time the results that are returned are going to

19     be what matches the script in the database at

20     this point in time which will change every day as

21     different interactions are logged, packages might

22     be updated by sales rep, e-file numbers are

23     changed, sales reps are assigned, different

24     dispositions are made.  It's a constantly

Page 69

1   evolving database.

2       Q.      (By Mr. Burke)  But I would understand

3   that the FOIA 082806 would never get larger.  Would

4   that be correct?  It could only get smaller.

5       A.      There's nothing systematically that would

6   keep a rep from manually entering that source code.

7       Q.      But barring a rep manually entering that

8   source code the FOIA 082806 list should only get

9   smaller, not larger, right?

10      A.      I'm not sure what you mean by get smaller.

11      Q.      Say hypothetically in September 2006 there

12  was a dialer campaign that called everybody that was

13  on the '06 FOIA list.  Okay?

14      A.      Okay.

15      Q.      It seems to me that everybody that was on

16  that list that didn't have a do-not-call notation

17  already on it would get a call, right?

18      A.      No.

19      Q.      Okay.  Why not?

20      A.      There are additional parameters in this

21  here that would further constrict who gets a call and

22  there are additional parameters in here that would

23  include individuals not on the FOIA list.

24      Q.      Right.  But in my hypothetical we're just

Page 70

1   using the FOIA list.  Okay?

2       A.      Okay.

3       Q.      So in this hypothetical vacuum if you

4   query the FOIA list everybody on the list is going to

5   get a call except for people who have do-not-call

6   requests; is that right?

7       A.      No.

8       Q.      Who wouldn't get calls?

9       A.      Any individual not meeting these other

10  criteria.  So if any one of those individuals is

11  currently assigned to a representative or is marked as

12  sold or is missing an address or any of the other

13  parameters, you know, even if you were -- you know,

14  running this list you're looking for that one source

15  and all these other parameters.

16      Q.      So let's set this aside.  Let's just do my

17  hypothetical fresh.

18              It appears to me that, it doesn't often

19  happen this simply, if you did a simple query for

20  everyone who is designated an '06 FOIA person each one

21  of those people would get calls except for ones who

22  have do-not-call requests; is that correct?

23      A.      If you are excluding all other

24  parameters --

Page 71

1       Q.      Yes.

2       A.      -- and if there were only two parameters

3   and only one of them subject to change, yes, the delta

4   between any two runs of this are going to be based on

5   the additions or changes to the second parameter.

6       Q.      And then fast forward four years and you

7   ran the same script for the '06 and you excluded the

8   do-not-calls.  Would there be anyone in the

9   fast-forward list who did not get a call in the older

10  list?

11              MR. HARTSELL:  Okay.  I'm going to object

12  to the form, and while I understand that you

13  started this by saying that you're speaking in a

14  hypothetical vacuum, you're making it sound now

15  like it actually happened.  You keep saying would

16  there have been anybody who didn't get a call.

17              THE WITNESS:  There's a fundamental

18  distinction here.  What may return as a result of

19  the query has no bearing necessarily on who

20  actually received a call.

21      Q.      (By Mr. Burke)  But it does have a bearing

22  on who --

23      A.      Who may potentially receive one.  However,

24  it has no bearing on who actually receives one, where

Page 72

1   a connect is actually made, whether or not the dialer

2   goes through that entire list that's loaded.

3       Q.      So maintain the hypothetical.  There

4   shouldn't be anyone in the fast-forward list who gets

5   an attempted call who didn't get an attempted call

6   earlier; is that right?

7               MR. HARTSELL:  Same objection to the form.

8               THE WITNESS:  I think the statement of

9   getting an attempted call is even somewhat

10  invalid.  However, my statement would be if you

11  have the same hypothetical query with two

12  separate parameters, one looking for a certain

13  source, one looking for some other indicator that

14  basically says you're invalid, do not call me,

15  yes, if you run it at one point in time it's

16  going to return exactly the list that meets those

17  parameters at that point in time, you know,

18  whatever that number may be.

19              If you fast forward four years, run the

20  exact same query, again, it's going to pull that

21  data from the database at this point in time.  If

22  any changes have been made to either one of those

23  parameters a difference will result.

24      Q.      (By Mr. Burke)  But there shouldn't be any

## Page 73

1  changes to the FOIA parameter.  I mean, that list
2  should be static, shouldn't it?
3      A.      The source table is a one-dimensional
4  relationship and, yes, the source should be
5  persistent.  There should be a history of sources in
6  there.
7      Q.      And so the only thing that would change
8  would be the do-not-calls potentially if you just had
9  those two parameters?
10     A.      Correct.
11     Q.      As to the do-not-call records that CCH
12 keeps -- does CCH keep records of people who have
13 requested not to be contacted?
14     A.      I'm not sure what you mean by "keep
15 records."
16     Q.      Okay.  Does CCH keep track of who has
17 requested not to be contacted?
18     A.      Yes.  If an individual asks not to be
19 contacted by us, an attribute we set in the database,
20 they'll basically be flagged as a do-not-contact
21 record.
22     Q.      When someone is flagged as a
23 do-not-contact record, is there any notation of the
24 attributes of the do-not-contact, for example, date?

## Page 74

1      A.      It's just a -- it's just a single
2  indicator on there that basically sets a source that
3  says -- actually, I take that back.  It's a
4  salesperson code, where they change the salesperson
5  code to do-not-contact, and, therefore, is excluded
6  from all future lists, queries, anything.
7      Q.      Do you see the do-not-call/do-not-contact
8  trigger anywhere on 1148, 1149 or 1150?
9      A.      The third line from the top --
10     Q.      On 1150?
11     A.      -- on 1150, correct.  That final subquery
12 includes DNC in terms of -- I don't know how technical
13 you want to get with this.  So basically you have
14 unions and minuses here and what it does is it takes a
15 set of data, joins them together and then subtracts
16 out this bottom set of record IDs and what this is
17 doing is basically saying take out anything with a
18 salesperson code of do-not-contact as well as three
19 other salesperson code or anything that has a status
20 of bad address or DNC for do-not-contact.
21     Q.      Does CCH use the Federal Trade Commission
22 do-not-contact list?
23     A.      I'm not sure -- the Federal Trade -- we do
24 have a do-not-contact list.  I do not know if it's the

## Page 75

1  Federal Trade Commission, I do not know if there are
2  multiples, but the national do-not-call list, yes.
3      Q.      And was that used back in 2010?
4      A.      Only after notification of this lawsuit.
5      Q.      So would it be accurate to say that before
6  June 2010 CCH had never used the national
7  do-not-contact list?
8      A.      Correct.  It's our understanding that list
9  is for consumers and individuals and we're prospecting
10 to businesses.
11     Q.      Has CCH ever used other do-not-call lists
12 such as state do-not-call lists?
13     A.      Not to my knowledge.
14     Q.      Does CCH have a process whereby it has an
15 internal companywide do-not-call list in addition to
16 the national do-not-call list?
17     A.      As stated here, do-not-call is an
18 attribute of a record.  Anytime someone requests via
19 verbally over the phone or however, trade show, don't
20 call me anymore or a request is made to our team as --
21 flag them do-not-call and move on.
22     Q.      What if someone were to request that they
23 not be called or contacted through e-mail, would that
24 be --

## Page 76

1      A.      No.  Same thing.  They'll log it and move
2  on.
3      Q.      Are you familiar with a process whereby
4  someone might unsubscribe to an e-mail list?
5      A.      In general or in particular?
6      Q.      In general.
7      A.      Yes.
8      Q.      The process is, you know, if you get an
9  e-mail that you want to unsubscribe from the list you
10 send an e-mail back that says unsubscribe, right?
11     A.      Generally.
12     Q.      Does CCH sometimes do e-mail marketing
13 campaigns?
14     A.      Not frequently to prospects but I believe
15 some have been done in the past, yes.
16     Q.      Would that be the same sales director and
17 sales managers who manage the e-mail campaigns as the
18 dialer campaigns?
19     A.      Correct, and they would generally
20 coordinate that with marketing.  The typical
21 utilization of that is -- a trade show follow-up is
22 the most frequent that we would utilize.
23     Q.      I notice in some of the materials produced
24 the most recent FOIA response that we received has

Page 77

1   e-mail addresses.  Are you aware of that?
2       A.      In the FOIA data that we received from the
3   IRS?
4       Q.      Yes.
5       A.      Yes.
6       Q.      Do you know if an e-mail campaign was sent
7   to people who were received through that FOIA
8   response?
9       A.      I do not know if that was done.
10      Q.      Who would know that?
11      A.      That would have to be one of the
12  individuals in our marketing department who does the
13  coordination of that effort.
14      Q.      Not the sales department?
15      A.      Typically any communication -- as I
16  previously stated, there would be coordination there
17  between the two, but any written communication is
18  handled by the marketing department, so any e-mails
19  that are going out to our customers or to prospects
20  would be drafted by those individuals.
21      Q.      And if there's query done to send the
22  e-mails, would that query be done on the OnContact
23  software as well?
24      A.      If it was to prospects, yes, it would be

Page 78

1   done on the OnContact database.
2       Q.      Why doesn't CCH keep track of data
3   regarding who among its prospective customers it calls
4   using its dialer?
5       A.      We have no business need to do so.
6       Q.      We talked earlier today about the
7   possibility that somebody could conceivably get a call
8   a day through different campaigns and I think your
9   testimony was that the sales director and managers
10  keep track of who is called with the dialer to ensure
11  that nobody gets too many calls; is that right?
12          MR. HARTSELL:  Object to the form and the
13          mischaracterization of his testimony.
14          THE WITNESS:  My statement was that
15          typically the parameters of campaigns are
16          mutually exclusive dealing with different sets of
17          focused prospects, businesses.  So, as previously
18          stated, they typically focus around some type of
19          transactional volume or the competitor tax
20          software package they utilize and each of those
21          is a one-to-one ratio between that and the
22          prospective business we're soliciting.  By its
23          nature you won't exist in two concurrent
24          campaigns.

Page 79

1       Q.      (By Mr. Burke)  How often over the past
2   five years were campaigns done through the dialer?
3       A.      Dialer calls would be placed depending
4   upon the time of year daily during our sales season or
5   renewal season.
6       Q.      We talked about backup tapes a few minutes
7   ago.  Are you familiar with -- I'll start over.
8           Are you familiar with the e-mail system
9   that the sales managers and sales director use?
10      A.      It's Microsoft Exchange; standard Outlook
11  system.
12      Q.      Is there a Microsoft Exchange server that
13  deals with the Microsoft Exchange in Outlook?
14      A.      Yes.
15      Q.      Where is that server located?
16      A.      At our office in Kennesaw.
17      Q.      Do you know if that server is ever backed
18  up?
19      A.      I don't know honestly.  That would be a
20  question for our IT department that deals with the
21  server maintenance.
22      Q.      Do you know if there's an e-mail retention
23  or deletion policy at CCH?
24      A.      I don't know that there's a stated policy.

Page 80

1   We do, however, have fairly strict size limitation on
2   what we can have in our mailboxes.
3       Q.      What are those size limitations; do you
4   know?
5       A.      I'm not certain of the specific
6   limitations for the general user.
7       Q.      How often are you required to purge your
8   e-mail because you've got too much in there?
9       A.      I'm probably an exception.  Almost daily
10  I'm either purging or archiving.
11      Q.      When you archive does it go on your hard
12  drive?
13      A.      Mine are stored on my hard drive, yes.
14      Q.      Is the archiving something that the other
15  employees such as sales managers and director are
16  supposed to do or is it just something you do?
17      A.      I don't think there's any directive.  It's
18  up to the individual employee.
19      Q.      So directing your attention again to
20  Exhibit 2, Pages 1148 and 1149, your testimony earlier
21  was that the six-digit numbers pertain to particular
22  prospective customers; is that right?
23      A.      It's a particular record in the OnContact
24  database.

Page 81

1    Q.    And those records were all excluded from
2    this particular dialer campaign, right?
3    A.    They were excluded from this query, yes.
4    Q.    That is a lot of records to exclude from a
5    particular campaign where the sales manager walks over
6    to Mr. --
7    A.    Wilson.
8    Q.    -- Wilson and tells Mr. Wilson what
9    parameters he or she wants, it seems to me.  It looks
10   like it's probably 50, maybe 75 records.
11         Has it ever happened that there's some
12   e-mail or memo or something like that that the sales
13   managers or sales director sends to Mr. Wilson
14   regarding the parameters of a campaign that they want
15   done?
16         MR. HARTSELL:  I'm sorry.  Is the question
17   does it ever happen that there could be an e-mail
18   or a memo containing the parameters?  Because it
19   was kind of a long introduction to that question
20   I want to make sure I understand what the actual
21   question is.
22         MR. BURKE:  Yes, that's the question.
23         MR. HARTSELL:  I think he's testified to
24   that already, but go ahead.

Page 82

1         THE WITNESS:  The answer is yes.  It's not
2    the standard business practice, but, yes, there
3    can be instances where e-mails are sent in lieu
4    of discussing it with Mr. Wilson.
5    Q.    (By Mr. Burke)  If you look at 1285 which
6    I've designated as Document 4 of Exhibit 2 there's
7    another long list of particular identifiers that are
8    excluded from the list.
9         Is it your understanding that the sales
10   managers stand at Mr. Wilson's desk and dictate these
11   numbers to Mr. Wilson?
12         MR. HARTSELL:  Object to the form as asked
13   and answered.  Go ahead.
14         THE WITNESS:  I think it's highly unlikely
15   that our managers are going to sit there and call
16   a set of record IDs.  I can't speculate as to the
17   nature of the request that went into the
18   exclusion; however, the result is likely from
19   something else occurring.  These may have been
20   records that they were in the process of
21   reassigning to one of our field reps or some
22   other -- you know, they've met some other
23   criteria of a group that wanted to be excluded.
24   It is unlikely that they were intending

Page 83

1    individual exclusions on this.
2    Q.    (By Mr. Burke)  Was there a search
3    performed for communications that might have included
4    parameters for scripts for dialer campaigns?
5    A.    At your request, yes, we asked our sales
6    management team and Daniel to produce any scripts or
7    any e-mails with any requests that they had.
8    Q.    And I think there was one e-mail that was
9    produced.  Is that your understanding, that there's
10   just one e-mail?
11         MR. HARTSELL:  Do you know?  I don't know
12   as I sit here how many.  I thought there was more
13   than one.
14         THE WITNESS:  I believe there were three
15   or four that were produced by our sales
16   management and then I believe that one fell
17   within the relevant period.
18   Q.    (By Mr. Burke)  What sort of search was
19   performed?
20   A.    We made a request of the sales management
21   and Daniel to look at what was available within their
22   Outlook and provide anything that was sent to Daniel
23   or that Daniel received.
24   Q.    Were any archived messages searched?

Page 84

1    A.    I can't speak as to what steps management
2    took.
3    Q.    Were there any backups that were searched;
4    do you know?
5    A.    Again, I can't speak to that.
6    Q.    Were there any document searches separate
7    from e-mail that were performed on Mr. Wilson or the
8    sales director's or managers' computers?
9    A.    I'm not quite sure what you mean by
10   document search.  However, we were asked to produce
11   any documents related to the dialer or dialer activity
12   and anything we had we produced.
13   Q.    Were any sales agents' PCs searched or
14   e-mails?
15   A.    I don't believe so, but a sales agent
16   doesn't have the ability to request a particular
17   dialer job or interact in any meaningful way regarding
18   that.
19   Q.    Was there any preservation of hard drives
20   that was done with relation to this case?
21   A.    I'm not sure I understand.
22   Q.    Are you familiar with the process of
23   preserving data on a hard drive?
24   A.    Yes.

Page 85

1    Q.    Was that performed with respect to this
2  case?
3    A.    It was our understanding in relation to
4  this case the date of importance was the call data
5  made from the dialer and we took the steps necessary
6  to get that data for the calls backed up from this
7  point forward.  We go in and basically back up that
8  data every day and it's saved off on a network drive.
9    Q.    So what data exists as to calls that the
10  dialer made before this lawsuit was filed?
11    A.    None.
12    Q.    I understand that the dialer is able to
13  preserve data about the calls that it attempts; is
14  that correct?
15    A.    For a certain duration, yes.
16    Q.    30 days or so?
17    A.    30 days or until a list is refreshed.
18    Q.    When CCH received notice of this lawsuit,
19  were there attempts made to preserve whatever data
20  existed on the dialer at the time?
21    A.    Once we were made aware, yes, we had to
22  contact our provider, our third-party provider of the
23  dialer, a company called Continuent, it's the
24  value-added reseller that we get our dialer services

Page 86

1  through, we had to contact them to determine what the
2  process was to take the detailed backups because, as I
3  said, it's something we had never done before because
4  we had no business need to do so.  So at some point in
5  late June we initiated that process with those guys
6  and I believe in early July our first successful
7  backup of the detailed information was made.
8    Q.    Was the dialer used in the interim during
9  June 2010?
10    A.    I don't believe so.
11    Q.    So there was a hiatus on the dialer until
12  you figured it out?
13    A.    For some period of time, I'm not sure of
14  the exact dates, but, yes, we stopped using the dialer
15  at that point.
16    Q.    Was there an attempt to locate historical
17  data about calls that had been made on the dialer
18  after this case was filed?
19    MR. HARTSELL:  He just described --
20    THE WITNESS:  Our initial thing is we
21  contacted the reseller that provides us with the
22  service at which point we learned that --
23  actually, we confirmed, because Daniel initially
24  stated that the detailed records are only kept

Page 87

1  for 30 days, we confirmed that with our provider
2  of the service at that time and started working
3  towards switching to back up that detailed data
4  on a daily basis.
5    Q.    (By Mr. Burke)  The call that's the
6  subject of this lawsuit was on May 31st, 2010.  The
7  lawsuit was filed somewhere around June 7, 2010, and I
8  served the Complaint around June 13th, 2010.  That's
9  well within 30 days of the call to my client, at
10  least.
11    Was there an effort made to preserve the
12  data that existed on the dialer at the time CCH
13  learned about this lawsuit?
14    MR. HARTSELL:  He just answered that.
15    MR. BURKE:  I'm not sure I got it.  I got
16  an answer prospectively, but I'm asking about
17  what was done with regard to the data that might
18  have existed on the dialer going back
19  historically.
20    MR. HARTSELL:  Well, I think he did answer
21  that.  I'll let him clarify it, but I think what
22  he told you was working with Continuent was both
23  to preserve it on a going-forward basis and
24  determine what, if anything, could be done to

Page 88

1  retrieve what, if anything, existed on the
2  dialer.  He can elaborate on that.
3    MR. BURKE:  Please, David, refrain from
4  testifying.
5    MR. HARTSELL:  Well, Alex, you know --
6    MR. BURKE:  I'm just asking.
7    MR. HARTSELL:  How about if you refrain
8  from asking repeating and misleading questions
9  especially on a topic that we have discussed at
10  length between counsel.  Okay?  Having said that,
11  and now we've both gotten to say something on the
12  record, why don't we let the witness say what he
13  wants to say.
14    THE WITNESS:  The answer is when we had
15  notification of the lawsuit we stopped all
16  activity -- any outbound activity.  There was no
17  refreshing of jobs or anything going on, no work
18  on the dialer.  As soon as we were notified that
19  we needed to backup this data we started the case
20  with Continuent.
21    That being said, as previously stated, the
22  detailed data is only available for either
23  30 days or when a job is refreshed which for us
24  on most jobs is a daily occurrence.  So, I mean,

Page 89

1    I'm not certain of the details of the time line
2    and specific dates of what occurred when, but I
3    do know that we made every reasonable effort to
4    try to capture what we could at that time.
5    Q.    (By Mr. Burke)  And the result was?
6    A.    We had our first successful backup of
7    whatever data was available sometime early July.
8    Q.    Who at CCH spearheaded the efforts with
9    Continuent?
10   A.    It was Daniel Wilson.
11   Q.    Do you know who at Continuent is Daniel
12   Wilson's contact?
13   A.    I'm not certain who his contact is, no.
14   Q.    What is Universal Tax Services?
15   A.    Universal Tax Systems.
16   Q.    Systems.  Sorry.
17   A.    It was the company that I worked for when
18   I began back in '99.  It was the parent company of the
19   TaxWise product line and I believe it may still be the
20   legal entity that is CCH Small Firm Services.
21   Q.    Do you know if Universal Tax Systems,
22   Inc., is an e-file provider?
23   A.    Define e-file provider.
24   Q.    Someone who is authorized by the Internal

Page 90

1    Revenue Service to file tax returns for others on the
2    Internet.
3    A.    On the Internet?
4    Q.    e-file.
5    A.    We do not prepare and file tax returns.
6    We provide services to businesses who are paid
7    preparers who prepare tax returns.
8    Q.    Are you aware of any requirement that your
9    employer maintain records of marketing attempts at
10   all?
11        MR. HARTSELL:  Requirement by whom?
12        THE WITNESS:  No.
13   Q.    (By Mr. Burke)  Any requirement at all.
14   A.    No.
15   Q.    Does CCH have a legal department?
16   A.    CCH Small Firm Services, CCH U.S.?
17   Q.    Does CCH Small Firm Services have a legal
18   department?
19   A.    We have counsel on site.  I believe,
20   however, he is in the employ of MultiSource.  They
21   have a global shared services back-office network.
22   Q.    Is there any person who is responsible for
23   ensuring that proper recordkeeping is done with
24   respect to the dialer?

Page 91

1        MR. HARTSELL:  Object to the form and the
2    lack of foundation, but go ahead.
3        THE WITNESS:  I'm not sure what you mean
4    by proper recordkeeping.  I mean, it's prospect
5    data, it's not tax return data.  We do have
6    standards in place for our financial data and our
7    tax return data, but in terms of the prospect
8    data there's no -- there's nothing there that
9    dictates a policy.
10       (Recess from 11:27 a.m. to 11:52 a.m.)
11   Q.    (By Mr. Burke)  Do you know if there were
12   any backups of the database that were preserved in
13   connection with this litigation?
14   A.    Of which database?
15   Q.    Of the OnContact database.
16   A.    I don't believe so.
17   Q.    Were there any other databases that were
18   backed up in connection with this litigation?
19   A.    No.  The only change that was made was the
20   manual backing up of the dialer data.
21   Q.    And that was for data after --
22   A.    That was at the point that this litigation
23   came about and we were instructed to do so.
24   Q.    I think your testimony was that sometimes

Page 92

1    there are multiple source codes for one record?
2    A.    Correct.
3    Q.    So, for example, if CCH obtained contact
4    information through a trade show and also through FOIA
5    that information would be noted in the database,
6    right?
7    A.    The OnContact database, yes.
8    Q.    So is it fair to say that records with
9    just one source code, that should be the only place
10   that the information was obtained?
11   A.    It's difficult for me to speculate on that
12   because we do have a variety of codes and in order
13   to -- if you wanted to confirm that that source code
14   was the actual origination and not just some
15   expression of interest you would have to engage in
16   some considerable data mining to see if you could
17   determine the date the record was created and the date
18   that source was added.  We try to have controls in
19   place and processes in the sales department wherein
20   the sales rep is supposed to log the source.  In the
21   past it's been perhaps not as tightly managed.
22   Anytime you involve a human in the equation and you
23   don't have any type of automated system, meaning
24   there's no integration when a call comes in, we don't

Page 93

1    have the luxury of having it feed directly to a
2    populated source, it's really dependent upon -- for
3    any of these ones where we get any type of in-call
4    it's dependent upon that individual to log it.  If it
5    was something that came from -- where one of our read
6    ops individuals was entering the list from a trade
7    show, then, yes, we could be reasonably certain that
8    if that's the first source and they're the ones that
9    entered that then that was the initial source and not
10   an expression of interest at a subsequent time.
11        Q.   So would it be fair to say that ideally if
12   there's only one source in there it means that that's
13   the only source from which the information came?
14        MR. HARTSELL:  I'm going to object to the
15        form.  I'm not sure how that question is
16        different than the one he just answered, but go
17        ahead.
18        THE WITNESS:  I guess the most concise
19        statement I'll make is it is -- without doing the
20        data mining to determine if the source was there
21        it would be difficult to say that was the
22        origination of that record.  The source code in
23        essence implies, you know, some interest has been
24        expressed or some update has been made to the

Page 94

1        record, so it may or may not correlate with the
2        actual creation of the record.
3        Q.   (By Mr. Burke)  Do you know how many
4    different source codes there are?
5        A.   Hundreds.  I mean, during the time
6    period -- there are specific codes for each trade
7    show, for each mailing, for the different websites
8    they might come in through.
9        Q.   Other than the FOIA source, do you know of
10   any sources of contact information that were entered
11   into OnContact where the phone number wasn't provided
12   directly to CCH?
13        A.   No.  Any other acquired list was utilized
14   for direct mail purposes only and any information from
15   that prospect beyond the acquired mailing address on
16   the list would come in from a response from that
17   individual and they're basically raising their hand in
18   some manner saying, hey, I'm interested, either
19   through the phone call or driving them to the website
20   where they get the information.
21        Q.   Is there any way to tell when FOIA sources
22   were used as part of campaigns?
23        A.   No.  There's evidence in the script, but
24   because there's no record of the dialer calls at that

Page 95

1    time it's impossible to recreate that point in time
2    that would have resulted in that.
3        Q.   Possibly through metadata or whatever
4    files these scripts are located on is what I'm
5    thinking.  I don't know.
6        A.   No, there's no real metadata to the
7    database.  You have your table structure and it's a
8    straight-up simple relational database.  Like I said,
9    these scripts are stored on a completely separate
10   system.  Anything beyond that you would have had to
11   have in place specific login to capture that and store
12   it which we had no business need to do so.
13        Q.   For the scripts that exist we might be
14   able to obtain information about when they were formed
15   from the files themselves?
16        A.   I'm not sure -- I mean, the script is just
17   a TextPad.
18        Q.   Right.
19        A.   Yes, you could look at the TextPad file
20   and it will have a create date associated with it,
21   but, again, that has no bearing on when it was
22   actually executed in the database.
23        Q.   Well, it could have some bearing.  I mean,
24   you're not going to --

Page 96

1        A.   It could.  However, my concern would be
2    that a lot of these -- there's fairly similar
3    parameters in a lot of these.  What Daniel has told me
4    he will do frequently is open up an existing one,
5    change a couple of the parameters to suit whatever the
6    notation reflected and then save off as a copy.  Now,
7    depending on how he does that it may retain the
8    original created date and you might have a modified
9    date of a more recent period.
10        Q.   When I was looking at the scripts I came
11   across some terms I wanted to ask you about.
12        A.   Okay.
13        Q.   One is a BP dialer.
14        A.   I'd have to see the -- is there one
15   referenced here?  Do you have a copy of the scripts?
16   I need to see some context to try to determine what
17   that really means.  Do you recall if it was embedded
18   in the script or at the top of the script with one of
19   these dash-dash?
20        Q.   Yes, I think it was on top.  What would it
21   mean if it was on top?
22        A.   Well, not necessarily to be on top but
23   any -- if you have a dash-dash that implies a notation
24   of some type.  BP typically refers to bank product.

Page 97

1  So what it would be is it would be again just
2  referencing the parameters of the script that the
3  sales manager had requested; I want records that have
4  a certain number of bank products.  I don't know if
5  you're familiar with what bank products are or if I
6  need to go into that.
7       Q.    Briefly what is a bank product?
8       A.    Everybody knows Block's, you know, Rapid
9  Refund.  It's your refund anticipation loan and it's
10 one of the attributes that kind of segment the
11 different prospective businesses that we're dealing
12 with.  We have targeted different marketing messages
13 to companies that offer bank products versus those
14 that don't.
15      Q.    What about commercial dialer?
16      A.    Again, it would be a nomenclature.
17 Commercial tends to refer toward your -- somewhat of
18 your bank product people.  They're the ones that tend
19 to have multiple locations and kind of churn out lots
20 of returns as opposed to your professionals which
21 would be you're hiring CPAs to do more complicated
22 returns, lower volume.
23      Q.    Sales dialer?
24      A.    I can only assume sales versus renewals.

Page 98

1  I'm not certain.
2       Q.    Dialer calls sometimes made in Spanish?
3       A.    We do have Spanish representatives and we
4  have indicators in our prospect database and our
5  current customer database that someone has said I
6  prefer a call in Spanish.  So I don't think we have
7  anything on the dialer itself that's actually Spanish,
8  but we do have calls directed toward Spanish-speaking
9  individuals that are then handed off to our
10 Spanish-speaking representatives assuming it's made in
11 a predictive capacity.  Otherwise, as we spoke before
12 with the managed, it's the Spanish-speaking
13 representative getting on and clicking or not
14 clicking.
15      Q.    Professional dialer?
16      A.    As I just stated, that would be
17 professional versus commercial.  Professional would
18 probably just be an indication of this might include
19 these certain tax packages, your higher end, sort of
20 your higher-end pro series kind of people.  It's just
21 an indication of the type of businesses you're
22 soliciting.  As I said, on my part that's somewhat
23 speculative assuming that's in the notes, but that's
24 most likely the utilization of those terms because

Page 99

1  there's nothing in the database that would really be
2  pertinent to that.
3       Q.    Continuent is like -- it's a support
4  company, isn't it?
5       A.    They're what's known as a VAR, a
6  value-added reseller.  So they -- yes, they basically
7  resale dialer products and supply support to specific
8  customers.
9       Q.    When did CCH first get a dialer; do you
10 know?
11      A.    I don't know specifically, but it was back
12 in probably close to 2002, 2003 maybe.  It was a
13 couple of years after I had been employed there.  I
14 don't recall specifically but it's been awhile.
15      Q.    Do you know whether CCH has permits to use
16 its dialer in Georgia or Illinois or any other state?
17      A.    I'm not sure what permits are required or
18 what specifically you're referring to.
19      MR. BURKE:  I want to break for another
20      four minutes and then I think we're done.
21      MR. HARTSELL:  Okay.
22      (Recess from 12:04 p.m. to 12:11 p.m.)
23      Q.    (By Mr. Burke)  We talked a little bit
24 about these entities, CCH, Inc., CCH Small Firm

Page 100

1  Services, Universal Tax Systems, Inc., and Wolters
2  Kluwer.
3            My question is, do you know what the
4  relationship between CCH Small Firm Services and CCH,
5  Inc., is?
6            MR. HARTSELL:  He can answer that question
7       to the best of his personal knowledge, but that
8       is not one of the areas where he was designated
9       for the 30(b)(6) deposition.  So with that
10      understanding I'll let him tell you what he
11      knows, but he's not speaking as a corporate
12      representative in his answer.
13           THE WITNESS:  I can speak to the reporting
14      structure.  I have no idea as far as the legal
15      setup.  I'm not prepared to answer that.  I do
16      know CCH U.S., Inc., is headed by Kevin Robert
17      and our president of Small Firm Services reports
18      to CCH U.S. and to Kevin Robert.  So from a
19      business perspective, from a reporting
20      perspective, we roll up under CCH U.S. and report
21      to that CEO.
22      Q.    (By Mr. Burke)  So in your experience do
23 you have any idea whether Kevin Robert has the right
24 to tell CCH Small Firm Services what to do?

Page 101

```
1        MR. HARTSELL:  Object to the form; calls
2   for speculation and lacks foundation.
3        THE WITNESS:  I mean, I'm not sure what
4   you mean by "what to do."
5        MR. HARTSELL:  Don't speculate about what
6   his authority or job function is.
7        MR. BURKE:  I just asked for his
8   experience.
9        MR. HARTSELL:  Don't speculate about what
10  his job authority or responsibilities are.
11       THE WITNESS:  It's a somewhat nebulous
12  question.  He provides budget guidance and, you
13  know, beyond that -- the reason that they
14  acquired the two companies they did is because we
15  were in a segment of the market with which CCH
16  was having trouble penetrating, so rather than
17  spending their marketing dollars trying to drive
18  into that market they decided acquisitions was an
19  easier way to go.
20  Q.    (By Mr. Burke)  And that was about in '06?
21  A.    Correct.
22       MR. BURKE:  We reserve the right to recall
23  you, Mr. Holbrook, if your responses turn out to
24  have been incomplete or if you weren't the person
```

312-442-9087Veritext Chicago Reporting Company 800-248-3290   847-406-3200

Page 102

```
1   most knowledgeable or if they turned out to be
2   incorrect, of course, call other witnesses.
3   Subject to that, I'm finished for today.
4        MR. HARTSELL:  We'll reserve.
5        (Deposition concluded at 12:15 p.m.)
6        (Pursuant to Rule 30(e) of the Federal
7   Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e),
8   signature of the witness has been reserved.)
```

312-442-9087   Veritext Chicago Reporting Company 800-248-3290   847-406-3200

Page 103

```
1   STATE OF GEORGIA  )
                      ) SS:
2   COUNTY OF FULTON  )
3        IN THE UNITED STATES DISTRICT COURT
4        FOR THE NORTHERN DISTRICT OF ILLINOIS
              EASTERN DIVISION
5   _____
6   NICHOLAS MARTIN, on behalf  |
    of himself and others       |
7   similarly situated,         |
                                |  CASE NO.
8              Plaintiff,        |
                                |  1:10-CV-3494
9          vs.                  |
                                |
10  CCH, INCORPORATED,          |
                                |
11             Defendant.        |
    _____
12
13       I, BRIAN HOLBROOK, state that I have
    Read the foregoing transcript of the testimony given
14  by me at my deposition on the 17th day of June, 2011;
    that said transcript constitutes a true and correct
15  record of the testimony given by me at said deposition
    except as I have so indicated on the errata sheets
16  provided herein.
17              _____
18                   BRIAN HOLBROOK
19  No corrections (Please initial) _____
    Number of errata sheets submitted_____
20  SUBSCRIBED AND SWORN to
    before me this _____ day
21  of _____, 2011
22  _____
         Notary Public
23
24
```

312-442-9087   Veritext Chicago Reporting Company 800-248-3290   847-406-3200

Page 104

```
1
2             C E R T I F I C A T E
    STATE OF GEORGIA:
3   COUNTY OF FULTON:
4
5        I hereby certify that the foregoing
6   transcript was taken down, as stated in the
    caption, and the questions and answers thereto
7   were reduced to typewriting under my direction;
8   that the foregoing pages 1 through 102 represent
9   a true, complete, and correct transcript of the
10  evidence given upon said hearing, and I further
11  certify that I am not of kin or counsel to the
12  parties in the case; am not in the regular employ
13  of counsel for any of said parties; nor am I in
14  anywise interested in the result of said case.
15       This, the 28th day of June, 2011.
16
17
18
19       LISA A. HUNSICKER, CCR-A-421
20
21
22
23
24
```

312-442-9087   Veritext Chicago Reporting Company 800-248-3290   847-406-3200

```
 1
 2                COURT REPORTER DISCLOSURE
 3
 4        Pursuant to Article 10.B of the Rules and
      Regulations of the Board of Court Reporting of the
 5    Judicial Council of Georgia, I make the following
      disclosures:
 6
 7        1.   I am not disqualified for a relationship of
               interest under the provisions of O.C.G.A.
 8             Section 9-11-28(c).
 9        2.   I am a Georgia Certified Court Reporter.
10        3.   I am present as a representative of
               JPA Reporting, LLC.
11
12        4.   JPA Reporting, LLC was contacted by Veritext
               Chicago Reporting to provide court reporting
13             services for this deposition.
14        5.   I will not be taking this deposition under any
               contract prohibited by Georgia law.
15
16
17
                       LISA A. HUNSICKER, CCR-A-421
18                     June 17, 2011
19
20
21
22
23
24
```

---

**&**
& 2:8
**0**
02111 2:9
06 49:17 50:20 71:7
105:9
082806 69:3,8
**1**
1 3:5,14 43:18,21
46:13 104:9 105:7
10 13:9
10,000 58:21
10.b 4:2 105:4
102 104:9
10:23 55:18
10:31 55:18
1148 45:2,14 46:23
47:9,19 74:8 80:20
1149 46:23 47:19
74:8 80:20
1150 45:5 46:23
47:19 51:17 67:15
11:27 91:10
11:52 91:10
1230 1:16
1280 45:15
1283 45:15
1285 45:16 82:5
1286 45:16
1287 45:16
12:11 99:22
12:15 102:5
137 87:8
155 2:5
16 50:12
1639 45:17
1662 45:18
17 1:13 50:12
105:18
17th 103:13

**1999** 10:5,12
**1:10** 1:6 103:8
**2**
2 3:6,14 44:13,16
67:7 80:20 82:6
105:9
2,000 58:19
20 12:24
2002 99:12
2003 99:12
2006 22:2,4 53:2
67:16,18 69:11
2008 43:6 67:16
2009 43:6
2010 38:14,19 66:12
67:5 75:3,6 86:9
87:6,7,8
2011 1:13 103:13,21
104:16 105:18
2100 1:16
25 26:4
28th 104:16
**3**
3 105:10
3,000 38:22
30 1:11 13:5 26:4
85:16,17 87:1,9
88:23 100:9 102:6
312-729-5288 2:6
312-849-8100 2:15
2:19
31st 34:2,17
66:12 87:6
3494 1:6 103:8
**4**
4 82:6 105:11
4100 2:13,17
421 1:20 104:19
105:17
43 3:5
44 3:6

**5**
5 105:13
50 81:10
**6**
6 1:11 100:9
60601 2:6,14,18
617-357-5500 2:10
**7**
7 29:22 30:6,7 87:7
727 2:9
75 81:10
77 2:14,18
**8**
800 65:19
**9**
9-11-28 105:8
9-11-30 102:7
9020 2:5
98 29:21
99 87:8
9:15 1:14

**a**
a.m. 1:14 55:18,18
91:10,10
a.numb 51:23
a.state 50:13
ability 33:2 84:16
able 41:23 54:1,16
85:12 95:14
abort 34:2,17
absence 9:12 14:6
30:23 40:20,21
54:12
accessing 31:1
accounting 5:8 7:21
12:17,22 13:4,24
14:2,5 15:29 25:15
accurate 7:14 17:5
18:5 29:5 49:20
53:3 62:2 75:5

**accurately** 5:5
**acquired** 5:12,22
6:5 94:13,15 101:14
**acquisition** 52:20
**acquisitions** 101:18
**act** 21:16,20
**action** 21:11
**active** 35:13 59:21
**activity** 84:11 88:16
88:16
**actual** 22:11 54:17
59:21 81:20 92:14
94:2
**added** 45:24 92:6
96:
**addition** 75:15
**additional** 20:15
69:20,22
**additions** 71:5
**address** 27:4 41:20
49:13 50:7 51:24
70:12 74:20 94:15
**addresses** 23:1 41:4
49:15 77:1
**admin** 36:17
**administer** 33:3
**administration**
32:13,23 56:8
**administrative**
10:13,14 36:16
**admissions** 38:15
**advantage** 20:9
**advertise** 13:3 14:11
14:14
**advertisements** 13:5
**advertising** 21:10
**aforementioned**
21:6
**agent** 36:5 43:4,7
54:10,12 57:19,24
59:1,16,18 84:15
**agents** 36:3 84:13
**ago** 5:13 21:19
58:10 62:1 65:24
79:7

---

**agree** 35:23 46:1
**agreeing** 46:12
**ahead** 40:19 66:14
68:12 81:24 82:13
91:2 93:17
**alex** 5:15 46:11 55:1
88:5
**alexander** 2:4
**algorithms** 35:18
**alias** 48:22 49:1,2
**allowed** 33:4
**allows** 49:3 63:9
**analysis** 62:7 63:1
8:12 11:11,16
**analyst** 10:20,24
11:5,6,7,10,21
**announcements**
37:8
**annual** 15:2
**answer** 5:3 36:2
60:8 82:1 87:16,20
88:14 100:6,12,15
**answered** 5:5 36:6
82:13 87:14 93:16
**answers** 4:18,19
104:7
**anticipation** 97:9
**anybody** 36:22
71:16
**anymore** 75:20
**anyplace** 54:19
**anytime** 36:17 75:18
92:22
**anyway** 104:15
**appear** 45:7 46:8
**appearances** 2:1
**appears** 70:18
**appended** 42:21
**application** 28:24
29:1,12,13
**applications** 29:14
**approach** 02:16
**approximate** 19:3
**approximately** 5:13
21:19 26:4

**archive** 80:11
**archived** 83:24
**archiving** 80:10,14
**area** 9:18 16:19 17:2
18:18,20 19:7
**areas** 100:8
**article** 4:2 105:4
**aside** 70:16
**asked** 11:9 63:24
82:12 83:5 84:10
101:7
**asking** 56:1 63:22
87:16 88:6,8
**asks** 73:18
**assigned** 26:23
68:23 70:11
**assignment** 8:17
**assistant** 10:13
**associated** 95:20
**assume** 97:24
**assumes** 66:13
**assuming** 98:10,23
**atlanta** 1:17 9:18
16:19
**atlantic** 3:14 57:19
**attached** 3:14 57:19
**attempt** 60:18 84:16
**attempted** 54:16
56:18 72:5,5,9
**attempts** 60:7,16
85:13,19 90:9
**attend** 13:1
**attended** 9:23
**attention** 46:22
80:19
**attribute** 73:19
75:18
**attributes** 20:15
73:24 97:10
**atx** 5:12,22 50:18
**audible** 4:19
**authority** 100:1,16
**authorized** 89:24
**automated** 56:17

**automatic** 36:19
**autopilot** 35:21,24
**available** 27:1,12,17
31:18 32:12 35:3
36:16,15,21 23:51:12
59:6,20,21 83:21
88:22 89:7
**avaya** 15:13
**avenue** 2:5,9
**average** 13:5,8
**averaged** 12:24
**aware** 58:22,23 77:1
85:21 90:8
**awhile** 99:14

**b**
**b** 1:11 103:9
**bachelor** 10:7
**back** 7:6,11 8:7
12:15 53:10,14 54:6
55:13,23 59:14 67:7
67:14 74:3 75:3
76:10 85:7 87:3,18
89:10 90:2 99:11
**backed** 64:12,16
79:17 85:6 91:18
**background** 9:22
**backing** 91:20
**backups** 64:10,20,20
79:6 86:7 88:19
89:6
**backups** 64:4,22
84:2 86:2 91:12
**bad** 36:11 74:20
**bank** 96:24 97:4,5,7
97:13,18
**barring** 69:7
**base** 37:9
**based** 38:15,23 39:1
36:4 43:2 63:5
56:20 66:23 71:14
79:17 85:6 91:18

**b** 3:11,10,13 34:20
44:15 45:10,20 46:6
46:15,18,19 55:4,7
55:14 56:3 58:9
60:20 66:9 67:3
68:7 69:2 71:21
72:24 79:1 81:22
82:5 83:2,18 87:5
87:15 88:3,6 89:5
90:13 91:11 94:3
99:19,23 100:22
101:7,20,22
**bench** 14:13
**beneath** 12:12
**berry** 9:23
**best** 34:21 100:7
**beyond** 56:10 94:15
95:10 101:13
**big** 10:21 22:22
88:15 99:23
**bits** 9:16
**block's** 97:8
**blocks** 41:18
**board** 4:3 105:4
**bob** 57:10
**boston** 2:9
**bottom** 44:20 45:5
45:22,24 74:16
**boxes** 32:21,23
**bp** 96:13,24

**brands** 65:22
**break** 4:22,23 55:6
55:6,9,11,14,17
99:19
**bremen** 64:19
**brian** 1:12 4:5,12,13
103:12,17
**briefly** 49:7
**budget** 101:12
**building** 12:19
18:22
**built** 29:12,14,15
**bunch** 35:7
**burke** 2:4,4 4:9 5:19
5:21 23:22 35:23
38:8,13 40:23 43:20
44:15 45:10,20 46:6
46:15,18,19 55:4,7
55:14 56:3 58:9
60:20 66:9 67:3
68:7 69:2 71:20 72:5
72:24 79:1 81:22
82:5 83:2,18 87:5
87:15 88:3,6 89:9
90:13 91:11 94:3
98:6 102:2
**called** 13:16 15:13
28:4 61:12 67:23
68:9 69:12 75:23
78:10 85:23
**caller** 65:2,13,16
61:1,6,10 67:14
**calling** 33:9 59:14
60:1 65:8
**calls** 25:3,8,11 27:17
33:6,8 35:8,18 36:2
36:2,7 38:23 39:5
54:10,20 55:2 56:9
56:13,21 57:20
58:21 59:8,11,12,19
65:17 66:16 70:8,21
71:8 73:8 78:3,11
79:3 85:6,9,13
86:17 94:24 98:2,8
101:1

---

**busy** 56:23 60:20
**button** 33:6 34:1,2
34:11,16,17
**buy** 13:19
**c**
**c** 29:16 38:11 49:10
104:1,1 105:8
**call** 5:16 21:11,12
21:13 26:16,21
27:18 33:23 34:1,2
34:2,4,12,14,16,17
34:18 35:14,19
36:18 54:1,14,16
36:13,18 58:2,23
59:21 60:4,10 69:12
77:6 81:2,5,14
**campaigns** 20:5
23:11,12,14 24:20
34:23 43:13 60:13
61:2,4,5 62:4 63:18
63:23 76:13,17,18
78:8,15,24 79:2
83:4 94:22
**capacities** 14:23
**capacity** 45:5
98:11
**caption** 104:7
**capture** 89:4 95:11
**care** 5:17 22:18
**carries** 24:1 45:5
**case** 1:5 9:12 36:23
42:19 63:14 67:8
84:20 85:2,4 86:18
88:19 103:7 104:13
104:15
**cater** 13:4
**cch** 1:7,11 4:14 5:7
5:10,11,12,14,22
6:1,3,8,12,13 7:14
12:9,20 14:11,12,12
14:13,21 27:16
33:15 37:16 39:11

**campaign** 15:18,23
16:1,2 17:6,10,12
17:18,21 18:2,3
19:10,13,14,17,19
19:21 20:1,19 21:1
21:1,2 23:14,17
24:1,15 27:24 33:9
33:17,18,19,21,22
33:22 34:3,21 35:9
35:10,15,16 40:16
43:5 47:20,22,24
49:24 54:1,7,9 56:5
56:21,22 58:21,23
59:21 60:4,10 69:12
77:6 81:2,5,14
**campaigns** 20:5
23:11,12,14 24:20
34:23 43:13 60:13
61:2,4,5 62:4 63:18
63:23 76:13,17,18
78:8,15,24 79:2
83:4 94:22
**capacities** 14:23
**capacity** 45:5
98:11
**caption** 104:7
**capture** 89:4 95:11
**care** 5:17 22:18
**carries** 24:1 45:5
**case** 1:5 9:12 36:23
42:19 63:14 67:8
84:20 85:2,4 86:18
88:19 103:7 104:13
104:15
**cater** 13:4
**cch** 1:7,11 4:14 5:7
5:10,11,12,14,22
6:1,3,8,12,13 7:14
12:9,20 14:11,12,12
14:13,21 27:16
33:15 37:16 39:11

**75:6,11,14 76:12**
78:2 79:23 85:18
87:12 89:8,20 90:15
90:16,16,17 92:3
94:12 99:9,15,24,24
100:4,4,16,18,20,24
101:15 103:10
**cch's** 44:3 61:23
**cer** 1:20 104:19
105:17
**cell** 62:18,22 63:1,5
63:8 65:6 66:24
**certain** 13:18 15:6
18:9 20:16,17 22:3
22:8 23:2 34:19
**certainly** 34:24
**certainty** 66:3
**certified** 105:9
**certify** 104:5,12
**cfo** 12:7
**change** 68:20 71:3
73:7 74:4 91:19
96:5
**changed** 68:23
**changes** 71:5 72:22
73:1
**character** 58:19
**characters** 58:19
**charge** 24:2
**chicago** 2:6,14,18
105:12
**churn** 97:19
**circumstances** 39:6
**civil** 102:7
**clarification** 4:24
54:24
**clarify** 4:24 55:13
55:20 87:21
**class** 51:8 64:6,7,8

clear 45:18 58:6 66:8
clearly 38:6,8,9
click 33:24 34:1,16 34:17
clicking 98:13,14
client 55:12 66:5,9 87:9
close 17:14 19:1 99:12
closer 35:21
code 14:10 28:19 29:17 48:13 51:21 69:6,8 74:4,5,18,19 92:9,13 93:22
codes 92:1,12 94:4,6
coding 48:12 50:15
collection 3:6
college 9:23 10:8
come 20:20 21:6,8 55:12 56:5,22 94:8 94:16
comes 16:1 92:24
coming 59:17 61:18
comma 23:6
comments 27:21
commercial 97:15 97:17 98:17
commission 74:21 75:1
common 18:4 29:13 53:18
communication 37:4 77:15,17
communications 83:3
companies 51:10
company 6:7 11:13 13:16 41:21 46:10 49:7,9,14 61:8,9 85:23 89:17,18 99:4
companywide 75:15
compare 41:19

comparison 59:7
competent 44:7,9
competitive 20:9
competitor 27:10 78:19
competitors 20:9 61:23
compiled 45:9
complaint 87:8
complete 104:10
completely 5:5 48:1 95:9
completion 56:22
complicated 97:21
computer 51:7 53:12
computers 84:8
conceivably 78:7
concern 96:1
concise 93:18
concluded 102:5
concurrent 78:23
condition 50:10 51:6
conditions 20:7
confer 55:12
conference 5:16
configurable 60:6
configuration 60:23 66:23
configure 60:7,16
configured 65:19,23 66:1,4,16,22
confirm 92:13
confirmed 86:23 87:1
confusion 58:8
connect 27:18 30:23
connected 30:21
connection 91:13,18
consecutive 61:4

considerable 92:16
considered 46:8
consistent 92:13
consists 46:14
constant 12:10,11
constantly 68:24
constitutes 103:14
constrain 43:15
constraint 51:24
constraints 40:13 48:23
constrict 69:21
consumers 75:9
contact 15:5 41:21 58:1,2,4 73:20,23 73:24 74:5,7,18,20 74:22,24 75:7 85:22 86:1 89:12,13 92:3 94:10
contacted 73:13,17 73:19 75:23 86:21 105:11
contacting 15:11 20:14
contacts 41:14 42:8 65:9
contains 42:18
content 61:6
contents 3:1
context 96:16
continuent 85:23 87:22 88:20 89:9,11 99:3
contract 105:14
control 33:1
controls 92:18
conventions 32:8
converted 30:7
conveyed 63:21
coordinate 76:20
coordinated 33:8
coordination 77:13 77:16

copy 64:23 65:1 96:6,15
copyright 6:9 100:11
correct 5:24 8:20 9:21 10:16,18 11:4 12:5 14:17 16:15,20 17:3,8 19:2,3 21:1 23:15 24:4 28:23 31:11 34:9,13 35:2 35:4 36:4 37:12,15 39:18 42:7 44:24 49:8,12,16,19 51:16 55:3 56:3 57:18,21 65:11 69:4 70:22 73:10 74:11 75:8 76:19 85:14 92:2 101:21 103:14 104:10
corrections 103:14
correlate 94:1
council 4:3 105:5
counsel 2:1 47:1 88:10 90:19 104:12 104:14
country 16:14
county 103:2 104:3
couple 22:24 41:14 96:5 99:13
course 30:20 102:2
court 1:1 4:3,17 103:3 105:2,4,9,12
cpas 97:21
create 67:21 95:20
created 31:10 37:3 53:18 92:17 96:8
creation 31:14 38:3 53:15 94:2
criteria 70:10 82:23
criticality 64:9
crm 7:11,20,22
cross 4:8
crr 1:20

cubes 17:15 18:11 18:14,23 19:1
current 6:14 16:22 20:14 61:11 98:5
currently 61:8 62:7 65:18,21 70:11
customer 7:23 8:5 12:17 22:18 25:1 27:2,6,12,16 37:9 41:12 53:24 57:24 62:16 98:5
customers 12:15 15:5 20:14,15 38:4 52:6 59:1 61:12 62:3,7 77:19 78:3 80:22 99:8
cv 1:6 103:8
cycle 15:3

**d**

d 39:23
daily 8:16 79:4 80:9 87:4 88:24
daniel 9:4,5,9 12:3 24:1 32:13 40:20 56:7 61:17 63:22,22 67:10 83:6,21,22,23 86:23 89:10,11 96:3
days 60:2 61:12
data 27:11 30:16 31:23 32:24 34:15 40:13,16,21 41:7,18 41:19,19 42:9,19,21 47:16 48:6 50:5 51:12 59:6 72:21 74:15 77:2 78:2 84:23 85:4,6,8,9,13 85:19 86:17 87:3,12 87:17 88:19,22 89:7 91:5,5,6,7,8,20,21 92:16 93:20
database 21:5 23:9 23:11 24:2 25:3 30:11,24 39:12,14
define 14:14 30:23 89:23
degree 10:2,6

deletion 79:23
delimited 23:6
delivered 22:10 23:5
delta 71:3
demos 13:15 38:3
department 7:1 8:2 8:15 9:1 15:8 77:12 77:14,18 79:20 90:15,18 92:19
departments 6:19 12:9,12,13,16 14:24 99:1
dependent 35:7 93:2 93:4
depending 64:5 79:3
depends 19:15 33:9 60:21
deposited 6:11
deposition 1:13 3:5 4:15 44:2,4 100:9 102:5 103:13,14 105:12,13
described 86:19
describe 3:3
description 3:3
designated 46:3
designation 49:11
designed 13:24 24:20 47:16
designing 28:19
desk 19:9,18 23:13 24:11 82:10
desktop 7:12 25:19 29:2
desktops 24:6 25:23 26:1 29:6 30:10
detailed 86:2,7,24 87:3 88:22
details 6:8 32:9 89:17
determination 51:13

determine 47:21 62:18 86:1 87:24 92:17 93:20 96:16
develop 3:5
developer 5:8 28:10 28:13,15
development 6:20 7:4 8:1 12:18 22:20 28:13
dialed 56:21
dialer 8:16,19,21,22 8:23 9:3,6,7,10 14:16,18,20,21,22 15:18,21,22 16:1,2 16:12 17:6,11,17,22 25:8,11 27:17,18,19 28:20 31:18,19,23 32:2,7,11,13,16,18 36:2,10 38:14 40:15 47:19 54:20 55:2 56:2,5,7,11,18 57:3 59:8,16,19 60:3,10 60:18 62:4 65:17 67:23 68:3 69:12 72:1 76:18 78:4,10 79:2,3 81:2 83:4 84:11,11,17 85:5,10 85:12,20,23,24 86:8 86:11,14,17 87:12 87:18 88:2,18 90:24 91:20 94:24 96:13 97:15,23 98:2,7,15 99:7,9,16
dialers 8:24 14:11
dialing 15:14
dictate 82:10
dictates 91:9
difference 72:23
differences 33:11
different 18:6 20:13 22:10 25:12 29:12 29:13,16 32:7,15

33:10,12 35:17 39:15 41:1 45:21 65:22 66:20 68:21 68:23 78:8,16 93:16 94:4,7 97:11,12
differently 41:13
difficult 41:13 92:11 93:21
digit 50:18 51:9 80:21
digits 51:18
dimensional 73:3
diminishing 13:10
direct 13:7,9,11 21:7 40:20 41:24 62:9 94:14
directed 98:8
directing 46:22 80:19
direction 104:8
directly 9:10 11:8 12:3 21:13 28:5 31:23 32:2 93:1 94:12
director 6:14,16 11:23,24 16:10,17 16:18 25:22 26:6 27:23 59:2 61:13 61:14 63:13,20 62:14 70:16 76:19 79:9 80:1 85:13 92:9,16 61:2 64:11
disclosure 4:1 105:2
disclosures 105:5
discovery 63:14 67:8
discuss 23:16,17,20 23:21,22
discussed 88:9
discussing 92:4
dislike 37:24

displays 56:15
dispositions 68:24
disqualified 105:7
distinction 71:18
distribution 8:18
district 1:1,1 103:3 103:4
division 1:2 103:4
dnc 74:12,20
document 43:22 44:19 45:4,6 46:3 46:14,24 82:6 84:6 84:10
documents 44:18 45:1,21 46:2,9,9,20 63:19 84:11
doe 26:16,19 54:6,7 54:9
doing 48:23 74:17 93:19
dollars 101:17
download 31:20
drafted 77:20
drive 2:14,18 13:14 32:4 67:13 80:12,13 84:23 85:8 101:17
driven 20:10 59:13
drives 13:16 84:19
driving 21:12 94:19
duly 4:6
duplicate 61:10
duration 85:15
duties 6:16 10:23 11:7

**e**

e 20:11 38:11 64:1,1 64:2 68:22 75:23 76:4,9,10,12,17 77:1,6,18,22 79:9 79:22 80:8 81:12,17 82:3 83:7,8,10 84:7 84:14 89:22,23 90:4 102:6,7 104:1,1

earlier 14:15 67:19 72:6 78:6 80:20
early 86:6 89:7
easier 101:19
eastern 1:2 103:4
editor 28:4 31:8
educational 9:22
effectively 18:10
efficient 49:4
effort 77:13 87:11 89:3
efforts 89:8
either 28:19 33:24 34:10,16 36:24 48:24 53:15 67:12 72:22 80:10 88:22 94:18
elaborate 58:7 88:2
electronically 61:11
embedded 96:17
employ 90:20 104:13
employed 4:13,14 10:9 99:13
employee 64:7
employees 80:15
employer 90:15
engage 13:7 92:15
ensure 51:24 60:1 61:3,15 78:10
ensuring 36:14 90:23
entered 93:9 94:10
entering 69:6,7 93:6
enterprise 7:10
entire 43:14 48:24 62:15 72:2
entirely 13:8 35:7
entities 99:24
entity 89:20
equal 50:15 51:3,5 52:3
equals 50:14 52:16

equation 92:22
errata 103:15,19
especially 88:9
esq 2:4,7,12,16
essence 93:23
essentially 12:14 28:2 33:21 34:3,14 49:2 50:5
existing 16:23 17:1 18:24
event 51:14
everybody 69:12,15 70:4 97:8
evidence 64:1 94:23 104:11
evolving 69:1
exact 23:2 26:3 66:4 72:20 86:14
exactly 72:16
examination 4:8
examined 4:6
example 28:7 27:17 63:7 73:24 92:3
exception 80:9
exchange 79:10,12 79:13
exclamation 50:14
exclude 81:4
excluded 50:24 53:5 71:7 74:5 81:1,3 82:8,23
excludes 52:7
excluding 52:4 70:23
exclusion 50:11 82:18
exclusions 83:1
exclusive 61:6 78:16
excuse 46:7
execute 28:16 34:1,16
executed 95:22
executing 28:21
executive 11:12 18:23
exhibit 3:3 43:18,21 44:13,16,16 45:5,11

45:13 61:7 80:20 82:6
exhibits 3:14 51:18
exist 41:11,15 78:23 81:3
existed 41:20 85:20 87:12,18 88:1
existing 15:5 26:23 41:19 96:4
experience 100:22 101:8
expert 66:19
explain 47:13
explained 45:10
export 31:8 32:3 56:7
expound 37:2
express 37:4
expressed 93:24
expression 92:15 93:10
extent 33:3

**f**

f 104:1
facility 38:6 64:19
fact 12:16 39:7
fair 39:7 92:8 93:11
fairly 26:15 80:1 96:2
familiar 8:23 9:2 26:11 32:9 38:13,16 50:3 65:2,12 76:3 79:7,8 84:22 97:5
far 33:9 67:3 100:14
fast 71:6,9 72:4,19
federal 74:21,23 75:17 102:6
feed 56:15 93:1
fell 43:15 83:16
field 16:11 42:17 42:8,11,15,20,21 43:3,6 52:16,20,22 53:2 67:14,16,20,22 82:21

figure 41:14 59:5
figured 86:12
figures 27:23
file 23:8 31:9,10,16 31:17,21 32:5,10 46:24 53:11,11,12 53:15,15,16 68:22 89:22,23 90:1,4,5 95:19
files 23:3,4,5 95:4 95:15
filing 20:11 43:16
final 49:17 74:11
financial 91:6
fine 52:9
finished 102:3
firm 4:14 5:7,10,14 6:1,3,12 14:12,13 65:22 89:20 90:16 90:17 99:24 100:4 100:17,24
first 4:6 24:18 45:7 46:22 47:12,19 50:9 51:18 52:12 53:21 62:14 86:6 89:9 93:8 100:24 104:6
five 5:13 8:3 13:1 17:7 18:5 21:19 22:10 40:6 71:6
flagged 43:1 73:20
flipping 51:17
floor 2:8 18:16,22
flows 63:24
focus 79:18 77:18
focused 78:17
foia 21:18 22:3,5 39:10,19 40:6,16,21 40:23 41:5,7,19 42:8,11,15,20,21 43:3,6 52:16,20,22 53:2 67:14,16,20,22 82:21

68:4,6,8,15 69:3,8 69:13,23 70:1,4,20 73:1 76:24 77:21 92:4 94:9,21
following 52:14 105:5
follows 4:7
foot 36:12
foregoing 103:13 104:5,9
forgot 5:15
form 23:18 35:22 40:18 66:7,13 68:11 71:12 72:7 78:12 82:12 91:1 93:15 101:1
formed 95:14
formulate 24:15
forward 71:6,9 72:4 72:19 85:7 87:23
found 42:20 53:10 53:14,24 64:2 67:11 101:8
foundation 91:2
four 5:13 8:3 13:1 17:7 18:5 21:19 22:10 40:6 71:6
fourth 3:5 51:19,22
freedom 21:16,20
freeform 58:12,17
frequency 13:12
frequent 37:6 76:22
frequently 37:5 76:14 96:4
fresh 70:17
friday 1:13
front 8:7
ftp 31:20 32:17
ftp's 31:17
fulfilling 100:12
fulfillment 12:18 102:1
function 101:6

functioning 52:11
fundamental 68:14 71:17
fundamentally 35:16
further 69:21 104:11
future 16:12 48:13 74:6

**g**

g 1:8,9,11,16,21,22
g.recordid 50:17 52:11
g.sold 52:3
general 18:18 49:6 26:12 76:2,6 80:6
generally 26:12 76:11,19
genesis 63:18
georgia 1:17 4:4 9:20 10:1 17:2 99:16 103:1 104:2 105:5,9,14
getting 31:22 59:22 59:23 65:14 72:9 98:13
give 5:3 68:8
given 4:15 15:7 103:13,14 104:10
global 90:21
gm 48:10,14
gmin 49:13
gminfo 48:8,16
go 11:18 21:1 23:9 23:17 35:11 40:18 54:6 66:14 68:11 80:11 81:24 82:13 85:7 91:23 96:19 97:16 97:18
goes 45:15 72:2
going 5:3 8:9 11:3 13:10 13:10 35:12 48:22 51:14 52:5 55:9

**going**
55:11 56:18 61:20
62:13,15 68:18 70:4
70:4,4,14 71:9,10
72:2,4,16 73:1
74:22,24 75:2,7,8
75:15,16 76:4,9
82:7,8 85:17 93:6
94:13,16
**good** 4:21 24:16
30:2 37:22 68:9
**gotten** 88:11
**graduated** 10:5
**great** 37:17 47:12
**group** 7:12 11:2,19
12:18 15:4 16:11,12
17:21 44:16,18
45:11,13 51:6,18
82:23
**guess** 38:16 47:24
53:16 93:18
**guessing** 52:22
**guidance** 101:12
**guy** 9:14
**guys** 42:6 57:7 86:5

**h**
**h** 2:4
**hand** 41:16 44:21
94:17
**handed** 44:15 98:9
**handing** 43:20
**handle** 56:8
**handled** 77:18
**handoff** 59:22
**handoffs** 66:20
**handwriting** 44:20
46:13
**handwritten** 45:21
45:24
**happen** 15:19 16:2
33:7 36:5 58:15
70:19 81:17
**happened** 42:16
43:9,10 66:11,14
71:15 81:11
**happens** 9:13 27:24
31:6 33:21 66:17

**hard** 32:4 44:17
80:11,13 84:19,23
**hartsell** 2:12 5:15
23:18 35:22 40:18
44:19 45:3,12,23
46:7,16 54:23 55:5
55:9,16,19 58:5
60:14 66:7,13 68:6
68:11 71:11 72:7
78:12 81:16,23
82:12 83:11 86:19
87:14,20 88:5,7
90:11 91:1 93:14
99:21 100:6 101:1,5
101:9 102:4
**he'll** 19:23 28:1,3
**head** 8:16
**headed** 100:16
**hear** 38:1
**heard** 37:23
**hearing** 104:11
**heavy** 36:9
**hey** 94:18
**hiatus** 86:11
**hierarchy** 26:5
**higher** 98:19,20
**highly** 82:14
**hired** 37:18
**hiring** 97:21
**historical** 86:16
**historically** 68:10
87:19
**history** 64:21 73:5
**holbrook** 1:12 4:5
4:12 46:19 55:19
101:23 103:12,17
**holiday** 39:7
**holt** 22:15
**home** 63:7
**honestly** 79:19
**house** 42:6
**houses** 40:1
**huh** 44:22 48:18
**huhs** 4:21

**human** 15:16,17
35:5 92:22
**hundred** 22:24
41:14
**hundreds** 94:5
**hunsicker** 1:20
104:19 105:17
**hutchinson** 12:7
**hypertechnical**
31:22
**hypothetical** 69:24
70:3,17 71:14 72:3
72:11
**hypothetically**
69:11

**i**
**idea** 16:2 24:16 59:5
66:11 67:17 68:9
100:14,23
**ideally** 57:1 93:11
**identification** 43:19
44:14
**identifier** 50:22
65:20,20
**identifiers** 46:7
**identify** 16:5
**ids** 50:24 74:16
82:16
**illinois** 1:1 2:6,14,18
99:16 103:4
**immediately** 34:1,16
**implement** 19:14
**implements** 19:20
**implies** 93:23 96:23
**import** 52:16
**importance** 85:4
**important** 37:7
**imported** 41:8,10
52:20
**impossible** 95:1
**imported** 27:19
**incidents** 24:20,23
24:24 25:15,16
59:10

**include** 6:19 24:11
50:14 59:11 62:24
68:8 69:23 98:18
**included** 41:5,6
83:3
**includes** 14:1,2,3
74:12
**including** 40:16
53:1
**inclusion** 42:15
**incomplete** 101:24
**incorporated** 1:7,11
103:10
**incorrect** 102:7
**increasing** 13:12
**indicate** 52:19 59:16
**indicated** 103:15
**indicating** 68:22
**indication** 98:18,21
**indicator** 25:17 27:8
43:2 72:13 74:2
**individual** 82:22
9:11 21:12 24:21
26:22 27:6,10 38:5
46:8 52:1 57:2 70:9
73:18 80:18 83:1
93:4 94:17
**individuals** 7:2,3
8:3,14 9:12 13:17
18:9 26:1,2 31:2
52:4 69:23 70:10
75:9 77:12,20 93:6
98:9
**industry** 37:7
**influenced** 20:6
**information** 6:23
7:12 11:18 13:20
21:16,20,21,24 27:1
27:15 33:19 38:17
38:18 39:11,11,19
40:24 42:9 48:15
54:11,12 56:4 58:2
59:14 62:10,11

63:17,19 67:4 86:7
92:4,5,10 93:13
94:10,14,20 95:14
**inherent** 60:3
**initial** 20:21,23,24
21:1 22:3 31:14
86:20 93:9 103:18
**initially** 86:23
**initiate** 34:1
**initiated** 33:10 86:5
**initiation** 66:17
**initiative** 17:23 20:8
**inside** 16:11,13
**installed** 32:24
**instance** 28:10
**instances** 82:3
**instructed** 91:23
**integration** 56:11,12
57:11 92:24
**intended** 28:18
**intending** 67:4
82:24
**interact** 37:4 67:6
**intent** 13:18 25:13
40:3 84:17
**interacting** 28:5
**interaction** 12:8
25:1,6,13,15,17
42:19 54:17 56:20
57:1,3,6,10 58:4,15
**interactions** 25:7,10
27:5,15 36:12 68:21
**interactive** 13:15
**interest** 92:15 93:10
93:23 105:7
**interested** 27:9
94:18 104:15
**interface** 24:7 25:24
26:2
**interim** 86:8
**internal** 7:5 12:16
75:15 89:24
**internally** 20:22
**internet** 90:2,3

**interrupt** 8:8,9
**introduction** 81:19
**invalid** 72:10,14
**involve** 92:22
**involved** 22:11,13
23:24 32:3
**involvement** 15:20
35:5,8 36:9
**irs** 21:21,22 22:7,10
37:7 77:3

**j**
**job** 6:13,14 11:5
18:3 32:15 36:20,21
36:24 37:1,1,2,3,3
38:14,16,18 39:6,8
39:8 43:5 57:5,15
57:16,22 60:24
84:17 88:23 101:16
101:10
**jobs** 20:16 37:6
88:17,24
**john** 12:7 26:16,19
54:6,7,9,10
**join** 50:6
**joining** 50:5
**joins** 48:23 50:1,2
74:15
**jpa** 105:10,11
**judicial** 43:6 50:12
**july** 86:6 89:7
**jump** 10:21
**june** 1:13 75:6 86:5
86:9 87:7,8 103:13

**k**
**kavanagh** 2:9 57:21
**kawana** 16:23 17:4
**keep** 8:8 69:6 71:15
73:12,14,16 78:22,10
**keeps** 73:12
**kennesaw** 30:16,17
79:16

**kept** 39:13 65:1
86:24
**kevin** 100:16,18,23
**kin** 104:12
**kind** 13:10 15:12
37:1 47:19 81:19
97:10,19 98:20
**klein** 2:8
**kluwer** 6:6,7 100:2
**know** 4:22,24 6:6,8
7:17 9:15,16 13:4
13:13,19 14:4 17:17
18:22 19:13,20,23
20:7,20 22:7,12,13
23:23 26:3 27:21
29:13,18,21,23
30:22 31:13 32:4
34:20 35:11,24
36:19 40:16 41:17
42:2,5,8 43:2,9,10
43:24 44:7 46:1,4
46:10,16 47:2,10
48:8 50:12 52:18
54:3 56:15,23 57:9
57:10,10 59:22
61:17 62:6 63:22
65:16,20,24 66:21
67:3,8,11 68:15
70:13,13 72:17
74:12,24 75:1 76:8
77:6,9,10 79:17,19
79:22,24 80:4 82:22
83:11,11 84:4 88:5
89:3,11,21 91:11
93:23 94:3,9 95:5
97:4,8 99:10,11,15
100:3,16 101:13
**knowledge** 39:2,4
63:6 75:13 100:7
**knowledgeable**
44:11 102:1
**known** 20:15 99:5
**knows** 60:19 97:8
100:11

**l**
**l** 2:12 38:11 47:7
**lack** 91:2
**lacks** 101:2
**language** 28:3,14,14
29:4,11,17 50:15
51:2
**large** 22:23 23:3
43:12
**larger** 69:3,9
**last** 2:4 105:14
**lawsuit** 75:14 85:10
85:18 87:6,7,13
88:15
**lawyer** 44:3
**lead** 8:17
**learned** 86:22 87:13
**leave** 36:10
**legal** 14:8,9 44:1
92:9 100:15,17
100:14
**legislation** 20:8
**length** 45:1 88:10
**lenny** 22:15
**level** 7:11 26:7
**lewis** 16:22 17:1
18:24
**licensed** 15:3
**lieu** 82:3
**limitation** 60:3
**limitations** 80:3,6
**limited** 24:19 57:12
57:13
**line** 4:12 48:4
50:12 51:4,19,22,23
52:2,10 74:9 89:1
89:19
**lines** 6:4 50:1,6
52:14
**lisa** 1:20 104:19
105:17
**list** 42:12,15,21,21
43:3,14 48:12 51:1

52:20,22 67:20,21
69:8,13,16,23 70:1
70:4,4,14 71:9,10
72:2,4,16 73:1
74:22,24 75:2,7,8
75:15,16 76:4,9
82:7,8 85:17 93:6
94:13,16
**listed** 61:10 68:16
**lists** 22:10,14,21
74:6 75:11,12
**literally** 12:19
**litigation** 47:1 62:19
62:20,21 63:3,4
91:13,18,22
**little** 35:5 51:7 99:23
**lives** 9:19
**llc** 2:4 105:10,11
**load** 31:18 32:14
**loaded** 17:22 23:11
31:12 35:9,12,14
39:20 40:6,9 72:2
**loading** 33:20
**loan** 97:9
**local** 67:13
**locate** 86:16
**located** 30:9,11
79:15 95:4
**location** 31:13
**locations** 97:19
**log** 57:3 58:1,3 68:2
76:1 92:20 93:4
**logged** 25:6,7 27:19
52:13 35:9 42:17
54:15,18,20 55:2
56:24 57:16 59:10
59:20 68:21
**logging** 25:9 56:17
**login** 95:11
**logs** 33:20 23:15
56:20
**long** 11:13,24 81:19
82:7
**look** 32:21 44:6 48:4
72:16 80:12 82:5

83:21 95:19
**looking** 45:19 47:18
52:13 67:14 96:10
72:12,13 96:10
**looks** 32:22 38:22
49:5,6,13,17 50:11
53:1 81:9
**lost** 60:8
**lot** 30:4,8 42:4 81:4
96:2,3
**lots** 97:19
**lower** 97:22
**luxury** 93:1

**m**
**m**
**machine** 29:18,19
29:24 32:19 67:13
**machines** 29:7,8,9
**magazine** 21:12
**mail** 8:17 13:7,9,11
21:7 56:24 62:9
64:1,1,2 75:23 76:4
76:9,10,12,17 77:1
77:6 79:8,22 80:8
81:12,17 83:8,10
84:7 94:14
**mailboxes** 80:2
**mailing** 94:7,15
**mails** 77:18,22 82:3
83:7 84:14
**main** 9:14,16 48:15
**maintain** 8:5 72:3
90:9
**maintained** 46:10
**maintenance** 15:3
15:3 31:4 79:21
**making** 22:11 61:15
71:14
**manage** 18:10 76:17
**managed** 33:14,17
33:18,20,21,22 34:3
34:14,21,23 35:9
57:22 58:23 92:21
76:1 76:8 82:5

**management** 6:23
7:15,23 11:2,18
15:21 16:4,5,7 18:8
20:8 24:22 36:9,14
83:6,16,20 84:1
**manager** 11:12,17
11:18,20 24:23
27:22 38:6 43:7
64:10 81:5 97:3
**managers** 16:10,21
16:22 18:13 24:18
52:4,8 70:11
**market** 12:20,21
13:3 20:6 101:15,18
**marketing** 8:7 13:6
19:16 54:13 76:12
76:20 77:12,18 90:9
97:12 101:17
**marketplace** 16:6
**martin** 1:3 103:6
**massachusetts** 2:9
**match** 42:20
**matched** 42:24 43:3
**matches** 41:17
68:19
**materials** 76:23
**mcguirewoods** 2:13
2:17

**mean** 6:22 7:9,17,22
8:9,13,21 13:22
17:17,21 21:9,9
23:20 24:24 27:13
29:3 34:5 35:24
34:12 40:21 45:1,7
48:21 50:21 58:10
64:21 69:10 73:1,14
94:5 95:16,23 96:21
101:3,4
**meaning** 16:13 41:2
92:23
**meaningful** 84:17
**means** 31:22 47:10
47:13 50:4 52:18
93:12 96:17
**meeting** 70:9
**meets** 72:16
**member** 16:3
**memo** 81:12,18
**memorial** 38:20
**mention** 61:23
**mentioned** 58:3
**merged** 5:13 40:24
41:1
**mergers** 41:15
**message** 37:4,10,11
57:15
**messages** 37:14
83:24 97:12
**met** 82:22
**metadata** 95:3,6
**michael** 16:24 17:2
19:1
**michigan** 2:15
**microsoft** 79:10,12
94:3
**middle** 55:7
**mine** 30:8 3:13
**mining** 92:16 93:9
**minutes** 54:23 58:10
**minutes** 79:6 99:20

**mirror** 64:18
**mis** 6:19,22 7:1
11:18,20
**mischaracterization**
78:13
**misleading** 55:10,11
**missed** 56:23
**missing** 70:12
**misstatements**
68:14
**mistake** 30:7
**model** 31:3 67:23
**modified** 53:16 96:8
**modify** 28:1
**module** 32:14,23
36:17
**molly** 16:22 17:4
**moment** 62:11
**monitors** 36:21
**mouth** 36:11
**move** 75:21 76:1
**multimedia** 38:2
**multiple** 13:23
15:20 32:3 60:7,16
61:18 63:9 66:18,20
92:1 97:19
**multiples** 75:2
**multisource** 90:20
**mutually** 61:5 78:16

**n**
**n.e.** 11:21
**name** 4:10 6:4 27:4
38:10 39:21 41:21
41:21 48:10,11 49:1
65:9
**names** 16:16 22:24
41:4 49:9
**naming** 32:7
**national** 75:2,6,16
**nature** 19:15 47:23
54:4 78:23 82:17
**nebulous** 101:11

**necessarily** 45:7
46:1,5,7,12 54:3
71:19 96:22
**necessary** 85:5
48:17 54:23 55:22
78:5 86:4 95:12
**need** 4:22,24 37:8
59:8,10 60:2,5,11
96:16 97:6
**needed** 42:8 61:4,5
66:13 68:11 71:11
78:12 82:12 91:1
**needs** 52:6
**neither** 34:18
**net** 29:16
**network** 31:3 66:24
67:13 85:8 90:21
**never** 37:23 57:17
69:3 75:6 86:3
**new** 14:23 16:18
20:5,6 21:2,3 26:1,2
56:4
**news** 37:7
**nicholas** 1:3 103:6
**nightly** 64:18
**nomenclature** 18:4
97:16
**non** 52:6 60:6
**north** 2:5
**northern** 1:1 103:4
**notary** 103:22
**notation** 42:10,13
63:1,5,11 67:14
69:16 73:23 96:6,23
**note** 27:20 57:9
**noted** 25:4 57:17
92:5
**notepads** 53:18
**notes** 25:15,17 57:8
58:10,11,14,16
59:10 98:23
**notice** 3:5 44:2,2
61:22 62:10 63:2
76:23 85:18
**notification** 75:4
88:15
**notified** 88:18
**null** 81:23

**number** 13:10 18:9
21:13 26:3 27:4,13
41:20 44:20 45:21
45:24 50:8,8 56:23
59:8,10 60:2,5,11
94:11 97:4 103:19
**numbers** 17:2
20:18,19,24 21:4,15
23:1 33:5 41:5 45:5
45:14 49:18,20
50:18 51:9 62:17
63:10 67:15,22 68:8
68:15,22 80:21
82:11
**numerous** 6:18
12:22

**o**
**o** 39:23
**o.c.g.a.** 102:7 105:7
**object** 23:18 35:22
40:18 55:14,16 66:7
66:13 68:11 71:11
78:12 82:12 91:1
91:23 100:6 101:1,5
**objection** 72:7
**obtain** 95:14
**obtained** 21:15
67:22 92:3,10
**occurred** 89:2
**occurrence** 65:12
66:21 88:24
**occurring** 55:24
82:19
**occurs** 56:14 67:15
97:13
**office** 7:6,11 12:15
19:4 30:17 55:23
79:16 90:21
**offices** 2:4 17:14
**oh** 42:11
**okay** 5:1,2,5,6
8:9 10:23 12:11
17:23,24 19:16
35:13 38:20,21 44:4
44:5,10 46:15 54:7
54:8,22 55:6 56:14
60:18 69:13,14,19
70:1,2 71:11 73:16
88:10 96:12 99:21
**older** 40:13 71:9
**onc** 48:10
**once** 11:21 27:22
32:12 33:5 59:20
85:21
**oncontact** 21:15 24:3
24:5,9,15 25:4,8,19
25:22 26:11,19,22
27:3,20 28:8,23,24
30:9 39:16,17 40:4
40:22,24 41:6,8,22
42:9,10,14 48:15
53:23 54:11,15,18
57:16 59:4,10 62:24
64:16 77:22 78:1
80:23 91:15 92:7
94:11
**ongoing** 7:5 8:16
**online** 8:14 16:6 38:3
**open** 96:4
**opens** 54:10
**operation** 8:16,19
8:21,24
**operations** 6:15,17
6:21 8:12 11:11,16
11:23 12:1
**operators** 36:1
**opportunities** 16:5
**opportunity** 16:5
**opposed** 15:3 97:20

**[ops - previously]**  Page 12

ops 93:6
optimize 13:14
options 34:13
oracle 28:19,22,24
 30:13,15 40:1 41:2
 41:24 48:22
oracleclient 30:24
order 15:18,22 44:3
 46:3 92:12
original 3:14,14
 96:8
originates 17:6
origination 92:14
 93:22
outbound 35:18,19
 65:23 66:16,22
 88:16
outgoing 25:7
outlook 79:10,13
 83:22
overlap 61:19
overwrite 40:10
owns 41:8

**p**
p 39:23
p.m. 99:22,22 102:5
package 27:10 61:8
 61:9 78:20
packages 43:16
 68:21 98:19
page 3:3 17:20 45:2
 45:2 51:17,19 52:12
 55:24 67:15
pages 46:14,23 47:2
 47:19 80:20 104:9
paid 21:22 90:6
parameter 50:9 71:5
 73:1
parameters 20:1,3
 23:14 27:23 28:1
 43:16 49:23 53:6
 69:20,22 70:13,15
 70:24 71:2 72:12,17

72:23 73:9 78:15
 81:9,14,18 83:4
 96:5,5 97:2
parent 6:7 89:18
part 17:22 25:13
 36:9 51:14 53:2,24
 54:7 57:4 61:16
 94:22 98:22
participated 63:14
particular 17:23
 27:24 46:3 49:23
 51:10 60:9,24 76:5
 80:21,23 81:2,5
 82:7 84:16
parties 42:2 104:13
 104:14
party 37:18 85:22
passed 56:13
paycheck 6:10,11
pc 31:12 32:24 33:1
pcs 7:7 84:13
pdf 46:24
pds 15:13
peachtree 1:16
penetrating 101:16
people 6:24 7:16,18
 8:1,4 16:9 17:7 36:2
 43:5 53:1 65:7
 67:22 70:5,21 73:12
 77:7 97:18 98:20
people's 16:16
perform 41:23
performed 83:3,19
 84:7 85:1
period 34:19 59:11
 83:17 86:13 94:6
 96:9
permits 99:15,17
persistent 73:5
person 9:2,9 10:15
 37:16,19 44:10
 54:13 70:20 90:22
 101:24
personal 65:5 100:7

personally 65:15
perspective 15:17
 44:1 100:19,20
pertain 80:21
pertinent 99:2
phone 23:17 28:1
 36:15 38:1,23,23
 39:5 41:4,20 49:18
 49:20 60:2 61:3
 62:17 63:7,8,8,9,11
 65:6,8,9,10,13,17
 66:5,10,16,24 68:5
 68:15 75:19 94:11
 94:19
phones 62:18,22
 63:1,5
phrase 41:12
physical 14:20 19:6
physically 30:15
picture 18:15 55:22
pieces 9:16 13:9
pitch 62:15
pk 28:10,12,13 41:18
place 35:13,18 63:10
 63:11 91:6 92:9,19
 95:11
placed 34:3,19 79:3
places 62:8
plaintiff 1:5 2:3
 103:8
plaintiff's 3:3 43:18
 44:13
play 24:4 63:18
plays 6:9
please 4:11 37:2
 44:6 88:3 103:18
point 22:8 32:10
 45:3 52:5,9 63:24
 68:17,20 72:15,17
 72:21 85:7 86:4,15
 86:22 91:22 95:1
points 15:20 55:22
policy 57:23 79:23
 79:24 91:9

pop 56:14 57:13
 59:23
pops 59:15 65:10
populated 93:21
portion 41:7,9,10
 48:5
position 10:19
possibility 36:8 78:7
possible 43:6 59:4
 67:21
possibly 67:16 95:3
potential 62:7
potentially 47:5
powerbuilder 29:1
 29:3,10,11,14,15
practice 82:2
predictive 15:14,14
prefer 34:22 98:16
preparation 14:1
prepare 90:5,7
prepared 100:15
preparers 90:7
prerecorded 37:11
 57:15
present 16:5,10
presented 33:23
preservation 84:19
preserve 85:13,19
 87:11,23
preserved 91:12
preserving 84:23
president 100:17
press 33:6 34:11
presumably 40:10
pretty 22:22 68:9
prevalent 12:23
preview 33:23 34:14
previous 40:10
 52:12
previously 56:6 61:7
 77:16 78:17 88:15

**[primarily - reference]**  Page 13

primarily 7:20
 22:15
primary 9:11 50:22
prior 21:22 27:5
 59:13
pro 99:20
probably 12:24
 23:16,19 25:4 26:17
 41:1 42:3 50:12
 51:10 80:9 81:10
 98:18 99:12
procedural 28:14
procedure 102:7
process 22:11 23:24
 25:14 33:20 56:6
 63:21,23 75:14 76:3
 76:8 82:20 84:22
 86:2,5
processes 92:19
prod 39:21,24 40:3
 40:7,11
produce 20:16 64:1
 83:6 84:10
produced 44:18
 46:6 47:1 57:8 59:8
 64:3 76:23 83:9,15
 84:12
producing 61:16
product 6:4 13:18
 13:19,21 15:6,6
 16:4 20:7 27:8
 36:13 89:19 96:24
 97:7,18
production 40:2
products 12:20,21
 13:23 14:3 15:2
 21:14 97:4,5,13
 99:7
professional 14:3
 98:15,17,17
professionals 5:9
 13:4,24 97:20
program 29:17
programming 28:16
 29:4 41:18,24

prohibited 105:14
promoted 10:17
proper 90:23 91:4
proprietary 7:1,17
prospect 21:5 24:2
 25:13 26:23 27:6
 41:12 42:19,20,22
 47:23 91:4,7 94:15
 98:4
prospecting 47:22
 75:9
prospective 15:11
 25:1,18 27:2,16
 53:24 57:24 58:24
 61:20 78:3,22 80:22
 97:11
prospectively 87:16
prospects 25:10
 76:11 77:19,24
 78:17
protocol 31:21
provide 11:1 19:24
 83:22 90:6 105:12
provided 94:1
 103:15
provider 85:22,22
 87:1 89:22,23
providers 66:21
provides 20:11
 65:16 86:21 101:12
providing 63:17
provisions 105:7
psychology 10:7
public 103:22
publications 13:3
 21:7,9,11
pull 45:13 103:17
pulled 32:6 48:7
 50:10
purchased 27:7
purge 80:7
purged 40:14

purging 80:10
purposes 94:14
pursuant 4:1 102:6
 105:4
put 28:3 45:6,24
 46:2,11 58:18

**q**
queried 52:23
queries 28:19,21
 52:14 68:8 74:6
query 24:12 28:3,6
 28:14 31:5 47:17
 49:18 51:11 56:7
 59:4 70:4,19 71:19
 72:11,20 77:21,22
 81:3
question 4:23 5:4
 23:19,19 24:13 30:2
 41:2 54:4 79:20
 81:16,19,21,22
 93:15 100:3,6
 101:12
questions 4:18 14:5
 55:8 62:14 88:8
 104:7
quickly 49:3
quite 84:9

**r**
r 38:11 39:23 104:1
raise 61:19
raising 94:17
ran 41:17 68:4 71:7
range 45:14
rapid 97:8
rate 58:22,24
ratio 78:21
read 93:5 103:13
reading 21:12
ready 35:11,13
real 50:9 99:3
really 10:22 19:1
 45:12 54:4 93:2
 96:17 99:1

reason 34:18 101:13
reasonable 89:3
reasonably 93:7
reassigning 82:21
recall 23:7 96:17
 99:14 101:22
receipt 66:16
receive 22:12 71:23
received 39:12
 54:13 66:5 71:20
 76:24 77:2,7 83:23
 85:18
receives 19:21 71:24
recess 55:18 91:10
 99:22
record 4:10 5:20
 25:14 26:19 37:20
 38:12 43:12 45:4
 50:23,24 52:8,13
 53:4 56:14,15,16
 57:13 62:10 68:16
 73:21,23 74:16
 75:18 80:23 82:16
 88:12 92:1,17 93:22
 94:1,2,24 103:14
recorded 37:13
recorded 50:22
recording 38:7
recordings 38:1
recordkeeping
 90:23 91:4
records 32:14 37:17
 38:24 41:11 42:24
 43:11 52:19 73:11
 73:12,15 81:1,4,10
 82:20 86:24 90:9
 92:8 97:3
recreate 95:1
red 61:10
reduced 104:8
recorded 50:22
refer 25:15 51:9
 97:17
reference 48:13
 49:3

**[referenced - sales]**  Page 14

referenced 49:5
 96:15
referencing 97:2
referred 47:6
referring 20:21
 99:18
refers 51:5,6 96:24
refinement 19:24
reflected 96:6
refrain 88:3,7
refreshed 85:17
 88:23
refreshing 88:17
refund 97:9,9
regard 87:17
regarding 20:1
 38:18 63:17 78:3
 81:14 84:17
regular 104:13
regulation 37:8
regulations 4:2
 105:4
related 84:11
relation 84:20 85:3
relational 50:3 95:8
relationship 5:11
 6:9 7:23 73:4 100:4
 105:7
relative 37:5
relevant 64:3 83:17
renewal 14:23 15:1
 15:2,4,6 20:6 79:5
renewals 20:13
 97:24
rep 26:8,17,17,18,21
 26:24 27:2 33:22,22
 33:24 34:4,5,7,10
 34:11,14 35:9,12
 36:23 54:18 56:13
 56:20 57:2,23,23
 58:1 62:13 63:11
rep's 35:7
repeating 88:8

rephrase 54:5
report 12:3,6 100:20
 105:2,9
reporting 4:3 6:19
 8:16 11:1,3,9 99:3
 105:1,11,12
reports 100:17
represent 46:23
 104:9
representation
 48:11,12
representative
 35:20 58:13,14,18
 70:11 98:13 100:12
 105:10
representatives
 62:12 98:3,10
represented 56:19
reps 15:22 26:4 27:5
 34:24 36:14 56:8
 68:23 82:21
request 19:15,21,24
 21:20,23 22:9,11
 23:24 33:19 43:8,11
 43:13 75:20,22
 82:17 83:5,20 84:16
requested 61:6
 73:13,17 97:3
requesting 22:13
requests 21:16,18
 22:6 57:8 61:15,16
 61:18 64:1,2 67:23
 70:6,22 75:18 83:7
required 11:2 22:12
 80:7 99:17
requirement 90:8
 90:11,13
resale 99:7
research 14:3,7,8,9
 14:10 38:17
reseller 85:24 86:21
 99:6

reserve 101:22
 102:4
reserved 102:8
resides 9:1 28:24
 29:1 40:22
resource 9:17
respect 34:23 39:10
 85:1 90:24
response 39:10 41:5
 43:6 53:2 76:24
 77:8 94:16
responses 21:10
 40:6 62:9 101:23
responsibilities
 101:10
responsible 7:4 8:15
 9:17 18:6 31:3
 104:13
rest 15:10
result 40:22 51:1,11
 51:15 52:20 71:18
 72:23 82:18 89:5
 104:15
resulted 95:2
results 31:7,8 68:18
retain 96:7
retention 79:22
retrieve 88:11
return 47:16 71:18
 72:16 91:5,7
returned 31:7 68:18
r
return 21:22 27:13
 90:1,5,7 97:20,22
revenue 6:20 8:11
 8:12 11:11,16 90:1
review 38:23
revised 3:5
revolves 61:7
right 10:15 13:10,20
 14:16 16:14 17:16
 19:4,10 23:10,14,17
 24:3 25:5 26:20
 32:11 33:2 34:6,12
 35:1 36:3 37:14
 49:7,11,18 51:11

53:11 54:2 55:15
 58:2 60:11,22 65:10
 69:9,17,24 70:6
 72:6 76:10 78:11
 80:2 82:1 92:6
 95:18 100:23
 101:22
rmr 1:20
robert 100:16,18,23
roddy 2:8
role 61:17 63:18
roll 100:20
room 9:19 10:1
 30:16,17
 32:23
rough 59:5
roughly 22:4 38:22
route 35:19
routed 36:3
row 50:7 61:12
rows 18:22
rule 4:2 5:2 102:7
rules 4:2 57:4 102:7
 105:4
run 31:5 71:4
ryan 2:8

**s**
s 47:7
s.source 52:16
sale 20:5,6
sales 8:15 10:13,20
 10:23 11:2,3,5
 12:17 14:23 15:8,21
 16:1,2,3,7,11,11,18
 17:6,23 18:7 19:16
 21:1,1,3,24 24:18,22
 24:23 25:1 26:1,2
 26:4,8,17,17,18,21

**[sales - source]**  Page 15

27:2,5,22 29:6 34:7
 36:3,9,14,22 43:4,7
 43:7 54:10 56:4
 57:19,23,23 58:1,14
 59:1,16,24 61:2
 62:13,15 63:11,13
 63:13,20 64:10
 68:22,23 76:16,17
 77:14 78:9 79:4,9,9
 80:15 81:5,12,13
 82:9 83:5,15,20
 84:8,13,15 92:19,20
 97:3,23,24
salespeople 17:9
 18:6 19:9,17 23:12
 24:5,9,14 25:9,21
 26:1 30:10
salespeople's 24:8
salesperson 10:18
 19:12,24 21:2,2 23:7
 34:5,7 74:4,4,18,19
sam 16:18
sarah 2:16 5:16
save 96:6
saved 83:5
saving 45:13 50:24
 57:14 60:9,10 71:13
 71:15 74:17 94:18
says 35:13 42:11
 48:5 52:15 56:14
 72:14 74:3 76:10
schema 48:10,24
science 10:7 51:7
screen 32:20 56:13
 57:13 59:15,16,23
screwed 30:8
script 28:22,24 47:4
 47:6 53:8,21 68:17
 68:19 71:7 94:23
 95:16 96:18,19 97:2
scripts 61:23 67:7,9
 68:4,6,7 83:4,9 95:4
 95:9,13 96:10,15
scrub 62:21

scrubbed 62:17
search 26:22 83:2
 83:18 84:10
searched 67:8 83:24
 84:3,13
searches 13:11 40:2
search 13:11 21:22
 79:4,5
second 2:8 71:5
seconds 74:2 78:16
see 26:22 36:1 44:21
 44:21 48:2,17 50:18
 51:19 52:16 54:17
 65:7 74:7 92:16
 96:14,16
seen 22:21 43:21
 46:20 66:23
sees 61:17
segment 18:7 97:10
 101:15
salespeople 17:9
salesperson 18:7 97:10
select 47:14,15 48:5
 76:21 92:4 93:7
 94:7
sam 16:18
sarah 2:16 5:16
sent 44:3 73:2 83:2
 83:22
separate 39:13
 44:19 45:20 46:22,8
 48:1 50:4 61:4
 72:12 84:6 95:9
separation 19:6
september 69:11
sequential 45:7
series 50:18 98:20
server 30:11,13,15
 30:17,18,21,23 31:1
 31:3,18 32:22,23
 78:17,21,21 79:2,3,7
 79:17,21
servers 7:7 64:4,5
 64:11,13
service 12:18 86:22
 87:2 90:1
services 4:14 5:7,10
 5:14 6:1,3,12 14:12

14:13 65:22 85:24
 89:14,20 90:6,16,17
 90:21 100:1,4,17,24
 105:12
set 35:10 70:16
 73:19 74:15,16
 82:16
sets 74:2 78:16
settings 60:3
setup 100:15
seven 60:2 61:4,12
shared 90:11
sheets 103:15,19
shennan 2:7
shoot 36:11
short 19:6
shorthand 48:12
 49:2,11
show 13:11 75:19
 76:21 92:4 93:7
 94:7
shown 34:14
shows 12:23,24 21:6
 62:9 65:13 99:9
side 44:21
sign 51:3
signal 56:23 60:21
signature 14:8
similar 15:10 96:2
similarly 14:10 103:17
simple 26:15 29:7
 56:15 70:19 95:8
simply 57:13 70:19
single 47:5 74:1
sis 17:16 18:1
 82:15 83:12
site 13:15,17 16:13
 21:13 32:6,6,13
 90:19
sites 8:6,7
sitting 35:10
situated 14:1 103:7
situation 39:2
six 7:2,16,18 45:1
sixth 5:16,13,23
scrub 6:21

80:21
size 23:2 43:12 80:1
 80:3
skip 52:15
skips 45:16,17
slightly 20:13
slow 36:24
small 4:14 5:7,10,14
 6:1,3,12 14:12,13
 64:2 65:22 89:20
smaller 69:4,9,10
snap 64:18
software 5:9 7:10,15
 7:18 14:2,24 24:3
 25:5 26:20 28:9,17
 30:9 35:17 41:23
 49:2,11
sold 27:8 52:4,8,8
solicit 15:5
soliciting 78:22
somebody 25:3 33:6
 36:6 37:1 58:7
somewhat 72:9
sony 81:18 90:11
sorry 7:15,10,14
sort 7:15 9:15 20:3
 34:20 44:17 53:12
 83:18 98:19
sound 39:1 71:14
sounds 10:14,21
 28:16
source 20:21,23,24
 14:22 45:2,16,17,18
 43:1,2 47:22 48:2
 49:3 53:5 59:13
 62:13 68:16 69:6,9,8
 70:14 72:13 73:3,4
 74:2 92:1,9,13,18
 92:20 93:2,8,9,12

| | | | |
|---|---|---|---|
| 93:13,20,22 94:4,9 | **starting** 21:19 36:20 | **submitted** 103:19 | **table** 3:1 42:17 48:8 |
| **sources** 21:6 59:12 | 45:2 47:9 | **subquery** 74:11 | 48:10,11,14,15 49:1 |
| 62:8 73:5 94:10,21 | **starts** 33:18 | **submitted** 103:20 | 49:3,5,6,8,14,19 |
| **spanish** 98:2,3,6,7,8 | **state** 4:10 20:10 | **subsequent** 93:10 | 73:3 95:7 |
| 98:10,12 | 75:12 99:16 103:1 | **subset** 52:14 | **tables** 28:5 47:23 |
| **speak** 24:19 34:22 | 103:12 104:2 | **subtracts** 74:15 | 48:3,6 50:4,5,7 |
| 39:3 84:1,5 100:13 | **stated** 61:7 75:17 | **success** 58:22,24 | **take** 4:17,23 28:1 |
| **speaking** 71:13 98:8 | 77:16 78:18 79:24 | **successful** 60:17 | 32:14 41:19 44:3 |
| 98:10,12 100:11 | 86:24 88:21 98:16 | 86:6 89:6 | 55:6,6,9,11 59:9 |
| **spearheaded** 89:8 | 104:6 | **suit** 96:5 | 74:3,17 86:2 |
| **special** 42:15 | **statement** 47:3,5,14 | **suite** 1:16 2:5,13,17 | **taken** 64:18,20 |
| **specialist** 8:22 9:6 | 47:15,16 48:1,6 | **supply** 99:7 | 104:6 |
| 15:22 17:12 28:20 | 49:20 72:8,10 78:14 | **support** 7:5,13 8:6 | **takes** 74:14 |
| 34:15 36:10,17 | 21:13 99:3,7 | 21:13 99:3,7 | **talk** 23:13 24:16 |
| **specialist's** 32:19,24 | **statements** 3:6 | **supporting** 8:15 | 26:16 36:6 58:15 |
| **specific** 31:13 51:5 | **states** 1:1 103:3 | **supposed** 5:16 58:1 | **talked** 57:10 78:6 |
| 80:5 89:2 94:6 | **static** 73:2 | 58:3 80:16 92:20 | 79:6 99:23 |
| 95:11 99:7 | **status** 74:19 | **sure** 4:18 8:8 17:20 | **talking** 19:12 20:3 |
| **specifically** 65:21 | **steps** 32:3 84:1 85:5 | 17:21 24:13 32:1 | **tapes** 79:6 |
| 99:11,14,18 | **stop** 36:24 | 50:2 51:2 54:6 | **targeted** 97:12 |
| **specifics** 23:7,23 | **stopped** 86:14 88:15 | 61:11 65:23 69:10 | **targets** 62:3 |
| **speculate** 67:1 82:16 | **storage** 40:13 63:9 | 73:14 74:23 81:20 | **task** 41:13,23 |
| 92:11 101:5,9 | **store** 95:11 | 84:9,21 86:13 87:15 | **tasks** 8:17 |
| **speculation** 101:2 | **stored** 53:17 63:10 | 91:3 93:15 95:16 | **taste** 36:11 |
| **speculative** 98:23 | 64:19 67:12 80:13 | 99:17 101:3 | **tax** 5:8 12:21 13:4 |
| **spell** 16:23,24 38:10 | 95:9 | **surrounding** 57:5 | 13:24 14:1,5,10,10 |
| 39:22 48:24 | **stores** 64:20 | **switching** 87:3 | 14:23 22:17 27:10 |
| **spending** 101:17 | **straight** 23:9 95:8 | **sworn** 4:6 103:20 | 42:23 43:16 61:8,9 |
| **spoke** 98:11 | **streaming** 38:4 | **syntax** 48:24 | 62:6 78:19 89:14,15 |
| **sql** 3:6 28:2,4,10,13 | **street** 1:16 | **system** 7:11,20,21 | 89:21 90:1,5,7 91:5 |
| 31:7 41:18 47:3,5,7 | **strict** 80:1 | 7:24 15:14,14 20:22 | 91:7 98:19 100:1 |
| 50:16 56:7 | **strictly** 28:21 | 24:15 29:15 50:23 | **taxwise** 5:12,22 |
| **ss** 103:1 | **strikes** 41:13 | 56:11 57:11 65:18 | 10:10,11 65:21 |
| **staff** 15:21 | **structure** 18:8 95:7 | 79:8,11 92:23 95:10 | 89:19 |
| **staging** 3:5 | 100:14 | **systematic** 63:12 | **team** 6:20,20,21 9:7 |
| **stand** 82:10 | **structured** 28:3,14 | 68:2 | 9:12 16:7,9 75:20 |
| **standard** 15:3 27:4 | **studio** 38:2,5 | **systematically** 69:5 | 83:6 |
| 29:8 79:10 82:2 | **stuff** 30:8 42:3 | **systems** 6:23 7:6 | **technical** 32:2,9 |
| **standards** 30:16 | 47:10 50:21 | 11:19 12:15 40:2 | 74:12 |
| **standing** 34:8 | **sub** 52:14 | 55:23 56:1 57:12 | **technology** 7:12 |
| **stands** 15:13 28:13 | **subject** 71:3 87:6 | 89:15,16,21 100:1 | **telephone** 2:16 5:18 |
| **start** 15:24 20:23 | 102:3 | **t** | 20:18,19,24 21:15 |
| 52:23 67:20 79:7 | **subjects** 44:11 | **t** 104:1,1 | 50:7 66:19 |
| **started** 36:19 71:13 | **submit** 13:19 | | **tell** 12:11 17:12 |
| 87:2 88:19 | | | 21:18 37:23 38:19 |

| | | | |
|---|---|---|---|
| 44:17,17 47:18 48:2 | **thinking** 55:1 95:5 | **traffic** 13:14,16 | **u** |
| 49:22 50:2 53:7,20 | **third** 8:10 18:21 | **train** 60:8 | **u.s.** 14:12 90:16 |
| 94:11 99:12 100:10 | 37:1,18 42:2 49:10 | **training** 8:6 | 100:16,18,20 |
| 100:24 | 51:17 74:9 85:22 | **transactional** 27:11 | **uh** 6:21 44:22 48:18 |
| **telling** 50:6 63:22 | **thought** 60:8 83:12 | 42:22 78:19 | **ui** 29:2,15 |
| **tells** 81:3 | **thousand** 22:24 | **transcript** 3:14 | **ultimately** 66:23 |
| **template** 28:2 | 41:14 | 103:13,14 104:6,10 | **ultratax** 61:11 |
| **templates** 32:15 | **three** 6:18 12:12 | **transfer** 31:21 | **understand** 4:23 5:4 |
| **tend** 97:18 | 16:10,21 26:6 33:10 | **transferred** 32:5 | 24:13 38:15 39:8 |
| **tends** 97:17 | 33:12,13,15 34:13 | **transitioned** 2:17 | 45:23 46:18 54:4 |
| **tenth** 48:4 | 46:14,23 47:2,18 | **traveling** 16:14 | 66:19 69:2 71:12 |
| **term** 18:1 | 74:18 83:14 | **trend** 13:10 | 81:20 84:21 85:12 |
| **terms** 8:16 14:10 | **tier** 64:6,7,8 | **trigger** 74:8 | **understanding** |
| 29:2 30:24 41:2 | **ties** 61:24 | **trouble** 101:16 | 66:15 75:8 82:9 |
| 50:10 55:24 74:12 | **tightly** 92:21 | **true** 103:14 104:10 | 83:9 85:3 100:10 |
| 91:7 96:11 98:24 | **time** 10:17 11:8,14 | **try** 13:14 15:18 10:10 | **understood** 5:4 58:5 |
| **testified** 4:7 14:15 | 22:16 34:19 52:5,9 | 24:15 43:15 60:19 | **unions** 74:14 |
| 34:10 66:9 81:23 | 52:21 59:9,11,23 | 60:21 89:4 92:18 | **unit** 6:4 |
| **testify** 44:7,9 | 68:18,20 72:15,17 | 96:16 | **united** 1:1 103:3 |
| **testifying** 55:4 88:4 | 72:21 79:4 85:20 | **trying** 18:15 36:13 | **universal** 89:14,15 |
| **testimony** 62:1 66:8 | 86:13 87:2,12 89:1 | 55:5 101:17 | 89:21 100:1 |
| 67:19 78:9,13 80:20 | 89:4 93:10 94:5 | **turn** 101:23 | **unsubscribe** 76:4,9 |
| 91:24 103:13,14 | 95:1,1 | **turned** 102:1 | 76:10 |
| **texas** 50:11,13 51:11 | **times** 20:17 22:6,8 | **two** 6:4 15:15 50:2,5 | **update** 93:24 |
| **text** 23:4,5,7 31:8,10 | **timing** 37:8 | 54:9 57:11 71:2,4 | **updated** 42:22,24 |
| 31:15,17 32:10 | **title** 6:13,14 9:5 | 72:11 73:9 77:17 | 68:22 |
| 53:11 58:12,17 | 11:17 | 78:23 101:14 | **uploads** 31:23 |
| **textpad** 53:17 95:17 | **today** 44:8 78:6 | **type** 20:7 24:21 | **upset** 61:20 |
| 95:19 | 102:3 | 27:11 29:16 31:20 | **urie** 16:23 17:4 |
| **thank** 37:23 | **told** 19:8 34:15 | 33:9 59:2 78:18 | **use** 13:4 14:4,11,21 |
| **theoretically** 68:15 | 87:22 96:3 | 92:23 93:3 96:24 | 15:1,8,10 20:16 |
| **thereto** 104:7 | **tool** 28:4,10,17,18 | 98:21 | 24:23 29:17 32:13 |
| **thing** 8:10 25:16 | **tools** 8:6 36:16,21 | **types** 33:11,12,13 | 34:21 36:13 37:20 |
| 31:20 47:21 54:16 | **top** 47:9 61:22 74:9 | **typewriting** 104:8 | 38:2 62:7 74:21 |
| 73:7 76:1 86:20 | 96:18,20,21,22 | **typical** 63:21 76:20 | 79:9 99:15 |
| 98:1 | **topic** 89:12 | **typically** 16:1,3 17:6 | **user** 24:7 25:24 33:4 |
| **think** 5:21 8:10 | **topics** 44:8 | 17:11 18:3 19:23 | 80:6 |
| 12:24 19:8 20:8 | **totally** 30:8 | 20:6 21:11 27:9 | **uses** 15:4 35:17 |
| 22:21 30:4 34:10 | **track** 73:16 78:2,10 | 38:7 43:14 59:2 | **usually** 33:8 37:17 |
| 54:24 55:21 57:7,14 | **tracking** 24:20 | 61:5,7 77:15 78:16 | **utility** 24:19 |
| 59:6 60:7,10,14,15 | **trade** 12:23 75:1,19 | 78:18 96:24 | **utilization** 28:18 |
| 61:24 67:19 68:13 | 76:21 92:4 93:6 | | 76:21 98:24 |
| 72:8 78:8 80:17 | 94:6 | | **utilizations** 37:6 |
| 81:23 82:14 83:8 | | | |
| 87:20,21 91:24 | | | |
| 96:20 98:6 99:20 | | | |

| | | | |
|---|---|---|---|
| **utilize** 13:13 16:12 | **waiting** 35:19 36:1 | 33:1 82:10 89:12 | |
| 21:14 26:22 37:5 | **walk** 19:9,18 23:12 | **windows** 29:7,8,9,19 | |
| 38:5 49:1 76:22 | 24:10 | 29:21,22,23 | |
| 78:20 | **walks** 81:5 | **wish** 13:19 21:14 | |
| **utilized** 20:22 32:8 | **wall** 18:12 | **witness** 37:23 40:20 | |
| 47:24 94:13 | **want** 17:12 20:1 | 55:21 60:17 66:15 | |
| **utilizing** 27:11 | 23:17 24:1,11,16 | 68:13 71:17 72:8 | |
| 28:11 30:24 61:8 | 32:1 36:10 45:3,18 | 78:14 82:1,14 83:14 | |
| **v** | 46:12 55:10 58:8 | 86:20 88:12,14 | |
| **vacation** 9:13 | 61:21 63:23 74:13 | 90:12 91:3 93:18 | |
| **vacuum** 70:3 71:14 | 76:9 81:14,20 97:3 | 100:13 101:3,11 | |
| **vaguely** 26:13,14 | 99:19 | 102:8 | |
| **value** 85:24 99:6 | **wanted** 40:15 43:4 | **witnesses** 102:2 | |
| **var** 99:5 | 58:7 82:23 92:13 | **wolters** 6:6,7 100:1 | |
| **variable** 58:19 | 96:11 | **word** 18:1 | |
| **varied** 6:18 | **wants** 19:17 55:19 | **work** 4:21 10:10 | |
| **varies** 20:5 58:17 | 81:9 88:13 | 15:16,17 16:14 18:12 | |
| 64:5 | **way** 33:18 43:13 | 34:24 39:13 40:17 | |
| **variety** 14:22 62:8 | 45:6 46:11 53:7,20 | 53:10,14 63:7 88:17 | |
| 92:12 | 56:19 59:24 61:2 | **worked** 11:8 89:17 | |
| **various** 14:2 | 63:16 84:17 94:21 | **workers** 12:16 | |
| **varying** 45:1 | 101:19 | **working** 37:2,22 | |
| **verbally** 63:21 | **ways** 12:22 | **workstation** 24:10 | |
| 75:19 | **wayside** 13:11 | 32:17 | |
| **veritext** 105:11 | **we've** 12:24 13:5,8 | **wound** 53:24 54:7 | |
| **version** 29:23 30:1 | 62:8 10:8 88:11 | **write** 58:1 | |
| **versus** 20:9 97:13,24 | **web** 6:20 8:1 13:13 | **writes** 6:10 | |
| 98:17 | 59:13 | **written** 21:23 77:17 | |
| **video** 38:4 | **website** 13:20 62:11 | **wrote** 56:7 | |
| **virtual** 33:14 37:1,2 | 94:19 | **x** | |
| 37:3 39:8 57:15 | **websites** 94:7 | **xp** 29:21 30:3,4 | |
| **visibility** 67:1 | **week** 60:2 | | |
| **voice** 8:17 37:17,19 | **weeks** 54:9 | **y** | |
| 37:21,22,24 56:4 | **went** 10:10 53:10,14 | **y** 38:11 52:3 | |
| **volume** 27:11 39:3,4 | 53:23 82:17 | **yeah** 59:21 61:14 | |
| 42:22 78:19 97:22 | **west** 2:14,18 | **year** 10:4 13:6,9 | |
| **volumes** 43:17 | **whatnot** 56:24 | 15:7 20:17 38:20 | |
| **vp** 22:17,18,19 | **wilson** 9:4,9 12:3 | 42:23 65:24 79:4 | |
| **vps** 22:16 | 18:24 19:12 23:13 | **years** 5:13 12,13 | |
| **vs** 1:6 103:9 | 24:17,19 27:22 | 21:19 71:6 72:19 | |
| **w** | 30:20 31:5 40:15 | 79:2 99:13 | |
| **wacker** 2:14,18 | 67:10 81:7,8,8,13 | **z** | |
| **wait** 34:2 54:23 | 82:4,11 84:7 89:10 | **zielinski** 2:16 | |
| | **wilson's** 91:5 19:9,18 | | |
| | 23:13 24:11 29:18 | | |

# Exhibit M

## Alex Burke

| | |
|---|---|
| **From:** | Zielinski, Sarah A. <SZielinski@mcguirewoods.com> |
| **Sent:** | Wednesday, October 12, 2011 5:28 PM |
| **To:** | Alex Burke |
| **Cc:** | 'Gary Klein'; 'Shennan Kavanagh'; Hartsell, David L. |
| **Subject:** | RE: CCH's Supplemental Discovery Responses |

Alex,

Both sets of phone records include dialer calls as well as non-dialer calls. We can tell the dialer calls from the Verizon phone records because those records separate out the dialer calls from non-dialer calls. In contrast, the Bell South phone records do not separate out dialer and non-dialer calls. On the Verizon records, we can tell the dialer calls because they are not assigned an outgoing phone number. Note that when I say "dialer calls" I am including managed, predictive, and virtual calling campaigns.

**Sarah A. Zielinski**
McGuireWoods LLP
77 West Wacker Drive
Suite 4100
Chicago, IL 60601-1818
312.849.8288 (Direct Line)
312.698.4598 (Direct FAX)
szielinski@mcguirewoods.com

*This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

---

**From:** Alex Burke [mailto:ABurke@BurkeLawLLC.com]
**Sent:** Tuesday, October 11, 2011 1:29 PM
**To:** Zielinski, Sarah A.
**Cc:** 'Gary Klein'; 'Shennan Kavanagh'; Hartsell, David L.
**Subject:** RE: CCH's Supplemental Discovery Responses

Sarah,

I don't understand what you mean.

Could you please explain how to tell what calls were made from the dialer in the Verizon records, and why this is not apparent from the Bell South records? Do the Bell South records show any dialer calls at all?

Alex

BURKE LAW OFFICES, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com

The information transmitted through this communication is intended only for the addressee and may contain confidential and/or privileged material. Any unauthorized interception, review, retransmission, dissemination, or other use of, or taking of any action upon this information by persons or entities other than the intended recipient is prohibited and may subject the unauthorized person or entity to criminal or civil liability. If you received this communication in error, please contact us immediately at (312)

729-5288, and delete the communication from any computer or network system.  This message is not intended to create an attorney-client relationship.  Unless you have entered into a written, signed document entitled "Authorization" with Burke Law Offices, LLC, the firm does not represent you.

---

**From:** Zielinski, Sarah A. [mailto:SZielinski@mcguirewoods.com]
**Sent:** Tuesday, October 11, 2011 1:18 PM
**To:** Alex Burke
**Cc:** Gary Klein; Shennan Kavanagh; Hartsell, David L.
**Subject:** RE: CCH's Supplemental Discovery Responses

Alex,

While I do not agree that this information was ordered as part of the motion to compel, the answer to your question is that the Verizon phone records show the dialer calls, but the Bell South records do not.

We do not have any additional documents to produce at this time, but we acknowledge our duty to supplement pursuant to Rule 26(e).

Thank you,

**Sarah A. Zielinski**
McGuireWoods LLP
77 West Wacker Drive
Suite 4100
Chicago, IL 60601-1818
312.849.8288 (Direct Line)
312.698.4598 (Direct FAX)
szielinski@mcguirewoods.com

*This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

---

**From:** Alex Burke [mailto:ABurke@BurkeLawLLC.com]
**Sent:** Monday, October 10, 2011 11:26 AM
**To:** Zielinski, Sarah A.; Hartsell, David L.
**Cc:** Gary Klein; Shennan Kavanagh
**Subject:** CCH's Supplemental Discovery Responses

Sarah,

In going over CCH's supplemental responses to plaintiff's first discovery requests, produced pursuant to court order, I notice that CCH indicated in response to interrogatory 3 that it was "unable to identify [dialer communications] because the Verizon phone records in defendant's possession do not distinguish between phone call  made to cell phones and to land lines."

Is CCH able to identify what calls were made using its dialer, without regard to whether the call was to a cell phone or land line?  Production of this information was ordered as part of the motion to compel.  We request that it be produced.  Please let me know one way or the other.

Also, does CCH have any supplemental materials or information to produce in response to any discovery request?

Alex

BURKE LAW OFFICES, LLC

155 N. Michigan Ave., Suite 9020

Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com

The information transmitted through this communication is intended only for the addressee and may contain confidential and/or privileged material. Any unauthorized interception, review, retransmission, dissemination, or other use of, or taking of any action upon this information by persons or entities other than the intended recipient is prohibited and may subject the unauthorized person or entity to criminal or civil liability. If you received this communication in error, please contact us immediately at (312) 729-5288, and delete the communication from any computer or network system.  This message is not intended to create an attorney-client relationship.  Unless you have entered into a written, signed document entitled "Authorization" with Burke Law Offices, LLC, the firm does not represent you.